## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

<table>
<tr><td>

LEADERS OF A BEAUTIFUL STRUGGLE
  25 W. Fayette St.
  Baltimore, MD 21201

ERRICKA BRIDGEFORD
  136 Garden Ridge Rd.
  Cantonsville, MD 21228

KEVIN JAMES[*]

    *Plaintiffs*,

v.

BALTIMORE POLICE DEPARTMENT
  601 East Fayette Street
  Baltimore, MD 21202

MICHAEL S. HARRISON, in his official
capacity as Baltimore Police Commissioner
  601 East Fayette Street
  Baltimore, MD 21202

    *Defendants*.

</td><td>

Civil Action No. 20-929

</td></tr>
</table>

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      This lawsuit challenges the Baltimore Police Department's ("BPD") deployment of aircraft to conduct long-term, wide-area aerial surveillance of the entire city of Baltimore. The BPD's mass surveillance system will persistently record the movements of virtually all of Baltimore's 600,000 residents, including Plaintiffs. This surveillance system presents a novel and society-changing threat to individual privacy and to free association, and it violates the Constitution.

---

[*] In a concurrently filed motion, Plaintiff Kevin James has requested a waiver of his obligations under Local Rule 102.2(a) to provide his home addresses in the caption of this complaint.

2.      The BPD calls this system the "Aerial Investigation Research" program, or "AIR." The BPD has contracted with a company, aptly named Persistent Surveillance Systems, LLC ("PSS"), whose planes will fly over Baltimore at least 40 hours a week. Once per second, advanced wide-angle camera systems on those planes will collect images of over 90 percent of the city at a time, creating slow-frame-rate video recordings of pedestrians on sidewalks, parks, driveways, and back yards, and vehicles moving about on public streets and private lots. To Plaintiffs' knowledge, the BPD has not yet commenced the program.

3.      The AIR program would put into place the most wide-reaching surveillance dragnet ever employed in an American city, giving the BPD a virtual, visual time machine whose grasp no person can escape. And though the program's objectives to reduce crime and violence are laudable, the Constitution dictates that this all-seeing and ever-present "eye in the sky" is not an available solution.

4.      Plaintiffs Leaders of a Beautiful Struggle ("LBS"), Errica Bridgeford, and Kevin James are Baltimoreans deeply concerned about their community, its relationship with law enforcement, justice, and equality. The ability to associate with others, free from unwarranted government scrutiny, is essential to Plaintiffs' political activity and advocacy. If the AIR program is permitted to proceed, it will violate Plaintiffs' privacy rights and burden their freedom of association; it will undermine the ability of LBS to carry out political activities crucial to its mission; and it will hinder Ms. Bridgeford's and Mr. James's advocacy and community organizing.

5.      Through this action, Plaintiffs seek a declaration that the BPD's policy and practice of persistent aerial surveillance violates their First and Fourth Amendment rights; an

injunction against Defendants' operation of the AIR program; and an order requiring the BPD to destroy the information about them that it has collected in violation of their constitutional rights.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983 because this lawsuit alleges violations of the U.S. Constitution.

7.      The Court has authority to grant declaratory and injunctive relief, and any other appropriate relief, under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and under the Court's inherent equitable jurisdiction. A substantial, actual, and continuing controversy exists between the parties with respect to Plaintiffs' claims for declaratory and injunctive relief.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this district and the events giving rise to the claim occurred in this district.

## PARTIES

9.      Plaintiff LBS is a Baltimore-based grassroots think-tank, founded in 2010, that advances the public policy interests of Black people in the city through youth leadership development, political advocacy, and intellectual innovation. LBS's work addresses historic and structural impediments to Black people's quality of life, including poverty, violence, and white supremacy in the American political and socio-economic order. To this end, LBS advocates for policing reform, and it has spearheaded numerous legislative efforts aimed at policing accountability. LBS has been a frequent critic of law enforcement's use of surveillance technologies against Black communities. LBS sues on its own behalf and on behalf of its staff.

