## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

LEADERS OF A BEAUTIFUL STRUGGLE
*et al.*,

            *Plaintiffs*,

     v.

BALTIMORE POLICE DEPARTMENT
*et al.*,

            *Defendants*.

Civil Action No. 20-929

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A TEMPORARY RESTRAINING ORDER & A PRELIMINARY INJUNCTION

Brett Max Kaufman[*]
Ashley Gorski[*]
Alexia Ramirez[*]
Nathan Freed Wessler[*]
Ben Wizner[*]
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
T: 212.549.2500
F: 212.549.2654
bkaufman@aclu.org
agorski@aclu.org
aramirez@aclu.org
nwessler@aclu.org
bwizner@aclu.org

David R. Rocah (Bar No. 27315)
American Civil Liberties Union Foundation
   of Maryland
3600 Clipper Mill Road, Suite 350
Baltimore, MD 21211
T: 410.889.8555
F: 410.366.7838
rocah@aclu-md.org

[*] *pro hac vice* application forthcoming

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................. 2

    I.    Plaintiffs ............................................................................................................. 2

    II.    Defendants' AIR Program ................................................................................... 4

ARGUMENT ................................................................................................................... 11

    I.    Plaintiffs are likely to prevail on the merits of their claims that the BPD's wide-area aerial surveillance system is unconstitutional. ................................................ 12

        A.    The BPD's wide-area aerial surveillance system violates the Fourth Amendment. ..... 12

            1.    The acquisition of location information through wide-area aerial surveillance is a Fourth Amendment search. ................................................ 12

            2.    The warrantless use of wide-area aerial surveillance to collect and track the locations of all Baltimoreans at once is unreasonable under the Fourth Amendment. ............. 19

            3.    The rules regulating the BPD's wide-area aerial surveillance system are unreasonable under the Fourth Amendment. ............................................. 24

        B.    The BPD's wide-area aerial surveillance system violates the First Amendment. ......... 28

    II.    Plaintiffs will suffer irreparable harm as a result of the BPD's wide-area aerial surveillance system. ............................................................................................ 33

    III.    The balance of equities favors granting preliminary injunctive relief. ............................. 33

    IV.    The public interest favors granting preliminary injunctive relief. ..................................... 34

CONCLUSION ................................................................................................................ 35

# TABLE OF AUTHORITIES

## <u>Cases</u>

*[Redacted]*,
  402 F. Supp. 3d 45 (F.I.S.C. 2018) ........................................................................25

*ACLU v. Clapper*,
  785 F.3d 787 (2d Cir. 2015) .................................................................................31

*Arizona v. Gant*,
  556 U.S. 332 (2009) .......................................................................................19, 21

*Bates v. City of Little Rock*,
  361 U.S. 516 (1960) ..............................................................................................30

*Berger v. New York*,
  388 U.S. 41 (1967) .........................................................................................20, 25

*Boyd v. United States*,
  116 U.S. 616 (1886) ..............................................................................................13

*Brigham City v. Stuart*,
  547 U.S. 398 (2006) ..............................................................................................24

*Buckley v. Valeo*,
  424 U.S. 1 (1976) ..................................................................................................29

*Bursey v. United States*,
  466 F.2d 1059 (9th Cir. 1972) ..............................................................................32

*California v. Ciraolo*,
  476 U.S. 207 (1986) ..............................................................................................15

*Carpenter v. United States*,
  138 S. Ct. 2206 (2018) ....................................................................................passim

*Centro Tepeyac v. Montgomery Cty.*,
  722 F.3d 184 (4th Cir. 2013) ................................................................................33

*Chandler v. Miller*,
  520 U.S. 305 (1997) ..............................................................................................21

*City of Indianapolis v. Edmond*,
  531 U.S. 32 (2000) .....................................................................................21, 22, 24

*City of L.A. v. Patel*,
   135 S. Ct. 2443 (2015) ...................................................................................19, 21

*City of Ontario v. Quon*,
   560 U.S. 746 (2010) ..............................................................................................19

*Clark v. Library of Cong.*,
   750 F.2d 89 (D.C. Cir. 1984).............................................................................29, 30

*Conner v. Donnelly*,
   42 F.3d 220 (4th Cir. 1994) .................................................................................11

*Dow Chemical Co. v. United States*,
   476 U.S. 227 (1986) .........................................................................................15, 16

*Elrod v. Burns*,
   427 U.S. 347 (1976) ..............................................................................................33

*Ferguson v. City of Charleston*,
   532 U.S. 67 (2001) ...........................................................................................22, 23

*Florida v. Riley*,
   488 U.S. 445 (1989) ..............................................................................................16

*Gibson v. Fla. Legislative Investigation Comm.*,
   372 U.S. 539 (1963) ..............................................................................................30

*Giovani Carandola, Ltd. v. Bason*,
   303 F.3d 507 (4th Cir. 2002) ...........................................................................33, 34

*Goldstein v. Chestnut Ridge Volunteer Fire Co.*,
   218 F.3d 337 (4th Cir. 2000) .................................................................................11

*In re Directives [Redacted] Pursuant to Section 105B of the Foreign Intelligence*
   *Surveillance Act*,
   551 F.3d 1004 (F.I.S.C. Rev. 2008) .................................................................25, 26

*In re First Nat'l Bank*,
   701 F.2d 115 (10th Cir. 1983) ..............................................................................32

*In re Grand Jury Proceedings*,
   776 F.2d 1099 (2d Cir. 1985) ...............................................................................29

*In re Grand Jury Proceedings*,
   863 F.2d 667 (9th Cir. 1988) ................................................................................32

*Katz v. United States,*
    389 U.S. 347 (1967) ...................................................................................19, 25

*Kyllo v. United States,*
    533 U.S. 27 (2001) .................................................................................14, 18, 19

*Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. Waterfront Comm'n of N.Y. Harbor,*
    667 F.2d 267 (2d Cir. 1981) ...................................................................31, 32

*Lytle v. Doyle,*
    326 F.3d 463 (4th Cir. 2003) .............................................................................11

*Marron v. United States,*
    275 U.S. 192 (1927) ........................................................................................20

*Maryland v. Garrison,*
    480 U.S. 79 (1987) ..........................................................................................20

*Maryland v. King,*
    569 U.S. 435 (2013) ........................................................................................22

*Master Printers of Am. v. Donovan,*
    751 F.2d 700 (4th Cir. 1984) ...........................................................................29

*McDonald v. United States,*
    335 U.S. 451 (1948) ........................................................................................25

*Mich. Dep't of State Police v. Sitz,*
    496 U.S. 444 (1990) ........................................................................................22

*Mills v. District of Columbia,*
    571 F.3d 1304 (D.C. Cir. 2009)........................................................................33

*Monell v. NY.C. Dep't of Soc. Servs.,*
    436 U.S. 658 (1978) ........................................................................................11

*NAACP v. Alabama,*
    357 U.S. 449 (1958) ........................................................................................30

*New Jersey v. T.L.O.,*
    469 U.S. 325 (1985) ........................................................................................21

*New York v. P.J. Video, Inc.,*
    475 U.S. 868 (1986) ........................................................................................30

*Owens ex rel. Owens v. Lott*,
   372 F.3d 267 (4th Cir. 2004) .................................................................................20, 27

*Owens v. Balt. City State's Attorneys Office*,
   767 F.3d 379 (4th Cir. 2014) .................................................................................11

*Riley v. California*,
   573 U.S. 373 (2014) .......................................................................................passim

*Rodriguez v. Robbins*,
   715 F.3d 1127 (9th Cir. 2013) ...............................................................................34

*Roe v. Dep't of Def.*,
   947 F.3d 207 (4th Cir. 2020) .................................................................................11

*Samson v. California*,
   547 U.S. 843 (2006) .............................................................................................25

*Shelton v. Tucker*,
   364 U.S. 479 (1960) .........................................................................................31, 32

*Smith v. Balt. City Police Dep't*,
   No. MJG-13-1352, 2014 WL 12675230 (D. Md. Mar. 25, 2014)............................12

*Stanford v. Texas*,
   379 U.S. 476 (1965) .............................................................................................20

*State v. Muhammad*,
   451 P.3d 1060 (Wash. 2019) .................................................................................15

*Steagald v. United States*,
   451 U.S. 204 (1981) .............................................................................................20

*Tabbaa v. Chertoff*,
   509 F.3d 89 (2d Cir. 2007) ...................................................................................30

*United States v. Bobo*,
   477 F.2d 974 (4th Cir. 1973) .................................................................................24

*United States v. Broadhurst*,
   805 F.2d 849 (9th Cir. 1986) .................................................................................16

*United States v. Cuevas-Sanchez*,
   821 F.2d 248 (5th Cir. 1987) .................................................................................16

*United States v. Jones*,
   565 U.S. 400 (2012) ........................................................................................13, 14, 29

*United States v. Karo*,
   468 U.S. 705 (1984) ........................................................................................21

*United States v. Knotts*,
   460 U.S. 276 (1983) ........................................................................................14

*United States v. Martinez-Fuerte*,
   428 U.S. 543 (1976) ........................................................................................22

*United States v. Moore-Bush*,
   381 F. Supp. 3d 139 (D. Mass. 2019)..................................................................16

*Winter v. Nat. Res. Def. Council*,
   555 U.S. 7 (2008) ........................................................................................11

*WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*,
   553 F.3d 292 (4th Cir. 2009) ........................................................................33

*Ybarra v. Illinois*,
   444 U.S. 85 (1979) ........................................................................................27

*Zurcher v. Stanford Daily*,
   436 U.S. 547 (1978) ........................................................................................30

## **Statutes**

42 U.S.C. § 1983 ........................................................................................11

## **Other Authorities**

Alissa Scheller, *6 Maps That Show How Deeply Segregated Baltimore Is*, HuffPost,
   Dec. 6, 2017..............................................................................................7

Arthur Holland Michel, *Eyes in the Sky: The Secret Rise of Gorgon Stare and How It Will
   Watch All of Us* (2019) ..............................................................................9

