# UNITED STATES DISTRICT COURT

# DISTRICT OF MARYLAND

| | |
|---|---|
| LEADERS OF A BEAUTIFUL STRUGGLE *et al.*,<br><br>        *Plaintiffs*,<br><br>   v.<br><br>BALTIMORE POLICE DEPARTMENT *et al.*,<br><br>        *Defendants*. | Civil Action No. 20-929 |

## DECLARATION OF DAYVON LOVE

I, Dayvon Love, declare:

1.　　I am a resident of Baltimore, Maryland, and I am over the age of eighteen. I have personal knowledge of the facts stated in this declaration and if called to testify I could and would testify competently thereto. I am providing this declaration in my capacity as Director of Public Policy at Leaders of a Beautiful Struggle ("LBS").

2.　　I am currently the Director of Public Policy at LBS, a position I have held since I co-founded the organization in 2010. I am also a co-author of several publications including *The Black Book: Reflections from the Baltimore Grassroots*, a collection of essays that describe important issues facing grassroots activists and organizers in Baltimore, and *When Baltimore Awakes*: *An Analysis of the Human & Social Service Sector in Baltimore City*, a critique of the human/social service sector in Baltimore. I am a second-generation resident of Baltimore and I have long been involved in the

community. Prior to starting LBS, I was a Baltimore high school teacher, a legislative aide at City Hall, a community center volunteer, and a debate coach.

3.      My work as Director of Public Policy at LBS primarily involves engaging with elected officials, organizing community stakeholders, producing materials to help in our advocacy work, and generally navigating the political terrain in Baltimore. My day-to-day work varies greatly. I focus some days on researching and tracking political dynamics, which includes identifying what policies elected officials and major institutions plan on proposing or implementing. This research informs my development of long-term strategies to advance LBS's policy goals and advocacy campaigns. Other days are spent attending community meetings and talking one-on-one with individuals to get a sense of what people in Baltimore are doing and thinking. I also often meet with and advise local organizations, such as the Baltimore City Children and Youth Fund. And, when the Maryland General Assembly is in session, my role shifts to focus on more direct political advocacy and lobbying.

I.    **Background**

4.      LBS is a Baltimore-based grassroots think-tank founded in 2010 that advances the public policy interests of Black people in the city, through youth leadership development, political advocacy, and autonomous intellectual innovation. LBS is currently organized as a limited liability company, and has a leadership team consisting of a Chief Executive Officer, a Chief Operating Officer, a Director of Public Policy, a Director of Research, a Cultural Curator, an Events and Projects Manager, and a Bookkeeper. We are a Black independent group of concerned leaders engaging the public

policy arena, and we are unbeholden to any foundation, nonprofit, or political party. LBS seeks to radically change the discourse around local and regional politics by injecting community voices into political conversations through policy research, advocacy, and community organizing from a grassroots perspective.

5.      LBS is a public policy entity positioned to effectively address the complex issues facing Black Baltimore residents in every arena of civil society. LBS is also a Black research institution that combines academic rigor, tactical vision, accessible communication, and a Black Power framework. Additionally, LBS organizes and facilitates youth leadership programming that connects policy debate and social justice to the development of positive self-identity for Black youth.

6.      LBS has 360 sustainers who donate monthly to our organization, an email list with approximately 10,000 names, and a Facebook page with approximately 11,000 followers.

7.      A central focus of LBS's work is addressing historic and structural impediments to Black people's quality of life, including poverty, violence, and white supremacy in the American political and socio-economic order. To this end, we have been heavily involved in policing reform and have spearheaded numerous legislative efforts aimed at policing accountability. For example, we helped pass Christopher's Law, which requires police officers to be trained in CPR, cultural sensitivity, the proper use of force, and interacting with the physically and mentally disabled. During the 2019 Maryland General Assembly, we vigorously fought the creation of a private police force at Johns Hopkins University.

And during the 2020 Maryland General Assembly, we supported bills focused on restricting police use of force, reforming Maryland's Law Enforcement Officer Bill of Rights to increase police accountability, and amending Maryland's public records law to increase transparency and accountability in how departments address police misconduct.

8.      Related to our work on policing reform, LBS has frequently voiced concerns about the use of surveillance technologies against Black communities. Following the police violence and protests in Ferguson, Missouri, LBS cautioned against deploying body cameras as a mechanism of policing reform and transparency, and encouraged discourse about how body cameras can be abused. In 2016, LBS was a prominent critic of the Baltimore Community Foundation's decision to serve as a conduit to fund the secret aerial surveillance trial in Baltimore. LBS has also spoken out against the BPD's use of persistent aerial surveillance. And LBS has organized public presentations to inform community members and activists about surveillance technologies.

