## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| LEADERS OF A BEAUTIFUL STRUGGLE *et al.*,<br><br>    *Plaintiffs*,<br><br>    v.<br><br>BALTIMORE POLICE DEPARTMENT *et al.*,<br><br>    *Defendants*. | Civil Action No. 20-929 |

### DECLARATION OF KEVIN JAMES

I, Kevin James, declare:

1. I am a resident of Baltimore, Maryland, and I am over the age of eighteen. I have personal knowledge of the facts stated in this declaration and if called to testify I could and would testify competently thereto.

**I.   Background**

2. I have lived in Baltimore County and City for nineteen years. I moved to Baltimore in 2001 to teach at one of the local city high schools through Teach for America. After my time with Teach for America, I decided to stay in Baltimore and have since become deeply involved in the community. I have been a committed activist and community organizer since that time. I volunteered for many years with the Baltimore Algebra Project to advocate for a number of issues that face Baltimore youth, such as increasing funding for schools and extending the hours students could use bus passes. I have also been involved with many grassroots movements in Baltimore, and I have worked with organizations such the Baltimore Algebra Project, the United Workers, and the Right to Housing Alliance in Baltimore. Additionally, I am a former trained paramedic and have periodically volunteered as an Emergency Medical Technician in

Baltimore County. During the Baltimore Uprising in 2015, I volunteered as a street medic during the protests.

3. Currently, I work full-time for an IT company and, in my spare time, I remain committed to serving the Baltimore community. I have focused recently on advocating and educating the Baltimore community about mental health and racial justice issues. I and fellow advocates organize meetings and workshops to educate community members about mental health issues and create opportunities to reduce the associated stigma. I am also involved in advocacy and protests to call for equitable and fair treatment of immigrants and marginalized groups within our community.

4. Additionally, I am the hip-hop artist known as Son of Nun. My music is an opportunity for me to convey messages about power, freedom, racism, and community. Through my songs, I try to hold Baltimore institutions accountable and empower the Baltimore community. I have released two albums, *The Art of the Struggle* and *Blood and Fire*, and I am currently working on my third. I have a committed following of listeners within the Baltimore community. Over the last 17 years, I have had the privilege of performing at numerous local events that showcased various social justice issues, such as obtaining equitable pay for workers, increasing policing accountability, and abolishing the death penalty. I have also shared the stage with activists, such as exonerated former death row inmates Shujaa Graham and Darby Tillis, Black Lives Matter student leader Makayla Gilliam-Price, and the late historian Howard Zinn. My commitment to organizing and improving the Baltimore community influences and shapes my music. At the most basic level, I try to convey through my art that everyone should have access to justice and equality; there is no reason to deny people access to such treatment based on their nationality or any other arbitrary descriptor.

## II.     The Impact of the AIR Program's Wide-Area Aerial Surveillance

5.     The BPD's wide-area aerial surveillance system (the "AIR program") threatens my ability to move about in public, associate with others, and organize politically, free from unwarranted government scrutiny. Ordinarily, most days I am out of the house by 7:00 am and I spend the day in public, driving along public roads to my job, meeting friends to get dinner in neighborhoods like Charles Village or Montebello, and visiting the Tubman House community garden. I also spend time each day in the front yard and the area immediately behind my home. And I frequently participate in protests and community events throughout Baltimore that necessarily require me to leave my home. I cannot avoid leaving my home, nor should I have to make that choice to remain free from unjustified government surveillance.

6.     Under the AIR program, the BPD has broad power to develop specific reports on people who merely meet others who are in the vicinity of the four target crime scenes (i.e., murder, non-fatal shooting, armed robbery, or car-jacking). Ordinarily, as part of my community organizing and engagement, I often visit and speak with people in Tubman House and the Gilmor Homes. Given the high rate of violent crime in these areas, I believe that, during the operation of the program, I will be in the vicinity of a crime scene involving one of the four target crimes, or I will meet with individuals who were in the vicinity of one such crime scene. Accordingly, if the AIR program is permitted to go forward, I believe that the program will generate an individualized report about me.

7.     I am personally concerned by the AIR program's Orwellian nature. The City and the BPD may claim that if you are not doing anything wrong, you do not have anything to worry about. But that claim is clearly disproven by the countless historic examples where the government used surveillance to oppress politically threatening groups. I am troubled by the BPD being given this extremely powerful new tool with which they can harass people. As a

result, the implementation of the program will certainly give me pause, make me hyper-cognizant of my movements, and make me feel less free. It is disquieting to know someone is watching you all the time—it is dark, sinister, and unjust.

8. Additionally, if the BPD's wide-area aerial surveillance program is permitted to proceed, it will undermine and significantly burden my political advocacy and organizing. I will have to be more aware of and deliberate about whom I meet and associate with, whether in my home or elsewhere, because all of my associations will be captured by the BPD. I will have to spend time deliberating about whether those associations could result in unwarranted government scrutiny. And as I recruit individuals to participate in community events, protests, and rallies, I will be obligated to tell them about the AIR program and explain the risks the program poses. Typically, when I talk with individuals about participating in community or political events, we have only a limited about of time to discuss the event or issue. The time I spend explaining the AIR program will often reduce the time available for our substantive discussion. In addition, I believe the AIR program will result in fewer people being willing to participate in several of the community events, protests, and rallies for which I'm recruiting them, and that people will be more hesitant to participate in political dissent.

9. I am also deeply worried by the effect the AIR program will have on the already-frayed relationship between the Baltimore community and the BPD. Surveilling everyone, all day, every day, is not going to help that relationship at all. Commissioners and officers should be standing up to this and recognizing that this will undermine the relationships they are trying to build. The answer to improving community relationship with law enforcement is not more surveillance, but building actual relationships and creating actual accountability for abuses by police. Rather than investing in surveillance, the City of Baltimore should be investing in schools and healthcare—for the people of Baltimore.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 8th day of April, 2020.

_Kevin James_
Kevin James