**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

LEADERS OF A BEAUTIFUL
STRUGGLE, *et al.*

     *Plaintiffs,*

  v.

BALTIMORE POLICE DEPARTMENT,
*et al.*,

     *Defendants.*

Case No.  RDB-20-0929

**BALTIMORE POLICE DEPARTMENT AND POLICE
COMMISSIONER MICHAEL S. HARRISON'S RESPONSE
<u>IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION</u>**

DANA P. MOORE
Acting City Solicitor
ELISABETH S. WALDEN
KARA K. LYNCH
Baltimore City Department of Law
100 N. Holliday Street, Suite 100
Baltimore, Maryland 21202
T: 410.396.3659
F: 410.659.4077

*Counsel for Baltimore Police Department
and Police Commissioner Michael S.
Harrison*

Dated:  April 15, 2020

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTS .............................................................................................................................. 2

STANDARD OF REVIEW ................................................................................................. 9

ARGUMENT .................................................................................................................... 9

   I.   Plaintiffs Are Not Likely To Succeed On The Merits.................................................. 11

      A.  The AIR pilot program does not offend the Fourth Amendment. ........................... 11

         1.  The operation of the AIR pilot does not effectuate a "search" within the meaning of the Fourth Amendment. ..................................................................................... 11

            i.    Aerial photography and surveillance is not a search. ................................. 12

            ii.   Observation of public movements is not a search. ..................................... 14

            iii.  Plaintiffs' reliance on *Carpenter* is misplaced.......................................... 16

         2.  Plaintiffs do not have standing to challenge the AIR program. ............................ 21

      B.  Plaintiffs cannot prevail on a First Amendment claim because they lack standing. . 23

   II.  No Person Will Suffer An Irreparable Injury If The AIR Pilot Proceeds ...................... 27

   III.  The Public Interest Favors Proceeding With The AIR Pilot Because It May Assist In Abating Serious, Violent Crime ................................................................................... 28

   IV.  The Balance Of Hardships Favors Proceeding With The AIR Pilot .............................. 30

Defendants Baltimore Police Department ("BPD") and Police Commissioner Michael S. Harrison, through undersigned counsel, hereby file their response in opposition to Plaintiffs' Motion for a Temporary Restraining Order & a Preliminary Injunction (Dkt. No. 2).  Contrary to Plaintiffs' assertions, BPD's operation of the Aerial Investigation Research ("AIR") pilot program is entirely consistent with constitutional principles.  There is no basis for this Court to impose the extraordinary relief that Plaintiffs seek and their Motion should be denied.

## INTRODUCTION

BPD and the City itself currently have a remarkable opportunity.  As the City suffers persistently high levels of violent crime, philanthropic funding in excess of $3.6 million has made it possible for BPD to evaluate adding a potential investigatory tool for its detectives to use in combatting the most serious of violent crimes.  The primary ambition of the AIR program is to provide BPD detectives investigating homicides, shootings, and armed robberies (including carjackings) an additional source of investigative leads – the route travelled to and from the crime scene by people who were present for the crime, and as such are likely witnesses or potential suspects.

The pilot program will be operated by BPD's vendor, and works by taking sequential aerial photographs over Baltimore at a resolution of roughly one pixel per person.  At this resolution, it is impossible to discern personal characteristics from the photo.  The system is also limited to 12 hours of continuous data collection, and then only during daylight hours under favorable weather conditions.  If aerial data is available, though, the vendor can employ its proprietary technology to map the movement of dots to or from the scene of a qualifying crime.  Based on these routes, conventional, ground-based, imaging resources such as Citiwatch cameras and license plate readers may be able to identify the suspects or witnesses present at a crime scene.

Though aerial photography is hardly new technology – and its constitutional legitimacy hardly subject to debate – this application has never been systematically evaluated.  The purpose of the pilot program is to learn, through objective third party research, whether AIR is effective in helping detectives solve the most serious violent crimes that plague Baltimore City.  Upon conclusion of the pilot program, and informed by the recommendations of multiple independent research partners, BPD will determine whether, and if so how, the AIR program will continue.

There is no violation of constitutional rights in taking low-resolution aerial photography for short time windows and using that data to develop leads in the investigation of violent crimes. At bottom, this lawsuit is driven by Plaintiffs' different – in their view, better – ideas of how BPD should respond to the epidemic of violent crime in Baltimore.  What tactics BPD should use, and what strategies it should pursue, are policy decisions properly entrusted to the Police Commissioner.  The Court should decline Plaintiffs' invitation to supplant his judgment, as this would deny BPD the opportunity to explore a potentially useful tool in the City's crime fight against violent crime.

## **FACTS**

On April 1, 2020, the Board of Estimates[1] approved and authorized the execution of a professional services agreement between BPD and a private contractor for the purpose of conducting the AIR pilot program.[2]  This approval came one week after the agreement's first

---

[1] Currently, the Baltimore City Board of Estimates consists of five voting members: The Mayor, President of the City Council, the Comptroller, the Acting City Solicitor, and the Acting Director of Public Works. The President of the City Council serves as President of the Board of Estimates, and the City Comptroller serves as Secretary to the Board.

[2] The approved agreement (herein, "Agreement") is Exhibit B to the Declaration of Alexia Ramirez in support of the Motion.  For convenience, page citations to the Agreement refer to the page number listed in the ECF header.

appearance on the Board's agenda, when consideration was postponed to allow for consideration

of a protest lodged by counsel for Plaintiffs in this action.  The Agreement outlines the salient

features of the AIR pilot program, the purpose of which is to evaluate the extent to which AIR

may assist BPD in solving and closing some of the most violent crimes in Baltimore City –

murders, shootings, and armed robberies (including carjackings).  Agreement, p. 21.  Although the

budgeted cost of operating for the pilot period exceeds $3.6 million, philanthropic funds will

support the full cost of the AIR pilot resulting in no cost to City taxpayers.  *Id.* at 4, 29.

The pilot program will run for approximately six months during which time the contractor

will fly three aircraft over Baltimore City collecting imagery data approximately 12 hours per day,

during daylight hours.  *Id.* at 18-19; Decl. of Ross McNutt, Ph.D. (attached as Exh. A), ¶ 5.  The

aircraft will take wide-angle photographs at a resolution limited to one pixel per person.[3]

Agreement, p. 22.  At this resolution, a person is represented by a single dot.  The system cannot

determine any personally identifiable characteristic, including a person's ethnicity, gender, or

clothing, nor features of vehicles.  *Id.*  No infrared or night vision technology will be used and the

ability to capture usable data will be weather dependent.  *Id.*

Once collected, images will be transmitted from the aircraft to ground stations operated by

the contractor.  *Id.*  These facilities are staffed by roughly 35 vendor employees, most residents of

the Baltimore area, who have been extensively background checked and trained as analysts or

support the program in other capacities.[4]  *Id.* at 9-10; McNutt Decl., ¶ 9. The data is then accessed

---

[3] Examples of the imagery captured in connection with the AIR pilot program can be found at
pages 7 and 8 of BPD's Community Education Presentation, attached as Exhibit A to the
Declaration of Alexia Ramirez in support of Plaintiffs' Motion.

