FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2020 APR 24· AM 9: 42

CLERK'S OFFICE
AT BALTIMORE

BY_____DEPUTY

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

LEADERS OF A BEAUTIFUL
STRUGGLE, *et al.*,

    Plaintiffs,

v.

BALTIMORE POLICE
DEPARTMENT, *et al.*,

    Defendants.

\*    \*

\*

\*

\*

\*

\*

\*

Civil Action No. RDB-20-0929

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

## MEMORANDUM OPINION

Earlier this month, after a period allowing for public comment, the Baltimore City Board of Estimates approved a contract between the Baltimore Police Department ("BPD") and Persistent Surveillance Systems ("PSS") to conduct an initiative known as the Aerial Investigation Research ("AIR") pilot program. This program is to run for approximately six months, during which time PSS will fly three aircraft over Baltimore City approximately 12 hours per day during daylight hours.

Plaintiffs Leaders of a Beautiful Struggle, a Baltimore-based organization, and Erricka Bridgeford and Kevin James, Baltimore City residents (collectively, "Plaintiffs"), seek a preliminary injunction which would prohibit the operation of the AIR program. On April 9, 2020, Plaintiffs commenced this lawsuit against the BPD and Baltimore Police Commissioner Michael S. Harrison (collectively, "Defendants") and filed a Motion for a Temporary Restraining Order & a Preliminary Injunction (ECF No. 2), alleging that the AIR program violates their rights under the First and Fourth Amendments to the United States Constitution.

On that same day, this Court conducted a telephone conference and issued an Order which effectuated a temporary agreement reached by the parties pursuant to which the BPD agreed that no surveillance flights would occur until this Court issued a decision on the preliminary injunction motion. On April 21, 2020, this Court conducted a public telephone conference and heard arguments on the motion.[1]

The Plaintiffs contend that the technology in the AIR program will be so precise as to invade the individual liberties of Baltimore citizens. The BPD contends that, though a potentially useful investigative tool, the AIR pilot program has significant limitations. The Defendants contend that the program cannot provide real-time surveillance and that images captured by the program will depict individuals as a single pixel—essentially, a dot on the map. Accordingly, the Defendants contend that individual physical characteristics will not be observable. The resolution of this factual dispute must await discovery in this case.

Plaintiffs have not met their heavy burden to show that they are entitled to a preliminary injunction in this matter. The United States Supreme Court and the United States Court of Appeals for the Fourth Circuit have long upheld the use of far more intrusive warrantless surveillance techniques than the AIR program. The Plaintiffs place great reliance on the United States Supreme Court's recent opinion in *United States v. Carpenter*, 138 S. Ct. 2206 (2018), which addressed the use of historical cell site location information. The Supreme Court in that case specifically stated that its opinion did not "call into question conventional

---

[1] Pursuant to Standing Order 2020-07 of this Court, normal court operations have been postponed and continued through June 5, 2020. The parties agreed to proceed with the hearing on the Motion for a Preliminary Injunction by way of a teleconference which was made accessible to the public.

surveillance techniques and tools, such as security cameras." *Id.* at 2220. Accordingly, for the reasons set forth below, Plaintiffs' Motion for a Preliminary Injunction (ECF No. 2) is DENIED and the AIR pilot program may proceed.

## BACKGROUND

Plaintiffs seek a preliminary injunction prohibiting the operation of an aerial surveillance project known as the Aerial Investigation Research ("AIR") pilot program. The program is to be conducted by the Baltimore Police Department ("BPD") with the assistance of Persistent Surveillance Systems ("PSS"), an Ohio-based private contractor. The AIR pilot program has been the subject of public discourse for some time. In August 2016, news reports revealed that the BPD had collaborated with PSS to conduct aerial surveillance over the City of Baltimore for several months.[2] Ultimately, this initial program was discontinued. In December 2019, Commissioner Harrison announced that the City would resume its collaboration with PSS after holding a series of community meetings to inform the public about the program.[3]

In March 2020, the Baltimore Police Department conducted three public meetings to discuss how the AIR pilot program would operate.[4] As a result of the exigent circumstances presented by the COVID-19 Pandemic, two of these meetings were conducted through

---

[2] Monte Reel, *Secret Cameras Record Baltimore's Every Move From Above*, Bloomberg Businessweek, Aug. 23, 2016, https://www.bloomberg.com/features/2016-baltimore-secretsurveillance; Kevin Rector & Luke Bridgewater, *Report of Aerial Surveillance by Baltimore Prompts Questions, Outrage*, Balt. Sun, Aug. 24, 2016, https://www.baltimoresun.com/maryland/baltimore-city/bs-md-ci-secret-surveillance-20160824-story.html.

[3] Justin Fenton & Talia Richman, *Baltimore Police Back Pilot Program for Surveillance Planes, Reviving Controversial Program*, Balt. Sun, Dec. 20, 2019, https://www.baltimoresun.com/news/crime/bs-md-ci-cr-baltimore-police-support-surveillance-plane-20191220-zfhd5ndtlbdurlj5xfr6xhoe2i-story.html.

[4] *See* Eddie Kadhim, *Baltimore Police met with the community to give insight on pilot program*, WMAR, Mar. 11, 2020, https://www.wmar2news.com/spyplane.

3

Facebook Live.[5] Consistent with the BPD's obligations under a Consent Decree issued in *United States v. Baltimore Police Dep't, et al.* (JKB-17-0099), the BPD announced the AIR pilot program on its website, which provided public educational materials describing the AIR program's objectives.[6] On April 1, 2020, the Baltimore City Board of Estimates authorized the execution of a Professional Services Agreement between the Baltimore Police Department and Persistent Surveillance Systems for the purpose of implementing the AIR pilot program. (Professional Services Agreement ("PSA"), ECF No. 3-2.)

Pursuant to the Professional Services Agreement, Persistent Surveillance Systems will fly three aircraft over Baltimore City using the "Hawkeye Wide Area Imaging System." (*Id.* at 22.) The planes will cover about 90 percent of the City, capturing about 32 square miles of the City per image every second. (*Id.*; Community Education Presentation, ECF No. 3-1.) Each of the three planes will fly for a "minimum" of forty hours per week, resulting in total coverage of about 12 hours per day for a period of six months, weather permitting. (PSA 22; Decl. of Ross McNutt, Ph.D ¶ 5, ECF No. 30-1.) The Baltimore Police Department hopes to use these images to solve violent crimes, specifically: homicides and attempted murder, shootings resulting in injury, armed robbery, and carjacking (the "Target Crimes"). (PSA 21.)

The AIR program's observational capabilities are limited. PSS cannot provide real-time surveillance. (McNutt Decl. ¶ 8; PSA 22-24.) The on-board technology does not have

---

[5] March 11 meeting available at https://www.facebook.com/BaltimoreCityPolice/videos/1062399994125598/; March 23 meeting available at https://www.facebook.com/BaltimoreCityPolice/videos/3400646286628872/; March 30 meeting available at https://www.facebook.com/BaltimoreCityPolice/videos/212014970074066/.