10.      Plaintiff Erricka Bridgeford is a Black activist in Baltimore City, where she was born and raised. Ms. Bridgeford is the co-founder and current co-organizer of Baltimore Ceasefire 365 ("Ceasefire"), a movement that serves as a hub for organizations and citizens to support one another, work together, and share resources with the goal of seeing an end to murder

in Baltimore City. Ceasefire organizes quarterly "ceasefire weekends" in the city, and one recent study has shown that these efforts have led to more than a 50% reduction in gun violence in Baltimore while in effect.

11.     Plaintiff Kevin James is an information-technology professional, hip-hop musician, activist, volunteer Emergency Medical Technician, and community organizer. Mr. James lives in Baltimore City and has lived in the area since 2001, when he joined Teach for America in Baltimore. He has been involved with many grassroots movements in the city, including advocacy related to school funding, housing rights, mental health, and immigration.

12.     Defendant Baltimore Police Department ("BPD") is the police department for the City of Baltimore. No state official or agency exercises any supervisory authority over the BPD or the Police Commissioner of the BPD. The BPD operates only within the City of Baltimore. The BPD is the entity responsible for the implementation of the AIR program.

13.     Defendant Michael S. Harrison is the Police Commissioner of the BPD. He has supervisory authority over all operations of the BPD, including policymaking authority over the AIR program. On behalf of the BPD, Commissioner Harrison signed the contract with PSS to implement the AIR program. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

### Background

14.     Wide-area, persistent aerial surveillance is not entirely new. It was first developed as a military program, named Gorgon Stare, for use over battlefields abroad.

15.     It is also not entirely new to Baltimore. In 2016, the BPD and PSS initially deployed this technology for several months, keeping it secret from the public, the Mayor of Baltimore, and the city's prosecutors. It was only after news reports revealed the existence of this system—which led to an overwhelming public outcry—that the BPD halted this surveillance.

Ultimately, the BPD recorded more than 300 hours' worth (and one million images) of the movements of ordinary Baltimoreans as they moved about the city. Although PSS publicly represented that the information it collected would be deleted after 45 days, PSS instead saved all of the recordings indefinitely.

16.     In September 2019, PSS pitched the BPD on a three-year, $6.6 million revival of the aerial surveillance program. In December 2019, Baltimore Police Commissioner Michael Harrison announced that, despite the program's "controversial history," he intended to enter into a contract for a 180-day pilot program of wide-area, persistent aerial surveillance, beginning in the spring of 2020.

17.     In March 2020, as Baltimoreans were reeling from a State of Emergency declaration by Governor Larry Hogan concerning the fast-evolving coronavirus pandemic, and the shuttering of enormous portions of the local and national economies, the BPD held three public meetings about its imminent aerial surveillance program. The meetings were conceived as steps to assuage the public in the wake of the BPD's secret aerial surveillance trials with PSS in 2016. The first, on March 11, was attended by just 20 people. Two other meetings, rescheduled to March 23 and March 30, were held as online Facebook events, as Baltimoreans were under emergency orders prohibiting gatherings of more than ten people.

18.     On April 1, 2020, the Baltimore Board of Estimates approved the BPD's contract with PSS to implement the AIR program (the "Contract") by a 3-to-2 vote.

**The AIR Program**

19.     According to the Contract, the BPD will authorize PSS to use its aerial technology and analytics to assist in the investigation of certain crimes in Baltimore during a six-month "pilot" period. The BPD acknowledges that this technology's "effect on crime has not been

analyzed and is unknown." The cost of the 180-day program, funded by Texas-based philanthropists, is estimated to be $3.69 million.