Baltimore Police Department, Aerial Investigation Research Pilot Program, Facebook
   (Mar. 23, 2020)........................................................................................11

Baltimore Police Department, Community Education Presentation: Aerial Investigation
   Research (AIR) Pilot Program (Mar. 2020) .....................................................passim

Baltimore Police Department, Aerial Investigation Research Pilot Program (AIR), Facebook (Mar. 30, 2020) ......................................................................................passim

Benjamin Powers, *Eyes Over Baltimore: How Police Use Military Technology to Secretly Track You*, Rolling Stone, Jan. 6, 2017 ........................................................................5

Brandon Soderberg & Raven Rakia, *Baltimore's 'Eye in the Sky' Plane is Back with a New Pitch: Surveil the Police*, Oct. 28, 2018 ..........................................................8

Brandon Soderberg, *Persistent Transparency: Baltimore Surveillance Plane Documents Reveal Ignored Pleas to Go Public, Who Knew About the Program, and Differing Opinions on Privacy*, Balt. Sun, Nov. 1, 2016 .....................................................5

City of Baltimore, City of Baltimore Consent Decree ...............................................29

City of Baltimore, Open Baltimore: CCTV Cameras ...................................................7

Daniel Solove, *The First Amendment as Criminal Procedure*, 82 N.Y.U. L. Rev. 112 (2007) ........................................................................................30

David Collins, *Crime-Fighting Technology Outpaces Ability to Regulate It*, WBalTV, July 24, 2017 .......................................................................................................................8

Editorial, *Aerial Surveillance is Not the Answer to Baltimore's Crime Problem*, Balt. Sun, Oct. 14, 2019 ...................................................................................................10

Elizabeth Janney, *Maryland Tracks License Plates, Traffic With Surveillance*, Patch, Dec. 11, 2019....................................................................................................................8

Emily Opilo, *Baltimore Spending Board Approves Surveillance Plane Pilot Program to Capture Images From City Streets*, Balt. Sun, Apr. 1, 2020 .................................11

Homer, *The Iliad* (Robert Fagles tr., Penguin Classics 1990) (c. 1190 BCE)................9

Jason Palmer, *Mobile Location Data 'Present Anonymity Risk'*, BBC News, Mar. 23, 2013 .......................................................................................................................17

Justin Fenton & Talia Richman, *Baltimore Police Back Pilot Program for Surveillance Planes, Reviving Controversial Program*, Balt. Sun, Dec. 20, 2019, ...................................4, 10

Kevin Rector & Ian Duncan, *State Lawmakers, ACLU Consider Legislation to Regulate Police Surveillance*, Balt. Sun, Sept. 3, 2016.......................................................4, 5

Kevin Rector & Luke Bridgewater, *Report of Aerial Surveillance by Baltimore Prompts Questions, Outrage*, Balt. Sun, Aug. 24, 2016 .............................................................5

Kevin Rector, *Baltimore Officers Pitched on Putting Three Surveillance Planes in the Sky at Once, Covering Most of City*, Balt. Sun (Sept. 19, 2019)................................10

Letter from Kevin Davis, Baltimore Police Commissioner, to Natalie A. McKeown Finegar, Deputy District Public Defender (Sept. 20, 2016) ......................................................5

McKenna Oxenden, *Baltimore Police Department Holds First Community Forum on Surveillance Plane That's Set to Launch in April*, Balt. Sun, Mar. 11, 2020...........................11

Michael Calhoun, *EXCLUSIVE: St. Louis Eyed as Test Market for Aerial Crime Surveillance Technology*, KMOX NewsRadio 1120, June 19, 2019 ...............................................9

Monte Reel, *Secret Cameras Record Baltimore's Every Move From Above*, Bloomberg Businessweek, Aug. 23, 2016.....................................................................................5, 29

Morgan Cloud, *Searching Through History; Searching For History*, 63 U. Chi. L. Rev. 1707 (1996)................................................................................20

Office of Gov. Larry Hogan, COVID-19 Pandemic: Orders and Guidance ....................10, 11, 34

Persistent Surveillance Systems, Hawkeye II .............................................................6

Persistent Surveillance Systems, NightHawk II..........................................................19

Professional Services Agreement, Aerial Investigation Research ("AIR") ..........................passim

Robert Sheckley, *Watchbird*, Galaxy Sci. Fiction (Feb. 1953) .....................................12

Stephen R. Wilk, *Medusa: Solving the Mystery of the Gorgon* (2000)............................9

Tim Prudente, *2019 Closes With 348 Homicides in Baltimore, Second-Deadliest Year on Record*, Balt. Sun, Jan. 1, 2020 ..............................................................................23

Yves-Alexandre de Montjoye et al., *Unique in the Crowd: The Privacy Bounds of Human Mobility*, 3 Sci. Reps. 1376 (2013)..........................................................................17

## INTRODUCTION

The Baltimore Police Department ("BPD") is set to imminently deploy aircraft to circle above Baltimore as part of a comprehensive system of long-term, persistent, wide-area aerial surveillance that will cover more than 90 percent of the city, recording second-by-second the movements of Baltimore's 600,000 residents. This mass surveillance system presents a radical and society-changing threat to individual privacy and to free association, and it violates the Constitution.

The BPD calls this system the "Aerial Investigation Research" program, but its objective is surveillance, not science. It is designed to enable the warrantless collection of information about all of Baltimore's residents for law-enforcement use. The BPD has signed a contract with a private corporation to put this pervasive surveillance program into practice. The contract describes the work that the corporation, straightforwardly called "Persistent Surveillance Systems," will do at BPD's direction to track and record the movements of Baltimore's residents; to link that information to other BPD-operated surveillance systems (including ground-based video cameras and automatic license plate readers); and to deliver reports to the BPD that comprehensively detail the movements of individuals who have been in the vicinity of crime scenes—and the movements of everyone those individuals have met.

There is one thing that is conspicuously missing from the contract, though: any role whatsoever for the judicial branch. Despite launching one of the most expansive domestic surveillance systems in American history, the BPD will not seek judicial approval before sending its planes into the skies to record Baltimoreans from above, nor will it seek a warrant before accessing the information for use in criminal investigations and prosecutions.

That means that this Court will be the only one to pass on the legality of Baltimore's novel mass surveillance system before it becomes a chilling and all-seeing part of daily life. The system would put into place the most wide-reaching surveillance dragnet ever employed in an American city, giving the BPD access to a comprehensive record of the movements and activities of every Baltimore resident each time they leave their home. "[T]his newfound tracking capacity runs against everyone," "not just . . . persons who might happen to come under investigation," and accordingly offends the bedrock protections for a free society that the Constitution has long provided. *Carpenter v. United States*, 138 S. Ct. 2206, 2218 (2018). The program's objectives to reduce crime and violence in Baltimore are laudable—indeed, that is one of the central aims of Plaintiffs' own work. But Plaintiffs understand that the way to address the effects of entrenched structural power in Baltimore, including poverty and violence, is through community-building, education, and policy advocacy, not by granting futuristic policing powers to an entity that has historically and systematically infringed the rights of Black and Brown communities. The Constitution dictates that the use of the BPD's indiscriminate aerial dragnet is not an available solution to Baltimore's ills.

For the reasons that follow, the Court should stop this program before it ever gets off the ground.

## FACTUAL BACKGROUND

### I.    Plaintiffs

Plaintiffs are Baltimoreans.

Plaintiff Leaders of a Beautiful Struggle ("LBS") is a grassroots think-tank founded in 2010 that advances the public policy interests of Black people in Baltimore, through youth leadership development, political advocacy, and intellectual innovation. *See* Declaration of

Dayvon Love ("LBS Decl.") ¶ 4. A central focus of LBS's work is addressing historic and structural impediments to Black people's quality of life, including poverty, violence, and white supremacy in the American political and socio-economic order. *Id.* ¶ 7. To this end, it has been heavily involved in advocacy surrounding policing reform, and it has spearheaded numerous legislative efforts aimed at policing accountability. *Id.* An important component of LBS's advocacy is maintaining close proximity to the communities it represents in order to prioritize the needs of the community in its agenda-setting. *Id.* ¶ 12. It has been a frequent critic of law enforcement's use of surveillance technologies against Black communities. *Id.* ¶ 8.

Plaintiff Erricka Bridgeford is a Black activist in Baltimore, where she was born and raised. *See* Declaration of Erricka Bridgeford ("Bridgeford Decl.") ¶¶ 2, 4. She has been an involved community activist since the late 1990s and has focused on a range of social justice issues during that time, in particular abolishing the death penalty and supporting survivors of homicide victims. *Id.* ¶ 4. She is the co-founder of Ceasefire Baltimore 365 ("Ceasefire"), a movement that serves as a hub for organizations and citizens to support one another, work together, and share resources with the goal of seeing an end to murder in Baltimore City. *Id.* Ceasefire organizes quarterly 72-hour "ceasefire weekends" in the city—and they work. *Id.* ¶ 5–6. One recent study has shown that these efforts have led to an estimated 52% reduction in gun violence in Baltimore during such weekends, with no evidence of a "postponement effect" in the following days. *Id.* ¶¶ 17. As part of her work for Ceasefire, Ms. Bridgeford conducts significant community outreach in neighborhoods throughout Baltimore, including by visiting every murder site in the city within two weeks of the crime occurring—and, on ceasefire weekends, visiting those sites within a day or even a matter of hours. *Id.* ¶ 7.

Plaintiff Kevin James is an information technology professional, hip-hop musician, activist, and community organizer. Mr. James has lived in Baltimore City and County since 2001, when he moved to join Teach for America at a city high school. Declaration of Kevin James ("James Decl.") ¶¶ 2–4. He has been involved with many grassroots movements in Baltimore, working on issues that include school funding, housing rights, mental health, and immigration. *Id.* ¶¶ 2–3. He is also a trained paramedic, and has volunteered both as a periodic Emergency Medical Technician in Baltimore County and as a street medic during 2015 protests. *Id.* ¶ 2. Through his activism and music, Mr. James expresses his values of community-building, justice, and equality. *See id.* ¶¶ 3–4.