9.      In addition to our direct political activity, LBS also strives to support activists within our community. Our Malcolm X Talks draw significant attention throughout the year and we are tremendously proud of our collaborations and continued partnerships with local leaders and institutions. We also teach future activists through our civic engagement trainings and our past Eddie Conway Debate Institute. As a result, we have cultivated an extensive network of activists in Baltimore who are now leading their own work within the Baltimore community. We also regularly hold Black Power Happy Hours

which are social gatherings to network with our supporters at Black-owned
establishments.

**II.    The Impact of the AIR Program's Wide-Area Aerial Surveillance on LBS**

10.    The BPD's wide-area aerial surveillance system (the "AIR program") threatens
LBS's ability to associate with others and organize politically, free from unwarranted
government scrutiny. As an organization, we have been very outspoken in our criticism of
Baltimore law enforcement practices. We suspect that our public events are already
subject to BPD monitoring, and we worry about a new surveillance system that would
give the BPD more tools to surveil our activities, as well as the individuals and groups
with whom we associate.

11.    Additionally, LBS is gravely concerned about the historic role surveillance has
played in enabling the government apparatus to target and harm organizations with our
sensibilities. Federal agencies have worked in collaboration with local law enforcement
to surveil political dissenters throughout our country's history. The FBI's COINTELPRO
is but one harrowing example of how surveillance has been used by the government to
harm and silence outspoken individuals like us. We are adamantly opposed to a program
that gives law enforcement new and improved tools to watch and potentially harm people
who challenge the dominant social order and power structure.

12.     If the AIR program is permitted to proceed, it will undermine and significantly
burden LBS's work. An important component of our work is maintaining close proximity
to the communities we represent in order to prioritize the needs of the community in our

agenda-setting. This requires LBS staff to travel throughout Baltimore by foot, by bus, and by car.

13.     Although our connection to the Baltimore community is one that is highly and mutually beneficial and productive, the AIR program will necessitate a tempering of that connection and will affect how we move about in the community. By capturing information about everywhere LBS staff go, the AIR program will capture extensive information about LBS's activities and associations. We will have to be more cognizant of the individuals and groups with whom we associate because many of our relationships are private and sensitive. The nature and extent of these relationships are also private and sensitive. Knowing that our movements are being recorded every time we move about in public would force us to change our behavior in order to maintain the privacy of our relationships, including by altering the means by which we travel and the timing of certain meetings in which we take part. This effort will divert time and staff resources from other LBS work. We would not wish to disclose any such relationships to law enforcement or the government for fear of retaliation against our community members based on their vocal dissent or criticism. We do not want to put other people at risk by revealing to the government that they are working or associating with a group like ours.

14.     Additionally, we expect that some of our present and future partners will decide not to engage with us or be around us because the government will always be watching. Sadly, in certain political arenas, an association with LBS is a professional death sentence. Many people will not want to subject themselves to the scrutiny and risks that

accompany being associated with our organization, which is why we keep many of our associations and relationships private.

15.     The BPD's AIR program will not only disrupt our work, but it will also generate information that could be weaponized against us in the future. We constantly worry about the way our activities might be used against us. And we worry that the AIR program will increase opportunities for that to happen.

16.     The BPD's AIR program will have a tremendous chilling effect on individuals and organizations in the Baltimore community, including LBS. Already, we know that many people are frightened of the implications of challenging the status quo in our city. Increased, pervasive surveillance would amplify the challenges we already encounter in organizing people to take the political steps necessary to achieve progress.

17.     Additionally, if this technology becomes permanently adopted by the BPD, LBS is concerned by the AIR Program's lack of oversight and accountability mechanisms. One only needs to look to the BPD's brief, secret aerial surveillance trial with Persistent Surveillance Systems in 2016 to see how the program can be misused. For example, the most common offense the secret trial was used to identify was traffic accidents—not the violent crime that the BPD publicly claims as the justification for aerial surveillance. Likewise, the planes were deployed during the Freddie Gray trials to monitor protest activity because the City and the BPD were concerned the trial verdicts would lead to unrest.

18.     Not only does the AIR Program present the risk of misuse, it would also supercharge the tools that already contribute to the racial disparities that exist in Baltimore with respect to policing. The wide-area aerial surveillance program is linked to existing surveillance systems, such as CitiWatch surveillance cameras and automatic license plate readers, to monitor and identify people. These existing systems are overwhelmingly located in Black neighborhoods in Baltimore and the Downtown Business District. Because the BPD will grant PSS access to these systems in conjunction with the AIR program and link data between all of them, the BPD's new aerial surveillance system will disproportionately affect these areas. LBS believes the wide-area aerial surveillance program will only further exacerbate the tensions and lack of trust that exists in Baltimore between marginalized communities and law enforcement.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this ___7 day of April, 2020.

_____
Dayvon Love