[4] The contractor's strict privacy policies are not limited to rigorously investigating the
background of employees who will handle the AIR data.  McNutt Decl., ¶ 18.  All analysts are
trained and agree to follow privacy policies that have been modeled on industry best practices
and incorporate input from a wide range of organizations.  *Id.*  As part of the privacy program,

only after receiving a case number related to a murder, non-fatal shooting, armed robbery, or carjacking.[5]  Agreement, p. 1.  AIR technology categorically will not be used to seek out criminal activity.  *Id.* at 1; McNutt Decl., ¶ 11.  Indeed, the contractor does not have the authorization, or even ability, to conduct real-time surveillance.  Agreement, p. 24.  Rather, the program can be employed, and the collected images reviewed, only when an egregious violent crime is already known to have occurred for the purpose of developing investigative leads.  *Id.* at 1.

Then, the AIR contractor can examine the images and "tag" vehicles or individuals that were near the crime scene.  McNutt Decl., ¶ 12.  Human analysts then manually track the "tagged" moving dots (which represent individuals and vehicles) to and from the incident location, including over sidewalks and roads in public places.  *Id.*  The contractor can use these images to patch together the movements of the tagged dots subject to some substantial limitations.  *Id.*, ¶¶12-13.  For example, if a dot representing a person enters a structure, it is beyond the capability of the technology to know whether a dot leaving that structure is the same or a different person.  Likewise for a car entering a parking garage.  *Id.,* ¶ 13.  Further, the continuity of any tracking is necessarily cut off each evening when data collection for the day ends.  *Id.*, ¶ 14.  Lacking information about the movements of people or vehicles during the time that flights are not in operation it is not

---

the AIR contractor provides internal oversight of its analysts and will report weekly, monthly, and quarterly their activities and their findings of any unauthorized activity.  *Id.*  Every activity of the analysts is recorded and tracked, and must be traceable to an authorized investigation.  *Id.*  The contractor analyzes the locations and tracks made by all analysts for unauthorized viewing activity and provides these tools to BPD and external partners to facilitate appropriate oversight.  *Id.*

[5] The Agreement does allow for use of the technology in extraordinary and exigent circumstances upon written request of the Police Commissioner.  *Id.* at 21.  It is anticipated that this authority will be rarely, if ever, used.  In any event, any use of the AIR technology pursuant to this provision will be reported to the independent evaluators whose public reporting is discussed at p. 6-7.

possible to stitch imagery together to track the same subject day after day. *Id.* Additionally, because the process is time intensive, requiring one hour of labor for every two hours of tracked activity, the number of incidents the contractor can analyze is limited. *Id.*, ¶ 12.The program captures movement; it cannot capture, look for, or track a named individual or specific vehicle.

The contractor will provide detectives investigating a target crime with an investigative briefing within 18 hours, which includes imagery analysis, the location and timing of the crime, the observable actions at the crime scene, the tracks of vehicles and people to and from the crime scene and locations visited before and after the crime. *Id.,* 15; Agreement, p. 23. A more detailed report will be provided within 72 hours, which will include information regarding relevant ground-based cameras (for example, Citiwatch and license plate readers) along the routes taken to or from the crime scene and video images of people or vehicles taken as they passed by, if available. *Id.* at 23-24. BPD will not directly access the raw photographic data, and intends to use the imagery and reports provided by the contractor solely for the purpose of investigating the target crime for which it was requested. *Id.* at 24; McNutt Decl., ¶ 16. The contractor is prohibited from using data collected during the AIR pilot for any purpose other than facilitating investigations as described in the Agreement and assisting prosecutors and defense counsel in criminal prosecutions. Agreement, p. 24-25.

If the AIR images are used for an investigatory purpose, they will be compiled into information packets and become part of the permanent case file. *Id.* at 22. As with all evidence, it will be produced to the prosecution and made available to the defense through discovery requests consistent with the prosecution's *Brady* and *Giglio* obligations. *Id.* Any imagery not identified as relevant to a criminal investigation and reduced to an evidentiary packet will be destroyed after 45 days. *Id.* at 25, McNutt Decl., ¶ 17.

Consistent with its purpose to test and rigorously evaluate the AIR program, the pilot is designed to incorporate robust independent evaluation. Exhibit C to the Agreement requires both BPD and the contractor to provide full support to multiple independent research partners evaluating various aspects of the AIR program's functioning. *Id.* at 31; *see also* BPD New Technology Initiatives, https://www.baltimorepolice.org/sites/default/files/General%20Website %20PDFs/ BPD_AIR_Research_Descriptions_final.pdf. Morgan State University has been requested to conduct an independent review of the program's overall efficacy in contributing to solving the target crime categories. The RAND Corporation is also tasked with assessing whether the AIR program's data was useful to investigators and whether it produced improved outcomes as measured by increase in solve rates, clearance rates, or reduction in rates of the target crimes.[6] *Id.* The University of Baltimore will conduct two waves of surveys to assess residents' perceptions of the AIR program and how attitudes towards AIR impact perceptions of police legitimacy. *Id.* The Policing Project at New York University School of Law will review the program to evaluate civil rights and civil liberties concerns, and make recommendations for process improvements. *Id.* The reports of all of the independent research partners will be made public. *Id.* at 31-33.

---

[6] Plaintiffs speculate, unrelated to any legal argument, that the ability to conduct useful research is somehow impaired by the COVID-19 pandemic and the drastic social distancing measures implemented to control its spread, including the Governor's issuance of a "stay-at-home" order. *See* Plaintiffs' Memorandum of Law in Support of Their Motion for a Temporary Restraining Order & a Preliminary Injunction, ECF No. 2-1 ("Brief") at 34; Order No. 20-03-30-01 (issued Mar. 30, 2020) (available at https://governor.maryland.gov/wp-content/uploads/2020/03/Gatherings-FOURTH-AMENDED-3.30.20.pdf) (last accessed Apr. 13, 2020). As of April 13, 2020 Baltimore had experienced 81 homicides, five more than the same duration of time in the prior year. Further, homicide data for the preceding 7- and 28-day periods show year to year increases in 2020 as compared to the same periods in 2019. Certainly, there is no shortage of murders, shootings, and armed robberies requiring investigation, and therefore no constraint on RAND's opportunity to assess the effectiveness of the AIR program in the context of those investigations.