[6] Baltimore Police Department, New Technology Initiatives, https://www.baltimorepolice.org/transparency/newtechnologyinitiatives.

zoom, telephoto, night vision, or infrared capabilities. (McNutt Decl. ¶ 5; PSA 22.) The imagery is limited to "1 pixel per person"—essentially, a single dot on the map. (PSA 22.) Accordingly, an individual's characteristics are not observable in the images. (*Id.*) As the planes will not fly at night or during inclement weather, significant gaps in the imagery data will emerge. (McNutt Decl. ¶ 14.) These gaps in the record prevent the monitoring of a person's movements over the course of multiple days. (*Id.*)

Images collected by the aircraft will be transmitted to ground stations operated by Persistent Surveillance Systems and stored in its servers. (PSA 22; ECF No. 3-1 at 13.) Unanalyzed data will be stored for up to 45 days during the pilot program. (PSA 25.) Data that is analyzed in connection with a crime will be compiled into packets and become a permanent part of the case file. (Letter from Michael S. Harrison to the Honorable President and Members of the Board of Estimates, dated Mar. 17, 2020, ECF No. 3-2.) PSS analysts will only access the data after "receiving an incident number or other notification related to a murder, non-fatal shooting, armed robbery, or car jacking." (McNutt Decl. ¶ 10.) In those circumstances, the PSS analysts will use the imagery data "to locate crimes, track individuals and vehicles from a crime scene and extract information to assist BPD in the investigation of target crimes." (PSA 22.) This is a labor-intensive process. Analysts must "tag" the individuals and vehicles appearing in the images, which appear as dots, and manually track the tagged dots to and from the incident location. (McNutt Decl. ¶ 12.) Using this process, PSS analysts will require about 1 hour to track 2 hours' worth of movements made by a single vehicle. (*Id.*)

According to the Professional Services Agreement, Persistent Surveillance Systems will be permitted to integrate its services with existing BPD technologies, including the Computer Aided Dispatch System, CitiWatch Ground-Based Cameras, the Shot Spotter Gun Shot Detection System, and License Plate Readers. Persistent Surveillance Systems is permitted to integrate its "iView software" with these systems "to help make all the systems work together to enhance their ability to help solve and deter crimes." (PSA 23.) PSS will use the integrated services to provide reports to the BPD. In ordinary circumstances, Persistent Surveillance Systems will provide an investigative briefing to the BPD within eighteen hours of PSS's "notice of a Target Crime on the CAD System monitors or BPD's request . . . to analyze a Target crime." (*Id.*) The briefing will include "imagery analysis" as well as "driving behaviors of vehicles from the crime scene prior to and after a crime." (*Id.*) Within 72 hours, PSS will provide a more detailed Investigation Briefing Report, which will include ground-based camera video (including CitiWatch video) and the tracked movements of people who met with individuals at the crime scene. (*Id.* at 24.) Persistent Surveillance Systems will provide "real time support" to the BPD "in exigent circumstances and only at the written request of the BPD Police Commissioner." (*Id.* at 23.)

The AIR pilot program will be subject to extensive evaluations and oversight. Morgan State University has been asked to assess the program's efficacy in fighting crime. The RAND Corporation will conduct a similar analysis, focusing on whether the program produces higher clearance rates and reduces crime. (PSA 31.) The public's perception of the program will be studied by the University of Baltimore. (*Id.* at 32.) The New York University School of Law will conduct a "civil rights and civil liberties audit" of the AIR pilot program. (*Id.* at 32-33.)

6

The record reflects significant public support for the AIR pilot program. The United Baptist Ministry Convention, comprised of more than 100 Maryland churches, submitted a letter to Commissioner Harrison expressing support for the AIR program. (Letter from Dr. Cleveland T. A. Mason, 2nd to Commissioner Michael Harrison (Mar. 30, 2020), ECF No. 30-2.) The Greater Baltimore Committee, the leading business advocacy organization in Baltimore, has also urged the adoption of the AIR program.[7]

Support is not completely unanimous, however. Plaintiffs Leaders of a Beautiful Struggle, Erricka Bridgeford, and Kevin James (collectively, "Plaintiffs") seek a preliminary injunction which would prohibit the operation of the AIR program. The Plaintiffs, all three of whom contribute to various Baltimore-based public advocacy initiatives, argue that the program violates their rights under the First and Fourth Amendments to the United States Constitution. On April 9, 2020, Plaintiffs commenced this lawsuit against the BPD and Michael S. Harrison, in his official capacity as the Baltimore Police Commissioner (collectively, "Defendants"), and filed a Motion for a Temporary Restraining Order & a Preliminary Injunction (ECF No. 2). The Plaintiffs' Complaint contains two Counts: a Fourth Amendment claim (Count I) and First Amendment claim (Count II), both brought pursuant to 42 U.S.C. § 1983.

On that same day, this Court conducted a telephone conference and issued an Order which effectuated a temporary agreement reached by the parties pursuant to which the BPD agreed that no surveillance flights would occur until this Court issued a decision on the

---

[7] Position Statement on Public Safety in Baltimore and Support of the Use of Aerial Surveillance in Baltimore, Oct. 15, 2019, https://gbc.org/statement-on-public-safety-in-baltimore-and-support-for-the-use-of-aerial-surveillance/.

preliminary injunction motion. On April 21, 2020, this Court conducted a public telephone conference and heard arguments on the motion.

## STANDARD OF REVIEW

A preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.,* 245 F.3d 335, 339 (4th Cir. 2001). In determining whether to issue a preliminary injunction, the Court must follow the test set forth by the Supreme Court in *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20, 129 S. Ct. 365 (2008) which requires a showing that: (1) the movant is likely to succeed on the merits; (2) the movant is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities favors the movant; and (4) that an injunction is in the public interest. 555 U.S. at 20; *accord. Roe v. Dep't of Def.,* 947 F.3d 207, 219 (4th Cir. 2020); *League of Women Voters of N.C. v. N.C.,* 769 F.3d 224, 236 (4th Cir. 2014);

The movant must show more than a "grave or serious question for litigation"; instead, it bears the "heavy burden" of making a "clear showing that [it] is likely to succeed at trial on the merits." *Real Truth About Obama, Inc. v. Fed. Election Comm'n,* 575 F.3d 342, 346 (4th Cir. 2009); *Int'l Brotherhood of Teamsters v. Airgas, Inc.,* 239 F. Supp. 3d 906, 912 (D. Md. 2017) ("Because a preliminary injunction is 'an extraordinary remedy,' it 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" (quoting *Winter,* 555 U.S. at 22, 129 S. Ct. 386)). Still, an injunction "is not granted as a matter of course, and whether to grant the injunction still remains in the equitable discretion of the [district] court even when a

plaintiff has made the requisite showing." *Bethesda Softworks, L.L.C. v. Interplay Entm't Corp.*, 452 F. App'x 351, 353 (4th Cir. 2011) (internal citations omitted).