20.     Under the AIR program, PSS will fly three manned aircraft over Baltimore equipped with its "Hawkeye Wide Area Imaging System." While neither the Contract nor Defendants have described that system in detail, PSS's website describes a "Hawkeye II" system as "consist[ing] of twelve, full color cameras" equipped with a "192 million pixel, full color, geo and ortho rectified airborne wide area surveillance sensor" with a "1/2 meter resolution throughout" its coverage area. Commissioner Harrison explained in his March 30 Facebook Live presentation that the BPD and PSS have "agreed" that resolution of the surveillance cameras will be "one pixel per person," but the "technology has the ability to upgrade the [image] quality." According to the Contract, the aircraft over Baltimore will capture one image per second covering up to 32 square miles each, and Commissioner Harrison has stated during his community presentations that the system will capture images of 90 percent of the city at once. The Contract provides that the planes will fly a minimum of 40 hours per week, weather permitting. While the system will not employ infrared or night vision technology, the Contract states that the aerial surveillance cameras are "sensitive enough to capture images at night with ambient City lighting." Although these images are technically photographs taken from cameras, the high frequency of these photographs, taken once per second, produces data akin to a slow frame-rate video feed.

21.     Unlike lawful forms of aerial surveillance, the warrantless AIR program subjects Plaintiffs and virtually all of Baltimore's 600,000 residents to long-term, wide-area, and indiscriminate surveillance that will capture the whole of an individual's movements and thereby reveal their privacies of life. This surveillance is inescapable, and revelation of private

information to the AIR program is involuntary: short of never leaving home when the planes are in the air, there is no way to avoid Defendants' surveillance system. But even one's home is not entirely safe from the surveillance, as the AIR program will also inevitably capture movements in the curtilage surrounding homes, including driveways and yards. The data collected through the AIR program will amount to a comprehensive record of the movements of Plaintiffs and nearly everyone in Baltimore—facilitating an unprecedented police power to engage in retrospective location-tracking.

22.     Although the resolution of the AIR program cameras will be one pixel per person—meaning that an individual cannot immediately be identified through a single image alone—Baltimoreans captured by the surveillance are in no way anonymous. That is the case for at least two reasons.

23.     First, with persistent aerial surveillance, it will be trivially easy to roll back the tape to trace pedestrians' or vehicles' paths to the homes they left in the morning, and roll it forward to the homes they returned to at night, thereby deducing identity. Moreover, it takes only a small number of unique location points to identify even an "anonymous" person. Researchers have shown that, using cell-phone location data, just four points are enough to identify an individual based on their pattern of movements. In short, the AIR program's ongoing collection of location data every second in Baltimore will yield unique and easily identifiable information about every resident who moves in the city over time, including Plaintiffs.

24.     Second, as explained in the Contract, the BPD and PSS will link AIR program data with the BPD's other surveillance technologies to identify individuals in the vicinity of crime scenes, as well as others who have "met with" those individuals. As set forth in the Contract and discussed by Commissioner Harrison in his community presentations, these

additional surveillance technologies include automated license plate readers and ground-based, closed-circuit television ("CCTV") security cameras. Both systems are far-reaching and will readily facilitate identification of individuals of interest to Defendants. And identifying individuals is the entire point of the AIR system technology.

25.     Particularly in light of the broad scope of data that Defendants will amass through the AIR program, the procedures governing the implementation of the program and the use of the resulting data are weak, vague, and incomplete. These procedures fail to adequately protect Plaintiffs' rights to privacy and free association.

26.     In his community presentations, Commissioner Harrison has emphasized that, as a technical matter, PSS will possess the AIR program's massive trove of aerial imagery and will provide specific data to the BPD only upon request. However, as discussed below, the Contract reveals that BPD and PSS personnel and systems will be deeply intertwined—and that PSS personnel will be responsible for tapping into the BPD's other surveillance technologies.

27.     According to the Contract, PSS will employ between 15 and 25 analysts in two seven-hour daily shifts, some of whom may work out of BPD's "Watch Center to be teamed with a sworn BPD officer or BPD analyst."

28.     Upon request by the BPD, PSS analysts will review AIR program data, as well as data from other BPD surveillance technologies, to produce reports for the BPD. The BPD will make requests of PSS in connection with investigations of any of four "Target Crimes"—murder, non-fatal shooting, armed robbery, or car-jacking. In addition, the Baltimore Police Commissioner retains the authority to approve other uses of AIR program data on a case-by-case basis.