## II.     Defendants' AIR Program

Defendants are the BPD and Baltimore Police Commissioner Michael S. Harrison.

In December 2019, Commissioner Harrison announced that the City of Baltimore would enter into a contract with Persistent Surveillance Systems ("PSS") to conduct a "180 day pilot program" of a wide-area aerial motion-imagery surveillance system, to be launched in April 2020.[1] But the system is not entirely new: the BPD deployed an earlier version of it for a period of months in 2016, keeping it secret not only from the public but from the Mayor of Baltimore and the city's top prosecutors.[2] The BPD halted its secret "trial" of PSS's surveillance

---

[1] BPD, Community Education Presentation: Aerial Investigation Research (AIR) Pilot Program at 3 (Mar. 2020) ("BPD Presentation") (attached as Exhibit A to Declaration of Alexia Ramirez ("Ramirez Decl.")); *see* Justin Fenton & Talia Richman, *Baltimore Police Back Pilot Program for Surveillance Planes, Reviving Controversial Program*, Balt. Sun, Dec. 20, 2019, https://www.baltimoresun.com/news/crime/bs-md-ci-cr-baltimore-police-support-surveillance-plane-20191220-zfhd5ndtlbdurlj5xfr6xhoe2i-story.html.

[2] *See* Kevin Rector & Ian Duncan, *State Lawmakers, ACLU Consider Legislation to Regulate Police Surveillance*, Balt. Sun, Sept. 3, 2016, https://www.baltimoresun.com/politics/bs-md-police-surveillance-legislation-20160903-story.html.

technology only after news reports revealed it, leading to an overwhelming public outcry.[3] During its 2016 trial run, PSS recorded more than 300 hours' worth of the movements of ordinary Baltimoreans as they moved about their city.[4] And although PSS publicly represented that the information it collected would be deleted after 45 days, it instead saved all of the recordings indefinitely.[5]

According to a "Professional Services Agreement" signed by the BPD and PSS in March 2020, the BPD will authorize PSS to use its "experimental aerial investigation research technology and analytics," whose use in "any US City" is unprecedented and whose "effect on crime has not been analyzed and is unknown," to assist in the investigation of certain crimes in Baltimore City during a six-month "pilot" period.[6] While the contract represents that information collected by PSS through this "Aerial Investigation Research" ("AIR") program is intended to be used in investigations related to only four categories of crimes—murder, non-fatal shootings, armed robberies, and car-jackings—there is effectively no such limitation, as the Baltimore

---

[3] *See id.*; Monte Reel, *Secret Cameras Record Baltimore's Every Move From Above*, Bloomberg Businessweek, Aug. 23, 2016, https://www.bloomberg.com/features/2016-baltimore-secret-surveillance; Kevin Rector & Luke Bridgewater, *Report of Aerial Surveillance by Baltimore Prompts Questions, Outrage*, Balt. Sun, Aug. 24, 2016, https://www.baltimoresun.com/maryland/baltimore-city/bs-md-ci-secret-surveillance-20160824-story.html.

[4] *See* Benjamin Powers, *Eyes Over Baltimore: How Police Use Military Technology to Secretly Track You*, Rolling Stone, Jan. 6, 2017, https://www.rollingstone.com/culture/culture-features/eyes-over-baltimore-how-police-use-military-technology-to-secretly-track-you-126885.

[5] *See* Brandon Soderberg, *Persistent Transparency: Baltimore Surveillance Plane Documents Reveal Ignored Pleas to Go Public, Who Knew About the Program, and Differing Opinions on Privacy*, Balt. Sun, Nov. 1, 2016, https://www.baltimoresun.com/citypaper/bcp-110216-mobs-aerial-surveillance-20161101-story.html; Letter from Kevin Davis, Baltimore Police Commissioner, to Natalie A. McKeown Finegar, Deputy District Public Defender, at 2 (Sept. 20, 2016), *available at* https://www.aclu.org/sites/default/files/field_document/opd_response_letter_regarding_csp_-_signed.pdf.

[6] Professional Services Agreement, Aerial Investigation Research ("AIR") ("BPD/PSS Contract") at 18 (attached as Exhibit B to Ramirez Decl.).

Police Commissioner retains the unreviewable authority to approve other uses in "extraordinary and exigent circumstances" on a case-by-case basis.[7]

PSS's aerial surveillance technology will bring the BPD an entirely novel capability, allowing it to amass a comprehensive record of the movements of every pedestrian and vehicle that moves about the city. Under the program, PSS pilots will fly over Baltimore in three manned aircraft, each equipped with its "Hawkeye Wide Area Imaging System."[8] While neither the contract nor a public BPD presentation provides a description of that system, PSS's website describes a system called "Hawkeye II"—which is also listed in the contract's budget[9]—as "consist[ing] of twelve, full color cameras" equipped with a "192 million pixel, full color, geo and ortho rectified airborne wide area surveillance sensor" with a "1/2 meter resolution throughout" its coverage area.[10] The BPD has explained that these cameras will capture images of 32 square miles of the city every second—covering about 90 percent of the city.[11] The spy planes will fly a minimum of 40 hours per week, "weather permitting."[12] While the system will not employ infrared or night vision technology, it is "sensitive enough to capture images at night with ambient City lighting."[13] The BPD and PSS have "agreed" that resolution of the surveillance cameras will be "one pixel per person," but the "technology has the ability to

---

[7] *Id.*

[8] *Id.* at 19.

[9] *See id.* at Ex. B.

[10] *See* PSS, Hawkeye II, https://www.pss-1.com/hawkeye-ii (quotations from various web pages) (attached as Exhibit C to Ramirez Decl.).

[11] BPD Presentation at 5.

[12] BPD/PSS Contract at 19.

[13] *Id.*

upgrade the [image] quality."[14] The cost of the program—fully funded by Texas philanthropists John and Laura Arnold through an entity called Arnold Ventures—is almost $4 million.[15]

This surveillance power will be further supercharged by integration with existing BPD surveillance capabilities. Specifically, PSS will employ between 15 and 25 analysts in two seven-hour daily shifts, some of whom may work out of the "BPD's Watch Center to be teamed with a BPD sworn officer or BPD analyst."[16] PSS analysts "will monitor BPD's [Computer Aided Dispatch] system from monitors in BPD facilities."[17] PSS will also be permitted to "integrate its imagery data analysis with BPD systems," including the BPD's centralized "CitiWatch" network of ground-based surveillance cameras (which are not employed pursuant to any judicial authorization).[18] The CitiWatch network includes more than 800 cameras in Baltimore City,[19] predominantly located in Black and Brown communities (as well as the downtown business district).[20] As part of the BPD's aerial surveillance program, PSS analysts "will track individuals and vehicles that pass the Baltimore CitiWatch CCTV cameras," and will

---

[14] BPD, Aerial Investigation Research Pilot Program (AIR) at 23:40, Facebook (Mar. 30, 2020), https://www.facebook.com/BaltimoreCityPolice/videos/vb.58771761955/212014970074066 ("BPD 3/30 Facebook Live Video").

[15] *See* BPD/PSS Contract at 1; *id.* at Ex. B.

[16] *Id.* at 19.

[17] *Id.* at 20.

[18] *Id.*

[19] *See* BPD 3/30 Facebook Live Video at 28:07.

[20] *Compare* City of Baltimore, Open Baltimore: CCTV Cameras (showing locations), https://data.baltimorecity.gov/Public-Safety/CCTV-Cameras/y3f4-umna, *with* Alissa Scheller, *6 Maps That Show How Deeply Segregated Baltimore Is*, HuffPost, Dec. 6, 2017, https://www.huffpost.com/entry/baltimore-segregated-maps-riots_n_7163248 (showing racial makeup of the city); *see* LBS Decl. ¶ 18.

7

"access or request CitiWatch camera information to provide more detailed descriptions."[21]

PSS will also link the images it collects to the BPD's warrantless automated license plate reader ("ALPR") network, directly allowing any "vehicles that are tracked from [a] crime scene . . . to be identified."[22] In 2016, the BPD's ALPR system collected 6.5 million "reads"— which can include license plates, vehicle make and model, images of drivers and passengers, distinguishing features (such as bumper stickers and body damage), and registration information—in Baltimore City.[23] According to the contract, PSS will be permitted to "integrate its iView software to accept and utilize" these and other BPD surveillance systems "to help make all of the systems work together to enhance their ability to help solve and deter crimes."[24]

According to the contract, PSS will analyze collected data "upon specific request by BPD or based on alerts" from the BPD's dispatch system.[25] It will then create, within 18 hours, an "investigative briefing" that will include results of "imagery analysis, the location and timing of a crime, the observable actions at the crime scene, the tracks of vehicles and people to and from the crime scene, the location the vehicles and people from the crime[] scene visited after and

---

[21] BPD/PSS Contract at 20. During the secret 2016 trial of PSS technology in Baltimore, PSS personnel also had "direct access to CitiWatch." Brandon Soderberg & Raven Rakia, *Baltimore's 'Eye in the Sky' Plane is Back with a New Pitch: Surveil the Police*, Oct. 28, 2018, Appeal, https://theappeal.org/baltimores-eye-in-the-sky-plane-is-back-with-a-new-pitch-surveil-the-police.

[22] BPD/PSS Contract at 20.

[23] David Collins, *Crime-Fighting Technology Outpaces Ability to Regulate It*, WBalTV, July 24, 2017, https://www.wbaltv.com/article/crime-fighting-technology-outpaces-ability-to-regulate-it/10353655; Elizabeth Janney, *Maryland Tracks License Plates, Traffic With Surveillance*, Patch, Dec. 11, 2019, https://patch.com/maryland/towson/maryland-tracks-license-plates-traffic-surveillance.

[24] BPD/PSS Contract at 20; *see* BPD 3/30 Facebook Live Video at 28:07 ("It absolutely will work with the city's camera system.").