A final safeguard incorporated into the pilot program design is the oversight of an independent verification and validation ("IV&V") consultant to audit the AIR program's operation. *Id.* at 34. Whereas the independent researchers are tasked with evaluating various aspects of the AIR technology's performance, the IV&V is separately responsible for independently verifying that the aerial imagery collected in connection with the pilot is used only for the purposes and stored in accordance with the procedures previously described. *Id.*

Finally, consistent with Commissioner Harrison's commitment to public transparency, substantial community outreach and education efforts were undertaken before the AIR program went before the Board of Estimates. On December 20, 2019, Commissioner Harrison announced publicly of BPD's intention to move forward on the AIR Program, declaring that the department would not begin the pilot program until May 2020 so there would be sufficient notice for public education meetings. Tyler Waldman, *Harrison: Surveillance Plan to Return for Trial Program Next Year*, WBAL (Dec. 20, 2019), https://www.wbal.com/article/427127/124/harrison-surveillance-plane-to-return-for-trial-program-next-year. On March 11, 2020, BPD held an in-person public meeting, which was simultaneously broadcast through social media, on the program including an extensive question and answer session. *See* Eddie Kadhim, *Baltimore Police met with the community to give insight on pilot program*, WMAR (Mar. 11, 2020), https://www.wmar2news.com/spyplane. The second and third planned community meetings were conducted on March 23 and 30 via Facebook Live due to state limitations on large gatherings enacted in response to COVID-19 concerns. In total, the Police Commissioner presented and responded to public questions on the AIR pilot program for more than three hours and the videos of these presentations received roughly 30,000 views. All three public meetings remain available

online and on the city's public broadcasting station, CharmTV.[7]   Commissioner Harrison also agreed to be interviewed extensively on this program by the Baltimore Sun editorial staff, which subsequently authored an editorial on the AIR program, in addition to widespread local news media coverage.  Consistent with BPD's obligations under the Consent Decree[8] it announced the AIR pilot program on its website including links to the public education materials, descriptions of the roles of the independent research partners, and the Agreement.  *See* https://www.baltimorepolice.org/transparency/newtechnologyinitiatives.        Likewise    BPD maintained open channels of communication with its Consent Decree Monitor and representatives of the Department of Justice as early as December 2019, when the AIR pilot program was being developed.  BPD presented AIR briefings to and consulted with representatives of the State's Attorney's Office for Baltimore City and United States Attorney's Office.  Furthermore, all members of Baltimore's federal, state and local elected delegations were given copies of the community educational presentation and an open line for communication of any questions or concerns of the program.

The AIR pilot program is currently in a preparatory phase.  Test flights involving collection of aerial imagery are temporarily suspended with the agreement of the Police Commissioner, pending resolution of the instant Motion.

---

[7] The following were last accessed on April 13, 2020.  March 11 meeting available at https://www.facebook.com/BaltimoreCityPolice/videos/1062399994125598/; March 23 meeting available at https://www.facebook.com/BaltimoreCityPolice/videos/3400646286628872/; March 30 meeting available at https://www.facebook.com/BaltimoreCityPolice/videos/ 212014970074066/.

[8] *See United States v. Police Dep't of Balt. City*, No. 17-cv-00099-JKB, ECF No. 2-2 (as modified by ECF No. 39).

## STANDARD OF REVIEW

A preliminary injunction is an "extraordinary remedy." *Winter v. Nat. Res. Defense Council, Inc*., 555 U.S. 7, 22 (2008).  It is the Plaintiffs' burden to demonstrate that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm, (3) the balance of hardships tips in their favor, and (4) the injunction is in the public interest. *Id.* at 20 (citation omitted). The Fourth Circuit has instructed that courts determining whether to impose such extraordinary relief "must separately consider each *Winter* factor." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (citation omitted).

A plaintiff must make a "*clear showing* that he is *likely* to succeed at trial." *Id.* (Citation omitted) (emphasis added). Thus, a preliminary injunction is "never awarded as of right," and courts must pay "particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citation omitted). Courts will not issue preliminary injunctions based on the "possibility" of irreparable harm, and moreover, "[t]he "possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm," and, there is a "presumption that a preliminary injunction will not issue." *Id*. (citations omitted) (alterations in original).

## ARGUMENT

Plaintiffs have not met their burden to show that they are entitled to the extraordinary relief requested. First, Plaintiffs have not made a "clear showing" that they are "likely" to succeed on the merits. *Di Base*, 872 F.3d at 230. Despite Plaintiffs' expansive reading of the Supreme Court's decision in *Carpenter v. United States*, 138 S. Ct. 2206 (2018)—which the Court specifically instructed should be read as a "narrow one," *id*. at 2220—and their mischaracterization of the AIR pilot program as some sort of Orwellian eye-in-the-sky, the case law unequivocally establishes that

aerial surveillance in public places is not a search within the meaning of the Fourth Amendment. *See, e.g., Florida v. Riley*, 488 U.S. 445 (1989); *California v. Ciraolo*, 476 U.S. 207 (1986); *Dow Chemical Co. v United States*, 476 U.S. 227 (1986). Their First Amendment claim stands even less of a chance of success, since Plaintiffs lack standing for the Court to entertain it on the merits. *Laird v. Tatum,* 408 U.S. 1 (1972). Even assuming *arguendo* that Plaintiffs have shown a "possibility" of success, the Supreme Court took care to differentiate between likelihood and possibility, and has instructed that "possibility" is categorically beneath the threshold required for a court to grant a preliminary injunction. *Winter*, 55 U.S. at 22.

Second, and relatedly, Plaintiffs have not shown that they will "likely" suffer irreparable harm because they have not established that they will "likely" prevail on the merits.

Third, Plaintiffs have not shown that the public interest favors granting a preliminary injunction. They have not "clearly" shown that they are "likely" to succeed on the merits, and, in addition, the AIR program has community support, as articulated below. The Plaintiffs describe themselves as "Baltimoreans," suggesting that they speak for the community at large: they do not. Plaintiffs are not entitled to usurp the BPD's tactical and policy decisions because such decisions do not align with their political agenda. *See, e.g.* Brief at 23 (asserting that remedying violent crime is Plaintiffs' self-adopted "mission" and explicating Plaintiffs' preferred crime control strategies).[9]

---

[9] Of note, BPD and Commissioner do not disagree with Plaintiffs that addressing the root causes of crime necessarily requires reinvesting in historically underinvested communities and rebuilding relationships with those communities. While other partners in the government, philanthropic, and community spheres are integral to that effort, Commissioner Harrison's realignment of the BPD around principles of community-based, problem-solving policing models supports Plaintiffs' stated objectives. *See* CRIME REDUCTION & DEPARTMENTAL TRANSFORMATION PLAN, June 2019, p. 12-13, https://www.baltimorepolice.org/sites/default/files/General%20Website%20PDFs/BPD_Crime_Reduction_and_Departmental_Transformation_Plan.pdf (last accessed Apr. 14, 2020).

Commissioner Harrison departs from the Plaintiffs, however, on the proposition that a single strategy is sufficient to address Baltimore's chronically high violent crime levels. His experience

Fourth, Plaintiffs have not shown that the equities favor granting such an "extraordinary remedy."  Plaintiffs argue that BPD "will suffer little, if any injury" if the Court grants a preliminary injunction that indefinitely forestalls progress on the AIR program. Brief at 33. This statement is baseless and ignores reality. The window of opportunity for BPD to avail itself of the philanthropic resources that make the AIR pilot program possible has not been guaranteed to remain open in perpetuity.  Again, Plaintiffs are not entitled to an injunction "as of right." *Winter*, 555 U.S. at 24 (citation omitted).