## ANALYSIS

Plaintiffs have failed to satisfy their heavy burden of showing that they are entitled to a preliminary injunction. Given the expedited nature of preliminary injunction proceedings, this Court must make a decision based on "evidence that is less complete than in a trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981). In reaching its ruling, "[t]he court may consider otherwise inadmissible evidence." *Mancia v. Mayflower Textile Servs. Co.*, CCB-08-273, 2008 WL 4735344, at *4 (D. Md. Oct. 14, 2008) (citation omitted). Findings of fact made at the preliminary injunction stage are not binding at trial. *Bartels by & through Bartels v. Saber Healthcare Grp., LLC*, 880 F.3d 668, 682 n.7 (4th Cir. 2018) (citing *Camenisch*, 451 U.S. at 395).

The record presently before this Court indicates that images produced by the AIR pilot program will only depict individuals as miniscule dots moving about a city landscape. The movement of these dots cannot be tracked without significant labor. Gaps in the imagery data foreclose the tracking of a single person over the course of several days. This limited form of aerial surveillance does not constitute a "search" under the Fourth Amendment, nor does it burden First Amendment speech activities. In a City plagued with violent crime and clamoring for police protections, this Court is loath to take the "extraordinary" step of stopping the AIR program before it even begins. *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001).

## I. Nature of the Claims.

This is a civil case. The Plaintiffs are suing the Baltimore Police Department and Michael S. Harrison, in his official capacity, pursuant to 42 U.S.C. § 1983. Section 1983 provides that "[e]very person," who, under color of state law causes the violation of another's federal rights, shall be liable to the party injured by his conduct. *See* 42 U.S.C. § 1983. In *Monell v. New York City Department of Social Services,* 436 U.S. 658, 690, 98 S. Ct. 2018 (1978), the Supreme Court held that a municipality or other local government may be subject to suit under § 1983 when its official policies or customs result in constitutional rights deprivations. *Burley v. Baltimore Police Dep't,* 422 F. Supp. 3d 986, 1014 (D. Md. 2019).

The Defendants do not raise any arguments concerning whether they may be sued under § 1983 or a *Monell* theory of liability, and instead focus on the preliminary injunction standard, the issue of standing, and the merits of the Plaintiffs' Fourth Amendment challenge. However, in some recent cases, the Baltimore Police Department has taken the position that it is not subject to liability under § 1983 or *Monell. See, e.g., Johnson v. Baltimore Police Dep't,* SAG-18-2375, 2020 WL 1694349 (D. Md. Apr. 7, 2020). As Judge Gallagher of this Court has recently explained, this contention has been rejected and the issue is currently before the Fourth Circuit. *Id.* at *9 (citing *Burley v. Balt. Police Dep't,* 422 F. Supp. 3d 986 (D. Md. Nov. 22, 2019), *appeal docketed and consolidated,* No. 19-2029 (4th Cir. Sept. 27, 2019); *Lucero v. Early,* No. GLR-13-1036, 2019 WL 4673448, at *3-5 (D. Md. Sept. 25, 2019), *appeal docketed,* No. 19-2072 (4th Cir. Oct. 4, 2019); Order, *Parks v. Balt. Police Dep't,* No. TDC-18-3092 (D. Md. Sept. 9, 2019), ECF 86, *appeal docketed and consolidated,* No. 19-2029 (4th Cir. Sept. 27, 2019)). This

Court adopts the rationale of these cases, and holds that the Baltimore Police Department and Harrison, in his official capacity, may be subject to suit under § 1983 and *Monell.*

Nevertheless, Defendants suggest that the actions of Persistent Surveillance Systems, as a private contractor, cannot be attributable to the Baltimore Police Department for purposes of assessing the Plaintiffs' § 1983 claims. Liability arises under § 1983 when "the conduct allegedly causing the deprivation of [the plaintiffs' rights is] fairly attributable to the State," or, in the case of a *Monell* action, to a policy of a local government entity. *Conner v. Donnelly,* 42 F.3d 220, 223 (4th Cir. 1994) (quoting *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S. Ct. 2744, 2753 (1982)); *Semple v. City of Moundsville,* 195 F.3d 708, 712 (4th Cir. 1999). A private entity may be held liable under § 1983 when it "has exercised powers that are traditionally the exclusive prerogative of the state." *Conner,* 42 F.3d at 224 (quoting *Blum v. Yaretsky,* 457 U.S. 991, 1005, 102 S. Ct. 2777 (1982)).

In this case, Persistent Surveillance System's actions may be attributable to the Baltimore Police Department for purposes of assessing the Plaintiffs' § 1983 claims. The Baltimore Police Department and Persistent Surveillance Systems have entered into a Professional Services Agreement, ratified by the Baltimore City Board of Estimates, to conduct aerial surveillance over Baltimore. As Defendants conceded during the Preliminary Injunction Hearing, Persistent Surveillance Systems would be exercising powers which are traditionally within the exclusive domain of the BPD when undertaking the actions authorized by the Professional Services Agreement. Accordingly, the capture and analysis of imagery data by Persistent Surveillance Systems is attributable to the Baltimore Police Department for purposes of the Plaintiffs' § 1983 claims.

11

## II.  Standing.

Before proceeding to the merits, this Court must determine whether the Plaintiffs have standing to sue the Defendants for First and Fourth Amendment violations. "Standing is an 'essential and unchanging part' of Article III's case or controversy requirement." James M. Wagstaffe, *Federal Civil Procedure Before Trial* § 24-III (2019) (quoting *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000)). To establish Article III standing, a plaintiff must (1) show an injury in fact, (2) demonstrate a causal connection between the defendants' actions and the alleged injury, and (3) show that the injury will likely be redressed by a favorable outcome. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130 (1995). An injury in fact must be "concrete, particularized, and actual or imminent." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149, 130 S. Ct. 2743 (2010). "Allegations of *possible* future injury" are not sufficient. *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409, 133 S. Ct. 1138, 1147 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158, 110 S. Ct. 1717 (1990)).

In this case, only the "injury-in-fact" requirement is in dispute. The Defendants advance distinct standing arguments with respect to the Plaintiffs' claims. As to their Fourth Amendment claims, Defendants contend that the Plaintiffs' standing is contingent upon the potential, *future* review of the imagery data by the Baltimore Police Department. With respect to the First Amendment claims, Defendants argue that the Plaintiffs' "subjective expectation of a chilling effect on their associations" does not constitute an injury-in-fact sufficient to confer standing to bring a First Amendment claim. These arguments are addressed in turn.