29.     PSS analysts will also produce reports for the BPD in response to alerts from the

BPD's Computer-Aided Dispatch system. PSS analysts will access this system "from monitors in

BPD facilities."

30.     In creating reports for the BPD, PSS analysts will not only analyze imagery data

from the AIR program, but will also "track individuals and vehicles that pass the Baltimore

CitiWatch CCTV cameras[,] noting the time the vehicles pass the cameras. [PSS] analysts will

access or request CitiWatch camera information[.]" PSS analysts will also use the BPD's Shot

Spotter Acoustic Gunshot Detection System to "speed the identification of the location of active

gun shots within the imagery," "allowing analysts to quickly identify the location and time of

gunshots."

31.     Within 18 hours of a BPD request or PSS's notice of a Target Crime on the

Computer-Aided Dispatch system, PSS will provide to the BPD an "investigative briefing" that

will include "imagery analysis," "the tracks of vehicles and people to and from the crime scene,"

"the location the vehicles and people from the crime[] scene visited after and before the crime,"

and "observations of driving patterns and driving behaviors of vehicles from the crime scene

prior to and after a crime."

32.     Within 72 hours of a BPD request or PSS's notice of a Target Crime, PSS will

provide to the BPD a detailed "Investigation Briefing Report," which will include "ground-based

camera video made available to [PSS] by BPD including but not limited to CitiWatch camera

video images of the vehicles and people tracked from the crime scene for the cameras they pass

on the way to and from the crime scene." In addition, the report will include "tracks of people

and vehicles that met with people who were tracked from the crime scene and the locations they

came from and went to."

33.     The Contract contemplates no role for judicial review before, or during any stage of, implementation of the AIR program.

34.     The standards related to the retention and deletion of AIR program data are both insufficiently protective and unclear. Commissioner Harrison's cover letter to the Contract, sent to the Baltimore Board of Estimates, states that "[u]nanalyzed imagery data will be stored for 45 days[,] after which point it will be deleted during the pilot period." In his community presentations, Commissioner Harrison has likewise represented that "Data is only stored for up to 45 days during the pilot." However, the Contract itself merely states that PSS "will retain the AIR imagery data for forty-five (45) days," without specifying that PSS will in fact purge the data. Notably, during the secret 2016 aerial surveillance trial run, PSS represented that it stored data for only 45 days. But a January 2017 National Police Foundation report found that, following the trial run, PSS simply moved the data to indefinite storage on backup servers.

35.     At present, according to the Contract, it appears that the lone mechanism for auditing "unauthorized use of the system" is "self-report[ing]" by PSS. Although Commissioner Harrison has stated in his presentations about the AIR program that an independent auditing firm will ensure that the program is used only for its intended purpose, Defendants have not yet identified the firm they or their funders intend to retain.

36.     In terms of physical security of the AIR program data, which will include information about every Baltimorean, the Contract states that it is left to PSS to "institute physical, technical and policy systems to ensure the integrity of the data it records in its surveillance and analysis." It is unclear whether these systems are in place, let alone whether they are adequate to protect this highly sensitive information.

37.     The Contract states one of Defendants' explicit goals in implementing this experimental pilot surveillance system is to enable BPD to collect and "to test and rigorously evaluate" data to determine whether to permanently implement wide-area aerial surveillance in Baltimore. Although Commissioner Harrison has stated in his presentations about the AIR program that the BPD will work with one of four "research partners" to evaluate the efficacy of the program, Defendants have not yet identified the particular research partner that they or their funders intend to retain.

38.     The data collected over the coming months will be of severely limited value due to the present circumstances of the COVID-19 pandemic. Due to Maryland's stay-at-home order, movement and activity are greatly reduced throughout Baltimore. Under these circumstances, the collection of data regarding the impact of the AIR program on the city's crime rates is effectively useless if meant to inform decisions about the system's use in times of ordinary city life.