[25] BPD/PSS Contract at 20.

before the crime."[26] Within 72 hours, PSS will provide a more comprehensive report that includes "imagery of the crime scene," "tracks" and locations of people whom PSS identifies as potential suspects or witnesses (as well as "people and vehicles that met with [those] people") both prior to and after the crime, and CitiWatch-captured video.[27] Data collected by PSS will be retained for 45 days and then, if unused and unanalyzed, allegedly deleted.[28]

Even evaluated on cold contractual language, it is clear that the BPD's wide-area aerial surveillance system is a vast, powerful, and unprecedented domestic spying apparatus. Little wonder, then, that the military's version of this aerial surveillance system—developed for use over battlefields abroad, beyond the ordinary reach of the Fourth Amendment—is codenamed "Gorgon Stare," after a Greek mythological monster from the underworld whose defining characteristic is its "'rigid, fixed, penetrating, unblinking stare.'"[29] In fact, the President of PSS—Ross McNutt—worked on an early version of this technology as a military contractor.[30] In recent years, McNutt has been seeking to contract with local law enforcement agencies to deploy this wartime apparatus over American cities.[31]

---

[26] *Id.*

[27] *Id.* at 20–21.

[28] *Id.* at 22; BPD Presentation at 15.

[29] Arthur Holland Michel, *Eyes in the Sky: The Secret Rise of Gorgon Stare and How It Will Watch All of Us* 40 (2019) (quoting Stephen R. Wilk, *Medusa: Solving the Mystery of the Gorgon* 124 (2000)); *see* Homer, *The Iliad*, XI:39–40 (Robert Fagles tr., Penguin Classics 1990) (c. 1190 BCE) (describing "the burning eyes, the stark, transfixing horror" of the "Gorgon's grim mask").

[30] *See* Michel, *supra* note 29, at 35–36.

[31] *See* Michael Calhoun, *EXCLUSIVE: St. Louis Eyed as Test Market for Aerial Crime Surveillance Technology*, KMOX NewsRadio 1120, June 19, 2019, https://kmox.radio.com/articles/st-louis-being-considered-test-market-new-aerial-crime-surveillance-technology.

The BPD's revival of its aerial surveillance system has been a matter of public controversy since McNutt pitched the department on a three-year, $6.6-million contract in September 2019.[32] While Police Commissioner Michael Harrison initially was "skeptical" of the program, he announced in December 2019 that despite its "controversial history," he intended to enter into a contract for PSS's services.[33] Commissioner Harrison's announcement took the public—as well as Baltimore State's Attorney's Office and the Office of the Public Defender, neither of which were consulted—by surprise.[34] Despite having made a final decision about the pilot program, he indicated at the time that he "look[ed] forward to hearing from our community and to educate them on what this is and what this is not."[35]

In March 2020, as Baltimoreans were reeling from a State of Emergency declaration by Governor Larry Hogan in response to the fast-evolving coronavirus pandemic, and the shuttering of enormous portions of the local and national economies,[36] the BPD held three public meetings concerning its imminent aerial surveillance program. The meetings were conceived as steps to assuage the public in the wake of the BPD's secret aerial surveillance trials with PSS in 2016. The first, on March 11, just after Governor Hogan's COVID-19 emergency declaration, was

---

[32] *See* Kevin Rector, *Baltimore Officers Pitched on Putting Three Surveillance Planes in the Sky at Once, Covering Most of City*, Balt. Sun (Sept. 19, 2019), https://www.baltimoresun.com/news/crime/bs-md-ci-cr-surveillance-pitch-20190919-dkurugpjdretrjzcevzlc7eabu-story.html; *see also* Editorial, *Aerial Surveillance is Not the Answer to Baltimore's Crime Problem*, Balt. Sun, Oct. 14, 2019, https://www.baltimoresun.com/opinion/editorial/bs-ed-1015-spy-plane-20191014-xlk36warirai7emy54nu3kpen4-story.html.

[33] Fenton & Richman, *supra* note 1.

[34] *Id.*

[35] *Id.*

[36] *See* Office of Gov. Larry Hogan, COVID-19 Pandemic: Orders and Guidance, https://governor.maryland.gov/covid-19-pandemic-orders-and-guidance ("Maryland Pandemic Orders").

attended by just 20 people.[37] Two other meetings, rescheduled to March 23 and March 30, were held as online Facebook events,[38] while Baltimoreans were under emergency orders prohibiting gatherings of more than ten people.[39]

On April 1, the Baltimore Board of Estimates approved the BPD's contract with PSS by a 3-to-2 vote.[40] To Plaintiffs' knowledge, the BPD has not yet sent up its planes.

## ARGUMENT

Plaintiffs seeking temporary or preliminary injunctive relief must establish that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in their favor, and that an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *see Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020). Plaintiffs readily meet this test.[41]

---

[37] McKenna Oxenden, *Baltimore Police Department Holds First Community Forum on Surveillance Plane That's Set to Launch in April*, Balt. Sun, Mar. 11, 2020, https://www.baltimoresun.com/news/crime/bs-md-ci-cr-community-forum-plane-20200312-xmcrmbzivfc2jp5xgalclqhmyi-story.html.

[38] BPD 3/30 Facebook Live Video; BPD, Aerial Investigation Research Pilot Program, Facebook (Mar. 23, 2020), https://www.facebook.com/BaltimoreCityPolice/videos/aerial-investigation-research-pilot-program/3400646286628872.

[39] *See* Maryland Pandemic Orders, *supra* note 36.

[40] Emily Opilo, *Baltimore Spending Board Approves Surveillance Plane Pilot Program to Capture Images From City Streets*, Balt. Sun, Apr. 1, 2020, https://www.baltimoresun.com/news/crime/bs-md-ci-baltimore-surveillance-plane-approved-20200401-sskjob7dgrevpjfyygrlgitnqi-story.html.

[41] The BPD's contract with PSS establishes a municipal "custom, policy, or practice" under *Monell v. New York City Department of Social Services*, 436 U.S. 658, 689–90 (1978). *Owens v. Balt. City State's Attorneys Office*, 767 F.3d 379, 402 (4th Cir. 2014). And the collection of location information by PSS through the AIR program constitutes "state action" under 42 U.S.C. § 1983, as it involves the explicit delegation and direction of policing functions to PSS through a contract signed by a final policymaker—the Baltimore Police Commissioner. *See, e.g.*, *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 342 (4th Cir. 2000); *Conner v. Donnelly*, 42 F.3d 220, 223–24 (4th Cir. 1994); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003); *see also, e.g.*, *Smith v. Balt. City Police Dep't*, No. MJG-13-1352, 2014 WL 12675230, at *4 (D. Md.

I.     **Plaintiffs are likely to prevail on the merits of their claims that the BPD's wide-area aerial surveillance system is unconstitutional.**

      A.     **The BPD's wide-area aerial surveillance system violates the Fourth Amendment.**

The surveillance machinery that is set to fly over Baltimore City puts into the BPD's hands a virtual, visual time machine whose digital eyes no person engaged in ordinary life can escape. This kind of panoptic surveillance infrastructure would have horrified the drafters of the Fourth Amendment, which was expressly designed to outlaw indiscriminate and wide-ranging searches conducted entirely at law enforcement's discretion. Warrantless, around-the-clock recording of even a single individual's movements is not a permissible exercise of executive power, and no warrant can authorize the constant recording of the movements of hundreds of thousands of people. Defendants' implementation of such a system in Baltimore violates the Fourth Amendment.

           1.     **The acquisition of location information through wide-area aerial surveillance is a Fourth Amendment search.**

No one, anywhere, reasonably expects that government cameras in the sky will record the whereabouts of an entire city's population second by second. That kind of surveillance is the stuff of dystopian fiction, not American cities.[42] And those details of location and movement, in their whole, are private. When the government records people's movements from above, around the clock and day after day, it has infringed upon the core of what the Fourth Amendment protects.

---

Mar. 25, 2014) (Baltimore Police Commissioner is an officer with "final policymaking authority" under *Monell*).

[42] *See, e.g.*, Robert Sheckley, *Watchbird*, Galaxy Sci. Fiction (Feb. 1953), *available at* https://www.law.upenn.edu/live/files/3400-sheckley-r-watchbird-1953 ("After all, murder was an old problem, and watchbird too new a solution.").

It is beyond dispute that people's long-term physical movements, even in public places, enjoy constitutional protection. Almost a decade ago, a majority of the Supreme Court adopted that view over strenuous government objection, and less than two years ago the Court affirmed it as the law of the land. *See Carpenter*, 138 S. Ct. at 2217 (citing concurring opinions of five Justices in *United States v. Jones*, 565 U.S. 400 (2012)). That protection exists because the recording of individual movements over time reveals our "privacies of life," *id.* (quoting *Riley v. California*, 573 U.S. 373, 403 (2014) (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886))), "provid[ing] an intimate window into a person's life, revealing not only . . . particular movements, but through them . . . 'familial, political, professional, religious, and sexual associations,'" *id.* (quoting *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring)). Long-term location tracking, made possible through advanced technology, intrudes upon the reasonable expectation that the government "would not—and indeed, in the main, simply could not—secretly monitor and catalog [a person's] every single movement . . . for a very long period." *Id.* (citing *Jones*, 565 U.S. at 430 (Alito, J., concurring)). In *Carpenter*, the Court rejected the government's argument that by carrying a cell phone, people forfeit their expectations of privacy in their movements such that the government can obtain reams of cell phone location information without a warrant. *See id.* at 2210. It reasoned that the use of a cell phone is so "indispensable to participation in modern society," and the sharing of location data with third parties so involuntary, that the Fourth Amendment's protections must apply. *Id.* That reasoning is an even better fit here, where the activity in question is ordinary people engaging in everyday human life on public streets. Short of never leaving home, there is no way to avoid the BPD's surveillance.[43]

---

[43] In fact, the location information collected through Defendants' system is far more precise than the data at issue in *Carpenter*. There, the government asserted that the cell site location records at issue could place a person only within a "wedge-shaped sector ranging from one-eighth to four

Defendants have assured Baltimoreans that the "use of aerial surveillance is constitutionally permitted in areas open to public view based on Supreme Court rulings." BPD Presentation at 15. But that is a brazen misrepresentation, one that has little application to a novel and rapacious technology like the AIR program, which has the power to constantly log the movements of an entire city. The *Carpenter* Court sternly warned of such technologies, and their potential to undermine the "degree of privacy against government that existed when the Fourth Amendment was adopted." *Carpenter*, 138 S. Ct. at 2214 (quoting *Kyllo v. United States*, 533 U.S. 27, 34 (2001)). As the Court explained, surveillance tools with the capacity to "effortlessly compile[]" highly "detailed" information, *id.* at 2216, to record indiscriminately and persistently in a way that "runs against everyone," *id.* at 2218, and to generate "retrospective" data that could be indefinitely mined by law enforcement, grant "police access to a category of information [that is] otherwise unknowable," *id.*, and therefore trigger the protections of the Fourth Amendment.