It is Plaintiffs' burden to show that they are entitled to a preliminary injunction—it is not BPD's burden to show that the AIR program is constitutional at this stage. Plaintiffs have not met their burden with respect to even one of the four required elements, and therefore, the Court should deny Plaintiffs' request for extraordinary relief.

## I.    Plaintiffs Are Not Likely To Succeed On The Merits.

### A.    The AIR pilot program does not offend the Fourth Amendment.

#### 1.  The operation of the AIR pilot does not effectuate a "search" within the meaning of the Fourth Amendment.

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. The word "search," of course, is a legal term of art. Until fairly recently in American history, a Fourth Amendment search occurred only if law enforcement "obtain[ed] information by physically intruding on a constitutionally protected area." *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (quoting *United States v. Jones*, 565 U.S. 400, 405

---

and education in decades as a policing professional inform Commissioner Harrison's judgment that long-term and short-term solutions should be pursued in tandem, and that every available resource, including the AIR pilot program, should be brought to bear in combatting the City's violent crime epidemic.

(2012)). Today, in addition to this property rights based approach, the Supreme Court has expanded its definition of "search" to include an intrusion upon an individual's reasonable expectation of privacy. *Carpenter v. United States*, 138 S. Ct. at 2213 (citing *Katz v. United States*, 389 U.S. 347, 351 (1967). The "reasonable expectation of privacy" test involves a two-part inquiry: first, whether the individual has a subjective expectation of privacy, and second, whether society is prepared to recognize that expectation as reasonable." *Carpenter*, 138 S. Ct. at 2213. Simply put, if there is no reasonable expectation of privacy, there is no search. "[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; i.e., one that has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (quotation omitted). Case law and common sense necessitate the conclusion that there is no reasonable expectation of privacy in the public movements of unidentifiable persons or vehicles near crimes scenes for discrete periods of time.

### i.   *Aerial photography and surveillance is not a search.*

"In determining whether a particular form of government-initiated electronic surveillance is a 'search' within the meaning of the Fourth Amendment, [the] lodestar is" the "'reasonable expectation'" test from *Katz v. United States*, 389 U.S. 347 (1967)." *Smith v. Maryland*, 442 U.S. 735, 739 (1979). The United States Supreme Court and the Fourth Circuit have held constitutional far more intrusive aerial surveillance than that contemplated by the AIR program. For example, in *California v. Ciraolo*, 476 U.S. 207 (1986), the Supreme Court upheld the warrantless real-time aerial surveillance of an individual's backyard (*i.e.* his private property). In *Ciraolo*, the police received an anonymous tip that the individual was growing marijuana plants in his yard, but were

unable to confirm because of a high fence erected around the property. *Id*. at 211. The police flew over the yard at 1,000 feet, confirmed the presence of marijuana plants, secured a warrant, and arrested the individual. *Id*. at 207. Even though the individual had manifested a subjective expectation of privacy installing high fences to prevent observation from ground-level vantage points, the Court noted that "the mere fact that an individual has taken measures to restrict some views of his activities does not preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible." *Id*. at 207. Similarly, in *Florida v. Riley*, 488 U.S. 445 (1989), the Supreme Court held that warrantless aerial surveillance of private property from an altitude of merely 400 feet did not violate the Fourth Amendment. *Id.* The aerial surveillance in *Riley* allowed the police to view the interior of a partially covered greenhouse located in a private, residential backyard. *Id*. at 447-48. *See also United States v. Breza*, 308 F.3d 430, 434-35 (4th Cir. 2002) (holding constitutional aerial surveillance of the defendant's property at an altitude of 200 feet because the helicopter flew above FAA regulations at a height that was a regular occurrence in the defendant's area); *Giancola v. State of W. Va. Dep't of Pub. Safety*, 830 F.2d 547, 551 (4th Cir. 1987) (holding constitutional aerial surveillance at 100 feet because the flight was consistent with FAA regulations and did not disturb the property).

Although *Ciraolo* and *Riley* were naked-eye surveillance, the Supreme Court has permitted law enforcement to observe what is visible from publicly navigable airspace without a warrant, even when using powerful camera technology. In *Dow Chemical Co. v. United States*, 476 U.S. 227 (1986), the Court held that a search did not occur when EPA investigators flew over an industrial complex belonging to Dow Chemical at 1,200, 3,000, and 12,000 feet and photographed parts of the property. *Id*. at 229-31. Agents used "the finest precision aerial camera available" that could capture "a great deal more than the human eye could ever see." *Id*. at 230. As noted, the AIR

program cameras do not have zoom, telephoto, or infrared technology and the subjects captured will appear at a resolution of one pixel per person. The wide-angle cameras to be used in the AIR program are hardly "fine precision" and the images they capture hardly cutting edge technology.

Law enforcement in *Ciraolo*, *Riley*, and *Dow Chemical* conducted surveillance by flying over the private property of specific, targeted, and identified individuals and/or properties at altitudes of a mere 400 to 1,000 feet. In contrast, the AIR program cannot be used to track movements of specific individuals or vehicles. The data can be accessed only after a violent crime is reported and the incident given an identification number. Unlike *Ciraolo*, *Riley*, and *Dow Chemical*, the intent of the AIR is not to capture or investigate images on individual's private properties, but rather to track public movements of unidentified persons and vehicles from crime scenes. The AIR program aircraft will also fly at much higher altitudes, within publicly navigable airspace. The activities at issue in the AIR program are far less intrusive than those described in *Ciraolo*, *Riley*, and *Dow Chemical* and therefore fall squarely within the holdings of these cases.

*ii.   Observation of public movements is not a search.*

The AIR contractor will piece together public movements of unidentifiable individuals and/or vehicles once it receives notification from BPD of a violent crime at a particular location. The Court's decisions in *Ciraolo*, *Riley*, and *Dow Chemical* are consistent with the general axiom that an individual does not have an expectation of privacy in their public movements. *See, e.g., United States v. Jones*, 565 U.S. 400 (2012); *United States v. Knotts*, 460 U.S. 276 (1983). Therefore, the observation of public movements is generally not a "search" within the meaning of the Fourth Amendment. *See Katz v. United States*, 389 U.S. at 351 ("[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."). In *United States v. Knotts*, the Supreme Court rejected the notion that the government

conducted a search by tracking a vehicle through public streets with visual surveillance aided by an electronic beeper attached to a container in the vehicle:

> [a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another. When [the defendant] travelled over the public streets he **voluntarily conveyed to anyone who wanted to look** the fact **that he was travelling over particular roads in a particular direction, the fact of whatever stops he made, and the fact of his final destination when he exited from public roads onto private property**.

460 U.S. at 281-82 (emphasis added). The constitutional analysis of the AIR program differs very little from that in *Knotts*. Public movements are public movements, regardless of the technology used to capture them. In fact, in *Knotts*, the Court opined that "[t]he fact that the officers in this case relied not only on visual surveillance, but on the use of the beeper . . . does not alter the situation. Nothing in the Fourth Amendment prohibited the police from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afforded them in this case," *id*. at 282, and that "[w]e have never equated police efficiency with unconstitutionality, and we decline to do so now." *Id*. at 284.