The collection of imagery data associated with the Plaintiffs is an "injury-in-fact" sufficient to support standing to bring a Fourth Amendment claim. As the United States

Court of Appeals for the Second Circuit held in *ACLU v. Clapper*, 785 F.3d 787 (2d Cir. 2015), data collection alone can confer standing to bring a Fourth Amendment claim. In that case, several non-profit civil rights organizations brought First and Fourth Amendment challenges to the National Security Administration's bulk telephone metadata collection program. 785 F.3d at 792. The plaintiffs had established that their call records were among those collected under the program. *Id.* at 801. The Defendants, a collection of federal government entities and officials, argued that Plaintiffs' injury-in-fact could only arise if the government reviewed this data. *Id.* at 800. The Second Circuit explained that the Defendants had misapprehended "what is required to establish standing in a case such as this one." *Id.* at 801. The Court held that, regardless of whether the Plaintiffs' claims ultimately prevailed, they nevertheless had standing "to allege injury from the collection, and maintenance in a government database, of records related to them." *Id.* As further discussed *infra*, following the Second Circuit's decision in *Clapper*, the United States Court of Appeals for the Fourth Circuit held that the interception and copying of communications sufficed to confer standing to bring Fourth Amendment claims. *Wikimedia Found. v. NSA*, 857 F.3d 193, 210 (4th Cir. 2017).

In this case, Plaintiffs have standing to challenge the collection and retention of data associated with them. There is no dispute that Plaintiffs' images—albeit in the form of a pixel-sized dot—will be captured by the airplanes deployed by Persistent Surveillance Systems and that those images will be preserved in a server it maintains. All Plaintiffs engage in public advocacy initiatives in Baltimore City, which requires them to traverse the city on foot, by bus, or by car. (Declaration of Dayvon Love ¶¶ 3, 12, ECF No. 4; Declaration of Erricka Bridgeford ¶¶ 7, 14, ECF No. 5; Declaration of Kevin James ¶¶ 2, 5, ECF No. 6.) Operating

13

roughly 12 hours per day in agreeable weather conditions and capturing 32-square miles of the city every second, the PSS planes will certainly capture individual imagery, even if only in the form of miniscule dots, as individuals move about Baltimore. Although PSS is not a Defendant in this matter, its activity is attributable to the Defendants as an exercise of the powers delegated to it by contract, which otherwise would be reserved to the Baltimore Police Department. Furthermore, as the Second Circuit explained in *Clapper*, it matters not that the BPD may never review the "dots" associated with these Plaintiffs. The collection of this data is alone sufficient to confer standing under Article III.

The Plaintiffs' anticipated efforts to modify their speech activity to avoid surveillance under the AIR pilot program constitutes an "injury-in-fact" in the First Amendment context. As the Fourth Circuit has recognized, "'standing requirements are somewhat relaxed in First Amendment cases,' particularly regarding the injury-in-fact requirement." *Davison v. Randall*, 912 F.3d 666, 678 (4th Cir. 2019) (quoting *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013); *see also Lopez v. Candaele*, 630 F.3d 775, 781 (9th Cir. 2010) ("First Amendment cases raise unique standing considerations that tilt dramatically toward a finding of standing." (internal quotation marks and citations omitted)). In the First Amendment context, "the injury-in-fact element is commonly satisfied by a sufficient showing of 'self-censorship, which occurs when a claimant is chilled from exercising his right to free expression.'" *Cooksey*, 721 F.3d at 235 (*Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011)).

Measures taken to avoid data collection may suffice as an injury-in-fact supporting standing to bring First Amendment claims. In *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193 (4th Cir. 2017), educational, legal, human rights, and media organizations brought First

and Fourth Amendment claims against the National Security Agency ("NSA") and other government entities related to the NSA's interception, collection, and review of text-based communications. *Id.* at 202. In response to these communication intercepts, Wikimedia Foundation alleged that it had taken "burdensome steps to protect the privacy of its communications and the confidentiality of the information it thereby receives" and had "self-censored communications or forgone electronic communications altogether." *Id.* at 204. Citing the rule articulated in *Cooksey, supra,* the United States Court of Appeals for the Fourth Circuit held that Wikimedia had standing to sue on First Amendment grounds because it had "self-censored its speech and sometimes forgone electronic communications." 857 F.3d at 211.

In this case, the Plaintiffs have clearly articulated how they will respond to the AIR program's implementation. Leaders of a Beautiful Struggle will "alter[] the means by which [they] travel" and the "timing of certain meetings." (Love Decl. ¶ 13.) James avers that he will "be more aware of and deliberate about whom [he] meet[s] and associate[s] with," and feel obliged to explain the risks he associates with the AIR program to people he recruits to participate in protest activity. (James Decl. ¶ 8.) Bridgeford will "shift most of [her] outreach and conversations to be over the phone, over social media, or over email, which will severely impact the nature and quality of the inherently personal and sensitive work" that she does through Ceasefire. (Bridgeford Decl. ¶ 15.) These actions present the mirror image of those at issue in *Wikimedia*: in response to electronic surveillance, Wikimedia took its communications offline and made efforts to shield its online work; in response to real-world surveillance, Plaintiffs in this case will attempt to conceal their movements around Baltimore

15

and will move their communications online. These efforts, like the parallel efforts made in *Wikimedia*, are sufficient to confer standing to bring a First Amendment claim.

Relying on *Laird v. Tatum*, 408 U.S. 1, 92 S. Ct. 2318 (1972) and *Donohoe v. Duling*, 465 F.2d 196 (4th Cir. 1972), Defendants argue that Plaintiffs' proffered injuries are too vague or speculative to satisfy Article III's injury-in-fact requirement. In *Laird*, the Supreme Court held that an alleged chilling effect on the exercise of First Amendment rights caused by "the mere existence . . . of a governmental investigative and data-gathering activity" does not suffice to establish Article III standing. *Laird*, 408 U.S. at 3, 92 S. Ct. 2318. The *Laird* Court reached its decision in part based on the Plaintiffs' failure to clarify the nature of their purported injury. This ambiguity caused the Court to speculate that the alleged chill "may perhaps be seen as arising from respondents' very perception of the system as inappropriate to the Army's role under our form of government . . . [or] speculative apprehensiveness that the Army may at some future date misuse the information in some way that would cause direct harm to respondents." *Id.* at 13. The Court further remarked that the plaintiffs "cast considerable doubt on whether they themselves are in fact suffering from" a First Amendment chill. *Id.* at 13 n.7. Following *Laird*, the Fourth Circuit likewise held that the "mere existence" of intelligence gathering cannot satisfy Article III's requirements. *Donohoe v. Duling*, 465 F.2d 196, 202 (4th Cir. 1972) (quoting *Laird*, 408 U.S. at 10, 92 S. Ct. 2324).

In this case, Plaintiffs have done far more than express vague concerns about the "mere existence" of information-gathering. Rather, Plaintiffs have shown that they will be subject to surveillance under the AIR program. Their Article III injuries stem from the fact that their movements will be captured in the imagery data obtained by Persistent Surveillance Systems,

16

and that they will need to take burdensome steps to avoid surveillance. These injuries are far more concrete and imminent than the vague concerns voiced in *Laird* and *Donohoe*.