**PSS's Activities Are Fairly Attributable to Defendants**

39.     The Contract makes clear that PSS will engage in long-term wide-area aerial surveillance over Baltimore at the BPD's direction, and that Defendants have delegated policing functions—namely, law enforcement surveillance—that are traditionally reserved for state actors to PSS. Every aspect of the AIR program is conducted pursuant to the Contract, which was negotiated by the BPD and signed by Commissioner Harrison, a final policymaker for the BPD. In the absence of the Contract, PSS would not be collecting imagery for 40 hours each week over 90 percent of Baltimore, nor would it be voluntarily submitting "investigative briefings" or "Investigation Briefing Reports" to the BPD. Defendants are affirmatively initiating, directing, encouraging, and facilitating PSS's surveillance through the AIR program, and PSS is participating in the AIR program to assist law enforcement. Accordingly, Defendants' and PSS's

conduct is under color of state law, and Defendants are responsible for PSS's execution of the AIR program.

40.    As discussed in paragraphs 19 to 38, Defendants have plainly delegated policing functions to PSS, encouraged PSS's implementation of the AIR program, and established a close nexus between themselves and PSS. In addition to the examples above, several other provisions of the Contract reflect Defendants' delegation, encouragement, and/or the close nexus between Defendants and PSS, such that PSS's operation of the AIR program is fairly attributable to Defendants.

41.    For example, the Contract provides that, "BPD shall provide [PSS] with access to its offices and personnel as are reasonably required for [PSS] to perform its duties and responsibilities under this Agreement."

42.    The Contract also provides that, "[t]o the extent of [PSS's] negligence, [PSS's] insurance coverage shall be primary insurance as respects the . . . BPD, its elected/appointed officials, employees, and agents." The BPD also dictates the Best's rating of the insurers providing coverage to PSS and the BPD.

43.    The Contract also provides that, if PSS should cease to exist, "custody of all records related to this Agreement will be transferred to BPD."

44.    The Contract also provides that, "[a]t any time during business hours and as often as BPD may deem necessary, there shall be made available to BPD for examination, [PSS's] records with respect to matters covered by this agreement"—including, presumably, data from the AIR program.

45.     The Contract also provides that, to the extent any images or other materials prepared by PSS under the Contract include material subject to copyright protection, "such materials have been specifically commissioned by BPD."

46.     The Contract also provides that PSS "shall obtain prior written approval regarding any advertising, publicity, or promotional materials from the BPD before such advertising, publicity, or materials can be released." In addition, "BPD will be responsible for answering all media requests related to the operation of the Pilot Program, and [PSS] will notify BPD of any media inquiry made to [PSS]."

## Plaintiffs

### Leaders of a Beautiful Struggle

47.     LBS is a Baltimore-based LLC organization that advances the public policy interests of Black people in the city through youth leadership development, political advocacy, and intellectual innovation. LBS strives to address the complex issues facing Black Baltimore residents in every arena of civil society. To do this, LBS seeks to radically change the discourse around local and regional politics by injecting community voices into political conversations through policy research, advocacy, and community organizing from a grassroots perspective.

48.     LBS's staff includes a Chief Executive Officer, a Chief Operating Officer, a Director of Public Policy, a Director of Research, a Cultural Curator, an Events and Projects Manager, and a Bookkeeper, all of whom advance LBS's activities in Baltimore.

49.     A central focus of LBS's work is addressing historic and structural impediments to Black people's quality of life, including poverty, violence, and white supremacy in the American political and socio-economic order. To this end, LBS has been heavily involved in policing reform and has spearheaded numerous legislative efforts aimed at policing accountability. For example, it helped pass Christopher's Law, which requires police officers to

be trained in CPR, cultural sensitivity, the proper use of force, and interacting with people with physical and cognitive disabilities. During the 2019 Maryland General Assembly, it vigorously fought the creation of a private police force at Johns Hopkins University. And during the 2020 Maryland General Assembly, it supported bills focused on restricting police use of force, reforming Maryland's Law Enforcement Officer Bill of Rights to increase police accountability, and amending Maryland's public records law to increase transparency and accountability in how departments address police misconduct.