Modern location-tracking technologies simply change the game. The practical constraints of traditional surveillance once placed natural checks on government power, since detailed, long-term, and expansive monitoring would have been "difficult and costly and therefore rarely undertaken." *Jones*, 565 U.S. at 429. But advanced technology effectively removes those checks, allowing "a too permeating police surveillance." *Carpenter*, 138 S. Ct. at 2214 (quotation marks omitted); *see United States v. Knotts*, 460 U.S. 276, 284 (1983) (observing that compared to the use of a beeper, which still requires painstaking, resource-intensive, individualized human monitoring, twenty-four hour "dragnet type law enforcement practices" would raise a distinct constitutional question); *Riley v. California*, 573 U.S. at 393 (rejecting the government's analogy

---

square miles," and only recorded location information at the start and end of incoming and outgoing calls. 138 S. Ct. at 2212, 2218. Here, of course, the stored footage pinpoints people's location to the yard, each and every second.

of a search of cell-phone data to that of a wallet because it equates a "ride on horseback" to a

"flight to the moon"). Never before could police have perfectly reconstructed even one person's

past movements over days, weeks, and months; never could they have dreamed of reconstructing

an entire city population's movements in this way.[44]

       It is true that in several cases decided a generation ago, the Supreme Court permitted

limited and transitory information-gathering from aircraft, but the Justices who decided those

cases could hardly have imagined the BPD's long-term, omnipresent aerial surveillance system,

and they certainly did not approve of it. And in recent years, "[w]hen confronting new concerns

wrought by" new, digital-age surveillance technologies, the "Court has been careful not to

uncritically extend existing precedents." *Carpenter*, 138 S. Ct. at 2222 (citing *Riley v. California*,

573 U.S. at 386).

       The three aerial surveillance cases date back more than thirty years, and each involved

targeted, short-term aerial observations with unsophisticated equipment or no equipment at all.

They involved nothing remotely as invasive, all-seeing, and comprehensive as the spying tool

now in the hands of the BPD. The first, *California v. Ciraolo*, 476 U.S. 207 (1986), involved a

one-time, "simple visual observation[]" of curtilage from 1000 feet with "the naked eye." *Id.* at

214–15. The next, *Dow Chemical Co. v. United States*, 476 U.S. 227 (1986)—decided the same

day as *Ciraolo*—concluded that the Fourth Amendment was not triggered by the aerial

observation of an industrial area akin to an "open field" through a flyover technique the Court

---

[44] In *Carpenter*, the Supreme Court found a Fourth Amendment search based on just seven days of an individual's cell-phone location information, but under Defendants' aerial surveillance system, they will retain a rolling 45 days' worth of Baltimoreans' location information in bulk. *See* BPD/PSS Contract at 22. Notably, one leading state supreme court recently held that the collection of a single location point of a single person through cell-phone location information was a Fourth Amendment search under the logic of *Carpenter*. *See State v. Muhammad*, 451 P.3d 1060 (Wash. 2019).

called "conventional" and "commonly used," without employing any "highly sophisticated surveillance equipment not generally available to the public." *Id.* at 233, 238. And the last, *Florida v. Riley*, 488 U.S. 445 (1989), permitted a helicopter flyover for naked-eye observations in a routinely used, publicly accessible airway. *Id.* at 449.[45]

The BPD's new aerial surveillance system is light years beyond the single flights at issue in those three old cases. It is not fleeting, but long-term—at least 180 days, and perhaps indefinite.[46] It is not targeted, but covers a wide area—indeed, 90 percent of Baltimore City. And it does not just produce static images, but a comprehensive and reviewable log of video that will be stored, analyzed, and linked to other surveillance technologies already in the BPD's hands.

---

[45] *See Florida v. Riley*, 488 U.S. at 448–49 (explaining that *Ciraolo* "control[led]" where a law enforcement officer made observations from a helicopter "[w]ith his naked eye"); *United States v. Broadhurst*, 805 F.2d 849, 854, 856 (9th Cir. 1986) (explaining that *Ciraolo* was limited to "unenhanced visual observations" and that its result "can hardly be said to approve of intrusive technological surveillance where the police could see no more than a casual observer"); *United States v. Cuevas-Sanchez*, 821 F.2d 248, 251 (5th Cir. 1987) ("It does not follow that *Ciraolo* authorizes any type of surveillance whatever just because one type of minimally-intrusive aerial surveillance is possible."); *see also Dow Chemical*, 476 U.S. at 238 (warning that "surveillance of private property by using highly sophisticated surveillance equipment not generally available to the public, such as satellite technology, might be constitutionally proscribed absent a warrant").

[46] The BPD's cameras will also inevitably capture activities and movements within the curtilage of many homes. The breadth and duration of this surveillance of the "area[s] immediately adjacent to a private home, where privacy expectations are most heightened," *Dow Chemical*, 476 U.S. at 237 n.4, distinguishes this situation from *Ciraolo*'s fleeting, naked-eye surveillance of curtilage. Though a person might expect their curtilage to be observed from a passing plane during the few seconds it takes for the aircraft to fly by, no one expects a government agent to fly circles over their home for 40 or more hours a week, month after month, recording every movement they, their family members, and their guests make in their driveway, yard, and other adjoining private property. *Cf. United States v. Moore-Bush*, 381 F. Supp. 3d 139, 149 (D. Mass. 2019) ("[T]he Court is sensitive to the different expectations people reasonably may have about activities on their driveway and near their front door. Although these activities, taken one by one, may not give rise to a reasonable expectation of privacy, as on the public roads, the Court aggregates their sum total for its analysis. . . . Here, law enforcement officers surveilled the home for eight months [with a pole camera]. A home occupant would not reasonably expect that." (citation omitted)).

*See* BPD/PSS Contract at 19–20; *supra* Factual Background. The result is a system of "tireless and absolute surveillance," *Carpenter*, 138 S. Ct. at 2218, that is incompatible with the Constitution.

The BPD has also suggested that the cameras it will mount on board its three surveillance aircraft are not precise enough to identify individuals on their own. *See* BPD Presentation at 5. But this is irrelevant to whether the recording of the Baltimoreans' whereabouts amounts to a Fourth Amendment "search," for three reasons.

First, with persistent aerial surveillance, it will be trivially easy to roll back the tape to trace pedestrians' or vehicles' paths to the homes they left in the morning, and roll it forward to the homes they returned to at night, thereby deducing identity. Moreover, it takes a startlingly small number of unique location points to personally identify even an "anonymous" person, meaning that ongoing collection of location data every second in Baltimore will yield unique and easily identifiable data about every Baltimore resident who moves about the city over time. In one leading study, the authors concluded that using cell-phone location data, just four points were enough to identify an individual based on their pattern of movements. *See* Yves-Alexandre de Montjoye et al., *Unique in the Crowd: The Privacy Bounds of Human Mobility*, 3 Sci. Reps. 1376 (2013), https://doi.org/10.1038/srep01376 (attached as Exhibit D to Ramirez Decl.); *see* Jason Palmer, *Mobile Location Data 'Present Anonymity Risk'*, BBC News, Mar. 23, 2013, https://www.bbc.com/news/science-environment-21923360 (quoting one author of the *Unique in the Crowd* study explaining its conclusion that "[t]he way we move and the behaviour is so unique that four points are enough to identify 95% of people"). Indeed, identifying specific people is the entire point of deploying a system like this one. When the BPD implausibly insists that its cameras in the sky will not be able to identify individuals, or that its wide-area

17

surveillance will only be used "to capture movements—not people," BPD Presentation at 4–5, it is worth asking why, then, it is implementing this surveillance at all.

Second, it matters not under the Fourth Amendment that some degree of additional legwork may be required to fill in the blanks left by the government's initial acquisition of information. In *Carpenter*, the Supreme Court "rejected the proposition that 'inference insulates a search.'" 138 S. Ct. at 2218 (quoting *Kyllo*, 533 U.S. at 36). There, the government argued that the Constitution had nothing to say about the warrantless collection of cell-phone location information because that data was not especially precise—indeed, that the data was so inexact that it alone could not definitively place the defendant at the crime scene. *See id.* But the Court brushed that argument aside, observing that the government "could, in combination with other information, deduce a detailed log of Carpenter's movements." *Id.* Similarly, here, the BPD will explicitly use its AIR program in conjunction with other powerful surveillance technologies, including CitiWatch and ALPR (as well, presumably, as other data that is either publicly available or accessible to the government, like names and addresses). *See* BPD/PSS Contract 20. Syncing aerial imagery with existing systems to identify individuals and vehicles captured from above will be a straightforward task. Once again, that appears to be the entire point.