In essence, the *Knotts* Court held that public visibility eliminates the reasonable expectation of privacy. *Id*.; *Compare United States v. Karo*, 468 U.S. 7705 (1984) (holding that using a beeper, lawfully placed in a container without the defendant's knowledge, in order to monitor the presence of the container inside the defendant's house, constituted an intrusion upon his reasonable expectation of privacy.). The visibility of the object is dispositive as to whether a "search" occurred. Publicly visible objects and movements are in a different category than those concealed within the four walls of a person's home. This distinction makes sense in the broader context of American values and Fourth Amendment jurisprudence. *See, e.g.*, *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (citation and internal quotation marks omitted) ("But when it comes to the Fourth Amendment, the home is first among equals. At the Amendment's very core stands the right of a

man to retreat into his own home and there be free from unreasonable governmental intrusion."). The AIR program is simply a creative, technological assist to surveillance tools already in law enforcement's tool kit. It does not travel inside person's homes or park outside a person's residence at all hours waiting for the individual to emerge. If it would be constitutionally permissible for a law enforcement officer to surveil an individual during daylight hours on foot, then it must too be constitutional for the officer to do so using the AIR program.

### iii.    Plaintiffs' reliance on Carpenter is misplaced.

In a 5-4 decision explicitly limited to the acquisition of more than 7 continuous days of cell-site location information (CSLI) data, the Court held that a Fourth Amendment search occurred. *Carpenter*, 138 S. Ct. 2217 (emphasis added) ("[W]e hold that an individual maintains a legitimate expectation of privacy in the record of his physical movements **as captured by CSLI**."). There, law enforcement collected 127 days of historic CSLI (culminating in almost 13,000 data points) from two wireless providers without a warrant. *Id*. at 2212. The majority found it significant that "[m]apping a cell phone's location over the course of 127 days provide[d] an all-encompassing record of [the defendant's] whereabouts." *Id*. at 2217.  Recognizing modern realities of a cell phone being an extension of a person, the Court was concerned with the breadth of the information the government could obtain about an individual's movement for a long period of time, which would include the person's "familial, political, professional, religious, and sexual associations." *Id*. at 2217-18.  The AIR program, of course, does not derive any identifying or location information from the cell phone other personal properly of any individual.

Plaintiffs read *Carpenter* expansively in an effort to apply its holding to all new uses of technology that they personally deem to be "dystopian." *See, e.g.*, Brief at 14 ("Modern location-tracking technologies simply change the game."). The Court specifically cautioned against

Plaintiffs' reading of the case. *See Carpenter*, 138 S. Ct. at 2220 ("Our decision today is a narrow one. We do not express a view on matters not before us: real-time CSLI or 'tower dumps' (a download of information on all the devices that connected to a particular cell cite during a particular interval.)"); *id*. (emphasizing that its holding **did not** "call into question conventional surveillance techniques and tools, such as security cameras"). As explained above, the Supreme Court and the Fourth Circuit have deemed warrantless aerial surveillance constitutional for nearly 35 years.

Moreover, in rendering its decision, the Court repeatedly highlighted the uniqueness of CSLI data and cell phones. *Id*. at 2218 (citations and internal quotation marks omitted) ("While individuals regularly leave their vehicles, they compulsively carry cell phones with them all the time" and noting that "nearly three-quarters of smart phone users report being within five feet of their phones most of the time, with 12% admitting that they even use their phones in the shower[.]"); *id*. at 2219 (stating that CSLI records are a "distinct category of information."). Indeed, "modern cell phones, which are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy. A smart phone of the sort taken from [defendant] was unheard of ten years ago; a significant majority of American adults now own such phones." *Riley v. California*, 573 U.S. 373, 385 (2014).

The omnipresence of cell phones, which provide location data without regard to whether the owner is in a public or private place, was a significant driver in *Carpenter*. This aligns with the distinction between *Karo* and *Knotts*, and the heightened privacy expectations individuals have in their private homes, discussed *supra*. Both cell phones, and the beeper in *Karo* can track movements within an individual's home and were thus considered omnipresent in the individuals'

life. The procedures authorized in *Knotts*, like the AIR pilot program, capture only movements visible to the public.

*Carpenter* is also inapposite because CSLI creates an easily prepared individually identifiable record that can reveal a comprehensive record of that particular individual's movements and activities at all hours and in nearly all locations. Again, the AIR program will be utilized only when a violent crime is reported, will track purely public movements that are traceable to a crime scene, cannot identify individuals or vehicles, and will capture up to 12 hours per day of data during daylight and favorable weather. It is not continuous monitoring in the same way that a cell phone can be considered "almost a 'feature of human anatomy.'" *Carpenter*, 138 S. Ct. at 2218 (quoting *Riley*, 134 S. Ct. at 2484). The AIR program does not use any special infrared, telephoto, zoom, or other technology comparable to CSLI.  In short, the *Carpenter* decision was a "narrow one" that was really about "a detailed chronicle of a person's physical presence compiled every day, every moment, over several years." *Id*. at 2200.  The AIR program information is inherently much more limited in scope than CSLI or continuous GPS tracking. It is far less detailed and intrusive than CSLI or GPS tracking, and falls squarely within aerial surveillance techniques previously held to be constitutional by the Supreme Court and Fourth Circuit.

Further, the limitation of *Carpenter*'s holding to collections exceeding 7 days' data suggests that a shorter collection period is permissible. *See, e.g., Young v. Owens*, 577 Fed. Appx. 410, 412 (6th Cir. 2014) (holding constitutional several weeks of surveillance of a store); *United States v. Gaskins*, 690 F.3d 569, 574, 577 (D.C. Cir. 2012) ("weeks of surveillance" using both stationary and moving vehicles, and a mounted pole cameras); *United States v. Johnson*, 480 Fed. Appx. 835, 837 (6th Cir. 2012) (residence under surveillance for five or 6 weeks); *United States*

*v. Gramlich*, 551 F.2d 1359, 1360-1361 (5th Cir. 1977) (continual surveillance of activities for "over three weeks."). Based on the operational realities of the AIR pilot program, the longest continuous stretch of data collection that would be conducted would be the roughly 12-hour flight window. McNutt Decl., ¶ 5. While planes are grounded overnight, or in inclement weather, a dot representing a vehicle in a parking lot may have disappeared. *Id.*, ¶ 13. Likewise, it cannot be known if the dot representing a person entering a house has departed. *Id.* Thus successive days of AIR data cannot be stitched together to create a continuous record of even one full day, much less a week, of any person's movements. *Id.*, ¶ 14.