Finally, Defendants cite *Clapper v. Amnesty Int'l. USA*, 568 U.S. 398, 133 S. Ct. 1138 (2013) for the proposition that changing practices to avoid surveillance is "categorically insufficient" to support standing. This reading of *Amnesty* is much too broad. In *Amnesty*, attorneys and various organizations brought, *inter alia*, a First Amendment challenge to Section 702 of the Foreign Intelligence Surveillance Act of 1978 ("FISA"), 50 U.S.C. § 1881a. *Amnesty*, 568 U.S. at 401, 133 S. Ct. 1138. Plaintiffs alleged that they worked closely with likely FISA targets and, in some cases, needed to exchange privileged communications with them. *Id.* at 406, 133 S. Ct. 1138. In response to expanded intelligence gathering authority effectuated by the FISA Amendments Act of 2008, Plaintiffs alleged that they had "ceased engaging" in certain electronic communications to avoid FISA surveillance and anticipated traveling abroad to conduct in-person conversations. *Id.* at 406-07.

The United States Supreme Court held that these purported injuries were insufficient to support Article III standing. *Id.* at 410. The Court reasoned that the Plaintiffs' theory of standing "relie[d] on a highly attenuated chain of possibilities," the first of which was the "highly speculative" proposition that the Government would target non-U.S. persons in communication with the Plaintiffs. *Id.* The Court further observed that the Plaintiffs had "no actual knowledge" of the Government's surveillance practices under § 1881a. *Id.* at 411. Accordingly, any efforts taken by the Plaintiffs to avoid the interception of their communications were "simply the product of their fear of surveillance." *Id.* at 417.

This is a very different case. The Plaintiffs in this case, unlike those in *Amnesty*, have benefitted from the BPD's transparency and have reached a fair understanding of the AIR pilot program. The BPD has clearly indicated that Persistent Surveillance Systems will surveil Baltimore for roughly 12 hours per day, capturing images of about 90 percent of the city. Should the Plaintiffs venture outside at all during this period—a near certainty—they will appear as one pixel in the PSS airplanes' wide-area photographs. Their efforts to avoid this surveillance are not at all the product of baseless fears or cascading contingencies, but rooted in an understanding of the program's straightforward objectives.

In summary, Plaintiffs have standing to bring their First and Fourth Amendment claims. The Plaintiffs' have established—at this early stage in the proceedings—that they will appear in imagery data collected by PSS. The collection of this data, and the efforts Plaintiffs will take to avoid appearing in PSS images, is an "injury-in-fact" sufficient to support Article III standing. The mere fact that the Plaintiffs have standing to present these claims, however, does not mean that the Plaintiffs are likely to prevail on them. *See Overbey v. Mayor of Baltimore*, 930 F.3d 215 (4th Cir. 2019) ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." (citing *Warth v. Seldin*, 422 U.S. 490, 500, 95 S. Ct. 2197 (1975))).

## III.    The Preliminary Injunction Standard.

To obtain a preliminary injunction, the Plaintiffs must show that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities favors them; and (4) that an injunction is in the public interest. 555

U.S. at 20; *accord. Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020). This Court addresses these requirements *seriatim*.

## A. Likelihood of Success on the Merits – Fourth Amendment Claim.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" by governmental actors. U.S. Const. amend. IV. In *Katz v. United States*, 389 U.S. 347 (1967), the Supreme Court held that a "search" occurs under the Fourth Amendment when the Government intrudes upon an individual's reasonable expectation of privacy. As Justice Harlan famously explained in his *Katz* concurrence, "a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33, 121 S. Ct. 2038 (2001) (quoting *Katz*, 389 U.S. at 361 (Harlan, J., concurring)).

In Count I of their Complaint, Plaintiffs claim that the imagery data captured by the AIR pilot program violates the Fourth Amendment to the United States Constitution. They argue that the program violates their reasonable expectation of privacy in their "long-term physical movements." (ECF No. 2-1 at 22.) The Plaintiffs' assertion warrants discussion of prior Fourth Amendment challenges to aerial surveillance techniques, widely-accepted pole camera surveillance, and various technological means of tracking a person's movements.

## 1. Aerial Surveillance and the Fourth Amendment.

Following *Katz*, the Supreme Court rejected three Fourth Amendment challenges to aerial surveillance methods. These cases involved far more intrusive means of aerial surveillance than the program presented in this case. First, in *Dow Chemical Co. v. United States*,

476 U.S. 227 (1986), the Supreme Court held that the Environmental Protection Agency ("EPA") did not conduct a "search" within the meaning of the Fourth Amendment when it flew an airplane equipped with a "standard, floor-mounted, aerial mapping camera" to take photographs of a Dow Chemical facility. *Id.* at 229. The plane made at least 6 passes over the plant at an altitude of 12,000, 3,000, and 1,200 feet, snapping about 75 photographs. *Dow Chemical Co v. United States*, 536 F. Supp. 1355, 1357 (1982). At the time, the camera represented the "finest precision aerial camera available," and permitted the EPA to capture "a great deal more than the human eye could ever see." 476 U.S. at 230. As the District Court observed, the camera "was capable of taking several photographs in precise and rapid succession," facilitating stereoscopic examination, which permits depth perception. *Id.* at 242 n.4 (Powell, J., concurring in part).

Despite the relative sophistication of the camera at issue, the Court determined that the fly-overs did not constitute a "search" within the meaning of the Fourth Amendment. The Court reached this decision in part based on long-standing Supreme Court doctrines which limited Fourth Amendment protections accorded to "open fields," but also considered whether the flights invaded a protected privacy interest. The Court held that the images produced by the camera "are not so revealing of intimate details as to raise constitutional concerns." *Id.* As a counterexample, the Court mused that "[a]n electronic device to penetrate walls or windows so as to hear and record confidential discussions . . . would raise very different and far more serious questions." *Id.* at 239. Such "highly sophisticated surveillance equipment" might raise Fourth Amendment concerns, but the equipment at issue in *Dow* did not.

On the same day that the Court decided *Dow*, it also issued an opinion in *California v. Ciraolo*, 476 U.S. 207 (1986). In *Ciraolo*, police officers flew a helicopter 1,000 feet over a defendant's home and, using only the naked eye, were able to observe marijuana growing in his enclosed backyard. *Id.* at 209. The Supreme Court held that, although the marijuana plants fell within the curtilage of the home—traditionally protected by the Fourth Amendment—the defendant nevertheless had no objectively reasonable expectation of privacy in the officer's surveillance because it took place in "navigable airspace" and "in a physically non-intrusive manner." *Id.* at 215.

Finally, in *Florida v. Riley*, 488 U.S. 445 (1989) the United States Supreme Court once again upheld the use of aerial surveillance. In *Riley*, a police officer circled twice above the Defendant's greenhouse in a helicopter and at the close-range of 400 feet. *Id.* at 448. From this distance, the officer observed marijuana growing through openings in the greenhouse's roof and sides. *Id.* In a plurality opinion, Justice White found that the Defendant had no reasonable expectation of privacy against surveillance of his greenhouse conducted by an aircraft flying within navigable airspace and in accordance with applicable flight regulations. *Id.* at 451. As in *Dow*, the plurality opinion emphasized that officers on-board the helicopter did not observe "intimate details" connected with the Defendant's use of his home. *Id.* at 452. In a concurrence, Justice O'Connor wrote to express her view that the inquiry should focus not on whether the helicopter had followed flight regulations, but whether it "was flying at an altitude at which members of the public travel with significant regularity." *Riley*, 488 U.S. at 454, 109 S. Ct. 693 (O'Connor, J., concurring).