50.     In addition to its direct political activity, LBS also strives to support activists within its community, through hosting talks, engaging in collaborations with local institutions, and conducting civic engagement trainings.

51.     An important component of LBS's advocacy is maintaining close proximity to the communities it represents in order to prioritize the needs of these communities in its agenda-setting. This requires its staff to travel throughout Baltimore, by foot, by bus, and by car.

52.     The AIR program intrudes on LBS's and its staff's reasonable expectations of privacy. In particular, it intrudes on LBS staff's reasonable expectation of privacy in the whole of their long-term physical movements, by foot, by bus, and by car. The AIR program's surveillance of these physical movements will capture LBS staff's privacies of life, thereby comprehensively revealing the private activities of LBS itself.

53.     The AIR program also infringes on LBS's and its staff's freedom to associate privately. If Defendants' wide-area aerial surveillance program is permitted to proceed, it will undermine and significantly burden LBS's work. LBS will have to be more cognizant of the individuals and groups with whom it associates, because many of its relationships are private and sensitive. The nature and extent of these relationships are also private and sensitive. The BPD's

continuous, comprehensive aerial recording of LBS staff's movements throughout Baltimore will force staff to change their behavior to maintain the privacy of their relationships, including by altering the timing of certain meetings and the means by which they travel. This effort will divert time and staff resources from other LBS work. LBS also believes that, as a result of the program, some of its present and future partners will decide not to engage with the organization out of fear the association would provoke government retaliation.

Erricka Bridgeford

54.     Plaintiff Erricka Bridgeford is a Black activist in Baltimore City, where she was born and raised. Ms. Bridgeford has been an involved community activist since the late 1990s, and has focused on a range of social justice issues during that time, in particular abolishing the death penalty and supporting survivors of homicide victims. She currently works full-time as the Director of Training for Community Mediation Maryland, which advances collaborative conflict resolution in Maryland.

55.     Ms. Bridgeford is also the co-founder and current co-organizer of Baltimore Ceasefire 365 ("Ceasefire"), a movement that serves as a hub for organizations and citizens to support one another, work together, and share resources with the goal of seeing an end to murder in Baltimore City. Ceasefire organizes quarterly "ceasefire weekends" in the city, and one recent study has shown that these efforts have led to more than a 50% reduction in gun violence in Baltimore while in effect.

56.     As part of her work for Ceasefire, Ms. Bridgeford conducts significant community outreach in neighborhoods throughout Baltimore, including by visiting every murder site in the city within two weeks of the crime occurring—and, on ceasefire weekends, visiting those sites within a day or even a matter of hours.

57.     The AIR program intrudes on Ms. Bridgeford's reasonable expectation of privacy in the whole of her long-term physical movements in Baltimore, by foot and by car.

58.     As part of Ms. Bridgeford's community organizing and engagement, she often visits and speaks with people in high-crime neighborhoods. The very nature of that work involves visiting murder scenes and talking with people who are processing the trauma associated with being in the vicinity of a murder. Accordingly, if the AIR program is permitted to go forward, Ms. Bridgeford believes it is likely that the program will generate an individualized report about her, pursuant to the terms of the Contract. This warrantless reporting will further intrude on Ms. Bridgeford's reasonable expectation of privacy.

59.     The AIR program also infringes on Ms. Bridgeford's freedom to associate privately. In her work for Ceasefire, Ms. Bridgeford drives from neighborhood to neighborhood throughout Baltimore to engage with communities affected by violence. Once in a neighborhood, she spends two to three hours walking along public streets and parks to interact with community members. She also sometimes walks with people she meets back to their homes to meet their family members and continue the conversation. Under the AIR program, Ms. Bridgeford will have to be far more cognizant of her associations in public, out of concern that each and every association will be captured by the AIR program, and that those associations will subject her to unjustified BPD scrutiny.