Third, even if the resolution of the BPD's cameras today is "one pixel per person," in assessing whether the government's use or exploitation of a certain technology threatens to "shrink the realm of guaranteed privacy," a court must also consider related, existing technologies that could further enhance the government's surveillance capabilities. *Kyllo*, 533 U.S. at 34, 36. Thus, any rule a court adopts in a case involving even "relatively crude" surveillance technology, *id.* at 36, "'must take account of more sophisticated systems that are already in use or in development,'" *Carpenter*, 138 S. Ct. at 2218 (quoting *Kyllo*, 533 U.S. at

18

36), rather than "leave the [public] at the mercy of advancing technology," *Kyllo*, 533 U.S. at 35. Cameras with far more precision and detail than those the BPD plans to use during its 180-day trial, as well as cameras with night vision and infrared capabilities, are just an upgrade away. *See* PSS, NightHawk II, https://www.pss-1.com/nighthawk-ii (discussing camera that provides "affordable nighttime, wide area surveillance" including in "[p]artial moonlight") (attached as Exhibit E to Ramirez Decl.); *see* BPD 3/30 Facebook Live Video at 23:40 (Commissioner Harrison explaining that the "technology has the ability to upgrade the [image] quality").

The BPD's belief that the Fourth Amendment has nothing to say about their decision to send airplanes equipped with video cameras into the sky to indiscriminately compile data, all day and every day, about every movement of the people of Baltimore, is wrong. This norm-shattering use of wide-area surveillance to engage in a constant dragnet of a major American city is, among other things, a Fourth Amendment "search."

> **2.     The warrantless use of wide-area aerial surveillance to collect and track the locations of all Baltimoreans at once is unreasonable under the Fourth Amendment.**

Defendants' adoption of an advanced wide-area aerial surveillance system allows them to engage in a staggering number of warrantless searches, which are "per se unreasonable under the Fourth Amendment." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)); *accord City of Ontario v. Quon*, 560 U.S. 746, 760 (2010); *City of L.A. v. Patel*, 135 S. Ct. 2443, 2452 (2015).

In fact, the BPD's surveillance system will subject all Baltimoreans, including Plaintiffs, to the particular form of search that the authors of the Fourth Amendment found most offensive—those pursuant to the constitutionally repugnant "general warrant." Stretching back to the origins of Anglo-Saxon law, such searches "have long been deemed to violate fundamental

rights. It is plain that the amendment forbids them." *Marron v. United States*, 275 U.S. 192, 195 (1927); *accord Maryland v. Garrison*, 480 U.S. 79, 84 (1987). The "general warrants" that the Framers deplored "specified only an offense," leaving "to the discretion of the executing officials the decision as to which persons should be arrested and which places should be searched." *Steagald v. United States*, 451 U.S. 204, 220 (1981).

Like a search conducted pursuant to a general warrant, Defendant's aerial surveillance system permits searches not predicated upon "an oath or information supplying cause." Morgan Cloud, *Searching Through History; Searching For History*, 63 U. Chi. L. Rev. 1707, 1738 (1996). Like a general warrant, it authorizes surveillance that "survive[s] indefinitely." *Id.* And like a general warrant, it is "not restricted to searches of specific places or to seizures of specific goods." *Id.*; *see Berger v. New York*, 388 U.S. 41, 59 (1967) (striking down electronic-surveillance statute that, like "general warrants," left "too much to the discretion of the officer executing the order" and gave the government "a roving commission to seize any and all conversations" (quotation marks omitted)). Opposition to general warrants "helped spark the revolution itself," *Carpenter*, 138 S. Ct. at 2213, as the Founders considered them to be "'the worst instrument of arbitrary power . . . that ever was found in an English law book,'" *Stanford v. Texas*, 379 U.S. 476, 481 (1965) (quoting American Revolutionary James Otis). Wide-area aerial surveillance, like the general warrants the Founders feared, places unprecedented discretion in law enforcement and does away with the requirement that law enforcement develop some measure of individualized suspicion prior to engaging in a search—here, "monitor[ing] and catalog[ing]" a person's "every single movement . . . for a very long period." *Carpenter*, 138 S. Ct. at 2217; *see Owens ex rel. Owens v. Lott*, 372 F.3d 267, 276–77 (4th Cir. 2004) (holding that a warrant authorizing the search of "all persons" at a single residence violated the Fourth

Amendment because it was "based on nothing more than their proximity to a place where criminal activity may or may not have occurred").

In fact, the BPD's aerial surveillance system is far more offensive to the Fourth Amendment than even the searches conducted pursuant to the general warrants of yore. Rather than conducting a general search of a single individual, the BPD is instead conducting indefinite warrantless surveillance of an entire city full of 600,000 people. Moreover, even a general warrant was—in name, at least—a warrant signed by a judge. But the BPD's system—which aims to follow every Baltimore resident around their city, around the clock—imagines no role for the courts at all.

Government officials may conduct a warrantless search only if one of the "few specifically established and well-delineated exceptions" to the warrant requirement applies. *Gant*, 556 U.S. at 338 (quotation marks omitted); *see United States v. Karo*, 468 U.S. 705, 717 (1984). None do here.

The Supreme Court has explained that warrantless surveillance may be reasonable under the Fourth Amendment where "special needs" render the warrant and probable-cause requirements impracticable and where the "'primary purpose' of the searches is '[d]istinguishable from the general interest in crime control.'" *Patel*, 135 S. Ct. at 2452 (quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000)); *see New Jersey v. T.L.O.*, 469 U.S. 325, 351 (1985) (Blackmun, J., concurring). But to bypass the Fourth Amendment's warrant requirement, then, the government must identify a specific, primary objective that is *distinct* from the kind of ordinary evidence-gathering and deterrence associated with everyday criminal investigation. *See Chandler v. Miller*, 520 U.S. 305, 314 (1997). Courts rigorously enforce this threshold condition, refusing to "simply accept" a government assertion of a "special need," and

"carr[ying] out a close review of the scheme at issue." *Ferguson v. City of Charleston*, 532 U.S. 67, 81 (2001).

For example, in *Edmond*, the Supreme Court considered the legality of a highway-checkpoint program whose "primary purpose" was "unquestionably" the interdiction of illegal narcotics. 531 U.S. at 40. The city argued that because the Court had previously held that other checkpoints (including to detect drunk driving and border smuggling) were lawful under the Fourth Amendment, so was its own. *See id.* at 42 (discussing *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444 (1990); *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976)). But the Court didn't bite. Rejecting any special need, the Court explained that if the Fourth Amendment did not prohibit checkpoints whose primary purpose was to "serve the general interest in crime control," it "would do little to prevent such intrusions from becoming a routine part of American life"— and that was a non-starter. *Id.* Further, the Court rejected the city's plea to treat its narcotics-checkpoint program under the special-needs doctrine because its drug problem was "severe and intractable." *Id.* "[T]he gravity of the threat alone," the Court explained, "cannot be dispositive of questions concerning what means law enforcement officers may employ to pursue a given purpose." *Id.*; *see Maryland v. King*, 569 U.S. 435, 448 (2013) ("Urgent government interests are not a license for indiscriminate police behavior."). Where the government's primary purpose is "the ordinary enterprise of investigating crimes," it may not sidestep the need for a warrant. *Edmond*, 531 U.S. at 44.

A year after *Edmond*, in *Ferguson v. City of Charleston*, 532 U.S. 67 (2001), the Court again rejected a government effort to recharacterize the primary purpose of a warrantless-search regime as something other than ordinary law enforcement. In *Ferguson*, the Court evaluated, against the special-needs threshold, a state hospital program that tested pregnant women for drug

22

use and, upon a second positive test, transmitted test results to the police. *Id.* at 72. While the state identified the program's "ultimate goal" as protecting the health of women and their unborn children, the Court, after "consider[ing] all the available evidence," determined that the "immediate objective of the searches"—and thus their primary purpose—"was to generate evidence *for law enforcement purposes* in order to reach that goal." *Id.* at 81–83. "[T]his distinction," the Court explained, "is critical." *Id.* at 84. "[L]aw enforcement involvement always serves some broader social purpose or objective," and if that were enough, "special needs" would immunize "virtually any nonconsensual suspicionless search." *Id.* But that is not how the Fourth Amendment works.

It may be that Defendants' intentions in implementing their wide-area aerial surveillance system are benevolent and commendable. Baltimore City and its residents (including Plaintiffs) just suffered through their second-deadliest year on record.[47] One of Plaintiffs' central missions is to remedy these and other social ills that impede the quality of life of aggrieved communities in Baltimore, and especially the Black community. *See* LBS Decl. ¶ 7; Bridgeford Decl. ¶¶ 4–8; James Decl. ¶¶ 3–4. But rather than look to new and omniscient forms of governmental monitoring and social control that will fall (as usual) on Black and Brown communities, Plaintiffs understand that these issues are not susceptible to magic solutions. *See* LBS Decl. ¶¶ 8, 11, 18; Bridgeford Decl. ¶ 17; James Decl. ¶¶ 7, 9. Instead, it takes a broad commitment to deep and lasting work—through community-building, youth education, and unapologetic political advocacy—to transform the deep-seated structural arrangements that impede the quality of life of

---

[47] *See* Tim Prudente, *2019 Closes With 348 Homicides in Baltimore, Second-Deadliest Year on Record*, Balt. Sun, Jan. 1, 2020, https://www.baltimoresun.com/news/crime/bs-md-ci-cr-2019-homicide-final-count-20200101-jnauuumukbdh3edsyypspsm3he-story.html.

for people of color in this city and around the country. *See* LBS Dec. at ¶¶ 4–5, 7–9, 12; *see* Bridgeford Decl. ¶¶ 4–8, 17; James Decl. ¶ 9.

The gravity of Baltimore's problems, and the city's need for relief, cannot justify any invocation of "special needs." *See Edmond*, 531 U.S. at 42. The surveillance system's goal is explicitly and straightforwardly to combat crime by identifying suspects for arrest and prosecution. *See* BPD/PSS Contract at 1–2 ("The purpose of this Agreement is for BPD to test out and rigorously evaluate an innovative AIR technology used to assist BPD investigate and reduce violent crime in Baltimore City."). And that is precisely the kind of general law-enforcement purpose—crime prevention and control—that the Supreme Court has time and again rejected as a reason to excuse the government from adhering to the strictures of the Fourth Amendment's warrant requirement.