Several years before the Court decided *Carpenter*, in *United States v. Jones*, 565 U.S. 400 (2012), the Supreme Court reviewed the use of a GPS tracking device affixed to the undercarriage of a vehicle to track the movements of the defendant over a period of 28 days. The Court held that the electronic location surveillance over a period of 28 days was a search and that admission of evidence obtained by the warrantless use of the GPS device violated the Fourth Amendment. Justice Scalia's majority opinion found that a search occurred under the traditional, pre-*Katz* "trespass" rationale (placing the GPS on the vehicle constituted a "trespass" which violates the Fourth Amendment),[10] but five members of the Court also acknowledged that individuals have a reasonable expectation of privacy in such invasive details of their physical movements. *See id.* at 430 (Alito, J., concurring); *id.* at 415 (Sotomayor, J., concurring). Justice Alito reasoned that "relatively short-term monitoring of a person's movements on public streets accords with

---

[10] *Jones*, 565 U.S. at 413-14 (Sotomayor, J., concurring) ("In this case, the Government installed a Global Positioning System (GPS) tracking device on respondent Antoine Jones' Jeep without a valid warrant and without Jones' consent, then used that device to monitor the Jeep's movements over the course of four weeks. The Government usurped Jones' property for the purpose of conducting surveillance on him, thereby invading privacy interests long afforded, and undoubtedly entitled to, Fourth Amendment protection".)

expectations of privacy that our society has recognized as reasonable. But the use of longer-term GPS monitoring in investigations of most offenses impinges on expectations of privacy." 565 U.S. at 430 (citing *Knotts*, 460 U.S. at 281-82).

The AIR program is not analogous to GPS monitoring or historic CSLI data collection. The AIR contractor will not, indeed cannot, capture continuous activities of individuals.  McNutt Decl., ¶ 14.  The contractor will capture photos of City streets for 12 hours per day during daylight hours. Outside of those 12 hours, City streets will be untracked and any "trail" is disrupted.  They cannot track an individual or vehicle continuously for more than one day during daylight hours. This is a similar type of surveillance that a law enforcement officer could conduct without the money and resource-saving technological assist provided by the AIR program.

Yet another distinguishing feature rendering *Carpenter* inapposite, AIR program contractors do not deliver the raw data set to the police, but instead apply sophisticated algorithms and labor intensive methods to find and identify relevant images related to a request from law enforcement to support an investigation or prosecution. McNutt Decl., ¶ 12.  Tracking the movements of a single person or vehicle over two hours requires one hour of analyst labor, and most investigations involve tracking multiple subjects. *Id.*  Accordingly, the vendor must prioritize requests for support of target crime investigations and allocate limited analytical capacity to those deemed to be the highest priority.  This is a far cry from the "effortless[]" compilation of "detailed" information concerning public and private movements that the Court found so distasteful in *Carpenter*. 138 S. Ct. at 2216.

Observations of public movements are expected in Baltimore. To the extent that an individual has a subjective expectation of privacy in his or her public movements viewed from an aircraft, such an expectation is not one that society is "prepared to recognize as reasonable."

20

*Carpenter*, 138 S. Ct. at 2213. At any given time, multiple helicopters (operated by BPD, other law enforcement agencies, and local media) are visible in the skies over Baltimore.  Likewise ground-based recording is prolific.  EZ pass systems, license plate readers, CitiWatch, CCTV, speed and red light cameras, private security systems for commercial and residential properties are all a routine part of daily life, as are images captured by the cellphones of ordinary citizens.  It cannot be that the public recognizes the abundance of cameras potentially capturing their activities in the public thoroughfare and still maintains a "reasonable" expectation of privacy in movement of a dot captured by the AIR program.

In sum, Plaintiffs have not made a "clear showing" that they are "likely" to succeed on the merits. *Winter*, 555 U.S. at 20; *Di Biase*, 872 F.3d at 230. In fact, the opposite is true. The lynchpin of Plaintiffs' argument is an expansive interpretation of *Carpenter*, which was a 5-4 decision that the Court expressly defined as "narrow," and strongly suggested should be limited exclusively to CSLI data acquisition for periods of seven days or more. 138 S. Ct. at 2217, 2217 n.3, 2220. Because Plaintiffs fail to meet the first element, the Court should deny their request for injunctive relief.

### 2.  Plaintiffs do not have standing to challenge the AIR program.

The AIR program could not even theoretically violate an individual's constitutional rights unless and until the BPD accesses or otherwise utilizes the information. Plaintiffs cannot bring an action alleging a constitutional violation based upon a future violation of constitutional rights, which may or may not occur. Plaintiffs do not have standing to challenge the constitutionality of the AIR program. To be sure, while the concept of standing "is not distinct from the merits," it "can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search." *Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018). In other words, a plaintiff must allege facts

to establish that law enforcement invaded his or her reasonable expectation of privacy. "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of *his* Fourth Amendment rights infringed." *Rakas v. Illinois*, 439 U.S. 128, 134 (1978) (emphasis added). This is because Fourth Amendment rights "are personal in nature." *Steagald v. United States*, 451 U.S. 204, 219 (1981). "[I]t is . . . clear that legitimate presence on the premises of the place searched, standing alone, is not enough to accord a reasonable expectation of privacy because it 'creates too broad a gauge for measurement of Fourth Amendment rights." *Byrd*, 138 S. Ct. at 1527 (2018) (quotation omitted). Although reasonableness is "the Fourth Amendment's ultimate touchstone," *Brigham City v. Stuart*, 547 U.S. 398, 398 (2006), "the question is not whether the officer[s] acted reasonably vis-à-vis the world at large. Rather, the question is whether the officer[s] acted reasonably as against the plaintiff." *Howerton v. Fletcher*, 213 F.3d 171, 173 (4th Cir. 2000).

Although Plaintiffs are residents of Baltimore City, they have not shown that data capturing their individual movements will be reviewed by BPD, or that BPD would have any way of identifying them specifically. As stated, the AIR program cannot reveal the physical characteristics of individuals or vehicles, and the data is reviewed only if a call comes in, and an incident number is assigned to, one of the enumerated violent crimes. Plaintiffs cannot request a preliminary injunction on the contingency that sometime in the future, it is possible that their constitutional rights may be violated in the event that they are near a crime scene.

Plaintiffs' constitutional rights are not implicated unless and until BPD uses the data collected by the AIR program to track movements that are attributed to them. The CSLI analyzed in the *Carpenter* case provides a useful analogy—the Court did not prohibit the cell phone providers from collecting CSLI—the collection of CSLI did not become a constitutional question

until law enforcement collected well in excess of seven days of data from the cell phone provider. *See generally Carpenter*, 138 S. Ct. at 2207; *see also Walter v. United States*, 477 U.S. 649, 662 (1980) (the Fourth Amendment's protections typically only apply to government actors). In other words, the collection of the data by AIR program contractors is not the constitutional issue; it is the BPD's retrieval of such data from the AIR program contractors and subsequent use. BPD will not have direct access to the raw data.