The United States Court of Appeals for the Fourth Circuit has considered Fourth Amendment challenges to aerial surveillance on two occasions. In *United States v. Breza*, 308 F.3d 430, 432, 434-35 (4th Cir. 2002), the Court held that the aerial observation of landscaped area surrounding defendant's house on his 92-acre farm by law enforcement officers in a helicopter at altitude of 200 feet did not violate defendant's Fourth Amendment rights. Borrowing from both Justice White and Justice O'Connor in *Riley*, the Fourth Circuit held that the surveillance was not a "search" because the helicopter complied with FAA regulations and such flights were a "regular occurrence" in the area. *Id.* at 434. Additionally, in *Giancola v. State of W. Va. Dep't of Pub. Safety*, 830 F.2d 547, 551 (4th Cir. 1987), the Fourth Circuit held that helicopter surveillance conducted at 100 feet over personal property of Plaintiffs was "reasonable" under the Fourth Amendment because it comported with FAA regulations.

Common strands emerge from these aerial surveillance cases. Chief among these is that the Supreme Court and the Fourth Circuit have generally upheld warrantless aerial surveillance. Fourth Amendment concerns are unlikely to be implicated so long as the surveillance occurs within navigable or regularly traveled airspace, *see Riley*, 488 U.S. at 451; *Id.* at 454 (O'Connor, J., concurring); *Ciraolo*, 476 U.S. at 215, and the flight does not permit the visual observation of "intimate details" associated with a person's home, *see Riley*, 488 U.S. at 452; *Dow*, 476 U.S. at 238, or disturb the use of a person's property by means of "wind, dust, or threat of injury," *Ciraolo*, 476 U.S. at 215; *Riley*, 488 U.S. at 452. Employing these principles, the Supreme Court has permitted police helicopters to approach so closely as to permit the unassisted identification of marijuana plants, and to employ cutting-edge camera technology to document industrial facilities.

22

The AIR pilot program is far less invasive than the feats of aerial surveillance permitted in *Riley, Ciraolo,* and *Dow.* There is no question that the PSS planes will fly in navigable airspace and will not present any risk of property damage or injury to the public. There is no indication in the record that the planes will attempt to descend to low altitudes and permit naked-eye observations of suspected crimes or contraband, as the Supreme Court permitted in *Ciraolo* and *Riley.* The planes cannot offer glimpses of "intimate details" involving the use of the home, as the Supreme Court has intimated would be impermissible. The program will only capture the Plaintiffs in this case as a series of anonymous dots traversing a map of Baltimore. What the Plaintiffs do in the privacy of their homes will not be observable and cannot be reconstructed through the AIR pilot program—even if imagery data is cross-referenced with existing police tools, like CitiWatch cameras. Although the Supreme Court has cautioned against "highly sophisticated surveillance equipment" capable of penetrating windows or recording conversations, *see Dow Chemical Co. v. United States,* 476 U.S. 227 (1986), the AIR program is a far cry from such Orwellian gadgets.

## 2. Pole Cameras and the Fourth Amendment.

Guided by the Supreme Court's decision in *Katz, Ciraolo, Dow,* and other cases, numerous federal Courts of Appeals—including the Fourth Circuit—have upheld the warrantless use of pole cameras to observe activities within a given radius. These pole cameras present a highly invasive means of surveillance, capable of observing a person's facial features and bodily movements as they navigate their habitual environs. *See United States v. Vankesteren,* 553 F.3d 286, 291 (4th Cir. 2009) (upholding warrantless placement of a motion-activated camera in an open field owned by the plaintiff, where he felt "comfortable enough to relieve

23

himself," to observe him killing endangered birds); *see also United States v. Houston*, 813 F.3d 282, 285-86 (6th Cir. 2016) (upholding warrantless use of pole camera installed 200 yards away from Defendant's farm which "could move left and right and had a zoom function," was trained on the Defendant's trailer and barn, where he spent most of his time, and was used to record 10 weeks of footage); *United States v. Bucci*, 582 F.3d 108, 116-17 (1st Cir. 2009) (upholding warrantless use of video camera installed on utility pole across the street from the defendant's house, which police used to observe his activities for eight months); *United States v. Jackson*, 213 F.3d 1269, 1276, 1280-81 (10th Cir.), *vacated on other grounds*, 531 U.S. 1033, 121 S. Ct. 621 (2000) (upholding warrantless use of pole cameras capable of zooming in to read individual license plates and to observe residential area). *But see United States v. Cuevas-Sanchez*, 821 F.2d 248 (5th Cir. 1987) (finding that extended, warrantless use of pole camera to capture drug-related activities occurring behind a 10-foot fence bordering defendant's backyard constituted a Fourth Amendment "search").

The AIR pilot program does not approach the surveillance capabilities of a pole camera. The imagery data collected by PSS planes cannot capture a suspect's bodily movements, observe facial expressions, record in real-time, zoom-in on suspicious activities, or record illegal activities near the curtilage of the home or even in open fields. The AIR pilot program has a limited capacity to track the movements of unique "dots" across a cityscape and to integrate this capability with existing police tools. Even when fully integrated with existing BPD surveillance tools, the AIR pilot program could not capture a host of private activities ordinarily subject to pole camera surveillance. To the extent that warrantless pole

camera surveillance is permissible under Fourth Amendment jurisprudence, so too is the AIR pilot program.

### 3. Application of *Carpenter v. United States.*

Plaintiffs seek to extend the Supreme Court's recent holding in *Carpenter v. United States*, 138 S. Ct. 2206 (2018) to the facts of this case. In *Carpenter*, the Supreme Court held that individuals have "a legitimate expectation of privacy in the record of [their] physical movements as captured through [cell site location information]." *Carpenter*, 138 S. Ct. at 2217. The Supreme Court cautioned that its holding was "narrow" and did not "call into question conventional surveillance techniques and tools, such as security cameras." *Id.* at 2220. Accordingly, *Carpenter* does not implicate the AIR pilot program.

A rudimentary understanding of historical cell site location information ("CSLI") is required to apprehend the applicability of *Carpenter* to the facts of this case. Cell phones perform a variety of functions by connecting to radio antennas called "cell sites." *Carpenter*, 138 S. Ct. at 2211. These cell sites may be located on towers and a host of common urban fixtures, including "light posts, flagpoles, church steeples, or the sides of buildings." *Id.* Cell phones continuously scan their environment for the best signal—usually from the closest cell site—even when it is not in use. *Id.* Each time a cell phone connects to a cell site, it generates a time-stamped record known as cell-site location information. *Id.* Cell phone service provides store these records, resulting in a log of "historical" CSLI. *Id.* at 2212.