60.     The AIR program will also burden the effectiveness of Ms. Bridgeford's work as a Ceasefire co-organizer. Ms. Bridgeford believes that some people will likely no longer feel comfortable having private and sensitive conversations with her, given that the very fact of their meeting will be captured by the BPD's blanket aerial surveillance. Furthermore, Ms. Bridgeford cannot change the timing of her outreach work to avoid surveillance without compromising her

work. If she were to only conduct community outreach when the planes are not flying (perhaps at night or during bad weather), she would encounter far less foot traffic on the streets, and she would have far less time in each neighborhood, because she cannot feasibly work every night and all night long. Because people will know definitively that they will be subject to aerial surveillance when associating with Ms. Bridgeford in public or inviting her into their home—and for that reason linked to every other person she meets with—Ms. Bridgeford believes the AIR program will undermine her role as a safe resource within the communities she serves.

61.     The AIR program's comprehensive and continuous surveillance will impair Ms. Bridgeford's work with Ceasefire in still other ways. Ms. Bridgeford believes that awareness of the AIR program will discourage others from volunteering and joining her in the streets to work with Ceasefire, because every association with individuals in high-crime areas will be captured by the BPD. In addition, Ms. Bridgeford anticipates that she will have to shift most of her outreach and conversations to be over the phone, over social media, or over email, which will severely impact the nature and quality of the inherently personal and sensitive work she does through Ceasefire.

Kevin James

62.     Kevin James is an information-technology ("IT") professional, as well as an activist, community organizer, and hip-hop artist who lives in Baltimore City. He volunteered for many years with the Baltimore Algebra Project to advocate for a number of issues that face Baltimore youth, such as increasing funding for schools and starting a bus pass program. He has also worked with organizations such the United Worker and the Right to Housing Alliance in Baltimore. In addition, Mr. James is a former trained paramedic, and he has periodically

volunteered as an Emergency Medical Technician in Baltimore County and as a street medic in Baltimore City during the 2015 protests.

63.     Currently, Mr. James works full-time for an IT company. In his spare time, he remains committed to serving the Baltimore community. He is especially focused on educating and reducing stigma in Black and Brown communities around mental health issues. He and fellow advocates organize meetings and workshops to educate others around mental health and to create opportunities to reduce the associated stigma. In addition, Mr. James is involved in advocacy and protests to call for equitable and fair treatment of immigrants and other marginalized groups.

64.     Mr. James typically spends his day outside of his home: driving public roads to his job, meeting friends to get dinner, and visiting the Tubman House community garden. He also spends time each day in the curtilage in front of and behind his home.

65.     The AIR program intrudes on Mr. James's reasonable expectation of privacy in the whole of his long-term physical movements, by foot and by car. It also intrudes on Mr. James's reasonable expectation of privacy in the curtilage surrounding his home.

66.     As part of his community organizing and engagement, Mr. James often visits and speaks with people in Tubman House and the Gilmor Homes, two areas with high rates of violent crime. He believes it is therefore likely that, during the operation of the AIR program, he will be in the vicinity of a crime scene involving one of the four Target Crimes, or he will meet with individuals who were in the vicinity of such a crime scene. Accordingly, he believes it is likely that the AIR program will generate an individualized report about him, pursuant to the terms of the Contract. This warrantless reporting will further intrude on Mr. James's reasonable expectation of privacy.

67.     The AIR program also infringes on Mr. James's freedom to associate privately. Mr. James often participates in protests and community events that require him to leave his home. The implementation of the AIR program will undermine and significantly burden his political advocacy and organizing. Mr. James will have to be more aware of and deliberate about whom he meets and associates with, whether in his home or elsewhere, because all of his associations will be captured by the AIR program. He will also have to spend time deliberating about whether those associations could result in unwarranted government scrutiny. In addition, when Mr. James recruits individuals to participate in community events, protests, and rallies, he will be obligated to tell them about the program and explain the risks the program poses. The time spent explaining the AIR program will often reduce the time available for substantive discussion, and Mr. James believes that the chilling effect of the AIR program will result in fewer people being willing to participate in the community events, protests, and rallies for which he is recruiting them.