The upshot is this: the BPD does not have a warrant to engage in wide-area aerial surveillance through the AIR program; the BPD could not lawfully obtain a warrant to engage in that surveillance; and the BPD has no justification to engage in that surveillance without one. For those reasons, its warrantless wide-area aerial surveillance over Baltimore is unreasonable under the Fourth Amendment.

### 3.    The rules regulating the BPD's wide-area aerial surveillance system are unreasonable under the Fourth Amendment.

Even if the BPD were permitted to amass data about every Baltimorean's location without a warrant, their overall scheme—including the procedures they have implemented to collect, store, and analyze that information—must still adhere to the Fourth Amendment's reasonableness requirement. *See Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) ("[T]he ultimate touchstone of the Fourth Amendment is reasonableness." (quotation marks omitted)); *United States v. Bobo*, 477 F.2d 974, 979 (4th Cir. 1973) ("[W]e know that the Fourth

24

Amendment means what it says—unreasonable searches are prohibited."). But the measures Defendants have contractually implemented to cabin the use of their bulk-collected location data fail that test.

Under the Fourth Amendment, reasonableness is determined by examining the "totality of the circumstances" to "assess[], on the one hand, the degree to which [government conduct] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Samson v. California*, 547 U.S. 843, 848 (2006) (quotation marks omitted). If "the protections that are in place for individual privacy interests are . . . insufficient to alleviate the risks of government error and abuse, the scales will tip toward a finding of unconstitutionality." *[Redacted]*, 402 F. Supp. 3d 45, 86–87 (F.I.S.C. 2018) (citing *In re Directives [Redacted] Pursuant to Section 105B of the Foreign Intelligence Surveillance Act*, 551 F.3d 1004, 1012 (F.I.S.C. Rev. 2008)).

First, the BPD's overall scheme fails a test of reasonableness because it fails to interpose "the deliberate, impartial judgment of a judicial officer . . . between the citizen and the police." *Katz*, 389 U.S. at 357 (quotation marks omitted). The Fourth Amendment reflects a judgment that the right to privacy is "too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals." *McDonald v. United States*, 335 U.S. 451, 455–56 (1948). The Supreme Court recognized this principle in *Berger*, where it struck down New York's wiretapping statute as unreasonable even though the state's scheme involved a limited form of court approval. *See* 388 U.S. at 54–55, 56 (explaining that the use of "indiscriminate" surveillance tools imposes "a heavier responsibility" on the courts in supervising the surveillance). Yet the BPD's contract imagines no role of any kind for a court—not before it puts mass surveillance into practice in Baltimore, and not before it accesses the data it collects to

build detailed dossiers about Baltimoreans, including those who aren't suspected of any crime. Simply put, Defendants have written and approved the rules for themselves, and even if those rules provided stronger privacy protections, they would not be enough. *See Riley v. California*, 573 U.S. at 398 ("[T]he Founders did not fight a revolution to gain the right to government agency protocols.").

Second, the rules Defendants have put into place purportedly to protect the individual privacy of the hundreds of thousands of Baltimoreans subject to persistent, wide-area aerial surveillance are as weak as they are vague and incomplete. The initial collection of information under the BPD's system is almost maximally permissive, widespread, and indiscriminate. The BPD's spy planes will intentionally record, on a daily basis, information about every single Baltimorean who steps outside while the planes are in flight. In those circumstances, the Fourth Amendment demands stringent regulation of how that collected information is stored, processed, and utilized by law enforcement on the back end. *See, e.g.*, *In re Directives*, 551 F.3d at 1015 (explaining that because foreign-intelligence surveillance by design reels in communications of United States persons, its lawfulness under the Fourth Amendment is contingent on the existence of minimization requirements that "serve as additional backstop against identification errors as well as a means of reducing the impact of incidental intrusions into the privacy of non-targeted United States persons").

Yet the central protection in Defendants' contract—which lays out a "Privacy Protection Program" over less than a single page—appears to be a promise to delete data that is not packaged by analysts after 45 days. *See* BPD/PSS Contract at 22.[48] As a result, the BPD will

---

[48] Notably, the contract states that data will be "retain[ed]" for 45 days, but it does not explicitly require data to be purged. *See* BPD/PSS Contract at 22. Even if this provision is eventually

have a 45-day rolling log of the movements of every person in Baltimore, linked to information

obtained (also warrantlessly) from BPD's other surveillance networks, including its CitiWatch

ground surveillance cameras and ALPRs. Critically, even beyond these comprehensive logs of

the movements of countless people, including those who merely happened to be near a crime

scene, *see id.* at 20–21, the BPD's data packages encompass not just the tracks and locations of

vehicles and people in the vicinity of a crime scene, but "people and vehicles *that met with*

people who were tracked from the crime scene," both backward and forward in time, *id.* at 20–21

(emphasis added). That means that Baltimoreans—and, given the nature of their work, especially

Plaintiffs, *see* LBS Decl. ¶¶ 12–15; Bridgeford Decl. ¶¶ 10–12; James Decl. ¶¶ 5–6—are likely

to be caught up in those data packages without justification. *See Ybarra v. Illinois*, 444 U.S. 85,

91 (1979) (holding that "a person's mere propinquity to others independently suspected of

criminal activity does not, without more, give rise to probable cause to search that person");

*Owens*, 372 F.3d 267, 276–77. The BPD's procedures even fail to specify a time limit for these

supposedly relevant interactions. If a resident of Baltimore gets lunch with a friend who, two

days later, is present near the commission of a serious crime, would that be enough to be drawn

into a permanently retained "evidence" file, and under the BPD's microscope? The procedures

do not say.

      The AIR program procedures are weak and incomplete for still other reasons. At present,

it appears that the lone mechanism for auditing "unauthorized use of the system" is "self-

report[ing]" by PSS. BPD/PSS Contract at 23. Although the contract with PSS contemplates the

retention of an "Independent Verification & Validation" firm to assess the BPD's use of mass

---

interpreted to constitute a purge requirement, the contract suggests that the 45-day period may be
extended once the program becomes permanent. *See id*.

aerial surveillance, *see id.* at Ex. D, there is no indication that such a firm has been retained, or that its oversight will even be based on effective and scientifically tested means. Not even the physical security of the data pool, which will include information about every single Baltimorean, is accounted for; it is, instead, left to PSS alone to "institute physical, technical and policy systems to ensure the integrity of the data it records in its surveillance and analysis." *Id.* at 22. This raises the question whether those integrity-ensuring systems are already in place, or not. Finally, the contract says nothing about what happens to the data once the contract comes to an end. *Id.* at 21.

If the consequences of the BPD's experimental surveillance system were not so serious, the protocols they have chosen to put in place to manage massive volumes of private information about ordinary Baltimoreans would be laughable. While Defendant's law enforcement interests are of course entitled to some weight in the reasonableness analysis, their contract "acknowledge[s]" that wide-area aerial surveillance's "effect on crime has not been analyzed and is unknown at this time." *Id.* at 18; *see* BPD 3/30 Facebook Live Video at 28:47 (Commissioner Harrison stating that "[t]here is no expectation that this will work"). On the other hand, the privacy intrusions here are both known and substantial—and they operate on an unprecedented scale. The AIR program's procedures fail to ameliorate those harms at either the individual or the collective level—indeed, they are designed to *encourage* the warrantless exploitation of constitutionally protected information. It is not a close question: the BPD's extraordinary intrusions into Baltimoreans' privacy are unreasonable under the Fourth Amendment.

**B.**     **The BPD's wide-area aerial surveillance system violates the First Amendment.**

The use of wide-area aerial surveillance to track and collect location information about Baltimore's residents as they move about—from home to a friend's, to a health clinic, to a

28

protest site, to a church, to a gay bar, and beyond—violates their First Amendment rights to association. For Plaintiffs, this violation is particularly acute, given the political nature of their work and the scrutiny that police may bring to associational activity that seeks to remedy systemic racism and violence in Baltimore and, indeed, in its police force. *See* LBS Decl. ¶¶ 7–8, 10–14; Bridgeford Decl. ¶¶ 11–13, 16; James Decl. ¶¶ 5, 8; *see also* City of Baltimore, City of Baltimore Consent Decree, https://consentdecree.baltimorecity.gov ("court enforceable agreement to resolve [the Department of Justice's] findings that it believed the [BPD] had engaged in a pattern and practice of conduct that violates the First, Fourth, and Fourteenth Amendments to the United States Constitution, and certain provisions of federal statutory law"); Reel, *supra* note 3 (discussing PSS's use of aerial surveillance in 2016, at the BPD's direction, to "monitor[] the city's reaction" to the acquittal of a BPD police officer tried for the murder of Freddie Gray).