And, assuming arguendo that *Carpenter* applies to the AIR program and that aerial surveillance is akin to CSLI data, Plaintiffs have not established that BPD could, much less would, obtain or utilize more than seven days of data without requesting a warrant. *Carpenter*, 138 S. Ct. at 2217 n.3 ("[W]e need not decide whether there is a limited period for which the Government may obtain an individual's historical CSLI free from Fourth Amendment scrutiny, and if so, how long that period might be. It is sufficient for our purposes today to hold that accessing seven days of CSLI constitutes a Fourth Amendment search); *id*. at 2234 (Kennedy, J., dissenting) (("The Court suggests that less than seven days of location information may not require a warrant. *See ante*, at 2217 n.3; *see also ante*, at 2220-2221 (Expressing no opinion on "real-time CSLI," tower dumps, and security camera footage)."). For these reasons, Plaintiffs do not have standing to challenge the constitutionality of the AIR program.

## B.       *Plaintiffs cannot prevail on a First Amendment claim because they lack standing.*

This Court should not reach the merits of the First Amendment claim – and it has no chance of succeeding – because Plaintiffs lack standing.  It is axiomatic that a plaintiff must demonstrate that he has been, or imminently will be, harmed in order to invoke judicial review of governmental action.  *Ex parte Levitt*, 302 U.S. 633, 636 (1937).  The harms that Plaintiffs contend are visited on them by the AIR program consist of fear of being surveilled and belief that the existence of the AIR program will impair their activities and associations.  "Allegations of a 'chill' are not an

adequate substitute for a claim of specific present objective harm or a threat of specific future harm; 'the federal courts established pursuant to Article III of the Constitution do not render advisory opinions.'" *Laird v. Tatum,* 408 U.S. 1, 13-14 (1972) (quoting *United Public Workers of America (C.I.O.) v. Mitchell*, 330 U.S. 75, 89 (1947)).  As a matter of law, Plaintiffs have failed to establish standing and, as such, their First Amendment claim is not properly before the Court.

Plaintiffs do not assert that their movements, meetings or associations are directly regulated by BPD, but rather that they would be harmed by the existence of the AIR pilot program. Particularly, Plaintiffs assert that the program causes them (and, they presume, their associates) to fear that they will be recorded or their movements included in one of the program's investigatory reports on a murder, shooting, or armed robbery.  Love Decl., ¶ 10; Bridgeford Decl., ¶¶ 10, 12, 16; James Decl., ¶ 6.  To mitigate this fear of being recorded, Plaintiffs claim that they will modify or limit their activities and interactions in a manner that is burdensome.  Love Decl., ¶¶ 13 ("Knowing that our movements are being recorded every time we move about in public would force us to change our behavior… [which will] divert time and staff resources from other LBS work."), 14 ("we expect that some of our present and future partners will decide not to engage with us"), Bridgeford Decl., ¶ 15; James Decl. ¶ 8.  Borne of their own advocacy and stated organizational missions, Plaintiffs further portend various abuses that will result from the operation of the program.  Love Decl., ¶ 15 (projecting that the AIR pilot will "generate information that could be weaponized against us"); James Decl., ¶ 7 ("I am troubled by the BPD being given this extremely powerful new tool with which they can harass people.").  In sum, Plaintiffs express the subjective expectation of a chilling effect on their associations.  Love Decl., ¶ 16 (the "AIR program will have a tremendous chilling effect"); Bridgeford Decl., ¶ 16 (projecting chilling

effect); James Decl., ¶ 8 (same).  Both the Supreme Court and the Fourth Circuit categorically reject this type of "harm" as sufficient to ground standing.

In *Laird v. Tatum*, the Supreme Court considered "whether the jurisdiction of a federal court may be invoked by a complainant who alleges that the exercise of his First Amendment rights is being chilled by the mere existence, without more, of a governmental investigative and data-gathering activity that is alleged to be broader in scope than is reasonably necessary for the accomplishment of a valid governmental purpose."  408 U.S. at 10.  There, plaintiffs were four individuals and nine unincorporated associations engaged in political activism who challenged the Army's "surveillance of lawful and peaceful civilian political activity."  *Id.* at 1.  The program at issue used "sophisticated electronic methods of surveillance" along with infiltration of meetings by secret agents to target political activists and gather information about their activities, which was then broadly distributed to federal, state and local government officials.  *Donohoe v. Duling*, 465 F.2d 196, 201 (4th Cir. 1972).

The *Laird* plaintiffs alleged that "the purpose and effect of the collection, maintenance and distribution of the information on civilian political activity… [was] to harass and intimidate plaintiffs and others similarly situated and to deter them from exercising their rights… protected by the First Amendment by invading their privacy, damaging their reputations, [and] adversely affecting their employment…"  Brief for Respondents, 1972 WL 135682, *7-8.  Further, the plaintiffs alleged they were harmed by "fear that they will be made subjects of reports in the Army's intelligence network," and, in fact, "most if not all… [had] been the subject of Army surveillance reports and their names [] appeared in the Army's records."  *Id.*, *8; *Tatum v. Laird*, 444 F.2d 947, 956, n. 17 (D.C. Cir. 1971), *rev'd*, 408 U.S. 1.  In rejecting the activists' claim, the *Laird* Court observed that regulatory, proscriptive, or compulsory government actions that fall

short of direct prohibitions against the exercise of First Amendment rights may violate the Constitution. *Laird*, 408 U.S. at 11. However, such an impermissible chilling effect cannot "arise merely from the individual's knowledge that a government agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some other and additional action detrimental to that individual." *Id.*

Similar to the claims here, the crux of the *Laird* plaintiffs' claims was that "they disagree[d] with the judgments made by the Executive Branch with respect to the type and amount of information the Army need[ed] and that the very existence of the Army's data-gathering system produce[d] a constitutionally impermissible chilling effect upon the exercise of their First Amendment rights." *Id.* at 13. This was insufficient. Absent a specific present objective harm, or threat of same in the future, plaintiffs lacked standing. *Id.* at 14.

Likewise, in *Donohoe v. Duling*, the Fourth Circuit considered the propriety of a police department routinely surveilling demonstrations and public meetings, photographing participants, and compiling files on them to be shared with other law enforcement agencies. 465 F.2d 196 (4th Cir. 1972). Noting that local police authorities enjoy a greater right to conduct domestic surveillance than the Army had in *Laird*, the *Donohoe* court held that plaintiffs had no justiciable claim. *Id.* at 202-203.

Further, claimed harms that fundamentally derive from fear of surveillance – changing business practices to avoid being recorded or hesitation by third parties to communicate, for example – are likewise categorically insufficient to establish standing for a First Amendment claim. *Clapper v. Amnesty Intern. USA*, 568 U.S. 398 (2013) (holding no injury established where plaintiffs undertook costly or burdensome measures to avoid being surveilled in electronic

communications, for example travelling to have in-person conversations, because they were "simply the product of their fear of surveillance"). *See also Wikimedia Found. v. Nat'l Sec. Agency/Cent. Sec. Serv.*, No. 1:15-CV-662, 2019 WL 6841325, at *24 (D. Md. Dec. 16, 2019) (applying *Laird* and observing that, in *Clapper*, "the Supreme Court has specifically found that a claimed reluctance by third parties to communicate with a plaintiff, due to their subjective fears of surveillance, is not fairly traceable to the alleged surveillance, and is thus foreclosed as a basis for standing.").