In *Carpenter*, prosecutors applied for court orders under the Stored Communications Act to obtain CSLI phone records related to Defendant Timothy Carpenter ("Carpenter"). .

*Carpenter*, 138 S. Ct. at 2212. The first order sought 152-days of cell site records from MetroPCS, which produced records spanning 127 days. *Id.* The second sought seven days of CSLI from Sprint, but yielded two days' of data. *Id.* At trial, FBI Agent Christopher Hess utilized this data to produce maps that placed Carpenter's phone near four alleged robberies. *Id.* at 2213. More specifically, the CSLI could place Carpenter "within a wedge-shaped sector ranging from one-eighth to four square miles." *Id.* at 2218.

The Court held that the Government's acquisition of CSLI constituted a "search" under the Fourth Amendment. As the Court acknowledged, a majority of the Justices had already recognized that "individuals have a reasonable expectation of privacy in the whole of their physical movements." *Carpenter*, 138 S. Ct. at 2217 (citing *United States v. Jones,* 565 U.S. 400, 430, 132 S. Ct. 945 (2012) (Alito, J., concurring); *id.* at 415, 132 S. Ct. 945 (Sotomayor, J. concurring). The use of CSLI contravened this expectation in part because it could expose the "privacies of life." *Carpenter*, 138 S. Ct. 2217 (citing *Riley v. California*, 573 U.S. 373, 403, 134 S. Ct. 2473 (2014)). The Court observed that Americans carry their cell phones not just in public, but "into private residences" and even into the shower—all the while leaving a "detailed log of [their] movements over several years." *Id.* at 2218, 2222. The Court's opinion was based squarely on the technology at hand: logging a suspect's movements using CSLI was "remarkably easy, cheap, and efficient" and could be achieved "[w]ith just a click of a button." *Id.* at 2218. Reinforcing this notion, the Supreme Court cautioned that its holding was "narrow" and did not "call into question conventional surveillance techniques and tools." *Id.* at 2220.

26

*Carpenter* simply does not reach this case because CSLI offers a far more intrusive, efficient, and reliable method of tracking a person's whereabouts than the AIR pilot program. Unlike CSLI, the AIR pilot program cannot produce a running log of the Plaintiffs' whereabouts or catalogue the "whole of their physical movements." *Carpenter*, 138 S. Ct. at 2217. Unlike a cell phone which relays location data "several times a minute" so long as its signal can reach a cell tower, the AIR pilot program has limited location-tracking abilities. As the Persistent Surveillance System airplanes will not fly at night and cannot capture images in inclement weather, gaps in the data will prohibit the tracking of individuals over the course of multiple days, much less "years," "127 days," or "7 days"—the time frames at issue in *Carpenter*. Tracking individuals using the AIR pilot program is not the "remarkably easy" exercise described in *Carpenter*. 138 S. Ct. at 2218. Tracking using imagery data requires time-intensive analyses—about 1 hour of labor to track two hours' of a vehicle's movements. Finally, and critically, the program cannot expose the "privacies of life." *Carpenter*, 138 S. Ct. 2217 (citing *Riley*, 573 U.S. at 403, 134 S. Ct. 2473). Unlike a cell phone, the AIR pilot program cannot follow the "dots" it observes into a person's home, shower, *see Carpenter*, 138 S. Ct. at 2218, or "daily sauna and bath." *Kyllo v. United States*, 533 U.S. at 38, 121 S. Ct. 203.

Plaintiffs advance several arguments in an effort to liken the collection of CSLI data to the capture of imagery data. First, Plaintiffs attempt to minimize the efforts required to track a person using the AIR pilot program, likening the work to reconstructing a person's movements using CSLI. They explain that, in one study, "authors concluded that using cell-phone location data, just four points were enough to identify an individual based on their pattern of movements." (ECF No. 2-1 at 26.) It is not at all clear that the same results would

obtain in this context. The Plaintiffs have not proffered any evidence suggesting that the same analysis applicable to cell-phone location data may be grafted on to the imagery data produced by the AIR pilot program.

Next, Plaintiffs argue that "it matters not under the Fourth Amendment that some degree of additional legwork may be required" to match a "dot" observed by the PSS planes with a particular individual on the ground and to collect information about that person's community activities or associations. They note that the Professional Services Agreement expressly contemplates the integration of the AIR pilot program technology with existing BPD resources, including CitiWatch cameras and license plate readers. (PSA 23.) In *Carpenter*, the Supreme Court once again rejected the notion that "inferences insulate a search," *Carpenter*, 138 S. Ct. at 2218 (citing *Kyllo*, 533 U.S. at 36, 121 S. Ct. 2038), and noted that CSLI must be combined "with other information" to reliably track a person's movements. *Carpenter*, 138 S. Ct. at 2218.

The Plaintiffs' argument, seeking to lump together discrete surveillance activities as one Fourth Amendment "search," is simply without merit. Using a combination of resources and activities—including police interviews, CitiWatch cameras, license plate readers, and public records—the Baltimore Police Department may be able to reconstruct a detailed account of a person's activities and associations. The addition of one more investigative tool—in this case, aerial surveillance—does not render the total investigatory effort a Fourth Amendment "search." In *Carpenter*, the Supreme Court focused on the acquisition of CSLI and its extraordinary qualities; it did not draw significant attention to ancillary investigative tools used

to corroborate or interpret information obtained through CSLI. Accordingly, *Carpenter* does not grant license to define a Fourth Amendment "search" so broadly that it encompasses several steps in the total investigatory effort.

In a final appeal, Plaintiffs caution that this Court "'must take account of more sophisticated systems that are already in use or in development,'" *Carpenter*, 138 S. Ct. at 2218 (citing *Kyllo*, 533 U.S. at 36, 121 S. Ct. 2038). They warn that far more sophisticated camera technology—such as the NightHawk II—is merely an upgrade away. (ECF No. 2-1 at 28.) A preliminary injunction simply cannot issue on the basis of conjecture and projections of future technological developments. In this case, the Defendants will implement a program that captures images of Baltimore on a sporadic basis—during daylight hours and in fair weather— and registers individuals as a single pixel. On these facts, the Plaintiffs have not established a likelihood of success on the merits of their Fourth Amendment claim.

### B. Likelihood of Success on the Merits – First Amendment Claim.

In Count II of their Complaint, Plaintiffs allege that the AIR program violates the First Amendment to the United States Constitution "because it infringes on Plaintiffs' exercise of associational freedoms through constant and inescapable monitoring by the BPD." (Compl. ¶ 72, ECF No. 1.) In its Response to the Plaintiffs' Motion for a Preliminary Injunction, Defendants argued only that Plaintiffs lacked standing to bring a First Amendment challenge and chose not to present arguments concerning the merits of the Plaintiffs' claim. Despite Plaintiffs' contention that Defendants have "effectively conceded" (ECF No. 31 at 17) the likelihood that Plaintiffs will prevail on their First Amendment claim, the moving party always

shoulders the "heavy burden" of demonstrating a likelihood of success on the merits. *Real Truth*, 575 F.3d at 346. The Plaintiffs have not satisfied that burden.