**CAUSES OF ACTION**

**<u>First Claim for Relief</u>**

**42 U.S.C. § 1983 Claim for Violation of Plaintiffs' Fourth Amendment Rights
(Against all Defendants by all Plaintiffs)**

68.     Plaintiffs incorporate by reference paragraphs 1 through 67 as if fully set forth herein.

69.     Defendants' warrantless AIR program violates the Fourth Amendment because it infringes upon a reasonable expectation of privacy in the whole of Plaintiffs' movements and captures information about the privacies of life. First, this program results in indiscriminate searches of Plaintiffs lacking any individualized suspicion or judicial approval, which are prohibited by the Fourth Amendment, and no exception to the Fourth Amendment's warrant

requirement applies. Second, Defendants' use and analysis of information collected through the AIR program absent judicial authorization also violates the Fourth Amendment. And third, Defendants' procedures governing this surveillance are constitutionally unreasonable.

70.     By entering into the Contract with PSS to implement the AIR program, Defendants, acting under color of state law, have established an official municipal policy that violates Plaintiffs' Fourth Amendment rights. This policy consists of persistent, wide-area aerial surveillance pursuant to the Contract. Commissioner Harrison, the signatory to the Contract for the BPD, is an officer with final policymaking authority. Once flights commence under the AIR program, the resulting surveillance will also constitute a persistent and widespread practice in violation of Plaintiffs' Fourth Amendment rights.

## Second Claim for Relief

### 42 U.S.C. § 1983 Claim for Violation of Plaintiffs' First Amendment Rights
### (Against all Defendants by all Plaintiffs)

71.     Plaintiffs incorporate by reference paragraphs 1 through 67 as if fully set forth herein.

72.     Defendants' warrantless AIR program violates the First Amendment because it infringes on Plaintiffs' exercise of associational freedoms through constant and inescapable monitoring by the BPD.

73.     By entering into the Contract with PSS to implement the AIR program, Defendants, acting under color of state law, have established an official municipal policy that violates Plaintiffs' First Amendment rights. This policy consists of persistent, wide-area aerial surveillance pursuant to the Contract. Commissioner Harrison, the signatory to the Contract for the BPD, is an officer with final policymaking authority. Once flights commence under the AIR program, the resulting surveillance will also constitute a persistent and widespread practice in violation of Plaintiffs' First Amendment rights.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against Defendants as follows:

1.      Declaring that the policies, practices, and acts of Defendants described here are unlawful and violate the First and Fourth Amendments to the Constitution of the United States;

2.      Permanently enjoining the Defendants and their agents, employees, successors, and all others acting in active concert with them, from operating the unconstitutional AIR program, including collecting or accessing any images through the program;

3.      Ordering Defendants to expunge all records of Plaintiffs created and maintained as a result of the unconstitutional and unlawful practices described here;

4.      Awarding Plaintiffs' counsel reasonable attorneys' fees and litigation costs, including but not limited to fees, costs, and disbursements pursuant to 42 U.S.C. § 1988; and

5.      Granting such other relief as this Court may deem just and proper.

April 9, 2020                                            Respectfully submitted,

Ashley Gorski[*]                                         /s/ David R. Rocah
Brett Max Kaufman[*]                                     David R. Rocah (Bar No. 27315)
Alexia Ramirez[*]                                        American Civil Liberties Union Foundation of
Nathan Freed Wessler[*]                                    Maryland
Ben Wizner[*]                                            3600 Clipper Mill Road, Suite 350
American Civil Liberties Union Foundation                Baltimore, MD 21211
125 Broad Street, 18th Floor                             T: 410.889.8555
New York, NY 10004                                       F: 410.366.7838
T: 212.549.2500                                          rocah@aclu-md.org
F: 212.549.2654
agorski@aclu.org
bkaufman@aclu.org
aramirez@aclu.org
nwessler@aclu.org
bwizner@aclu.org

[*] pro hac vice application forthcoming                 Counsel for Plaintiffs