Over the last decade, the Supreme Court has made clear that that sustained surveillance of individuals threatens freedom of association even when the surveillance is conducted in public places. *See Carpenter*, 138 S. Ct. at 2217–18 (citing concurring opinions of five Justices in *Jones*, 565 U.S. 400, and the majority opinion in *Riley v. California*, 573 U.S. at 401–03). Government surveillance that substantially burdens First Amendment rights, as the BPD's wide-area aerial surveillance program does, must survive "exacting scrutiny." *See, e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 64 (1976); *In re Grand Jury Proceedings*, 776 F.2d 1099, 1102–03 (2d Cir. 1985) (grand jury subpoena); *Clark v. Library of Cong.*, 750 F.2d 89, 94 (D.C. Cir. 1984) (FBI field investigation); *Master Printers of Am. v. Donovan*, 751 F.2d 700, 705 (4th Cir. 1984). It is constitutional only if it serves a compelling state interest and only if it is the "least restrictive

29

means" of achieving that interest. *See, e.g.*, *Clark*, 750 F.2d at 94–95, 98. The BPD's system fails this standard.[49]

First, the BPD's aerial surveillance system substantially impairs Plaintiffs' First Amendment rights because it exposes their private associations to government monitoring and scrutiny. Every time Plaintiffs leave their homes, the BPD will have a record of where they went, when, how long they stayed, who they were there with, and where they went next. That is, in fact, the very purpose of the surveillance. *See* BPD/PSS Contract at 20–21. The system impairs Plaintiffs' right of associational privacy by placing a record of all of their sensitive movements in the hands of the police. The scope of the BPD's surveillance system far exceeds that of the government surveillance that led to the Supreme Court's seminal associational-privacy cases, *NAACP v. Alabama*, 357 U.S. 449, 462 (1958); *Bates v. City of Little Rock*, 361 U.S. 516 (1960); and *Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539 (1963). While those cases involved demands for specific organizations' membership rolls, the information that the BPD is now gathering yields a much richer web of private associational information about Plaintiffs and

---

[49] When searches substantially burden First Amendment rights, a warrant is required. *See, e.g.*, *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (holding that First Amendment interests should be protected by applying Fourth Amendment warrant standards with "scrupulous exactitude" (quotation marks omitted)); *New York v. P.J. Video, Inc.*, 475 U.S. 868, 877–78 (1986) (holding that a warrant was an adequate constitutional safeguard for a search of expressive materials); *see also* Daniel Solove, *The First Amendment as Criminal Procedure*, 82 N.Y.U. L. Rev. 112, 154, 159 (2007) (First Amendment procedural protections apply when there is a "chilling effect," and "a warrant supported by probable cause will, in most cases, suffice to satisfy the narrow tailoring requirement").

But even where searches comply with the Fourth Amendment, they may violate the First. *See, e.g.*, *Tabbaa v. Chertoff*, 509 F.3d 89, 102 n.4 (2d Cir. 2007) ("Our conclusion that the searches constituted a significant or substantial burden on plaintiffs' First Amendment associational rights is unaltered by our holding that the searches were routine under the Fourth Amendment. . . . [D]istinguishing between incidental and substantial burdens under the First Amendment requires a different analysis, applying different legal standards, than distinguishing what is and is not routine in the Fourth Amendment border context.").

other Baltimoreans. It supplies a comprehensive map of the sensitive associational ties embedded

in Plaintiffs' everyday lives and community-based work. *See* LBS Decl. ¶¶ 10–18; Bridgeford

Decl. ¶¶ 10–16; James Decl. ¶¶ 5–8.

The Supreme Court's decision in *Shelton v. Tucker*, 364 U.S. 479 (1960), is instructive.

In that case, the Court found that First Amendment rights were substantially burdened by an

Arkansas law requiring teachers to "disclose every single organization with which [they had]

been associated over a five-year period." *Id.* at 487–88. In *Shelton*, the Second Circuit later

observed, the Supreme Court "adopted a commonsense approach and recognized that a chilling

effect was inevitable if teachers who served at the absolute will of school boards had to disclose

to the government all organizations to which they belonged." *Local 1814, Int'l Longshoremen's*

*Ass'n, AFL-CIO v. Waterfront Comm'n of N.Y. Harbor*, 667 F.2d 267, 272 (2d Cir. 1981). The

chilling effect is equally inevitable here.

Second, the BPD's aerial surveillance program fails exacting scrutiny because it is the

very definition of indiscriminate—the BPD is collecting all Baltimoreans' location information

because some tiny fraction of them may become useful to an investigation at some point in the

future.[50] Courts have rejected investigative efforts that were far more targeted than the one at

issue here. In *Local 1814*, the Second Circuit narrowed a subpoena for payroll records after

concluding that the subpoena would otherwise have an "inevitable chilling effect" on

---

[50] While it was part of a statutory holding rather than a constitutional one, the Second Circuit's
conclusion in *ACLU v. Clapper*, 785 F.3d 787 (2d Cir. 2015), a challenge to the National
Security Agency's bulk collection of Americans' phone records, is pertinent: "[T]he government
takes the position that the metadata collected . . . are nevertheless 'relevant' because they may
allow the NSA, at some unknown time in the future, utilizing its ability to sift through the trove
of irrelevant data it has collected up to that point, to identify information that is relevant. We
agree with appellants that such an expansive concept of 'relevance' is unprecedented and
unwarranted." *Id.* at 812 (footnote omitted).

constitutionally protected activity. 667 F.2d at 273–74. The modification, the Court held, would "appropriately limit the impairment of . . . First Amendment rights without compromising the [government's] legitimate investigative needs." *Id.* at 274.

The Supreme Court's analysis in *Shelton* is again illuminating. There, the Court characterized the law at issue as "completely unlimited" because it required teachers to "list, without number, every conceivable kind of associational tie—social, professional, political, avocational, or religious." 364 U.S. at 488. An inquiry into those associations could not be justified, the Court held, particularly when so many of them "could have no possible bearing" on the interests the government was seeking to protect. *Id.*; *see Bursey v. United States*, 466 F.2d 1059, 1083 (9th Cir. 1972) (affirming refusal to answer grand jury questions on First Amendment grounds), *overruled in part on other grounds*, *In re Grand Jury Proceedings*, 863 F.2d 667, 669–70 (9th Cir. 1988); *In re First Nat'l Bank*, 701 F.2d 115, 119 (10th Cir. 1983) (remanding for evidentiary hearing to determine whether subpoena would chill associational rights and, if so, whether breadth of subpoena could be limited). Indeed, in this case the First Amendment analysis is more straightforward than it was in *Shelton*. It is plain that the BPD, whose surveillance system imposes a quintessentially "unlimited and indiscriminate sweep," *Shelton*, 364 U.S. at 490, could advance its law enforcement objectives through less intrusive means.

Mass surveillance is designed to uncover private association, and the BPD's aerial surveillance program threatens to do that all too well. Because the BPD's AIR program will substantially burden Plaintiffs' First Amendment rights without justification, it is unconstitutional.

32

**II.      Plaintiffs will suffer irreparable harm as a result of the BPD's wide-area aerial surveillance system.**

Unless enjoined, the BPD's wide-area aerial surveillance system will cause irreparable harm to Plaintiffs. First and foremost, the BPD's system violates Plaintiffs' constitutional rights, which alone constitutes manifest, irreparable harm. *See, e.g.*, *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) ("[I]n the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim."); *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ("It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" (*quoting Elrod v. Burns*, 427 U.S. 347, 373 (1976))). And even if further demonstration of irreparable harm were required, such a requirement is surely met by evidence that the BPD's surveillance will burden Plaintiffs' and others' associational and expressive activity, particularly that of marginalized groups. *See* LBS Decl. ¶¶ 10–18; Bridgeford Decl. ¶¶ 10–16; James Decl. ¶¶ 5–8.

**III.     The balance of equities favors granting preliminary injunctive relief.**

The balance of equities also weighs heavily in favor of an injunction. While Plaintiffs will suffer significant harm in the absence of an injunction as the BPD compiles video of their daily movements, Defendants face little, if any, injury from its issuance. As the Fourth Circuit has recognized, government officials are not harmed by the issuance of a preliminary injunction which prevents the state from implementing a likely unconstitutional practice. *See Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013) (quoting *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)); *see also Rodriguez v. Robbins*, 715 F.3d 1127,

33

1145 (9th Cir. 2013) (explaining that the government "cannot suffer harm from an injunction that merely ends an unlawful practice").

Moreover, the injunction sought will impose no affirmative obligation, administrative burden, or cost upon Defendants. It will only pause implementation of their pilot program and maintain the status quo while the Court assesses its constitutionality. Furthermore, one of Defendants' explicit goals in implementing this experimental pilot surveillance system is to enable BPD to collect and "to test and rigorously evaluate" data to determine whether to permanently implement wide-area aerial surveillance over Baltimore. BPD/PSS Contract at 1–2. But the data collected over the coming months will be of practically no value due to the present circumstances of the COVID-19 pandemic. *See* Maryland Pandemic Orders, *supra* note 36. Under Maryland's stay-at-home order, movement and activity are greatly reduced throughout Baltimore. Under these circumstances, the collection of data regarding the impact of the AIR program on the city's crime rates is effectively meaningless if meant to inform analyses of its causal impact on crime rates during times of ordinary city life. *See* BPD Presentation 9–10 (discussing "measures of success" upon which the BPD will evaluate the trial period).

## IV.    The public interest favors granting preliminary injunctive relief.

Finally, preliminarily enjoining the BPD's wide-area aerial surveillance program is manifestly in the public interest. It is a well-established principle that "upholding constitutional rights surely serves the public interest." *Bason*, 303 F.3d at 521. Plaintiffs' constitutional rights, and those of every other Baltimorean, will be violated by Defendants' aerial surveillance system, and an injunction is the only way to protect them.

**CONCLUSION**

For the foregoing reasons, this Court should enjoin Defendants' AIR program—

specifically, by prohibiting the BPD from collecting or accessing any images of Baltimoreans

through wide-area surveillance.

April 9, 2020                                        Respectfully submitted,

Brett Max Kaufman*                                   /s/ David. R. Rocah
Ashley Gorski*                                       David R. Rocah (Bar No. 27315)
Alexia Ramirez*                                      American Civil Liberties Union Foundation
Nathan Freed Wessler*                                  of Maryland
Ben Wizner*                                          3600 Clipper Mill Road, Suite 350
American Civil Liberties Union Foundation            Baltimore, MD 21211
125 Broad Street, 18th Floor                         T: 410.889.8555
New York, NY 10004                                   F: 410.366.7838
T: 212.549.2500                                      rocah@aclu-md.org
F: 212.549.2654
bkaufman@aclu.org
agorski@aclu.org
aramirez@aclu.org
nwessler@aclu.org
bwizner@aclu.org

* *pro hac vice* application forthcoming           *Counsel for Plaintiffs***

---

** Counsel thanks Tiffany Wong and David E. Wechsler, students in the New York University
School of Law's Technology Law & Policy Clinic, for their contributions to this brief.