The plaintiffs in both *Donohoe* and *Laird* were, in fact, targeted for surveillance because of their exercise of First Amendment rights – more than plaintiffs here can argue – yet their fears of being surveilled were not injuries sufficient to confer standing. The same result must obtain here.

## II.   No Person Will Suffer An Irreparable Injury If The AIR Pilot Proceeds

For the foregoing reasons, the operation of the AIR pilot program will not offend the constitutional rights of any Baltimorean, including the Plaintiffs. Because Plaintiffs have not "clearly" shown that they are "likely" to succeed on the merits – as is undeniably their burden – and because they lack standing, they have not shown a constitutional violation that would give rise to an irreparable injury. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (citation omitted).

If the Court were ultimately to be persuaded, presumably by facts not in the current record, that the operation of the AIR pilot had transgressed a legal boundary, it would not be without authority to order relief. The totality of Plaintiffs' grievance resides in the collection of purportedly ill-gotten photographic imagery. If, in its final assessment, the Court were to determine that Plaintiffs were injured by the existence of that imagery, the Court would certainly be empowered to fashion an appropriate remedy.

**III.**    **The Public Interest Favors Proceeding With The AIR Pilot Because It May Assist In Abating Serious, Violent Crime**

As to the third *Winter* factor, the public interest favors proceeding with the AIR pilot program. 555 U.S. at 20. The level of violent crime in Baltimore has reached tragic proportions. In 2019, there were 348 homicides on record. This is the second highest murder rate in the City's history. In 1993, there were 353 murders, but there were 125,000 more residents. *See* Tim Prudente, *2019 closes with 348 homicides, second-deadliest year on record*, Balt. Sun, Jan 1, 2020, http://www.baltimoresun.com/news/crime/bs-md-ci-cr-2019-homicide-final-count-20200101-jnauuumukbdh3edsyypspsm3he-story.html; Justin Fenton, *USA Today names Baltimore 'the nation's most dangerous city'*, Balt. Sun., Feb. 19, 2018 http://www.baltimoresun.com/news/crime/bs-md-ci-usa-today-homicides-20180219-story.html. (stating that Baltimore produced its highest-ever per capita murder rate in 2017). It is obvious that Baltimore is a city in dire need of effective anti-violence tools. BPD has been given the opportunity—at no cost to taxpayers—to employ traditional surveillance techniques in a creative and unobtrusive way. This opportunity should not be laid waste because it does not fit Plaintiffs' political agenda. *See, e.g.*, Brief at 23 (wherein Plaintiffs explain their belief that although there is unprecedented violent crime in Baltimore, law enforcement should not use AIR because there are no "magic solutions," and instead "[i]t takes a broad commitment to deep and lasting work—through community building, youth education, and unapologetic political advocacy—to transform deep-seated structural arrangements …").

While Plaintiffs purport to altruistically speak for all Baltimoreans, they do not represent the public citizenry at large.  The AIR program enjoys wide community support as a creative and innovative tool with the potential to address crime without any disruption to daily life.  The United Baptist Ministry Convention, comprised of more than 100 Maryland churches including many

28

impacted by violent crime, wrote to Commissioner Harrison to "support the research and fact-finding test of AIR…" *See* Exhibit B, UMBC Letter of Support. This is consistent with Commissioner Harrison's experience in his first few weeks in Baltimore, when he participated in nine community meetings across the city, and heard from numerous residents who voiced their support for an aerial surveillance program.  In addition to these meetings, Commissioner Harrison scheduled meetings with community association leaders in all 13 council districts. A majority of the community leaders and residents that attended these meetings, not only voiced their support of the program, but stressed the importance of getting the program up and running as soon as possible. Likewise, the Greater Baltimore Committee, the leading business advocacy organization in Baltimore, has urged BPD to adopt the AIR program as an "innovative approach to crime solving." POSITION STATEMENT ON PUBLIC SAFETY IN BALTIMORE AND SUPPORT OF THE USE OF AERIAL SURVEILLANCE IN BALTIMORE, Oct. 15, 2019, https://gbc.org/statement-on-public-safety-in-baltimore-and-support-for-the-use-of-aerial-surveillance/.  The injunctive relief analysis is not a popularity contest, but it does not follow from Plaintiffs' self-appointment as advocate for Baltimoreans that the majority of Baltimoreans agree with them.

Governor Hogan has voiced support for the program, along with "dozens of victims, community groups, and business organizations." Justin Fenton and Talia Richman, *Baltimore police back pilot program for surveillance planes*, Balt. Sun, Dec. 20, 2019, http://www.baltimoresun.com/news/crime/bs-md-ci-cr-baltimore-police-support-surveillance-plane-20191220-zfhd5ndtlbdurlj5xfr6xhoe2i-story.html. Furthermore, as noted, there has been substantial transparency regarding the program, the program's implementation, like most of BPD's activities, will be subject to the oversight of the Monitoring Team and Department of Justice to ensure the Consent Decree is not violated, and, as noted in the contract, independent civilian

verification and validation auditors will audit the program and ensure that it is being used only for its intended purpose.

Moreover, the public has an interest in seeing the serious, violent crimes occurring in their neighborhoods solved, and the perpetrators held accountable. In light of the growing violent crime rate and the lack of City and BPD resources available, the public and the BPD deserve the opportunity to accept the philanthropically donated program to determine whether it lives up to its potential as a valuable investigative tool for detectives. Plaintiffs' attempt to substitute their judgment on crime-fighting for that of career law enforcement professionals, the Mayor of Baltimore City and the Governor of Maryland is entirely inappropriate. BPD is committed to both constitutional policing and protecting Baltimoreans. The AIR program presents a unique opportunity to accomplish both of these goals.

## IV. The Balance Of Hardships Favors Proceeding With The AIR Pilot

As explained in opening, BPD and the City currently have a remarkable opportunity in the AIR pilot program. Philanthropic support will allow BPD to learn whether AIR technology can streamline detectives' efforts and facilitate closing the most violent crimes and to do so free of cost to City taxpayers. There is, however, no guarantee that the window of this opportunity will remain open indefinitely. Were the AIR pilot to be derailed by months of delays in becoming operational, it could mean the loss of a valuable tool in the crime fight. BPD and the public it serves would both lose.

\* \* \* \* \*

For the foregoing reasons, Plaintiffs have provided the Court with no basis, other than their own disagreement with law enforcement policy decisions properly belonging to the Police

Commissioner, to impose the extraordinary relief they seek.  BPD and Commissioner Harrison respectfully request that the Court deny the Motion.

Dated:  April 15, 2020

Respectfully submitted,

DANA P. MOORE
Acting City Solicitor

*Dana P. Moore /ESW*

ELISABETH S. WALDEN
KARA K. LYNCH
Baltimore City Department of Law
100 N. Holliday Street, Suite 100
Baltimore, Maryland 21202
T: 410.396.3659
F: 410.659.4077

*Counsel for Baltimore Police Department
and Police Commissioner Michael S.
Harrison*