The First Amendment guarantees the freedom of speech, to worship, and to petition the government for the redress of grievances. U.S. Const., amend. I. The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622, 104 S. Ct. 3244 (1984). Government action which "'directly and substantially' interfere[s]" with this freedom of association violates the First Amendment. *Lyng v. Int'l Union*, 485 U.S. 360, 367, 108 S. Ct. 1184 (1988).

Plaintiffs rely on a series of cases involving the compelled disclosure of memberships and associations, principally *Shelton v. Tucker*, 364 U.S. 479, 81 S. Ct. 247 (1960). In *Shelton*, the Supreme Court considered whether an Arkansas statute which "compel[led] every teacher, as a condition of employment in a state-supported school or college, to file annually an affidavit listing without limitation every organization to which he has belonged or regularly contributed within the preceding five years." *Id.* at 248. The Supreme Court found the statute unconstitutional because its "unlimited and indiscriminate sweep" required the disclosure of information which had absolutely no bearing on the state's interest in ensuring its teacher's occupational health and fitness. *Id.* at 490. Plaintiffs contend that the AIR pilot program's surveillance capabilities will permit the Defendants to compile a comprehensive log of the Plaintiffs' associations—essentially producing the same unlawful result as the Arkansas statute in *Shelton*.

30

This argument is neither supported by the law or the record. *Shelton* falls within a larger corpus of Supreme Court precedents which hold that the First Amendment "protects against the compelled disclosure of political associations and beliefs." *Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87, 91, 103 S. Ct. 416 (1982) (citing, *inter alia*, *Shelton*, 364 U.S. at 479). These cases with respect to potential associations have no applicability to the issue of surveillance techniques which in no way compel or imperil speech. The record indicates that the AIR pilot program's surveillance capabilities are quite limited and cannot produce a comprehensive log of a person's associations. Accordingly, the Plaintiffs have failed to establish a likelihood of success on their First Amendment claims.

## C. Irreparable Harm.

The parties agree that the "irreparable harm" in this case would be a violation of the Plaintiffs' constitutional rights. *See, e.g., WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) ("[I]n the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim."). Having concluded that the Plaintiffs are not likely to succeed on the merits of their constitutional claims, this Court finds that the Plaintiffs have likewise failed to demonstrate "irreparable harm."

## D. Balance of the Equities.

Plaintiffs argue that the equities favor them, because prohibiting the AIR pilot program will cost the Defendants nothing—at worst, they argue, they will be prohibited from engaging

in an unconstitutional practice. (ECF No. 2-1 at 42-43.) Defendants counter that the AIR pilot program is slated to be fully funded by a philanthropic organization known as Arnold Ventures, and that further delays in the program's implementation may inhibit this source of funding. (ECF No. 30 at 32.) This prospect is within the realm of the possible. The Plaintiffs, on the other hand, stand neither to lose nor gain much of anything by the imposition or withholding of a preliminary injunction because they have not shown that the AIR program does not violate the Constitution. Accordingly, this Court finds that the balance of the equities favors the Defendants and thereby prohibits the issuance of a preliminary injunction.

### E. Public Interest.

Plaintiffs correctly note that "upholding constitutional rights surely serves the public interest." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002). In this case, the proposition is of limited relevance because the Plaintiffs are unlikely to establish a constitutional violation. For their part, the Defendants have introduced statements made in support of the AIR pilot program by various community leaders and organizations. The United Baptist Ministry Convention has written in support of the program. (Letter from Dr. Cleveland T. A. Mason, 2nd to Commissioner Michael Harrison (Mar. 30, 2020), ECF No. 30-2.) So too has the Greater Baltimore Committee.[8] Maryland Governor Larry Hogan has also indicated his support.[9] Defendants readily confess that the "public interest" factor is not

---

[8] Position Statement on Public Safety in Baltimore and Support of the Use of Aerial Surveillance in Baltimore, Oct. 15, 2019, https://gbc.org/statement-on-public-safety-in-baltimore-and-support-for-the-use-of-aerial-surveillance/.

[9] Justin Fenton and Talia Richman, *Baltimore Police Back Pilot Program for Surveillance Planes*, Balt. Sun, Dec. 20, 2019, http://www.baltimoresun.com/news/crime/bs-md-ci-cr-baltimore-police-support-surveillance-plane-20191220-zfhd5ndtlbdurlj5xfr6xhoe2i-story.html.

a popularity contest. (ECF No. 30 at 31.) Nevertheless, the fact that representatives of the Baltimore City community have expressed support for the program is a relevant consideration under this factor.

Another highly relevant consideration is the level of violence afflicting the City of Baltimore, which in in 2019 recorded 348 homicides despite maintaining a population of roughly 600,000 people.[10] Despite stay-at-home orders and emergency declarations designed to combat the spread of COVID-19, the homicides have continued.[11] As of April 8, 2020, it has been reported that the homicide rate in Baltimore is outpacing last year's rate. On April 8, 2019, Baltimore had recorded 71 homicides. By the same date this year, 75 homicides had occurred.[12] In a city plagued by violent crime and desperately in need of police protections, the public interest clearly does not favor the imposition of a preliminary injunction blocking constitutionally sound police programs.

## CONCLUSION

The Plaintiffs have failed to meet their heavy burden to establish their entitlement to a preliminary injunction. Accordingly, Plaintiffs' Motion for a Preliminary Injunction (ECF No. 2) is DENIED, and the AIR pilot program may proceed.

---

[10] Tim Prudente, *2019 closes with 348 homicides, second-deadliest year on record*, Balt. Sun, Jan 1, 2020, http://www.baltimoresun.com/news/crime/bs-md-ci-cr-2019-homicide-final-count-20200101-jnauuumukbdh3edsyypspsm3he-story.html; Justin Fenton, *USA Today names Baltimore 'the nation's most dangerous city'*, Balt. Sun., Feb. 19, 2018 http://www.baltimoresun.com/news/ crime/bs-md-ci-usa-today-homicides-20180219-story.html.

[11] *See* Justin Fenton, *Baltimore crime during coronavirus: Property crime plummets, gun violence continues*, Balt. Sun, Apr. 4, 2020, https://www.baltimoresun.com/news/crime/bs-md-ci-cr-baltimore-crime-coronavirus-20200404-4yjfurpd4jcfvogxssaut232ty-story.html.

[12] Baltimore City Homicide Rate is Currently Ahead of Last Year's, WJZ 13, Apr. 8, 2020, https://baltimore.cbslocal.com/2020/04/08/baltimore-city-homicide-rate-is-currently-ahead-of-last-years.

A separate Order follows.

Dated: April 24, 2020

Richard D. Bennett
United States District Judge