```
1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF MARYLAND
2


3    LEADERS OF A BEAUTIFUL STRUGGLE,   )
     et al.,                            )
4               Plaintiff,              )
          vs.                           )
5                                       ) CIVIL NO.: RDB-20-0929
     BALTIMORE POLICE DEPARTMENT        )
6    et al.,                            )
                Defendant.              )
7                                       )
     _____)
8

9                         Transcript of Proceedings
                   Before the Honorable Richard D. Bennett
10                       Tuesday, April 21st, 2020
                           Baltimore, Maryland
11

12   For the Plaintiff:

13        Ashley M. Gorski, Esquire
          Brett M. Kaufman, Esquire
14        David R. Rocah, Esquire
          Alexia Ramirez, Esquire
15        Nathan Freed Wessler, Esquire
          Ben Wizner, Esquire
16

     For the Defendant:
17
          Dana P. Moore, Acting City Solicitor
18        Elisabeth Walden, Assistant City Solicitor
          Kara Lynch, Assistant City Solicitor
19
     Also Present:  Commissioner Michael Harrison
20

21

22
     _____
23
                       Christine T. Asif, RPR, FCRR
24                     Federal Official Court Reporter
                       101 W. Lombard Street, 4th Floor
25                        Baltimore, Maryland 21201
```

```
 1                  P R O C E E D I N G S
 2            THE COURT:  Good morning.  I apologize, I've been
 3    saying good morning for the last five minutes I was starting
 4    to get worried.  I gather we're all on the line now.  This is
 5    a telephonic hearing on the record in the matter of Leaders of
 6    a Beautiful Struggle, et al., versus the Baltimore Police
 7    Department, civil action No. RDB-20-0929.
 8            Let me just go over the process here.  We're all a
 9    little muted, doing the best we can do.  We actually have a
10    better system hooked up than we've, perhaps, had in a while.
11    But let's make sure it's functioning properly here.  I want to
12    first of all thank my law clerk, Anthony Vitti and the clerk's
13    office for arranging this from various locations.  I, myself,
14    am here at the Federal courthouse.  This is Judge Richard
15    Bennett.  And also I want to thank Christine Asif, our
16    administrative court reporter, our chief reporter who is on
17    the line.  Christine, you are on the line?
18            THE COURT REPORTER:  I am.  Can you hear me?
19            THE COURT:  Yes, I can.  Good morning to you and
20    thank you, Christine.
21            THE COURT REPORTER:  Good morning.  Thank you.
22            THE COURT:  There is a standing order, I believe
23    it's now No. 2020-07, pursuant to which all civil and criminal
24    petit jury selections and trials and nonemergency proceedings
25    through June 5 have essentially been extended.  But we're
```

1     conducting this conference call on an important matter

2     remotely, which is on the record.

3              I would ask that, essentially, the process will be

4     as follows:  I'm going to have everyone introduce themselves

5     in a moment.  Let me just note that it will be very important

6     for people to identify themselves when they speak.

7              And I would note that all callers here are bound by

8     the same rules of our court that apply if we were sitting in

9     the courtroom.  Specifically, no recordings or broadcasting of

10    the proceeding.  This entire matter is being transcribed by

11    Ms. Asif.  And a transcript is available to anyone who would

12    like it, but there is no recording of these proceedings.

13             I think in order to have things work smoothly it's

14    going to be very important for everyone to mute their phone

15    when they are not speaking.  And then when they need to speak

16    then unmute it and then introduce themselves and I think that

17    should work fairly well here.

18             Let me just summarize the posture of this case and

19    then we will hear -- we'll have counsel identify themselves.

20    The -- on April the 9th, the plaintiff's leaders of a

21    beautiful struggle Erricka Bridgeford and Kevin James, the

22    plaintiffs, commenced this lawsuit against the Baltimore

23    Police Department and Baltimore Police Commissioner Michael

24    Harrison, alleging that the Aerial Investigation Research,

25    acronym AIR Program, violates their rights under the First and

1    Fourth Amendment to the United States Constitution.  And that

2    same day, on April the 9th, a motion for a temporary

3    restraining order and preliminary injunction were filed

4    seeking to enjoin and prohibit the Baltimore Police Department

5    from collecting or assessing any images through the AIR

6    Program.

7              I promptly scheduled a telephone call with counsel

8    the same day.  And it was agreed that the following schedule

9    would abide:  That pending a decision of this Court on the

10   motion for preliminary injunction, the Baltimore Police

11   Department and its agents and its assigns would essentially

12   agree that no flights to collect, obtain, or access any

13   photographic imagery would take place until we were able to

14   conduct this hearing.  And then I scheduled a briefing

15   conference.  And this matter has now been fairly briefed and I

16   thank counsel for their thorough briefing consistent with the

17   schedule they set forth on April the 9th.

18             And we are now here conducting this preliminary

19   injunction hearing here on the record.  And I have, given that

20   counsel have very carefully complied with my scheduling order,

21   I can promise you that I will comply with my requirement.  And

22   that is that I promise I will issue a decision on this motion

23   by this Friday, April the 24th, no later than 5:00 o'clock

24   p.m.

25             So that is the procedural posture of this case.  And

1    some of the ground rules that I think we should observe to

2    make sure that this goes smoothly.  And with that, if counsel

3    would identify themselves for the record, first for the

4    plaintiffs.  If counsel would identify themselves for the

5    record.

6            MS. GORSKI:  Good morning, Your Honor.  And may it

7    please the Court, this is Ashley Gorski speaking with the

8    ACLU, I'm joined by my colleagues Brett Kaufman, David Rocah,

9    Alexia Ramirez, Nate Wessler and Ben Wizner.  Today I'll be

10   discussing standing issues, PI factors and First Amendment

11   claim.  And my colleague Mr. Kaufman will be discussing the

12   Fourth Amendment claims.

13           THE COURT:  Yes.  Thank you very much, Ms. Gorski.

14   And welcome to all of you.

15           And on behalf of the defendants, the Baltimore

16   Police Department and Commissioner Michael Harrison.

17           MS. MOORE:  Good morning, Your Honor.  This is Dana

18   Peterson Moore, I'm the Acting City Solicitor for the City of

19   Baltimore, here on behalf of the Baltimore City Police

20   Department and Commissioner Michael S. Harrison.  Joined on

21   the call today by Lisa Walden who's the chief of legal and

22   legal counsel for the Baltimore Police Department and Kara

23   Lynch.  And I believe that Police Commissioner Harrison is

24   also on this call.

25           THE COURT:  All right.  Good morning to all of you.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

```
1    And with that, let me just suggest that what I think is being
2    constructive is that I'll give each side just a few minutes,
3    don't have to make it too lengthy, but five to seven minutes,
4    if you so desire, to make an opening statement here with
5    respect to the respective positions.  And then my view is that
6    we should first address the issue of standing in terms of the
7    challenge by the defendant as to the standing of the
8    plaintiffs with respect to the Fourth Amendment and First
9    Amendment challenges.
10        So if that works for everyone, let me first hear
11   from the plaintiffs for an opening statement.  And then I'll
12   hear from the defense.  And then we will proceed with the
13   matter of standing, starting first with the defendant's
14   counsel in terms of the challenge to the standing of the
15   plaintiffs in this matter.
16        MS. MOORE:  Thank you, Your Honor.  What the issue
17   here is the most expansive mass surveillance program ever
18   proposed in an American city.  It will subject virtually all
19   of Baltimore's 600,000 residents, including plaintiffs, to
20   inescapable surveillance.  The surveillance is not it is
21   imminent.  There is no question that plaintiffs have Article
22   III standing to challenge the AIR Program on Fourth and First
23   Amendment grounds.
24        Plaintiffs could also establish a likelihood of
25   success on their Fourth and First Amendment claims on the
```

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

1    merits.  I'm happy to speak of it more about standing or pause

2    now.

3            THE COURT:  No, let me hear next from the defense in

4    terms of their opening statement.  And then we will proceed

5    with the defendant's position, being their motion response as

6    to the standing issue.  Opening statement for the defense.

7            MS. MOORE:  Yes, Your Honor.  Dana Moore again.

8    Your Honor the AIR pilot program, which is an abbreviation for

9    the Aerial Investigation Research Program is actually a pilot

10   program.  It presents a remarkable opportunity to test the

11   efficacy of a constitutional surveillance tool that impinges

12   not at all on the daily lives of Baltimoreans.  It is not

13   disruptive.  It does not go into private lives.  It is not

14   invasive.  It is constitutional.  We believe, and will argue

15   momentarily, that none of the three named plaintiffs have

16   standing to pursue their claims against the city of

17   Baltimore's Police Department and Michael S. Harrison.

18           The plaintiffs are familiar to us.  We very much

19   appreciate and respect their advocacy and the organizational

20   efforts on behalf of bringing justice to Baltimore.  We value

21   their work.  They are, indeed, part of the solution to

22   Baltimore's rampant crime problem.  But their approach as

23   advocated in their papers is not the approach that the

24   Baltimore City Police Department has decided to pursue.  And

25   their approach and their views cannot be permitted to supplant

1    what is clearly a constitutionally reasonable crime fighting

2    initiative that in no way infringes upon any constitutionally

3    protected right held by any of the plaintiffs.

4            At the root this lawsuit is driven by the

5    plaintiff's own view of how the Baltimore Police Department

6    should respond to the pandemic of violent crime in the city of

7    Baltimore.  We know this because they tell us this in their

8    declaration.  That is what this lawsuit is about.  Certainly,

9    Your Honor, the tactics that the Baltimore Police Department

10   should use and what strategies it should pursue are policy

11   decisions correctly and fully entrusted to the police

12   commissioner, Michael S. Harrison.  For these reasons the

13   Court should reject the plaintiff's efforts to replace the

14   commissioner's judgment with their own.  Thank you.

15           THE COURT:  Thank you very much.  And with that I

16   think I misspoke, I want to hear first from the plaintiff in

17   terms of the standing issue and I apologize.  Obviously, to

18   establish Article III standing a plaintiff must show, one, an

19   injury in fact; two, a demonstrated causal connection between

20   defendant's actions and the alleged injury; and show that

21   the -- third, that the injury will likely be redressed by a

22   favorable outcome.

23           So that I'll be glad to hear, I think Ms. Gorski,

24   you indicated that you were going to be presenting the

25   argument for the plaintiffs on the standing issue.  I'll be

1 glad to hear from you.

2    MS. GORSKI:   Thank you, Your Honor, of the three

3 elements of the Article III standing the Court just

4 identified, the only issue in dispute here is injury in fact.

5 And I'll begin by speaking briefly about standing for

6 plaintiff's Fourth Amendment claim.

7    For this claim the plaintiffs have standing because

8 the BPD, through PSS, will be collecting their sensitive

9 location information.   Case law is clear that plaintiffs have

10 standing to allege Fourth Amendment injury from the government

11 collection of records relating to them, regardless of whether

12 those records are later searched.   And under established

13 precedents, PSS's collection is state action that is legally

14 attributable to the BPD.   The BPD has initiated the

15 surveillance and it has directed PSS to undertake it pursuant

16 to the contract.   Defendants haven't disputed the close nexus

17 between PSS and the BPD.   They haven't disputed the fact that

18 they've provided significant encouragement to PSS.   And they

19 have not disputed that PSS is exercising powers that are

20 traditionally the exclusive prerogative of the state.

21    If the Court disagrees with plaintiff on whether the

22 AIR Program ultimately violates a reasonable expectation of

23 privacy, that would be a merits issue not an Article III

24 standing one.   We didn't cite this case in our briefing but

25 the Supreme Court's decision in *Minnesota v. Carter* from 1998

1    explains that the definition of Fourth Amendment rights is

2    more properly placed within the purview of substantive Fourth

3    Amendment law than within that of standing.  And the Second

4    Circuit decision in *ACLU v. Clapper* is further support for

5    this point.  In that case the Court held that the collection

6    of plaintiff's call records established standing for their

7    Fourth Amendment claims without reaching the merits of that

8    claim.

9           I'm happy to speak now about First Amendment

10   standing if the Court would like or give time over to --

11          THE COURT:  Yes, you can go as to -- I would just

12   note, as I understand it, Ms. Gorski, and I'll hear from

13   Ms. Moore or Ms. Walden or Ms. Lynch in a moment, but as I

14   understand it the defendants have essentially taken the

15   position that your clients don't have standing to challenge a

16   possible future search.  And they have argued, probably not

17   the first time, certainly, talking about the Supreme Court's

18   opinion in *United States versus Carpenter* decided in June of

19   2018, which obviously is a key case for us to be discussing

20   here at 138 S.Ct. 2206.  And the defendants have essentially

21   argued that in the *Carpenter* case the Supreme Court did not

22   hold that the cell phone carriers violated the Fourth

23   Amendment, that it was the government access to that data that

24   violated the Constitution.  Essentially, as I understand it,

25   the thrust of the position of, again, the defendants I'll hear

1      in a moment, is that until there is a access of the data that

2      there has not been -- until there's nothing more than a

3      possible future search.  Do you want to respond to that before

4      you move to the First Amendment?

5              MS. GORSKI:  Yes, Your Honor.  So I think there are

6      two issues invited here.  The first issue is the state action

7      issue.  And because PSS is acting at the BPD's direction,

8      PSS's initial collection of plaintiff's information, before

9      any search takes place, the collection itself, the aerial

10     surveillance itself, is an injury sufficient for plaintiff's

11     Fourth Amendment claims.  And *ACLU v. Clapper* is very clear on

12     this point.

13             The 4th Circuit's recent decision in the *Wikimedia*

14     case is similarly support for this proposition.  There the

15     government argued that the NSA's collection of plaintiff's

16     communication did not constitute a Fourth Amendment injury and

17     that only the review of those communications subsequently

18     would qualify as an injury.  And the 4th Circuit was

19     unpersuaded.  It held the fact that the fact that the NSA is

20     intercepting communications shows that there's an invasion of

21     a legally protected interest and that suffices for standing

22     purposes.

23             So one issue is the state action issue.  And the

24     second issue is the notion that there is no injury until an

25     entity is reviewing or searching through these records.  It is

1    clear that PSS is a state actor here and its actions are

2    attributable to the BPD.  And it's clear under the *Wikimedia*

3    case, under *ACLU v. Clapper* that PSS's initial collection of

4    this information constitutes a Fourth Amendment injury.

5                THE COURT:  Thank you, Ms. Gorski.  We'll move to

6    the First Amendment next in just one second.  Just for the

7    record, for those members of the public or media that are

8    listening in here, PSS is obviously referring to Persistent

9    Surveillance Systems, which is the Ohio-based company which

10   has contracted with the Baltimore Police Department; correct?

11               MS. GORSKI:  Yes, Your Honor.  And my apologies for

12   just using the acronym.

13               THE COURT:  That's okay.  The Legal community

14   consistently using acronyms.  Always believe it's important to

15   emphasize for the public so they understand, PSS henceforth

16   for these matters here this morning, refers to Persistent

17   Surveillance Systems, which is the Ohio-based company, which

18   is to conduct the aerial surveillance that's at issue here.

19               So with that if you want to address the First

20   Amendment standing issue as well, Ms. Gorski.  And then I'll

21   hear from counsel for the City and Police Department.

22               MS. GORSKI:  Thank you, Your Honor.  And one final

23   note on the Fourth Amendment, you mentioned the defendant's

24   argument with respect to the *Carpenter* case.  And this case is

25   very, very different from the *Carpenter* case.  A cell phone

1   providers are not agents or instrumentalities of the

2   government.  Cell phone providers, when they collect

3   individual cell site location information, are not doing so at

4   the behest of the government.  Here, in contrast, PSS is

5   collecting this information at the behest, at the direction of

6   the BPD.  And that means that defendant's *Carpenter* analogy is

7   entirely misplaced.

8          Moving on now to the First Amendment argument.  I

9   want to emphasize at the outset that defendants do not dispute

10  the merits of plaintiff's First Amendment claims.  The only

11  First Amendment issue in dispute is the likelihood of

12  plaintiff's standing.  The plaintiffs here have established

13  three distinct First Amendment injuries, each of which is

14  sufficient to confer standing.  The first injury is the AIR

15  Program's collection of plaintiff's private associational

16  information.  This collection is itself an injury in fact.

17  And here I want to underscore that the defendants do not

18  dispute that plaintiffs' private information will be collected

19  pursuant to the AIR Program.  There's no question that

20  plaintiffs' location information will be collected by PSS.

21         The second injury that plaintiff's have identified

22  is the protective measures that they will be forced to take if

23  the AIR Program is permitted to go forward.  These include

24  plaintiff, Ms. Bridgeford, changing her means of

25  communication, which will impair her work.  And plaintiff

1    Leaders of a Beautiful Struggle altering the timing and

2    location of its meetings, which will divert staff resources

3    from other work.

4           And the Supreme Court has been very clear that these

5    kind of protective measures are cognizable injuries, so long

6    as the challenged government action is not hypothetical.  And

7    here the AIR Program is not hypothetical.  It is imminent.

8    This case is entirely unlike *Clapper versus Amnesty*

9    *International* in which the plaintiff's fear of surveillance is

10   speculative.  Here there is no question that plaintiffs will

11   be subject to the AIR Program and defendants don't dispute

12   that.

13          Under *Amnesty International*, under *Laidlaw*, under

14   *Department of Commerce v. New York*, plaintiffs' protective

15   measures are cognizable injury.  Defendants argue that *Amnesty*

16   forecloses the theory of injury based on protective measures,

17   but *Amnesty,* in fact, acknowledges and affirms the line of

18   cases holding that protective measures constitute cognizable

19   injuries.  Cases like *Monsanto* and *Laidlaw.*  Again*,* the

20   problem with Amnesty was that there the plaintiffs' protective

21   measures were based on hypothetical future harm and that's

22   just not the case here.

23          The third and final injury the plaintiffs have

24   identified is that they and the people they associate with

25   will be chilled.  And on this point the defendants devote much

1    of their briefing to *Laird* and *Donohoe*.  But the subjective

2    chill in those cases is very distinguishable from the chill

3    here.  We've explained this in the briefing and I won't

4    belabor it, but I do want to underscore two key points.

5                    First, in *Laird* the plaintiffs there claimed they

6    were chilled by the mere existence of an otherwise lawful

7    surveillance program.  They did not contest the legality of

8    the underlying surveillance.  Their only complaint was the

9    chilling effect.  And even then they cast considerable doubt

10   on whether they, themselves, were chilled.  Here in contrast,

11   plaintiffs have argued that the AIR Program violates the

12   Fourth Amendment.  They have also explained that they are

13   imminently subject to this program and that they have provided

14   concrete, objective evidence of chill.

15                    The second point that I want to emphasize is that in

16   the *Wikimedia* case, the 4th Circuit recently held that a

17   plaintiff's allegation that it was chilled by government

18   surveillance established cognizable First Amendment injury.

19   Defendants over read Laird, they suggest that Laird speaks so

20   broadly that it essentially forecloses a chilling effect

21   theory of injury in surveillance cases.  But *Wikimedia* makes

22   clear that where the surveillance is not hypothetical,

23   chilling effects are a basis for standing.

24                    THE COURT:  Thank you, Ms. Gorski.

25                    MS. GORSKI:  Thank you.

1          THE COURT:  Thank you very much.  And before I hear

2     from defense counsel, I would just note, so the record is

3     clear, that pursuant to the complaint that was filed and the

4     affidavit attached thereto on April 9th, just so I'm clear as

5     a matter of the record, the plaintiff, Leaders of a Beautiful

6     Struggle is a limited liability company founded in 2010, and

7     according to the affidavit of Dayvon Love, the director of

8     public policy for that organization, it seeks to advance the

9     public policy of, quote, black people in the city through

10    youth leadership, development, political advocacy, and

11    autonomous intellectual innovation.

12          And then, again, pursuant to the declarations

13    attached to the complaint that was filed, the plaintiff,

14    Erricka Bridgeford is a community activist in Baltimore and

15    the cofounder of Cease Fire Baltimore 365, which is, according

16    to the affidavit, organizes quarterly, quote, cease fire

17    weekends, end of quote, in Baltimore City.  And then the

18    plaintiff Kevin James is listed as an activist and community

19    organizer.  And his declaration is that it's in the Baltimore

20    area.  I don't know that he specifically listed that he's a

21    resident of the city of Baltimore, but that is contained in

22    the affidavit.

23          Is that a fair summary in terms of what has been

24    filed thus far?

25          MS. GORSKI:  Yes, Your Honor.

1          THE COURT:  Okay.  Thank you very much.  And so with

2     that on the standing matter, Ms. Moore or Ms. Walden or

3     Ms. Lynch, I'll be glad to hear from you on behalf of the

4     Baltimore Police Department and/or Commissioner Harrison.

5          MS. MOORE:  Dana Moore, I'll begin.  Your Honor --

6     hello, can you hear me?

7          THE COURT:  Yes, I can hear you.  Yes.

8          MS. MOORE:  All right.  I heard another voice, I

9     thought.

10          THE COURT:  That's all right.

11          MS. MOORE:  But Your Honor is correct, the

12     defendants do assert that there is no injury to any of the

13     plaintiffs unless and until the Baltimore Police Department

14     accesses or otherwise uses the information as to a particular

15     specific plaintiff.  It's important to note, after Your Honor

16     has decided, you know, a little bit more about each of the

17     plaintiffs.  They can always move forward for actions that

18     impact them, they are not suing on behalf of either Baltimore

19     or on behalf of an organization, they can only pursue claims

20     for and related to themselves.

21          So with that, the -- we believe that the AIR Pilots

22     Program can't even theoretically violate any of their

23     constitutional rights, as I said, until the Baltimore Police

24     Department accesses or otherwise uses the information as to

25     them.  Your reference to *Carpenter*, we think is very

1    instructive and very telling.  The *Carpenter* case made clear

2    that collecting the data was not the problem, it was how the

3    data was used and collected and stitched together.

4         Here the -- we believe that it's not -- the

5    collection of data alone cannot be grounds for asserting First

6    or Fourth Amendment standing.  For Your Honor to find

7    otherwise you would have to overturn 35 years of jurisprudence

8    that makes clear that aerial surveillance is within -- is

9    constitutionally reasonable.  Plaintiffs in this case have not

10   shown any data that -- any fact or any indication that their

11   own individual movements would ever be reviewed by the

12   Baltimore Police Department or even, you know, PSS through the

13   AIR Program.

14        There's a reason for that.  The AIR Program is not

15   able to reveal physical characteristics of individuals or

16   vehicles.  The data that is collected is only reviewed under

17   certain limited circumstances.  Specifically, if there's a

18   call that is assigned an incident number that relates to one

19   of the four enumerated terms, that is the only way that anyone

20   or anything would be identified through the AIR surveillance

21   program.

22        Plaintiffs are -- what they're seeking here is a

23   preliminary injunction.  And they can't get a preliminary

24   injunction on the contingency that at some time in the future

25   it's possible that their constitutional rights might be

1  violated.  And the only way that this could happen is if they

2  were near a crime.  This is speculative.  And that is not the

3  purpose of an Article III claim.  That's not grounds -- that's

4  not appropriate grounds for the issuance of a preliminary

5  injunction.

6          Here, the plaintiff's constitutional rights are not

7  implicated, again, unless and until the Baltimore Police

8  Department uses the data collected by the AIR Program to track

9  movements that are attributed to them.  That has not happened.

10 That is not likely to happen.  With respect to Leaders for a

11 Beautiful Struggle, they're -- in reading the declaration all

12 of their assertions are speculative.  They use the words we

13 worry about surveillance, we're gravely concerned about

14 surveillance, we expect that their partners might change how

15 they interrelate with them, information could be recognized.

16 These are fears.  These are not real injuries that have

17 actually occasioned to them or even are likely.

18          With respect to Ms. Bridgeford's declaration

19 there she states that it's likely that the Baltimore Police

20 Department would generate an individualized report about her.

21 But that is not even remotely likely, given the purpose,

22 limited scope, limited use of the AIR Program.  She asserts

23 that the AIR Program threatens her ability to effectively

24 conduct her work that she does for Cease Fire.  But, again,

25 that is speculative.  That is a forward-looking fear.  It's in

```
1    paragraph 17 that she really gets to the nub of her claim,

2    which is she feels that the AIR Program is -- and this is, you

3    know, right from the declaration -- is a lazy form of

4    policing.  And that real nub here.  That's the real injury

5    that they disagree with the use and the purpose of the

6    program.

7              With respect to Kevin James, again, his claims are

8    speculative.  I believe that I would be in the vicinity of the

9    crime.  This is all speculative.  None of this has actually

10   happened.  There's been no actual injury.  He's looking very,

11   very forward into time about the possibility maybe that he

12   would associate with someone who was near a crime.  These are

13   not injuries that can confer today, standing to pursue a

14   preliminary injunction.  Thank you.

15             THE COURT:  Ms. Moore, you had noted in the papers,

16   on behalf of the Police Department and the Commissioner, that

17   the -- not only your view that the collection of the data

18   cannot be a search, but that PSS is a third party, not a

19   government actor.  But clearly PSS in exercising powers of the

20   state, it carries out state action for purposes of Section

21   1983; correct?

22             MS. MOORE:  I don't think we make that claim.  I

23   think that plaintiffs make that claim, Your Honor.

24             THE COURT:  No, what I'm saying is that it's clear

25   that, just quickly with respect to standing on the matter, of
```

1    whether or not it is speculative and whether or not it

2    satisfies injury in fact, in terms of the contention that it's

3    an unconstitutional search by way of aerial surveillance there

4    is no dispute, is there, that to the extent that PSS exercises

5    powers pursuant to the contract with the City of Baltimore,

6    with the Police Department, it is exercising state action

7    essentially, that's not really an issue, would you agree with

8    that.

9              MS. MOORE:  Sure.  Yes.

10             THE COURT:  All right.  I'm just trying to make sure

11   that we're clear on that.

12        Ms. Gorski, anything further on the standing issue in

13   rebuttal?

14             MS. GORSKI:  Thank you, Your Honor.  I think now it

15   is very clear that defendants concede that PSS's initial

16   collection of information is attributable to the BPD.  And it

17   is also clear that defendants are not disputing that

18   plaintiffs will be subject to PSS's initial collection.  As I

19   mentioned earlier, the 2nd Circuit decision in *ACLU v. Clapper*

20   makes very clear that this collection itself is a cognizable

21   Fourth and First Amendment injury.

22             The Fourth Circuit's opinion in *Wikimedia* also makes

23   this point clear.  The government had argued in its

24   briefing -- isn't flushed out in the opinion, but if you read

25   the appellate brief it is clear that the government argued in

1    its briefing that the collection alone was not an injury.  And

2    the 4th Circuit rejected that argument.

3            Just a couple other quick notes.  Defense counsel

4    referred to 35 years of precedent and the fact that in finding

5    standing for plaintiffs this Court would have to overturn 35

6    years of precedent, we obviously disagree with defense

7    counsel's view of the aerial surveillance cases, from the

8    decades old aerial surveillance cases.  But those questions go

9    to the merits, not to standing.

10           And then finally, defendants characterize as

11   entirely speculative the plaintiffs' assertions that they are

12   also substantially likely to have the BPD and PSS develop

13   individualized reports on them, on both plaintiff James and

14   plaintiff Bridgeford.  Plaintiff Bridgeford having explained

15   that they're substantially likely to be in the vicinity of one

16   of the four target crimes.  And there's no evidence to the

17   contrary in the record.  They have clearly established a

18   substantial risk that they would be subject to individualized

19   reporting.

20           So while the collection alone is sufficient to

21   establish their standing, in addition to plaintiff under

22   substantial risk standard articulated in the Supreme Court's

23   decision in *Susan B. Anthony List,* these two plaintiffs have

24   also established standing with respect to the individualized

25   reporting.  Thank you, Your Honor.

1          MS. MOORE:  Your Honor?  May I respond briefly, Your

2     Honor?

3          THE COURT:  Yes.  Go ahead, Ms. Moore.

4          MS. MOORE:  Okay.  So with respect to the collection

5     of data, it's very important to understand and to note that

6     the images that will be collected through the AIR Pilot

7     Program will be collected at a -- at one pixel per person,

8     which you cannot identify a person, you cannot identify a

9     specific car, you can't determine what a person's ethnicity

10    is, you can't determine any distinctive clothing.  There will

11    not be any indication of who or what is captured by the data

12    unless and until there's a relevant crime that then is able to

13    link up to the site and use additional surveillance tools that

14    are already present in Baltimore.  So when the plaintiffs

15    assert that they're fearful that there will be an

16    individualized report created by them, that is mere

17    speculation.

18          And with respect to Ms. Bridgeford she, in her own

19    declaration, states that her work causes her to be present at

20    the scene of a murder within hours after the murder has

21    occurred or up to two weeks thereafter.  So her work, by its

22    own definition and description, does not cause her to fall

23    within the scope and purpose of the AIR Pilot Program.  The

24    AIR Pilot Program is intended to look at what happened, when

25    it happened, not after a crime has occurred.  So she, by

1    definition, by her own words, takes herself out of the scope

2    and range of the AIR Pilot Program.

3          And with respect to Kevin James, his description of

4    a work is very vague, it's very speculative, the likelihood

5    that there would ever be an individualized report about him is

6    really slim to none, just based on his own description of the

7    work that he does and how he navigates the public ways of

8    Baltimore.

9          It's also -- I wanted to include that with respect

10   to the chill, the plaintiffs do use that word in their

11   declaration.  And, again, there is not a specific present

12   objective harm or threat, or specific future harm to any of

13   these plaintiffs.  These are all plaintiffs that do their work

14   very publicly.  They rely on media and social media to advance

15   their causes.  But they are not individuals that are even by

16   their years of description of their work, present at any of

17   the specified crimes that are the subject and focus of the AIR

18   Pilot Program.

19         THE COURT:  Just to finish up and go to the matter

20   of the preliminary injunction and the standards, I would just

21   note that, Ms. Moore, that the 4th Circuit has held -- when it

22   comes to the matter of the First Amendment claim, the 4th

23   Circuit has held consistently that standing requirements are

24   somewhat more relaxed in First Amendment cases; correct?

25         MS. MOORE:  I'm not going to argue with Your

1   Honor.

2          THE COURT:  I mean, I think that really the First

3   Amendment claim follows the Fourth Amendment claim.  I think

4   that the whole issue of standing really does focus, I think,

5   on the matter of the Fourth Amendment claim.  And the thrust

6   of this, just so members of the public who are monitoring

7   this, just I think, when all is said and done, the issue here

8   on the matter of standing is that the plaintiffs argue that

9   the injury in fact is the collection of the imagery data,

10  which itself constitutes a search under the Fourth Amendment,

11  with the actions of Persistent Surveillance Systems being

12  attributable to the Baltimore Police Department.  Is that a

13  fair one sentence summary of the plaintiffs' position,

14  Ms. Gorski?

15         MS. GORSKI:  Yes, Your Honor.

16         THE COURT:  Okay.  And from the point of view of the

17  defendants, the defendants have essentially argued that there

18  is no standing to challenge a possible future search with

19  respect to the data that was captured by PSS and may or may

20  not be reviewed by the Baltimore Police Department.  Is that a

21  fair one sentence summary from your point of view, Ms. Moore?

22         MS. MOORE:  Yes, Your Honor.  And I would just add

23  that all of the data that is collected is based on what is

24  available in the public view.  There is no reach into private

25  spaces.  And so there is no reasonable expectation of privacy

1    as any of these plaintiffs navigate Baltimore's public ways.

2              THE COURT:  All right.  We'll get into the matter of

3    that on the merits in a minute, in terms of likelihood of

4    success on the merits, but I think that just for purposes

5    public consumption I think I fairly summarized what the

6    standing issue is.  Plaintiffs position being that the injury

7    in fact occurs the minute of the collection of imagery data,

8    which they contend itself constitutes a search.  And the

9    actions of the private company are attributable to the police

10   department.  And the defense position is that is speculative

11   and it's a possible future search.

12             So with that, let me just focus if we can next on

13   essentially the criteria here with respect to a preliminary

14   injunction.  As you all well know, the standard for granting a

15   preliminary injunction, as set forth under Rule 65 of the

16   Federal Rules of Civil Procedure.  It is clearly a, and

17   consistently held to be, an extraordinary remedy involving the

18   exercise of very far reaching power to grant a preliminary

19   injunction. And in determining whether to issue a preliminary

20   injunction this Court must follow a test as set forth by the

21   United States Supreme Court in *Winter versus Natural Resources*

22   *Defense Council*, 555 U.S. page 7, a 2008 opinion of the

23   Supreme Court.

24             And essentially the factors that we will be

25   addressing this morning are, first, the movant must be likely

1    to succeed on the merits.  Secondly, the movant, the

2    petitioner, the plaintiff is likely to suffer irreparable harm

3    absent preliminary injunctive relief.  Third, that the balance

4    of equities favors the movant, the plaintiff in a case.  And,

5    finally, that an injunction is in the public interest.  That

6    is the clear criteria here, which the Court must address this

7    morning.

8            And the 4th Circuit authority on that in recent

9    cases is *League of Women Voters of North Carolina versus North*

10   *Carolina* 769 F.3d 224, a 4th Circuit opinion in 2014.  So that

11   is the standard here.  And it is -- essentially the plaintiff

12   must show more than a grave or serious question for

13   litigation, instead it bears the heavy burden of making a

14   clear showing that it is likely to succeed on the merits so

15   we're not deciding this case today in this hearing, but we are

16   dealing with the matter of whether or not the plaintiffs

17   satisfy those criteria, so as to be entitled to a preliminary

18   injunction.

19           So what I propose to do here now on this analysis is

20   to proceed in that fashion with the -- first, the criteria of

21   the likelihood of success on the merits.  And we'll focus

22   first upon the Fourth Amendment claims set forth in Count 1,

23   the issues being whether the -- we'll call it the AIR Program,

24   which is essentially the Aerial Investigation Research.

25   Again, for members of the public, the legal community loves

1    acronyms.  But the AIR Program is for the Aerial Investigation

2    Research.  And then secondarily -- first, whether it

3    constitutes a search within the meaning of the Fourth

4    Amendment.  And secondly is the program reasonable under the

5    Fourth amendment.

6          And with that I'll be glad to hear from plaintiffs

7    counsel.  And I believe Ms. Gorski you indicated that I

8    thought you said Mr. Wizner or Mr. Kaufman or Mr. Wessler

9    would be addressing that; is that correct?

10         MS. GORSKI:  Your Honor, Mr. Kaufman will be

11   addressing the plaintiff's Fourth Amendment --

12         THE COURT:  Mr. Kaufman, glad to hear from you.

13         MR. KAUFMAN:  Thank you, Your Honor.  Glad to join

14   you here.  As Ms. Gorski pointed out, the BPD's program is the

15   most ambitious surveillance program ever deployed in an

16   American, using military technology that has the potential to

17   drastically change our democratic society.  It's a system that

18   will create, for the use of law enforcement, a rolling 45-day

19   log of plaintiffs' and other Baltimorean's movements.  It

20   imagines no role for the judiciary at all.  And all of that

21   amounts to an unconstitutional search under the Fourth

22   Amendment.

23         Now, first defendants collection of plaintiff's

24   location information is a Fourth Amendment search, which is

25   the threshold question under the Fourth Amendment.  And the

1   main reason is simple, no one anywhere reasonably expects that
2   government cameras in the sky will record their whereabouts,
3   and those of an entire city's population, second by second.
4   Now, the BPD argues that this isn't what their program does.
5   Because it says we will only collect dots.  Ms. Moore said
6   today that this program does not go into private lives.  But
7   this is wrong.  First putting aside for one second the dots.
8   The underlying location information that will be collected
9   under this program is far more rich and specific than the
10  information even at issue in *Carpenter*.  There, cell site
11  sectors can be quite large.  But here movements will be
12  captured down to a yard.
13          Now, as to the BPD's argument about dots and the
14  identifiability of images that the program will capture second
15  by second over the entirety city, in *Carpenter* the Supreme
16  Court rejected the proposition that influence insulates the
17  search and that's something that dated back to the *Kyllo* case
18  years before.  The Court observed in *Carpenter* that the
19  government could, in combination with other information,
20  seduce a detailed log of the defendant's movement.  And that
21  was sufficient to render it identifying and trigger the Fourth
22  Amendment.
23          And it's also worth pointing out that the
24  information at issue in *Carpenter* was not automatically
25  identifiable to a person or their ethnicity or their race or

1    their name, because requests for cell site information are

2    made as to phone numbers.  And so when a request is made, you

3    know a phone number and you link that with general location

4    information, but you still have to go through investigative

5    steps to link that to a name.  And we pointed out in a reply

6    brief, in the 6th Circuit decision that went up to the Supreme

7    Court in *Carpenter*, there's a nice explanation of all the work

8    that the FBI agents had to do just to link the location

9    information and make it meaningful as to the defendants.

10           Third, it will be exceedingly easy for the BPD to

11   identify the dots.  And we go through this in our initial

12   brief on page 17, but it's worth just pointing out a few

13   points from there.  First, it is easy to roll tape backwards

14   and forwards in time and find locations that are automatically

15   identifying to certain people.  Next, we point a study out in

16   our briefing that shows that -- and this is an unsurprising

17   finding I think -- that just four unique location points are

18   enough to identify 95 percent of people.  And this makes

19   sense, it goes to the heart of the rationale in *Carpenter*.

20   Which is that the whole of our movements, whether or not one

21   point by itself is observable by another person, are unique to

22   us.  And they reveal sensitive information and they implicate

23   a lot about our private lives.  And that deserves protection

24   under the Fourth Amendment.

25           Another reason that it would be easy to convert

1    these dots into people, these elements of the BPD and PSS's
2    own contract it's written right in there, that PSS will
3    integrate data from the city's closed circuit television
4    security cameras as well as its automatic license plate
5    readers, in order to ensure that people are identified.  And
6    make no mistake, the AIR Program exists to identify people.
7    And even ignoring the use of CCTV or ALPR, as I explained just
8    now, the collection is a search because identification is
9    easy, but these systems make identification even more
10   attributable.  And they're properly considered relevant to
11   that question.  The BPD puts them into the contract.  PSS will
12   have direct linkages to information.  It even talks about
13   reformatting some of the data systems to more easily digest
14   that information.  It doesn't go into specifics.  And so those
15   things bear very strongly on whether, as Ms. Moore says, this
16   program does not go into private lives.
17           Another point here is that this -- the collection of
18   this information is not simply an assortment of dots or
19   tracks, it is a time machine.  Never before did police have
20   perfectly reconstructed even one person's past movements over
21   days or 12 hours or weeks or months.  And never could they
22   even dreamed of reconstructing a entire city's populations
23   movements that way.  And that goes, again, to the heart of
24   what the *Carpenter* court was concerned about.  Because this
25   data collected by defendants will grant the police access to a

1    category of information that is otherwise unknowable.

2           The government points to, you know, it has a few

3    other arguments about why this is lawful.  And first it argues

4    that these cases from the 1980s about aerial surveillance

5    prove that aerial surveillance, period, is constitutional

6    under the Fourth Amendment.  And I don't want to belabor the

7    arguments here, I think we've pointed it out multiple times,

8    but those three cases approved of transitory, targeted,

9    naked-eye surveillance of static locations, not long-term,

10   indiscriminate, technology-assisted surveillance of people's

11   movement.  And even in the 1980s, after these cases came out,

12   if you look at our brief on footnote 45 in the first brief, we

13   point other courts that at that time, understood that the

14   limitation on those holdings and the fact that they were not

15   speaking to uses of advanced technology, like the AIR Program

16   put into place, you know, about 25 to 35 years later.

17           THE COURT:  Mr. Kaufman, if I could just interrupt

18   you just for one second, just so we're clear.

19           MR. KAUFMAN:  Sure.

20           THE COURT:  I didn't mean to interrupt your

21   argument.  I just want to make sure we're clear.  You're not

22   suggesting that this is a 24/7 program, 24 hours a day, 7 days

23   a week, because as I understand the Professional Services

24   Agreement, which has been filed here and actually is, I think

25   an addendum to your complaint filed on April the 9th, the

1    planes are to fly about 40 hours per week over a six-month

2    period, and they are essentially designed to provide

3    recordings of past activities not live surveillance, correct?

4    So we're not talking about a camera in the sky that's

5    constantly on 24 hours a day, 7 days a week; correct?

6         MR. KAUFMAN:  That's right, Your Honor.  And the

7    defendants point out that this is just going to be 12 hours a

8    day and they believe that that's a proper frame.  And we

9    strongly disagree with that.

10         First of all, this is daily collection.  This is not

11   a one-time, 12-hour flight.  This is daily collection, 12

12   hours a day, we're talking about 80 hours a week, that will be

13   held for 45 days automatically.  So to try -- I understand why

14   defendants would like to ship the frame into a 12-hour mode.

15   But that's just not even on the terms of what the defendants

16   have offered in their contract what is going to happen.

17         Now, absolutely, we would say that 24-hour,

18   round-the-clock surveillance is worse than 12, but this is

19   still the most comprehensive mass surveillance program ever

20   deployed in an American city.  I think if you're thinking

21   about reasonable expectation of privacy, I don't think that it

22   is reasonable, or people reasonably do expect that there will

23   be this kind of surveillance for 12 hours a day either.  So I

24   don't think that narrowing the time frame to 12 really helps.

25   It also raises a question of how long of a break the

1   defendants think sufficiently reset the clock on their
2   surveillance.  And they haven't suggested that there is a
3   magic number there.  And I don't think there is one.  And
4   that's because in reality, this is a constant, for all
5   practical purposes, this is constant surveillance every day,
6   aggregated over a 45-day rolling period.  And so focusing on
7   the 12 hours is just not enough.
8            I also point out, the BPD argues in its brief that,
9   you know, it's not continuous, so leaving the numbers aside
10  this isn't continuous surveillance.  And so, therefore,
11  *Carpenter* doesn't touch it and it's a constitutional program.
12  But in *Carpenter* it was not continuous surveillance either,
13  this is cell phone tracking.  And you can leave your phone at
14  home.  You can turn it off.  And the times that data is
15  generated when you're using your cell phone, is not a minute
16  by minute catalog of your movements automatically.  It's
17  whenever the cell phone talks to the tower.  Here this is a
18  second-by-second capture.  And so as I said, at the top, it's
19  a much more rich pool of data than even was at issue in
20  *Carpenter*. We've also pointed to some courts that I don't
21  think you need to even go there, but there has been a lot of
22  suggestion that *Carpenter*'s reasoning would even apply to
23  shorter collection of location information using advanced
24  technology.  And so I just think that the 12-hour focus is not
25  a winning argument for the defendants here.

1          Ms. Moore also suggests and the defendants in their

2     briefing also suggest that there is some blanket rule that

3     people lack a reasonable expectation of privacy when they are

4     in public, full stop.  That's just not the case.  The main

5     case they cite for that is *Knotts*.  And *Knotts* itself cabins

6     its holding to movements from one place to another.  The

7     *Carpenter* court doubled down on that reading of *Knotts*

8     explaining that it involved a discrete automotive journey.

9     And that is a very different kind of surveillance than what

10    the AIR Program proposes to do.  And even *Carpenter* itself,

11    talking about its own holding, said this case is not about

12    using a phone or a person's movement at a particular time.

13    It's about a compendium of movements and what the whole of

14    those movements add up to in terms of revealing the

15    intricacies and the privacies of a individual life.

16          The other case the government tries to use to argue

17    about no expectation of privacy when you're in public is

18    *Jones*.  But there five justices agreed, in concurring

19    opinions, that longer term location tracking violates a

20    reasonable expectation of privacy, regardless of whether those

21    movements were disclosed to the public at large.  So, again,

22    there is no rule that when you are in public you forfeit your

23    Fourth Amendment rights.  And certainly any sort of gesture at

24    that rule through *Carpenter*, post *Carpenter*, just absolutely

25    cannot survive.

1          Just a couple more points on the Fourth Amendment

2     argument.  There is no exception to the warrant requirement

3     for this program under the special needs doctrine.  The

4     defendants don't even use that phrase.  And I think that's

5     because it's just not available to them.  Ms. Moore today said

6     this is was a constitutionally reasonable crime fighting

7     initiative.  The contract says that the purpose of this

8     program is to assist BPD in investigating and reducing violent

9     crime in Baltimore City.  These are classic law enforcement

10    needs, that do not qualify under the special needs doctrine to

11    excuse the government from getting a warrant.

12         And related, both cases also emphasize that the

13    gravity of the threat alone cannot be dispositive of whether

14    law enforcement's actions are constitutional or reasonable.

15    And as the defendants have acknowledged, our plaintiffs are

16    very involved in Baltimore in trying to solve the ills that

17    are afflicting the community and their communities every

18    single day.  But whether or not the BPD is the proper policy

19    making entity to come up with solutions, the Constitution put

20    some of those policy off limits.  And it certainly puts the

21    AIR Program off limits.  Go ahead, Your Honor.

22         THE COURT:  Go ahead.  Just you mentioned *Jones*.  I

23    would note that the *Jones* case in 2012, which involved the

24    placement of the Global Positioning Device, the GPS device on

25    the vehicle, the five votes in the majority did not all agree

1    on the same premise.  Justice Scalia did not even address the

2    *Katz*-based, reasonable expectation of privacy framework, he

3    essentially evaluated it in the context of trespass.  And some

4    of his colleagues who voted with him did address the

5    Katz-based analysis; correct?

6         MR. KAUFMAN:  That's correct, Your Honor.  I didn't

7    mean to -- I hope I didn't imply that the majority --

8         THE COURT:  No, no, just so the record's clear that

9    the -- we're looking at -- although I'm reading the

10   *Carpenter* -- I note Mr. Kaufman that you and Mr. Wizner and

11   Mr. Wessler were actually counsel in the *Carpenter* case before

12   the Supreme Court; correct?

13        MR. KAUFMAN:  We were, Your Honor.

14        THE COURT:  And I've noted that, obviously, Justice

15   Kennedy in his dissent was critical of the whole Katz analysis

16   and reasonable expectation of privacy that really -- that is

17   really the analysis that we undertake in the aftermath of

18   *Jones* and certainly after *Carpenter* in terms of the,

19   essentially, the expectation of privacy set forth in the 1967

20   opinion of *Katz versus the United States*.  That is the

21   analysis that has to apply here; correct?

22        MR. KAUFMAN:  That is correct, Your Honor.  And just

23   back to the point about *Jones,* yes there was five justices

24   agreeing in concurrence on a *Katz* theory, but I think it's

25   proper to read *Carpenter* as basically implementing those views

1    as the law of the land.  The opinion in *Carpenter* cites those
2    concurrences multiple times throughout its analysis.  And so I
3    think it's reasonable to go back and read the meeting of those
4    five concurring justices minds as endorsing the arguments that
5    I was just talking about.
6              I just have one final point on the Fourth Amendment
7    merits.  Because the government has not even offered a special
8    needs argument, the fact that this is a warrantless program
9    ends the inquiry for the Court on reasonableness, because that
10   is how the analysis operates.  But I do want to just comment
11   on some of the arguments about the BPD's rules that it has put
12   in place through contracts, some of which needs to be -- have
13   been expanded upon in more detail in Mr. McNutt's declaration.
14   But even taking these rules, on their own terms, they are
15   unreasonable under the totality of the circumstances, which
16   would be the analysis if you somehow did get into a
17   reasonableness analysis there would be totality of the
18   circumstances.
19             Just very quickly, one, there's no judge involved in
20   this program at all.  And if you look back at the *Riley*
21   decision from the Supreme Court several years ago, there's
22   that wonderful quote from Chief Justice Roberts where he says,
23   "the revolution was not fought for the right to government
24   agency protocols."  And that is exactly what the BPD is
25   offering here.  It is offering an unwarranted system that is

1    not supervised by the judiciary, and making promises that the

2    executive will respect the rights of individuals.  And that's

3    simply, as the Court explained in *Riley*, not how the Fourth

4    Amendment works.

5          Another point on reasonableness is that because the

6    collection is so enormous at the outset, minimization of

7    irrelevant data or the private data of people who do not come

8    under suspicion later on needs to be strictly implemented at

9    the back end.  And that is just simply not the case here.  We

10   have a 45 rolling day log of basically 600,000 people at a

11   time.  And the fact that that data has promised to be deleted

12   at the end of that period is certainly not the kind of strict

13   minimization requirement that the Fourth Amendment would

14   propose, even if we were in a reasonableness analysis.

15         Another point, the unauthorized use of data by PSS

16   is subject only to PSS self reporting.  That is not the kind

17   of contract term or minimization requirement or even

18   government protocol that you would expect to see in a Fourth

19   Amendment compliant situation.

20         So I think I'll rest there.  If the Court has any

21   questions I'm happy to answer them.

22         THE COURT:  Well, I may in a minute.  But let me

23   just hear from the Police Department and from the City

24   Solicitor's Office and I may have questions to follow up on

25   all this.

1          Ms. Moore or Ms. Walden, whoever wants to address

2     this, be glad to hear from you.

3          MS. MOORE:  Your Honor, I'll begin and would ask

4     that Ms. Walden, if I overlook something she feel free to step

5     in.  And I want to begin by agreeing with Your Honor that we

6     believe that the considerations on whether or not to grant a

7     preliminary injunction are as you stated, set out in Winter

8     versus Natural Resource Defense Council, which is a 2008 case.

9     We agree with the four factors that we enunciate and agree

10    that all four factors must be met.  They have to be considered

11    separately.  Most importantly there is a presumption that a

12    preliminary injunction will not issue.

13          In this case that presumption has not been met.

14    Here's why:  The AIR Program does not constitute a search.

15    Much of what plaintiff's counsel has said in describing the

16    program is not correct.  First of all, it is not a rolling 45

17    day, continuous collection of data.  This, in my opinion, is

18    one of the frailties of the program, it can only collect --

19    and this is by agreement and by technology -- 12 hours of data

20    per day.  It can only -- the AIR Program can -- it's done by

21    three airplanes, you know, flying over Baltimore.  And they

22    can only fly weather permitting.  The planes cannot collect

23    data at night.  The data that is collected cannot -- and I

24    said this before -- cannot identify a specific individual.  It

25    cannot identify a specific automobile.  It cannot identify

1    demographic.  It cannot identify clothing.  It's not designed
2    to do that and it's not able to do that. The fact that there
3    is not a continuous surveillance or continuous collection of
4    data, we believe takes this squarely out of the *Carpenter*
5    consideration.
6             I also want to address the argument that there's,
7    quote, no judge involved in this program at all.  And here
8    it's helpful to remind everyone on this call that the
9    Baltimore City Police Department is a police department that
10   is under consent decree.  We are -- we meaning the police
11   department and Commissioner Harrison and all of his officers,
12   are beholden to use the Court -- the police court monitors,
13   the monitoring team whenever they are attempting to do
14   something novel.  And that's exactly what happened here.  Back
15   in December of 2019, when Commissioner Harrison determined
16   that, yes, we will try this, yes, we will institute this pilot
17   program, one of the first things he did was consult and confer
18   with the police monitoring team, consent decree monitoring
19   team, to let them know, along with the Justice Department,
20   that this is a decision that the police department in
21   Baltimore City has made.
22            And, of course, all of the decisions that the police
23   department for Baltimore City makes must relate to
24   constitutional policing.  If it's not constitutional, that
25   obviously presents a problem.  So those conversations were had

1    in December of 2019.

2              THE COURT:  Just if I can, Ms. Moore, just for the

3    record, again, for public dissemination here.  The consent

4    decree which you make reference is in United States versus

5    Police Department of Baltimore City, civil number JKB-17-0099.

6    As reflected in paper No. 2 in that file, as modified in paper

7    No. 39.  So that is the consent decree to which you're making

8    reference.

9              MS. MOORE:  Yes, Your Honor.  (Audio interference)

10   And I believe that the consent decree went into effect, I want

11   to say in 2016, 2017 at the very latest.  And we are still

12   under consent decree.  We meet regularly with Chief Judge

13   Bredar, the Court monitors are regularly in communication.

14             THE COURT:  Just for the record, again, just so the

15   record is clear for the public, that does not mean that the

16   Court in that case under the consent decree has ratified this

17   question.  This question is separately before me.  And it does

18   not mean, and you're not suggesting that Chief Judge Bredar

19   has signed off on this program; correct?

20             MS. MOORE:  You are so right.

21             THE COURT:  Correct, from the point of view of the

22   plaintiffs on this, from the ACLU point of view?  There's no

23   confusion on that.  Clearly, the consent decree does not mean

24   that the Court has ratified this program; correct?

25             MR. KAUFMAN:  Absolutely not.  In fact, DOJ said

1    explicitly it was not approving or disapproving of the program

2    and it has never been submitted to the Court.

3            THE COURT:  That's fine.  Go ahead, Ms. Moore.  I'm

4    just being careful so the public understands that we're all in

5    agreement as to the existence of the Consent Decree and also

6    the legal effect or lack thereof as to the question before me

7    now.

8            MS. MOORE:  Correct.  And to be very, very clear,

9    that role confers no legal effect on the efficacy and the

10   constitutionality of this program.  Zero effect.  But I raise

11   that simply to let the public know, and everyone who's

12   listening that we are still under consent decree and we still

13   operate under a constitutional policing framework.

14           I also want Your Honor to know that, in terms of

15   evaluating the efficacy and the propriety of this program, the

16   police department has, within the contract, agreed to have

17   independent evaluators through Morgan State University and I

18   believe New York University, but I'm not exactly certain of

19   that.  We have handed over the evaluation of this program to

20   others.  It is not going to be the police department of

21   Baltimore City assessing whether this program is efficacious

22   and how it's operating.  We have built in protection to make

23   sure that the stated uses and purposes are stuck to and that

24   there's no strain.

25           When we decided to pursue this program it was

1    announced publicly.  There were public meetings.  There were

2    meetings on Facebook live, which I understand to date, just as

3    of yesterday, there were 30,000 views of the education tool.

4    It still remains on the city's public television station,

5    which is Charm TV 25.  If anybody's listening now you can go

6    right there right now and see for yourself what this program

7    is about.

8          So let me talk about what it's about.  The program

9    is designed to evaluate -- it's a pilot program, first of all.

10   And it's designed to evaluate the extent to which the AIR

11   Program might assist the Baltimore Police Department in

12   solving and closing some of the city's most violent crimes.

13   And those are murders, shootings, armed robberies, and that

14   includes carjackings.  And it's important to note here that

15   these crimes have not abated or subsided even while this city

16   is under stay at home orders by both the governor and the

17   mayor of Baltimore City.  Murders actually are higher today

18   than they were this time last year.  So, clearly there is a

19   public need for something to respond to crime.

20         The AIR Program is designed to take sequential

21   aerial photographs at a resolution of roughly one pixel per

22   person.  And at that resolution it's not possible to discern

23   personal characteristics from the photo.  Again, the program

24   is limited to 12 hours of continuous data collection during

25   daylight hours.  And only when the weather permits it.

1          In order to actually use the data, there must be a

2     qualifying crime, one of the four that I just mentioned.  And

3     only then would PSS review the data, analyze it, and provide a

4     report to the Baltimore City Police Department.  They would

5     have to use conventional, ground-based imaging resources such

6     as city watch and license plate readers in order for this data

7     to even be usable.  And, again, we just hope that it helps the

8     police department solve and close crimes.  More details are in

9     some of our papers and you can get details from the actual

10    contract, which is exhibit -- part of the plaintiff's

11    submission.

12          I'm going to tell Your Honor what this program will

13    not do.  And this is what takes this out of the *Carpenter*

14    analysis.  The program will not provide real time surveillance

15    or track CSLI and try not to use acronyms, but that's Cell

16    Site Location Information.  That will not be collected, cell

17    phone data will not be collected through this program.  The

18    AIR Program's data will not determine who a specific

19    individual is or what a particular car is.  It will not

20    randomly review collected images.  In other words, the person,

21    the professionals that will be working this program will not

22    just randomly view collected images.  And they will not be

23    able to target any of these three plaintiffs through that

24    review.  That's really important to note.

25          It will only work when there's an egregious violent

1   crime that is already known to have occurred.  It is not

2   predictive.  The AIR Program will not determine if a dot

3   representing a person or car entering a building or structure

4   is the same person or car that exits that structure.  That's

5   one of the limits.  That's a result of collecting data only 12

6   hours a day, not 24 hours a day, seven days a week. So it will

7   not be able to stitch imagery together to tell a story of what

8   this person did every single day for 45 days.  It does not

9   have that capacity.  And, of course, there's no audio.  So

10  there will not be, you know, reaching in to hear

11  conversations.

12           We talked about *Carpenter* and I think that we feel

13  that the *Carpenter* case is one that, obviously, the plaintiffs

14  rely on.  This is a case they have to advance to the Court.

15  But this is not a *Carpenter* case for a number of reasons.  And

16  let me enumerate just a few.  Obviously, in *Carpenter* there

17  was concern that the government had collected at least seven

18  days, continuous days of cell site location information.  And

19  that's because they collected cell phone data, and as we all

20  know, particularly today, we're all on our -- most of us are

21  on our cell phones having this conversation, conducting this

22  hearing.  Our cell phones are with us pretty much 24/7.  If

23  you're like me -- not about me, but I keep both of my cell

24  phones very close to me at all times because there's a need.

25  And most Americans do the same.  Our phones are almost an

1    appendage, an extension of one of our limbs.  That is not the

2    situation that we find with the data that will be collected

3    through the AIR Program.  It is so limited.  It is not broad.

4    And it's not intrusive and expansive in scope.

5            The AIR Program -- in *Carpenter* there was the

6    Court specifically limited the -- its ruling to cell phone

7    data, CSLI, and that is just not what we have here.  In fact,

8    the technology that's contemplated by the AIR Program really

9    wasn't even available at the time that the *Carpenter* -- not

10   involved and the *Carpenter* decision was made.  The Supreme

11   Court in *Carpenter* held that a person maintains a legitimate

12   expectation of privacy and the record of their physical

13   movements as captured by CSLI.  And, of course, the AIR

14   Program will not use CSLI, nor will it create a record of an

15   individual's physical movement as those movements were

16   contemplated by the *Carpenter* case.  The *Carpenter* court found

17   it significant that mapping a cell phone's location over the

18   course of 127 days provided an all encompassing record of the

19   defendant's whereabouts.  That is not our situation here.  The

20   AIR Program will not capture cell phone data, nor will it

21   provide an all encompassing record of anyone's whereabouts.

22   It's simply does not work that way.

23           One of the compelling arguments in the *Carpenter*

24   case was that by collecting all of the data that was collected

25   regarding Mr. Carpenter, the government was able to really

1    stitch together a book of Mr. Carpenter's life over the course

2    of 127 days.  And that's what really pulled the story of the

3    intimacies of Mr. *Carpenter*'s life.  And that is what, in

4    part, the Court found so offensive and so concerning.  But

5    that's not our case here.  That is not the situation here, the

6    AIR Program will only capture data, movement that are in the

7    public.  And, again, it's limited to 12 hours a day.  So it's

8    not an intrusive look into anyone's life.  It will only

9    capture what is in the public and what these plaintiffs really

10   have no reasonable expectation of privacy in those movements.

11   The program does not -- it's not designed to capture the

12   intimacies of their lives and it will not capture the

13   intimacies of their lives.  And that was the situation in

14   *Carpenter*.

15            THE COURT:  As I understand it -- if I can just ask

16   a follow-up question, as I understand it, the imagery as

17   summarized in the Professional Services Agreement contract,

18   which is attached to the complaint from PSS, as I understand

19   it, the imagery is so limited, I think the phrase is one

20   pixel, p-i-x-e-l, per person, meaning that an individual

21   appears as a dot, that the individual characteristics are not

22   observable, your representation is that they are never

23   observable?

24            MS. MOORE:  Correct.

25            THE COURT:  Under no circumstances could the

1    individual characteristics be observable, even upon further
2    review, later review, that they still could not identify a
3    particular, specific person; is that correct?
4              MS. MOORE:   That is correct, Your Honor.  And that
5    is why the utility of the AIR Program is so reliant on
6    ground-based surveillance systems that are already in
7    existence in Baltimore.  In a nutshell, for you and the public
8    that are listening, the AIR Program works by identifying a dot
9    that is -- has gone to or was present at or has left the scene
10   of we'll just say a murder.  That dot would be tracked, where
11   did it start.  The dot was present at the time of the murder
12   and then it left the scene.  The utility of tracking that dot
13   is not realized or appreciated until such time as the
14   consultant is able to match that dot to data that is
15   collected, or has been collected by the ground video
16   surveillance cameras that are located throughout Baltimore,
17   and license plate readers.
18             The program is unique.  It's expansive.  We like
19   to -- we hope that it's effective, but it does have
20   limitations.  It only works with existing surveillance tools.
21   And good policing, good detective work, that's able to match
22   up.  And this is my next point why this situation, the AIR
23   Program is not the same as that of cell phone data collected
24   in *Carpenter*.  It's complicated, it's not easily -- you can't
25   just simply download the data and say, oh, there, we've got

1    our person.  We know, you know, who this is, what this is,
2    where they came from and where they went.  You've got to spend
3    time reviewing the data.  It takes two hours to find one hour
4    of data.  You've got to match it to data collected from other
5    sources.  It's complicated.  The program does not have some of
6    the -- it's been referred to as a eye in the sky, but it's not
7    really that.  It's a camera in the sky.  But it doesn't have
8    infrared, telephoto, zoom, or other technologies that one
9    might think would be really effective to make this more
10   valuable.  Any over -- pardon me.
11            MS. WALDEN:  This is Lisa, do you mind if I add in
12   just a couple of points?
13            THE COURT:  Go right ahead, Ms. Walden.  Go ahead.
14            MS. WALDEN:  I think it would be helpful for the
15   Court, and to anyone who hasn't seen these photos, to help
16   appreciate the type of data that the aerial cameras are
17   collecting, to take a review of document 3-1 in the docket.
18   And at page, I think, it's 9 of 17 you can see from the actual
19   images captured by the camera.  And as you'll see there,
20   they're very grainy, they're very distant.  And I think it
21   sort of reinforces the point the Solicitor was making that
22   there's no personal identifiable information in these photos.
23   You can't tell a man from a woman.  In fact, you might not be
24   able to tell a person from a small vehicle.
25            So that is the raw data at issue here.  And further,

1    to what the solicitor was commenting on, that sort of gives a

2    better holistic understanding of the way the program is to

3    operate, and also further distinguishes it from *Carpenter*,

4    because of the quality of these photos, in order to -- the

5    photos themselves are really useful for very little.  In order

6    to reduce them to useful, actionable information that could

7    assist in the investigation of a murder, shooting, armed

8    robbery, or carjacking, the contractor has to apply -- it's

9    one hour of analyst time to track one of these dots for two

10   hours of real time movement.

11            So it's enormously laborious and it requires the use

12   of very sophisticated algorithms to convert this grainy

13   photograph into something resembling a track, which itself

14   still does not identify the subject, as the solicitor was

15   saying.  You do still have to -- to reduce the dots to an

16   identity, you would have to find some sort of a conventional,

17   ground-based resource to identify who the person in the

18   picture -- what the car in the picture -- so I think those

19   points are fairly relevant to the general understanding of how

20   the system operates and also to why this really is not a

21   *Carpenter*-type of situation.  There is simply not the

22   bandwidth to track every person in the city in the manner that

23   the plaintiffs presuppose will occur.  It's not possible as a

24   practical matter.  And the underlying raw data itself is no

25   encyclopedic record of really much of anything.  And I think

1    that's an important sort of clarification point.  I apologize

2    if I interrupted.

3            THE COURT:  No, that's quite all right.  Thank you

4    very much, Ms. Walden.  Thank you.

5            MS. MOORE:  So, at base the plaintiffs argue that

6    the AIR data collection program is a time machine.  It simply

7    is not.  It's not a search.  It's not a search that -- there's

8    no requirement for a warrant.  We believe that the Supreme

9    Court and the 4th Circuit have already held constitutional far

10    more intrusive aerial surveillance than what is contemplated

11    by this program.  And here we would refer Your Honor to

12    *California versus Ciraolo* and *Dow Chemical versus United*

13    *States*.  And with that I'll rest on the -- unless you think I

14    should add something on the first *Winter* factor.

15            THE COURT:  No, before I hear further from Mr.

16    Kaufman, I would just note that with respect to the two cases

17    that you have mentioned, Ms. Moore, California versus Ciraolo,

18    a 1986 Supreme Court opinion, which involved a helicopter a

19    thousand feet over the defendant's enclosed backyard.  And

20    there were observations of marijuana with the naked eye and it

21    was deemed not to be a search.  Essentially, similar to

22    *Florida versus Riley*, a 1989 Supreme Court opinion.  Once

23    again a helicopter above a defendant's home or private areas

24    observing marijuana with the naked eye was deemed not to be a

25    search.  Essentially, in those two cases, as well as in *Dow*

1    *Chemical versus United States* in 1986, with respect to a

2    standard floor-mounted aerial mapping camera, taking

3    photographs of a commercial facility of 12,000, 3,000 feet,

4    essentially the Supreme Court held in those cases that it was

5    not a search.

6          Obviously, the position of the plaintiffs here is

7    that the world is changing now in light of the Supreme Court's

8    opinion in *United States versus Jones* in 2012, and the Supreme

9    Court's opinion in *United States versus Carpenter* in 2018

10   dealing with cell site location information.  Again, the legal

11   jargon for which is CSLI.

12         So with that let me hear further from you, Mr.

13   Kaufman.  I'll be glad to hear any response you make on this

14   and then I may have some follow-up questions of you as well.

15         MR. KAUFMAN:  Okay.  Thank you, Your Honor.  Just a

16   few points in response to that.  No. 1, the purpose of this

17   program is to identify people.  That is the purpose of the

18   program.  And it's worth asking, after listening to defense

19   counsel explain how blurry the photos are, and how meaningless

20   the information is, why the defendants are going through with

21   this program at all if that is actually the case.  And the

22   answers are both obvious and on the pages of the contract.

23   They intend to use this information to identify people,

24   because that is what the data is capable of doing.  And that

25   is what's going to happen.

1          Ms. Moore also says this is not a *Carpenter* case,

2     and while in some respect that may be true, the differences

3     make it an easier case not a harder one.  The BPD says that

4     the collection is not continuous.  I already addressed that,

5     but the collection by cell phone is just as -- it's even more

6     choppy than the 12 hours of data that the government would be

7     getting in one gulp under this program.  And then, of course,

8     they will be adding that together day after day for 45 days.

9     To say that that is a meaningful difference between this case

10    and *Carpenter* is just not correct.

11         THE COURT:  Mr. Kaufman, if I can just interrupt you

12    for one second.

13         MR. KAUFMAN:  Sure.

14         THE COURT:  I want to stay with you on this point.

15    The Police Department has indicated in terms of the

16    limitations of this system in identifying dots that really

17    can't identify people.  I just need for you to explain to

18    me -- obviously, we're not trying the entire case here today,

19    we're dealing with the matter of whether or not there is

20    likelihood of success on the merit to the extent that you get

21    a preliminary injunction immediately -- but with respect to

22    the abilities of this system the -- there's more Ms. Walden

23    had proffered that it may locate a dot that's at the scene of

24    a -- of an area of a known murder, and it may try to identify

25    a dot, be it a car or a person that may or may not go to

1    another area of the city.

2            That would -- obviously, the city, the police

3    department is trying to solve crimes and locate people who

4    have committed crimes.  But the matter of just following a

5    dot, obviously, has to lead to further, on-the-ground

6    investigation.  So I don't know that it's fair to say that, of

7    course, they're trying to identify people.  Of course they're

8    trying to identify those who've committed crimes.  But I don't

9    know that that means that identifying where a dot moves means

10   they're identifying people per se, just as to the surveillance

11   itself.  But I want to give you an opportunity to respond to

12   my concern in that regard.

13           MR. KAUFMAN:  Thank you.  Thanks, Your Honor, and I

14   appreciate that opportunity.  I guess there's a few possible

15   responses to that.  First, just as a factual matter, we're

16   talking about the collection of this information, PSS is a

17   state actor, the government conceded that today.  So for all

18   intents and purposes we're talking about a collection of data

19   that is in the government's hands.  And that data is capable

20   of identifying individuals.  Now, whether -- and I appreciate

21   the BPD wants to focus on what its current officers will be

22   doing with the data.  But that's not the focus of the Fourth

23   Amendment claim.  The claim is about collection of this data

24   in the first instance by this the government, which is exactly

25   what defense counsel conceded is happening here.  And so that

1    is the proper focus of the pooled data.

2            Now as to how this stuff is identifying, again,

3    the -- you can roll the tape backwards and forward to a

4    specific place.  If somebody's a homeowner, that's obviously

5    identifying.  We pointed to a study that shows that even some

6    of these anonymous dots living around the city can be used to

7    derive their identity fairly easily.  And they've -- it's

8    simply not relevant that the BPD hasn't put into its contract

9    that that's what it's going to do.  The point is the data will

10   be collected and that data will be in its state revealing of

11   that information.

12           And then the last piece, of course, is that -- and

13   this is something, you know, candidly, it's acknowledged by

14   the defense, it's acknowledged in the contract, it's pled in

15   our complaint, but CCTV and the LPR systems will be used and

16   integrated with the AIR Program.  So it's simply wrong to say

17   that this is a separate thing.  They have tied its together by

18   themselves and made that an explicit part of what they're

19   doing here.

20           Another point, just following from *Carpenter*, is

21   that it did not, as I said before, it was not so automatically

22   identifying in *Carpenter*, just to review what the government

23   had to do to make useful meaningful sense of CSLI, they had to

24   flip defendants to turn state witnesses to corroborate

25   defendant's presence in a large cell sector, that he was

1    actually participating in a crime at a particular crime scene.
2    They had to obtain their own CCTV footage near the crime scene
3    showing that the individual was nearby.  The FBI agent combed
4    through 13,000 location points to identify 16 points that
5    placed him near the crime.  All of that is exactly, if not --
6    it is exactly what the government tries to say insulates the
7    collection of information from a Fourth Amendment search here.
8    And that just simply cannot hold up even under the terms of
9    *Carpenter* itself.

10            I've also -- I explained before, but I think worth
11   pointing out again because the government insists on it, the
12   idea that the data in *Carpenter* is continuous and the data
13   here is not is just simply not true as a factual matter.  As
14   we pointed out, there is not a second-by-second catalog of
15   cell phone ping information that your carrier has.  That is
16   not how it works.  But here there will be a second-by-second
17   track of an individual person as they move around the city.
18   The purveyor of the system, Mr. McNutt has also described the
19   system as Google Earth with TiVo, and that's what it is, it's
20   a second-by-second ability to track location over time.
21   That's what it is.

22            Again, in *Carpenter* the data at issue was about
23   large sectors of, you know, wedge-shaped sectors that
24   surrounded a cell phone tower.  It was not a yard-by-yard ping
25   as to a person's location.  So the underlying data is even

1      more sensitive than the data that might just put you in a

2      neighborhood or on a particular block.  Here you know the

3      stoop a person is sitting on because of these cameras.

4              One final point in response and then I'm, again,

5      happy to answer anything else you would like, about the

6      policies.  And the -- the Department likes to -- wants to talk

7      about the policies, but as we explained, they have not argued

8      that a special needs analysis applies here.  And that is the

9      only way that you escape the warrant requirement as we pointed

10     out in our briefs.  And absent special needs, a warrant is

11     required.  And the bottom line is the Department has not

12     sought a warrant to bless this program, as we point out in our

13     first brief.  It could not get a warrant to bless this program

14     because it would effectuate a general search, the most reviled

15     kind of search under the Fourth Amendment and, in fact, the

16     reason that the Fourth Amendment was passed.  And it does not

17     intend to get a warrant at any point.

18              And so the protocols and policies are interesting.

19     We certainly would applaud anything that the department has

20     done to try to protect privacy through this program.  But the

21     fact of the matter is the program is designed to collect

22     identifying location information about the plaintiffs and

23     about 600,000 people in Baltimore.  And that is not

24     constitutional under the Fourth Amendment.

25              THE COURT:  All right.  Thank you, Mr. Kaufman.  Let

1    me just ask you a few follow-up questions just, again, for

2    purposes of the public understanding where we are here.

3    Essentially, I had mentioned the Supreme Court cases in the

4    1980s, *Florida versus Riley*, *California versus Ciraolo,* and

5    *Dow Chemical versus United States*, all of which essentially at

6    that time established that individuals do not have a

7    reasonable expectation of privacy on things which are

8    observable from flights in navigable airspace.  That was the

9    state of the law as of the late 1908s; correct?

10            MR. KAUFMAN:  Yes.  Those cases were decided within

11   a few years from each other.  And, I mean, it's worth just

12   talking for a moment about what those cases involved.  They

13   involved police, without a warrant, targeting an individual

14   that they were investigating, using their police resources, a

15   helicopter in one case, planes in another, flying at lawful

16   altitude and flying over properties one time.  And that is

17   what they did.  And, I don't think it takes a lot of

18   imagination, you don't have to go 40 years into the future and

19   read *Carpenter* to think about how those courts might have

20   analyzed the situation differently if for 80 hours a week --

21            THE COURT:  I understand.  No, I understand your

22   point on that.  I'm just trying to assure for purpose of

23   public dissemination we understand where we are here in 2020

24   on this question.  Because with respect to these short-term,

25   limited aerial surveillance, which were clearly just focused

1    on individuals, the United States Court of Appeals from the

2    4th Circuit, following that case law, clearly in cases which

3    you all have cited on both sides, I believe, *Giancola versus*

4    *State of West Virginia Department of Public Safety*, in which

5    the 4th Circuit relied upon the Supreme Court jurisprudence I

6    just mentioned, finding that a helicopter surveillance over

7    personal property was reasonable under the Fourth Amendment,

8    because it comported with Federal Aviation Administration

9    regulations.

10            And then there was a 4th Circuit opinion in 2002,

11   *United States versus Breza*, B-r-e-z-a, which upheld aerial

12   observation of landscaped area involving a defendant's house,

13   again, relying upon those trilogy of cases in the late 1980s.

14   And then what you had is in 2012 the *Jones* case that dealt

15   with the GPS system on a vehicle and the issue of expectation

16   of privacy going back to the *Katz* case on expectation of

17   privacy, which we've already discussed is the real analysis

18   here.

19            And then we get up to *Carpenter*, the case in which

20   you were involved, and two of your colleagues, in 2018,

21   involving cell site location information, very much focused

22   individually.  Essentially, the issue becomes the ambit of

23   *Carpenter* and I must -- I'm sure you've recognized, must

24   address the language of Chief Justice Roberts in his opinion,

25   because he specifically said -- and it was a five to four

1    opinion -- and in his opinion he noted specifically at 138

2    Supreme Court Reporter 2220, twenty two, twenty, it's 86

3    United States Westlaw 449, I believe, Our decision today is a

4    narrow one.  We do not express a view on matters not before

5    us, colon, real time CSLI -- meaning cell sight location

6    information or tower dumps.  And then he goes on, We do not

7    disturb the application of the *Smith* and *Miller* cases and

8    prior opinions of the Supreme Court.  And specifically Chief

9    Judge Roberts said at that time, as you're well aware Mr.

10   Kaufman, quote, Will call into question conventional

11   surveillance techniques and tools such as security cameras,

12   with respect to the limitation of that opinion.  And the --

13   essentially then Chief Justice Roberts found that the

14   acquisition of the cell site location information in *Carpenter*

15   was in fact a search.

16            Which I think leads us into a question that I need

17   to ask of you, do you have reference in footnote, I believe in

18   a footnote in your initial memorandum, you have referenced to

19   one opinion which followed the *Carpenter* case in the United

20   States District Court for the District of Massachusetts,

21   *United States versus Moore-Bush*, 381 F.Supp.3d 139, a 2019

22   opinion of that court, which is now on appeal to the United

23   States Court of Appeals for the 1st Circuit.  Are you counsel

24   in that case as well?

25            MR. KAUFMAN:  I'm counsel of amicus party in that

1   case.

2            THE COURT:  All right.  And the -- there the

3   question becomes a matter of a pole camera.  And I guess what

4   I want to give you an opportunity to respond to is that the

5   jurisprudence here, the view this court and certainly the 4th

6   Circuit has been that the constitutionality of pole cameras

7   had been upheld.  And, essentially, these pole cameras

8   operate -- in many instances they operate 24/7, they operate

9   24 hours a day, 7 days a week.  And they record everything

10  that happens on a particular street.

11           And the -- apparently in the *United States versus*

12  *Moore-Bush* case, last year before the United States District

13  Court for the District of Massachusetts, that court held that

14  a pole camera was a search, running afoul of the Fourth

15  Amendment.  And also holding that, therefore, the use of that

16  surveillance camera risked chilling First Amendment rights.

17  The arguments you make here with respect to the surveillance

18  program, the AIR Program of the Persistent Surveillance

19  Systems, I gather would apply to pole cameras as well, would

20  they not?

21           MR. KAUFMAN:  Well, I don't think that this is

22  exactly the same case at all as the pole camera case.  Though,

23  it's absolutely correct, and the *Moore-Bush* decision does a

24  good job of this in the District Court, explaining why

25  *Carpenter* leads the Court to that result, which as amicus we

do agree with that result.

What happened in *Moore-Bush* is I think eight months of continuous surveillance of an individual using, you know, when pole cameras started becoming, you know, part of ordinary law enforcement measures, they were rudimentary security cameras just put on a pole.  And they would have to go change the tape every once in a while.  And that's why they put it on utility poles so it looked like a normal activity and not tip anyone off.  But the cameras at issue in *Moore-Bush* are eight months, they are controlled from a centralized location in the police department, they can be viewed, they can be manipulated, they can be zoomed, they can be panned, they can be tilted, they can zoom in through windows, they can look at license plates.

So I think what the Court in *Moore-Bush* is doing, and something this Court does not need to do in this case, is sort of take a look at what *Carpenter* means in a new situation with a new technology.  But here we're not talking about challenging traditional surveillance methods in the case at all.  In fact, my colleagues on the other side acknowledge this is unique and unprecedented.  And so our argument does not require reading or overruling *Ciraolo*, or saying you know, flights like that that are ordinary parts of police practice for the last 30 years are not okay.  In fact, our argument depends on *Ciraolo* to show that the Court was concerned about

1    concerns that went far beyond the limited surveillance in

2    those kind of scenarios.  And while CCTV and ALPR are relevant

3    to the identification abilities of this system, they're

4    written into the contract as we discussed, we're not

5    challenging the use of sporadically located cameras.  I'm not

6    aware of any ALPR CCTV system that's as comprehensive as the

7    AIR Program.

8              And so I acknowledge Chief Justice Roberts, and

9    proper respect for the fact that he could only decide the case

10   in front of him, along with the other members of the Court.

11   And that's how all Courts should proceed, of course.  But the

12   fact that the *Carpenter* case didn't reach every other scenario

13   doesn't mean that its logic doesn't compel a certain result in

14   that case.

15             THE COURT:  All right.  Well, thank you very much,

16   Mr. Kaufman on that.  The -- with respect to the matter of

17   likelihood, what we're in, so the public is aware, we're in

18   the first step of a four-step analysis, the main step here in

19   terms of likelihood of success on the merits, and whether or

20   not the AIR Program surveillance is a search within the

21   meaning of the Fourth Amendment and whether or not it is

22   unreasonable under the Fourth Amendment.  With respect to

23   likelihood of success on the merits as to the First Amendment

24   claim, Count 2, essentially as I understand it the defendant

25   did not really address the merits on that, only that they

1    challenge standing.  And the position of the plaintiffs is

2    that any such monitoring will have a chilling effect on the

3    rights of association of the plaintiffs.

4            Want to -- anything to add to that from the point of

5    view of the plaintiffs, Mr. Kaufman, and then I'll hear from

6    Ms. Moore and from Ms. Walden on the Fourth Amendment issue.

7            MS. MOORE:  Your Honor, this is a Dana Moore.  I was

8    just wondering if I could respond very, very briefly to some

9    of the comments that were just made --

10           THE COURT:  Sure.  Go ahead.

11           MS. MOORE:  Thank you.  With respect to the AIR

12   Program, I just want to point out, and it's probably very

13   clear, but I just want to be abundantly clear, the AIR

14   Surveillance Program that we contemplate falls squarely within

15   the air surveillance techniques that have already been found

16   constitutional by the Supreme Court and the 4th Circuit.  It's

17   just that we're using that data that collected, we're using it

18   differently.  The collection system itself, it's exactly what

19   has been done and been approved in other courts. Important to

20   note that the *Carpenter* case is fairly limited.  They actually

21   cabined that decision strictly to CSLI.

22           Counsel -- addressing the state actor argument, I

23   want to back off that a little bit, and here's why:  Although,

24   there was a contract that governs how this program will be

25   operated, it's very important to note that this -- the police

1    department will get a very, very, very limited portion of the

2    data that's collected.  And will only get that data after it's

3    been analyzed and found to be related to a particular crime.

4    So the vast majority of the data that's collected, we'll never

5    see.  We'll never see because it's not relevant.

6            Counsel also said that the purpose of this program

7    is to follow people to identify people.  And that's not the

8    case, it's to follow movement.  They're asking why are we

9    using this if it's not so clear.  Because we are determined to

10   find and use any tool that looks like it is possible to aid

11   the police department in solving and clearing crime, so long

12   as those tools are constitutional, which this tool is.

13           Counsel stated that the purpose of this program is

14   to follow these plaintiffs.  And that is a very dangerous

15   comment to make.  And I want it to be very, very clear, that

16   is patently untrue.  And it's incredibly irresponsible to

17   state that that is the purpose of this program.  It is not to

18   follow these plaintiffs.  These plaintiffs -- that is not the

19   intention.  If they were to show up at all it would be

20   incidental and we would never even know, because it wouldn't

21   relate to any of the stated crimes.  Thank you.

22           THE COURT:  All right.  Well, just in that regard,

23   without getting too deep in the weeds on that, that contention

24   by plaintiffs is a matter that may have to be further reviewed

25   in terms of discovery if that's the contention.  And the

1    Police Department can certainly establish during discovery

2    that that representation by plaintiff's counsel may not be

3    correct.  But that's a matter -- we're not going to be able to

4    resolve that here today in terms of that contention.  I hear

5    what you're saying in terms of the contention of plaintiff's

6    counsel in that regard.

7            MR. KAUFMAN:  Your Honor, the --

8            THE COURT:  Yes.

9            MR. KAUFMAN:  Just to point out, I did not -- and I

10    think the transcript will show -- I did not say the purpose of

11    this program is to follow the plaintiffs.  I just needed to

12    point that out.  That is not what I said.

13            THE COURT:  I understand.

14            MR. KAUFMAN:  Thank you, Your Honor.

15            THE COURT:  I understand.  There's nothing improper

16    about what you've argued.  That's fine.  I'm just saying that

17    as to that, in terms of your contention as to what the program

18    can or cannot do, and the Police Department's response, no, it

19    cannot track as definitively as you say, that's a matter that

20    may have to be explored during discovery.  I would just note

21    that I think it's pretty clear that if a private entity

22    exercises powers that were traditionally the prerogative of

23    the state it is carrying out state action for purposes of

24    Section 1983.  There's a 4th Circuit case in 1994, *Conner*

25    *versus Donnelly* that clearly establishes that.

1    So let me just go, if I can, to the First Amendment

2  claim in terms of likelihood of success on the merits.  If

3  there's anything further that you all want to add for me as to

4  the First Amendment issue in terms of, again, the likelihood

5  of success on the merits the first of the four and the main of

6  the four factors we're addressing here today, Mr. Kaufman.

7    MS. GORSKI:  Your Honor, this is Ms. Gorski.

8    THE COURT:  Ms. Gorski, that's fine.  Be glad to

9  hear from you.

10    MS. GORSKI:  Great.  Thank you so much.  So on the

11  First Amendment claim, again, I just want to emphasize the

12  defendants have not disputed the merits of plaintiffs' First

13  Amendment claim, they've only disputed plaintiff's First

14  Amendment standing.  The AIR Program on the merits

15  substantially impairs plaintiffs' First Amendment freedom of

16  association.  And that's not just through some kind of

17  abstract chilling effect.  It concretely burdens and effects

18  their work in the ways set forth in the plaintiffs'

19  declaration.

20    The BPD is collecting a comprehensive map of the

21  ties embedded in plaintiffs' everyday lives in their

22  community-based work.  And that collection itself, for

23  standing purposes, confers a First Amendment injury.  And that

24  First Amendment injury is a substantial one.  Which means that

25  the government's program has to survive exacting scrutiny,

1   that is constitutional only if it is the least restrictive

2   means of achieving a compelling state interest.  And the AIR

3   Program fails that test for the reasons that my colleague Mr.

4   Kaufman has explained concerning the scope and the breadth of

5   that program.  Thank you.

6            THE COURT:  All right.  I would just note that it

7   seems to me that the matter of whether or not there's a search

8   and the matter of whether or not that -- there's a violation

9   of Fourth Amendment necessarily effects the analysis with

10  respect to a chilling effect as to First Amendment rights.  I

11  think both sides have mentioned the *Clapper versus Amnesty*,

12  the 2013 opinion of the United States Supreme Court, which I

13  think has specifically noted that surveillance itself does not

14  give rise to an injury in fact, creating Article III standing.

15  But I think it's been adequately briefed and I can review the

16  papers in ruling on this, when I make sure to file the opinion

17  by this Friday.

18            So in lining this out here --

19            MS. GORSKI:  Your Honor, I'm sorry, if I may.  One

20  very quick point on *Amnesty*.  *Amnesty* did not hold that

21  surveillance itself cannot constitute an injury in fact.  And

22  in fact it was the *Wikimedia* case, a separate case, the other

23  courts were very clear, including the 4th Circuit, that the

24  collection of private information is itself an injury in fact.

25  In *Amnesty* the issue was that the surveillance was entirely

1    speculative.  Plaintiffs, according to the Court, would be

2    speculating about the facts that they would be subject to the

3    surveillance.  Here, in contrast, plaintiffs are not

4    speculating.  Defendants do not dispute that plaintiff's

5    information will be collected by the AIR Program.  Thank

6    you.

7                 THE COURT:  All right.  Thank you very much

8    Ms. Gorski.

9                 And so with that let me just go to the issue of

10   irreparable harm.  Again, the law is very clear, so that the

11   public understands that for this Court to issue injunctive

12   relief as requested by the plaintiffs, the four factors that

13   must be satisfied are; one, the likelihood to succeed on the

14   merits, which is what we've been spending the last hour upon,

15   as to whether or not this program constitutes a search under

16   the Fourth Amendment.  Secondarily, whether the movant is

17   likely to suffer irreparable harm absent preliminary relief.

18   Third, the balance of equities in favor of the movant.  And,

19   finally, that an injunction is in the public interest.

20                So in lining it up here, I don't want to ignore the

21   second, third, and fourth requirements.  The plaintiffs

22   essentially argue that the irreparable harm is in the context

23   of a constitutional violation.  The defense's response is that

24   there is no constitutional violation.  I don't know that we

25   need to spend a lot of time on the irreparable harm issue.  It

1    is totally dependant upon this Court's determination of
2    likelihood of success on the merits as to the issue of whether
3    or not this is a search.
4            Is there anything either side wants to add on the
5    irreparable harm analysis before we get to the balance of
6    equities and the public interest, Mr. Kaufman or Ms. Gorski?
7            MS. GORSKI:  Your Honor, the only thing I would add
8    is that in our view the First Amendment analyses and the
9    Fourth Amendment analyses are distinct.  And so even if this
10   Court concludes that the initial collection of information
11   through the AIR Program does not constitute a Fourth Amendment
12   search, it has to separately undertake a First Amendment
13   analysis.  And that analysis also has to take into account
14   plaintiff's allegations with respect to the substantial
15   likelihood that they'll be subject to individualized
16   reporting.  And the First Amendment burden must be considered
17   separately as the irreparable harm analysis.  Thank you.
18           THE COURT:  All right.  Ms. Moore or Ms. Walden,
19   anything else you want to add on this.
20           MS. MOORE:  No, we don't want to belabor the point.
21   And we know that Your Honor has read our papers and will
22   review them.  We'll go with --
23           THE COURT:  All right.  Bottom line, again, so the
24   public understands, all four criteria have to be satisfied.
25   If you don't satisfy all four criteria, then the issue of the

1    matter of entering injunctive relief is within the equitable

2    discretion of this Court.  And, as I said earlier, it's a

3    heavy burden that lays upon the plaintiff in seeking

4    injunctive relief.

5         So the third of the four factors to consider is the

6    balance of the equities.  Essentially, the plaintiffs have

7    argued that in balancing the equities, government officials

8    are not harmed by the issuance of a preliminary injunction,

9    which prevents the state from implementing a likely

10   unconstitutional practice.  The defendants have responded that

11   the program is being supported by a philanthropic enterprise.

12   And that there is no guarantee that the funding will be

13   available indefinitely.  And that it would -- stopping this

14   program now would, perhaps, deprive the city of Baltimore of

15   those philanthropic efforts.  I'm aware of the arguments of

16   both sides on balancing the equities.  Does anyone want to add

17   anything further on that?

18        MS. MOORE:  Your Honor, this is Dana Moore -- I

19   apologize.

20        THE COURT:  Go ahead.  Ms. Moore, go ahead.

21        MS. MOORE:  So it's not just the funding issue, it's

22   the funding issue coupled with the reality that violent crime

23   continues in Baltimore.  The public has a very --

24        THE COURT:  I think we're going to get -- I think

25   that's more of a public interest analysis.  I hear you.  I'm

1    going to get there in a minute.  I just want to go over the

2    matter of balancing the equities here.  We're going to get

3    into that discussion on public interest in a moment, the

4    fourth of the four criteria.

5            Anything else you want to add on the balance of the

6    equities and I'll hear from Ms. Gorski next.

7            MS. GORSKI:  Nothing more, Your Honor.  Thank you.

8            THE COURT:  All right.  Let's get into what

9    Ms. Moore was about to get into and that's the public interest

10   here.  According to the papers here, and as I understand in

11   the pleadings here, that this is one thing I'm afraid is

12   rather distressing here in this difficult time that we're

13   facing in terms of the pandemic, and the very fact that we're

14   having this two-hour conference remotely, from different sites

15   on the telephone, because of steps taken in terms of only

16   having this court be open for emergency proceedings,

17   consistent with the executive orders of Governor Hogan of our

18   state, that according to my review of the papers as of eight

19   days ago, April the 13th, there were 81 homicides in the city

20   of Baltimore, which is five more than on April 13th, 2019.

21   And 2019 was among -- I think it was the second most violent

22   year in the history of the city.

23           And if one thing can be clear it's that the pandemic

24   and the stay-at-home orders, it does not appear to have had

25   any effect at all on the level of violence here in the city of

1    Baltimore.  And the Court cannot ignore the important factor
2    here of public interest with respect to the unfortunate
3    situation here in the city of Baltimore, where even a pandemic
4    cannot slow the pace of the killings in this city in certain
5    neighborhoods.

6             Now, the plaintiffs have essentially noted, as a
7    matter of public interest, that upholding constitutional
8    rights clearly serves a public interest, without question.
9    Clearly, no matter what the program is, if it's violative of
10   constitutional rights, one does not satisfy their
11   constitutional rights in the public interest of the overall
12   majority of the public.  But the defendants have argued that
13   the public interest favors the Aerial Investigation Review
14   Program, given this level of violence.  For the entire year of
15   2019 there were 348 homicides in the city of Baltimore.

16            And I do not ignore the fact that that the United
17   Baptist Ministry Convention, a leading religious organization
18   here in this city, as well as the Greater Baltimore Committee,
19   which is the -- essentially, the leading business advisory
20   organization, both have been involved in this matter.  They
21   have both expressed their support for this program.  And I
22   certainly do not ignore the fact that consistent with the
23   consent decree requirement, again, not getting the approval of
24   this court in any way, but consistent with the consent decree
25   that the Baltimore City Police Department has complied with

1    the consent decree in terms of providing notice of their

2    intentions in this regard as well as public hearings.

3            Having said that, as I know the plaintiffs would

4    likely note, having public hearings at this time is very

5    difficult and clearly there could have perhaps been more

6    public input if we weren't in the situation of essentially

7    sheltering in place here during the pandemic.  So the public

8    interest is not something I'm going to lightly just ignore

9    here.  Clearly, the fundamental issue here before me is

10   whether or not this constitutes a search, which would be

11   violative of the Fourth Amendment.

12           But I'd be glad to hear from plaintiff's counsel on

13   this and then I'll hear from defense counsel.  I note that the

14   plaintiff's counsel in its -- I mean, defense counsel in its

15   submissions here on the public interest issue, essentially

16   have contended that while the -- I think the exact language

17   was while the plaintiffs purport to altruistically speak for

18   all Baltimoreans, they do not represent the public citizenry

19   at large.  And the defense, the Police Department has noted

20   the support of the United Baptist Ministry Convention,

21   composed of some 100 churches, as well as the greater

22   Baltimore Committee.

23           So, plaintiffs, I'll be glad to hear from you on

24   this fourth of the four criteria in terms of the public

25   interest, Mr. Kaufman or Ms. Gorski.  And then I'll hear from

1    you Ms. Moore or Ms. Walden.

2          MS. GORSKI:  Thank you, Your Honor.  There are

3    unquestionably many weighty considerations here.  And

4    plaintiffs acknowledge and underscore that reality.  But as

5    defendants have acknowledged, the injunctive relief analysis

6    is not a popularity contest.  And the public interest inquiry

7    is not whether a raw majority of Baltimoreans favor wide-area

8    surveillance or not.  Ultimately, the BPD's objective here in

9    reducing crime is commendable, but the public has, at bottom,

10   an interest in vindicating its rights under the Fourth and

11   First Amendments.  And the BPD cannot pursue an

12   unconstitutional policy in service of its commendable

13   objective.  Thank you.

14         THE COURT:  All right.  Thank you very much,

15   Ms. Gorski.

16         And, Ms. Moore or Ms. Walden, I think Ms. Moore, you

17   wanted to address this matter, go right ahead.

18         MS. MOORE:  Sure, Your Honor.  Your Honor laid out

19   the factors neatly.  Crime continues, violent crime continues

20   in Baltimore.  We would have expected it to go way down given

21   the orders that we're all living under.  And that has not

22   happened.  That has not happened.  The community at large is

23   crying out for solutions.  They are expecting Commissioner

24   Harrison and his police department and Mayor Young and his

25   executive team to do something substantial to reduce crime.

1    We are getting that call at the time when we are seeing that

2    it's very difficult to recruit police officers or new officers

3    to the police department.  It is very difficult to keep

4    officers in the Baltimore City Police Department.  And this is

5    not just for us, this is happening across the country.  All

6    police departments are experiencing this.

7            We are concerned today about Baltimore.  What are we

8    going to do for Baltimore?  And the community is giving us the

9    answers.  They want us to take new and different and

10   constitutional solutions that will make this city safe.

11   That's why the United Baptist Ministry Convention has said,

12   and you're right, it's more than 100 churches that spoke out

13   through a letter saying, please use this program.  We had the

14   community meetings.  We went Facebook Live because we had to.

15   We had to do that.  And by going on Facebook live to talk

16   about this program, we've been viewed by more than -- we've

17   been more than 30,000 views.

18           Even before we started talking about this program,

19   you will recall, Your Honor, that even before Commissioner

20   Harrison was presented to the City Council for approval for

21   consideration and approval as Baltimore City's new police

22   commissioner, he did a complete tour of Baltimore City's many,

23   many communities.  And at those meetings all issues related to

24   the police department were raised.  And as he states in his --

25   in our papers, a number of people said we need the AIR

1    surveillance program.  It was known at the time.  And people

2    were asking that this program not just be brought back, but be

3    brought back quickly.

4              And it is unusual that a community, community

5    leaders, the Greater Baltimore Committee, and Baltimore

6    churches combine to voice support for any one thing.  That's

7    unusual.  It is unusual for Governor Hogan, our governor to

8    express support for programs in Baltimore that we believe will

9    be effective.  I believe that we have an unusual alignment of

10   new stars that say use this program.  Put it into effect.  Try

11   it.  Let's see if it works.  The time is now.  That is really

12   the overwhelming human cry out of Baltimore.  That is the

13   overwhelming, irrefutable public interest.  It cannot be

14   achieved by not permitting this program to go forward.  And it

15   is for this reason that we ask that the programs do go

16   forward.  Thank you.

17             THE COURT:  All right.  Thank you all very much.

18   And, again, I have before me a motion for preliminary

19   injunction here.  And it's analyzed under Rule 65 of the

20   Federal Rules of Civil Procedure.  This form of injunctive

21   relief is an extraordinary remedy to be exercised essentially

22   very sparingly and in limited circumstances, as the 4th

23   Circuit has held in cases that involves the very far reaching

24   power here of this Court.  And in determining whether or not

25   the issue at preliminary injunction I follow the test set

1   forth in *Winter versus Natural Resources Defense Council* and

2   the four factors that I have previously listed.  And,

3   essentially, the heavy burden on the plaintiffs is to make a

4   clear showing of likelihood to succeed on the merits. And

5   because preliminary injunction is an extraordinary remedy it

6   may only be awarded on a clear showing that plaintiff is

7   entitled to such relief.  And such an injunction is not

8   granted as a matter of course.  And whether to grant such a

9   preliminary injunction remains in the equitable discretion of

10  this Court.

11          That's what's before me now.  And I promise you all

12  that I will get on this right away.  I literally talked to

13  counsel the day this thing was filed, the day this thing was

14  filed, April the 9th.  And I want to thank the lawyers for

15  their high quality of briefing and the high quality of the

16  arguments here.  We've gone for over two hours and now the

17  ball is in my court.  And I will abide by that and I promise

18  you that I will have a written opinion on this matter and file

19  it by 5:00 o'clock this Friday, April the 24th.

20          Just so the record is clear, this doesn't -- I'm not

21  determining the overall case now.  I'm dealing with a question

22  of preliminary injunctive relief at this time.  And so with

23  that, unless there's anything further from the point of view

24  of the plaintiffs or the defendants, we will conclude this

25  call.

1          Again, I want to thank the clerk's office here,

2     Felicia Cannon and Catherine Stavlas, and their staff for

3     coordinating this.  I want to thank my law clerk, Anthony

4     Vitti, being off site coordinating this call.  And I want to

5     our lead administrative court reporter Christine Asif for her

6     work on this today.  Again, we're all remotely off site here.

7          Is there anything further from the point of view of

8     the plaintiffs before we call this to a conclusion?

9          MR. KAUFMAN:  Nothing further, Your Honor.

10         MS. GORSKI:  No, thank you.

11         THE COURT:  Anything further from the point of view

12    of the defendants?

13         MS. MOORE:  Your Honor, I left out a very important

14    constituency that is driving us to pursue this program, and

15    that is the families who have suffered grievous losses and

16    injuries to violent crime in Baltimore.  They are crying for

17    us to find a solution.  And they are asking that we use this

18    program.  And I apologize for forgetting to include them.

19         THE COURT:  That's all right.  I'm sure they all

20    realize that.

21         MS. MOORE:  Thank you.

22         THE COURT:  Okay.  Thank you all very much.  And

23    with that, this will conclude the telephone conference today

24    on this matter, leaders of a Beautiful Struggle versus

25    Baltimore City Police Department, civil number RDB-20-0929.

1    Thank you all very much.

2              MS. GORSKI:  Thank you, Your Honor.

3              MR. KAUFMAN:  Thank you, Your Honor.

4              MS. MOORE:  Thank you, Your Honor.

5              MS. WALDEN:  Thank you, Your Honor.

6              (The proceedings were concluded.)

7

8              I, Christine Asif, RPR, FCRR, do hereby certify that
     the foregoing is a correct transcript from the stenographic
     record of proceedings in the above-entitled matter.

9
                        _____/s/_____
10                          Christine T. Asif
                         Official Court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

< Dates >.
April 9th 16:4.
June 5 2:25.
.
.
< 1 >.
1 27:22, 53:16.
100 75:21, 77:12.
101 1:48.
12 31:21, 33:7,
    33:11, 33:18,
    33:23, 33:24,
    34:7, 40:19,
    44:24, 46:5, 48:7,
    54:6.
12,000 53:3.
12-hour 33:11,
    33:14, 34:24.
127 47:18, 48:2.
13,000 57:4.
138 10:20, 61:1.
139 61:21.
13th 73:19, 73:20.
16 57:4.
17 20:1, 30:12,
    50:18.
1908s 59:9.
1967 37:19.
1980s 32:4, 32:11,
    59:4, 60:13.
1983 20:21.
1983. 67:24.
1986 52:18, 53:1.
1989 52:22.
1994 67:24.
1998 9:25.
1st 61:23.
.
.
< 2 >.
2 42:6, 64:24.
2002 60:10.
2008 26:22, 40:8.
2010 16:6.
2012 36:23, 53:8,
    60:14.
2013 69:12.
2014. 27:10.
2016 42:11.
2017 42:11.

2018 10:19, 53:9,
    60:20.
2019 41:15, 42:1,
    61:21, 73:21,
    74:15.
2019. 73:20.
2020 1:19, 59:23.
2020-07 2:23.
21201 1:49.
2206. 10:20.
2220 61:2.
224 27:10.
24 32:22, 33:5,
    46:6, 62:9.
24-hour 33:17.
24/7 32:22, 62:8.
24/7. 46:22.
24th 4:23, 79:19.
25 32:16.
25. 44:5.
2nd 21:19.
.
.
< 3 >.
3,000 53:3.
3-1 50:17.
30 63:24.
30,000 44:3,
    77:17.
348 74:15.
35 18:7, 22:4, 22:5,
    32:16.
365 16:15.
381 61:21.
39. 42:7.
.
.
< 4 >.
40 33:1, 59:18.
449 61:3.
45 32:12, 33:13,
    39:10, 40:16,
    46:8, 54:8.
45-day 28:18,
    34:6.
4th 1:48, 11:13,
    11:18, 15:16,
    22:2, 24:21,
    24:22, 27:8,
    27:10, 52:9, 60:2,

60:5, 60:10, 62:5,
    65:16, 67:24,
    69:23, 78:22.
.
.
< 5 >.
555 26:22.
5:00 4:23, 79:19.
.
.
< 6 >.
600,000 6:19, 39:10,
    58:23.
65 26:15, 78:19.
6th 30:6.
.
.
< 7 >.
7 26:22, 32:22,
    33:5, 62:9.
769 27:10.
.
.
< 8 >.
80 33:12, 59:20.
81 73:19.
86 61:2.
.
.
< 9 >.
9 50:18.
95 30:18.
9th 3:20, 4:2, 4:17,
    32:25, 79:14.
_____/s/_____
    _____ 81:12.
.
.
< A >.
abated 44:15.
abbreviation 7:8.
abide 4:9, 79:17.
abilities 54:22,
    64:3.
ability 19:23,
    57:20.
able 4:13, 18:15,
    23:12, 41:2,
    45:23, 46:7,
    47:25, 49:14,

49:21, 50:24,
67:3.
above 52:23.
above-entitled
81:10.
absent 27:3, 58:10,
70:17.
Absolutely 33:17,
35:24, 42:25,
62:23.
abstract 68:17.
abundantly 65:13.
access 4:12, 10:23,
11:1, 31:25.
accesses 17:14,
17:24.
According 16:7,
16:15, 70:1,
73:10, 73:18.
account 71:13.
achieved 78:14.
achieving 69:2.
acknowledge 63:20,
64:8, 76:4.
acknowledged 36:15,
56:13, 56:14,
76:5.
acknowledges
14:17.
ACLU 5:8, 10:4,
11:11, 12:3,
21:19, 42:22.
acquisition 61:14.
acronym 3:25,
12:12.
acronyms 12:14,
28:1, 45:15.
across 77:5.
Acting 1:34, 5:18,
11:7.
action 2:7, 9:13,
11:6, 11:23, 14:6,
20:20, 21:6,
67:23.
actionable 51:6.
actions 8:20, 12:1,
17:17, 25:11,
26:9, 36:14.
activist 16:14,
16:18.

activities 33:3.
activity 63:8.
actor 12:1, 20:19,
55:17, 65:22.
actual 20:10, 45:9,
50:18.
actually 2:9, 7:9,
19:17, 20:9,
32:24, 37:11,
44:17, 45:1,
53:21, 57:1,
65:20.
add 25:22, 35:14,
50:11, 52:14,
65:4, 68:3, 71:4,
71:7, 71:19,
72:16, 73:5.
addendum 32:25.
adding 54:8.
addition 22:21.
additional 23:13.
address 6:6, 12:19,
27:6, 37:1, 37:4,
40:1, 41:6, 60:24,
64:25, 76:17.
addressed 54:4.
addressing 26:25,
28:9, 28:11,
65:22, 68:6.
adequately 69:15.
Administration
60:8.
administrative 2:16,
80:5.
advance 16:8, 24:14,
46:14.
advanced 32:15,
34:23.
advisory 74:19.
advocacy 7:19,
16:10.
advocated 7:23.
Aerial 3:24, 7:9,
11:9, 12:18, 18:8,
21:3, 22:7, 22:8,
27:24, 28:1, 32:4,
32:5, 44:21,
50:16, 52:10,
53:2, 59:25,
60:11, 74:13.

affidavit 16:4,
16:7, 16:16,
16:22.
affirms 14:17.
afflicting 36:17.
afoul 62:14.
afraid 73:11.
aftermath 37:17.
agency 38:24.
agent 57:3.
agents 4:11, 13:1,
30:8.
aggregated 34:6.
ago 38:21, 73:19.
agree 4:12, 21:7,
36:25, 40:9,
63:1.
agreed 4:8, 35:18,
43:16.
agreeing 37:24,
40:5.
Agreement 32:24,
40:19, 43:5,
48:17.
ahead 23:3, 36:21,
36:22, 43:3,
50:13, 65:10,
72:20, 76:17.
aid 66:10.
airplanes 40:21.
airspace 59:8.
al 1:6, 1:11, 2:6.
Alexia 1:28, 5:9.
algorithms 51:12.
alignment 78:9.
allegation 15:17.
allegations 71:14.
allege 9:10.
alleged 8:20.
alleging 3:24.
almost 46:25.
alone 18:5, 22:1,
22:20, 36:13.
ALPR 31:7, 64:2,
64:6.
already 23:14, 46:1,
49:6, 52:9, 54:4,
60:17, 65:15.
altering 14:1.
Although 37:9,

65:23.
altitude 59:16.
altruistically
  75:17.
ambit 60:22.
ambitious 28:15.
Amendments 76:11.
American 6:18,
  28:16, 33:20.
Americans 46:25.
amicus 61:25,
  62:25.
Amnesty 14:8, 14:13,
  14:15, 14:17,
  14:20, 69:11,
  69:20, 69:25.
among 73:21.
amounts 28:21.
an injury 8:18,
  11:10, 11:18,
  13:16, 22:1,
  69:14, 69:21,
  69:24.
analogy 13:6.
analyses 71:8,
  71:9.
analysis 27:19,
  37:5, 37:15,
  37:17, 37:21,
  38:2, 38:10,
  38:16, 38:17,
  39:14, 45:14,
  58:8, 60:17,
  64:18, 69:9, 71:5,
  71:13, 71:17,
  72:25, 76:5.
analyst 51:9.
analyze 45:3.
analyzed 59:20,
  66:3, 78:19.
and/or 17:4.
announced 44:1.
anonymous 56:6.
answer 39:21,
  58:5.
answers 53:22,
  77:9.
Anthony 2:12, 22:23,
  80:3.
anybody 44:5.

apologies 12:11.
apologize 2:2, 8:17,
  52:1, 72:19,
  80:18.
apparently 62:11.
appeal 61:22.
Appeals 60:1,
  61:23.
appear 73:24.
appears 48:21.
appellate 21:25.
appendage 47:1.
applaud 58:19.
application 61:7.
applies 58:8.
apply 3:8, 34:22,
  37:21, 51:8,
  62:19.
appreciate 7:19,
  50:16, 55:14,
  55:20.
appreciated 49:13.
approach 7:22, 7:23,
  7:25.
appropriate 19:4.
approval 74:23,
  77:20, 77:21.
approved 32:8,
  65:19.
approving 43:1.
April 3:20, 4:2,
  4:17, 4:23, 32:25,
  73:19, 73:20,
  79:14, 79:19.
April 21st 1:19.
area 16:20, 54:24,
  55:1, 60:12.
areas 52:23.
argue 7:14, 14:15,
  24:25, 25:8,
  35:16, 52:5,
  70:22.
argued 10:16, 10:21,
  11:15, 15:11,
  21:23, 21:25,
  25:17, 58:7,
  67:16, 72:7,
  74:12.
argues 29:4, 32:3,
  34:8.

argument 8:25,
  12:24, 13:8, 22:2,
  29:13, 32:21,
  34:25, 36:2, 38:8,
  41:6, 63:21,
  63:24, 65:22.
arguments 32:3,
  32:7, 38:4, 38:11,
  47:23, 62:17,
  72:15, 79:16.
armed 44:13, 51:7.
around 56:6,
  57:17.
arranging 2:13.
Article 6:21, 8:18,
  9:3, 9:23, 19:3,
  69:14.
articulated 22:22.
Ashley 1:25, 5:7.
aside 29:7, 34:9.
Asif 1:46, 2:15,
  3:11, 80:5, 81:8,
  81:13.
assert 17:12,
  23:15.
asserting 18:5.
assertions 19:12,
  22:11.
asserts 19:22.
assessing 4:5,
  43:21.
assigned 18:18.
assigns 4:11.
assist 36:8, 44:11,
  51:7.
Assistant 1:35,
  1:36.
associate 14:24,
  20:12.
association 65:3,
  68:16.
associational
  13:15.
assortment 31:18.
assure 59:22.
attached 16:4,
  16:13, 48:18.
attempting 41:13.
attributable 9:14,
  12:2, 21:16,

25:12, 26:9,
31:10.
attributed 19:9.
Audio 42:9, 46:9.
authority 27:8.
automatic 31:4.
automatically 29:24,
30:14, 33:13,
34:16, 56:21.
automobile 40:25.
automotive 35:8.
autonomous 16:11.
available 3:11,
25:24, 36:5, 47:9,
72:13.
Aviation 60:8.
awarded 79:6.
aware 61:9, 64:6,
64:17, 72:15.
away 79:12.
.
.
< B >.
B-r-e-z-a 60:11.
B. 22:23.
Back 29:17, 37:23,
38:3, 38:20, 39:9,
41:14, 60:16,
65:23, 78:2,
78:3.
backwards 30:13,
56:3.
backyard 52:19.
balance 27:3, 70:18,
71:5, 72:6,
73:5.
balancing 72:7,
72:16, 73:2.
ball 79:17.
BALTIMORE POLICE
DEPARTMENT 1:10.
Baltimorean 28:19.
Baltimoreans 7:12,
75:18, 76:7.
bandwidth 51:22.
Baptist 74:17,
75:20, 77:11.
base 52:5.
based 14:16, 14:21,
24:6, 25:23.

basically 37:25,
39:10.
basis 15:23.
bear 31:15.
bears 27:13.
Beautiful 2:6, 3:21,
14:1, 16:5, 19:11,
80:24.
becomes 60:22,
62:3.
becoming 63:4.
begin 9:5, 17:5,
40:3, 40:5.
behalf 5:15, 5:19,
7:20, 17:3, 17:18,
17:19, 20:16.
behest 13:4, 13:5.
beholden 41:12.
belabor 15:4, 32:6,
71:20.
believe 2:22, 5:23,
7:14, 12:14,
17:21, 18:4, 20:8,
28:7, 33:8, 40:6,
41:4, 42:10,
43:18, 52:8, 60:3,
61:3, 61:17, 78:8,
78:9.
Ben 1:30, 5:9.
Bennett 2:15.
best 2:9.
better 2:10, 51:2.
beyond 64:1.
bit 17:16, 65:23.
black 16:9.
blanket 35:2.
bless 58:12,
58:13.
block 58:2.
blurry 53:19.
book 48:1.
Bottom 58:11, 71:23,
76:9.
bound 3:7.
BPD 9:8, 9:14, 9:17,
11:7, 12:2, 13:6,
21:16, 22:12,
28:14, 29:4,
29:13, 30:10,
31:1, 31:11, 34:8,

36:8, 36:18,
38:11, 38:24,
54:3, 55:21, 56:8,
68:20, 76:8,
76:11.
breadth 69:4.
break 33:25.
Bredar 42:13,
42:18.
Brett 1:26, 5:8.
Breza 60:11.
Bridgeford 3:21,
13:24, 16:14,
19:18, 22:14,
23:18.
brief 21:25, 30:6,
30:12, 32:12,
34:8, 58:13.
briefed 4:15,
69:15.
briefing 4:14, 4:16,
9:24, 15:1, 15:3,
21:24, 22:1,
30:16, 35:2,
79:15.
briefly 9:5, 23:1,
65:8.
briefs 58:10.
bringing 7:20.
broad 47:3.
broadcasting 3:9.
broadly 15:20.
brought 78:2,
78:3.
building 46:3.
built 43:22.
burden 27:13, 71:16,
72:3, 79:3.
burdens 68:17.
business 74:19.
.
.
< C >.
cabined 65:21.
cabins 35:5.
California 52:11,
52:17, 59:4.
call 3:1, 4:7, 5:21,
5:24, 10:6, 18:18,
27:23, 41:8,

61:10, 77:1,
  79:25, 80:4,
  80:8.
callers 3:7.
camera 33:4, 50:7,
  50:19, 53:2, 62:3,
  62:14, 62:16,
  62:22.
cameras 29:2, 31:4,
  49:16, 50:16,
  58:3, 61:11, 62:6,
  62:7, 62:19, 63:4,
  63:6, 63:9,
  64:5.
candidly 56:13.
Cannon 80:2.
capable 53:24,
  55:19.
capacity 46:9.
capture 29:14,
  34:18, 47:20,
  48:6, 48:9, 48:11,
  48:12.
captured 23:11,
  25:19, 29:12,
  47:13, 50:19.
car 23:9, 45:19,
  46:3, 46:4, 51:18,
  54:25.
careful 43:4.
carefully 4:20.
carjacking 51:8.
carjackings 44:14.
Carolina 27:9,
  27:10.
Carpenter-type
  51:21.
carrier 57:15.
carriers 10:22.
carries 20:20.
carrying 67:23.
Carter 9:25.
Cases 14:18, 14:19,
  15:2, 15:21, 22:7,
  22:8, 24:24, 27:9,
  32:4, 32:8, 32:11,
  36:12, 52:16,
  52:25, 53:4, 59:3,
  59:10, 59:12,
  60:2, 60:13, 61:7,

78:23.
cast 15:9.
catalog 34:16,
  57:14.
category 32:1.
Catherine 80:2.
causal 8:19.
cause 23:22.
causes 23:19,
  24:15.
CCTV 31:7, 56:15,
  57:2, 64:2,
  64:6.
Cease 16:15, 16:16,
  19:24.
centralized 63:10.
certain 18:17,
  30:15, 43:18,
  64:13, 74:4.
Certainly 8:8,
  10:17, 35:23,
  36:20, 37:18,
  39:12, 58:19,
  62:5, 67:1,
  74:22.
certify 81:8.
challenge 6:7, 6:14,
  6:22, 10:15,
  25:18, 65:1.
challenged 14:6.
challenges 6:9.
challenging 63:19,
  64:5.
change 19:14, 28:17,
  63:6.
changing 13:24,
  53:7.
characteristics
  18:15, 44:23,
  48:21, 49:1.
characterize
  22:10.
Charm 44:5.
Chemical 52:12,
  53:1, 59:5.
Chief 2:16, 5:21,
  38:22, 42:12,
  42:18, 60:24,
  61:8, 61:13,
  64:8.

chill 15:2, 15:14,
  24:10.
chilled 14:25, 15:6,
  15:10, 15:17.
chilling 15:9,
  15:20, 15:23,
  62:16, 65:2,
  68:17, 69:10.
choppy 54:6.
Christine 1:46,
  2:15, 2:17, 2:20,
  80:5, 81:8,
  81:13.
churches 75:21,
  77:12, 78:6.
Ciraolo 52:12,
  52:17, 59:4,
  63:22, 63:25.
Circuit 10:4, 11:13,
  11:18, 15:16,
  21:19, 21:22,
  22:2, 24:21,
  24:23, 27:8,
  27:10, 30:6, 31:3,
  52:9, 60:2, 60:5,
  60:10, 61:23,
  62:6, 65:16,
  67:24, 69:23,
  78:23.
circumstances 18:17,
  38:15, 38:18,
  48:25, 78:22.
cite 9:24, 35:5.
cited 60:3.
cites 38:1.
citizenry 75:18.
Civil 1:9, 2:7,
  2:23, 26:16, 42:5,
  78:20, 80:25.
claim 5:11, 9:6,
  9:7, 10:8, 19:3,
  20:1, 20:22,
  20:23, 24:22,
  25:3, 25:5, 55:23,
  64:24, 68:2,
  68:11, 68:13.
claimed 15:5.
claims 5:12, 6:25,
  7:16, 10:7, 11:11,
  13:10, 17:19,

20:7, 27:22.
Clapper 10:4, 11:11,
  12:3, 14:8, 21:19,
  69:11.
clarification
  52:1.
classic 36:9.
clearing 66:11.
Clearly 8:1, 20:19,
  22:17, 26:16,
  42:23, 44:18,
  59:25, 60:2,
  67:25, 74:8, 74:9,
  75:5, 75:9.
clerk 2:12, 80:1,
  80:3.
clients 10:15.
clock 34:1.
close 9:16, 45:8,
  46:24.
closed 31:3.
closing 44:12.
clothing 23:10,
  41:1.
cofounder 16:15.
cognizable 14:5,
  14:15, 14:18,
  15:18, 21:20.
colleague 5:11,
  69:3.
colleagues 5:8,
  37:4, 60:20,
  63:20.
collect 4:12, 13:2,
  29:5, 40:18,
  40:22, 58:21.
collecting 4:5, 9:8,
  13:5, 18:2, 46:5,
  47:24, 50:17,
  68:20.
colon 61:5.
combed 57:3.
combination 29:19.
combine 78:6.
comes 24:22.
commenced 3:22.
commendable 76:9,
  76:12.
comment 38:10,
  66:15.

commenting 51:1.
comments 65:9.
Commerce 14:14.
commercial 53:3.
Commissioner 1:38,
  3:23, 5:16, 5:20,
  5:23, 8:12, 8:14,
  17:4, 20:16,
  41:11, 41:15,
  76:23, 77:19,
  77:22.
committed 55:4,
  55:8.
Committee 74:18,
  75:22, 78:5.
communication 11:16,
  13:25, 42:13.
communications
  11:17, 11:20.
communities 36:17,
  77:23.
community 12:13,
  16:14, 16:18,
  27:25, 36:17,
  76:22, 77:8,
  77:14, 78:4.
community-based
  68:22.
company 12:9, 12:17,
  16:6, 26:9.
compel 64:13.
compelling 47:23,
  69:2.
compendium 35:13.
complaint 15:8,
  16:3, 16:13,
  32:25, 48:18,
  56:15.
complete 77:22.
compliant 39:19.
complicated 49:24,
  50:5.
complied 4:20,
  74:25.
comply 4:21.
comported 60:8.
composed 75:21.
comprehensive 33:19,
  64:6, 68:20.
concede 21:15.

conceded 55:17,
  55:25.
concern 46:17,
  55:12.
concerned 19:13,
  31:24, 63:25,
  77:7.
concerning 48:4,
  69:4.
concerns 64:1.
conclude 79:24,
  80:23.
concluded. 81:6.
concludes 71:10.
conclusion 80:8.
concrete 15:14.
concretely 68:17.
concurrence 37:24.
concurrences 38:2.
concurring 35:18,
  38:4.
conduct 4:14, 12:18,
  19:24.
conducting 3:1,
  4:18, 46:21.
confer 13:14, 20:13,
  41:17.
conference 3:1,
  4:15, 73:14,
  80:23.
confers 43:9,
  68:23.
confusion 42:23.
connection 8:19.
Conner 67:24.
Consent 41:10,
  41:18, 42:3, 42:7,
  42:10, 42:12,
  42:16, 42:23,
  43:5, 43:12,
  74:23, 74:24,
  75:1.
consider 72:5.
considerable 15:9.
consideration 41:5,
  77:21.
considerations 40:6,
  76:3.
considered 31:10,
  40:10, 71:16.

consistent 4:16,
  73:17, 74:22,
  74:24.
consistently 12:14,
  24:23, 26:17.
constant 34:4,
  34:5.
constantly 33:5.
constituency
  80:14.
constitute 11:16,
  14:18, 40:14,
  69:21, 71:11.
constitutes 12:4,
  25:10, 26:8, 28:3,
  70:15, 75:10.
Constitution 4:1,
  10:24, 36:19.
constitutional 7:11,
  7:14, 17:23,
  18:25, 19:6, 32:5,
  34:11, 36:14,
  41:24, 43:13,
  52:9, 58:24,
  65:16, 66:12,
  69:1, 70:23,
  70:24, 74:7,
  74:10, 74:11,
  77:10.
constitutionality
  43:10, 62:6.
constitutionally
  8:1, 8:2, 18:9,
  36:6.
constructive 6:2.
consult 41:17.
consultant 49:14.
consumption 26:5.
contained 16:21.
contemplate 65:14.
contemplated 47:8,
  47:16, 52:10.
contend 26:8.
contended 75:16.
contention 21:2,
  66:23, 66:25,
  67:4, 67:5,
  67:17.
contest 15:7,
  76:6.

context 37:3,
  70:22.
contingency 18:24.
continues 72:23,
  76:19.
continuous 34:9,
  34:10, 34:12,
  40:17, 41:3,
  44:24, 46:18,
  54:4, 57:12,
  63:3.
contract 9:16, 21:5,
  31:2, 31:11,
  33:16, 36:7,
  39:17, 43:16,
  45:10, 48:17,
  53:22, 56:8,
  56:14, 64:4,
  65:24.
contracted 12:10.
contractor 51:8.
contracts 38:12.
contrary 22:17.
contrast 13:4,
  15:10, 70:3.
controlled 63:10.
Convention 74:17,
  75:20, 77:11.
conventional 45:5,
  51:16, 61:10.
conversation
  46:21.
conversations 41:25,
  46:11.
convert 30:25,
  51:12.
coordinating 80:3,
  80:4.
Correct 12:10,
  17:11, 20:21,
  24:24, 28:9, 33:3,
  33:5, 37:5, 37:6,
  37:12, 37:21,
  37:22, 40:16,
  42:19, 42:21,
  42:24, 43:8,
  48:24, 49:3, 49:4,
  54:10, 59:9,
  62:23, 67:3,
  81:9.

correctly 8:11.
corroborate 56:24.
Council 26:22, 40:8,
  77:20, 79:1.
Count 27:22,
  64:24.
country 77:5.
couple 22:3, 36:1,
  50:12.
coupled 72:22.
course 41:22, 46:9,
  47:13, 47:18,
  48:1, 54:7, 55:7,
  56:12, 64:11,
  79:8.
courthouse 2:14.
courtroom 3:9.
Courts 32:13, 34:20,
  59:19, 64:11,
  65:19, 69:23.
create 28:18,
  47:14.
created 23:16.
creating 69:14.
Crime 7:22, 8:1,
  8:6, 19:2, 20:9,
  20:12, 23:12,
  23:25, 36:6, 36:9,
  44:19, 45:2, 46:1,
  57:1, 57:2, 57:5,
  66:3, 66:11,
  72:22, 76:9,
  76:19, 76:25,
  80:16.
crimes 22:16, 24:17,
  44:12, 44:15,
  45:8, 55:3, 55:4,
  55:8, 66:21.
criminal 2:23.
criteria 26:13,
  27:6, 27:17,
  27:20, 71:24,
  71:25, 73:4,
  75:24.
critical 37:15.
cry 78:12.
crying 76:23,
  80:16.
CSLI 45:15, 47:7,
  47:13, 47:14,

53:11, 56:23,
61:5, 65:21.
Ct 10:20.
current 55:21.
.
.
< D >.
daily 7:12, 33:10,
33:11.
Dana 1:34, 5:17,
7:7, 17:5, 65:7,
72:18.
dangerous 66:14.
date 44:2.
dated 29:17.
David 1:27, 5:8.
day 4:2, 4:8, 32:22,
33:5, 33:8, 33:12,
33:23, 34:5,
36:18, 39:10,
40:17, 40:20,
46:6, 46:8, 48:7,
54:8, 62:9,
79:13.
daylight 44:25.
days 31:21, 32:22,
33:5, 33:13, 46:6,
46:8, 46:18,
47:18, 48:2, 54:8,
62:9, 73:19.
Dayvon 16:7.
dealing 27:16,
53:10, 54:19,
79:21.
dealt 60:14.
decades 22:8.
December 41:15,
42:1.
decide 64:9.
decided 7:24, 10:18,
17:16, 43:25,
59:10.
deciding 27:15.
decision 4:9, 4:22,
9:25, 10:4, 11:13,
21:19, 22:23,
30:6, 38:21,
41:20, 47:10,
61:3, 62:23,
65:21.

decisions 8:11,
41:22.
declaration 8:8,
16:19, 19:11,
19:18, 20:3,
23:19, 24:11,
38:13, 68:19.
declarations
16:12.
Decree 41:10, 41:18,
42:4, 42:7, 42:10,
42:12, 42:16,
42:23, 43:5,
43:12, 74:23,
74:24, 75:1.
deemed 52:21,
52:24.
deep 66:23.
Defendant 1:12,
1:32, 6:7, 6:13,
7:5, 8:20, 12:23,
13:6, 29:20,
47:19, 52:19,
52:23, 56:25,
60:12, 64:24.
Defense 6:12, 7:3,
7:6, 16:2, 22:3,
22:6, 26:10,
26:22, 40:8,
53:18, 55:25,
56:14, 70:23,
75:13, 75:14,
75:19, 79:1.
definition 10:1,
23:22, 24:1.
definitively
67:19.
deleted 39:11.
democratic 28:17.
demographic 41:1.
demonstrated 8:19.
departments 77:6.
dependant 71:1.
depends 63:25.
deployed 28:15,
33:20.
deprive 72:14.
derive 56:7.
described 57:18.
describing 40:15.

description 23:22,
24:3, 24:6,
24:16.
deserves 30:23.
designed 33:2, 41:1,
44:9, 44:10,
44:20, 48:11,
58:21.
desire 6:4.
detail 38:13.
detailed 29:20.
details 45:8,
45:9.
detective 49:21.
determination
71:1.
determine 23:9,
23:10, 45:18,
46:2.
determined 41:15,
66:9.
determining 26:19,
78:24, 79:21.
develop 22:12.
development 16:10.
Device 36:24.
devote 14:25.
difference 54:9.
differences 54:2.
different 12:25,
35:9, 73:14,
77:9.
differently 59:20,
65:18.
difficult 73:12,
75:5, 77:2,
77:3.
digest 31:13.
direct 31:12.
directed 9:15.
direction 11:7,
13:5.
director 16:7.
disagree 20:5, 22:6,
33:9.
disagrees 9:21.
disapproving 43:1.
discern 44:22.
disclosed 35:21.
discovery 66:25,

67:1, 67:20.
discrete 35:8.
discretion 72:2,
  79:9.
discussed 60:17,
  64:4.
discussing 5:10,
  5:11, 10:19.
discussion 73:3.
dispositive 36:13.
dispute 9:4, 13:9,
  13:11, 13:18,
  14:11, 21:4,
  70:4.
disputed 9:16, 9:17,
  9:19, 68:12,
  68:13.
disputing 21:17.
disruptive 7:13.
dissemination 42:3,
  59:23.
dissent 37:15.
distant 50:20.
distinct 13:13,
  71:9.
distinctive 23:10.
distinguishable
  15:2.
distinguishes
  51:3.
distressing 73:12.
District 1:1, 1:2,
  61:20, 62:12,
  62:13, 62:24.
disturb 61:7.
divert 14:2.
docket 50:17.
doctrine 36:3,
  36:10.
document 50:17.
doing 2:9, 13:3,
  53:24, 55:22,
  56:19, 63:15.
DOJ 42:25.
done 25:7, 40:20,
  58:20, 65:19.
Donnelly 67:25.
Donohoe 15:1.
dot 46:2, 48:21,
  49:8, 49:10,

49:11, 49:12,
  49:14, 54:23,
  54:25, 55:5,
  55:9.
dots 29:5, 29:7,
  29:13, 30:11,
  31:1, 31:18, 51:9,
  51:15, 54:16,
  56:6.
doubled 35:7.
doubt 15:9.
Dow 52:12, 52:25,
  59:4.
down 29:12, 35:7,
  76:20.
download 49:25.
drastically 28:17.
dreamed 31:22.
driven 8:4.
driving 80:14.
dumps 61:6.
during 44:24, 67:1,
  67:20, 75:7.
.
.
.
< E >.
earlier 21:19,
  72:2.
Earth 57:19.
easier 54:3.
easily 31:13, 49:24,
  56:7.
easy 30:10, 30:13,
  30:25, 31:9.
education 44:3.
effect 15:9, 15:20,
  42:10, 43:6, 43:9,
  43:10, 65:2,
  68:17, 69:10,
  73:25, 78:10.
effective 49:19,
  50:9, 78:9.
effectively 19:23.
effects 15:23,
  68:17, 69:9.
effectuate 58:14.
efficacious 43:21.
efficacy 7:11, 43:9,
  43:15.
efforts 7:20, 8:13,

72:15.
egregious 45:25.
eight 63:2, 63:9,
  73:18.
either 17:18, 33:23,
  34:12, 71:4.
elements 9:3,
  31:1.
Elisabeth 1:35.
embedded 68:21.
emergency 73:16.
emphasize 12:15,
  13:9, 15:15,
  36:12, 68:11.
enclosed 52:19.
encompassing 47:18,
  47:21.
encouragement
  9:18.
encyclopedic
  51:25.
end 16:17, 39:9,
  39:12.
endorsing 38:4.
ends 38:9.
enforcement 28:18,
  36:9, 36:14,
  63:5.
enjoin 4:4.
enormous 39:6.
enormously 51:11.
enough 30:18,
  34:7.
ensure 31:5.
entering 46:3,
  72:1.
enterprise 72:11.
entire 3:10, 29:3,
  31:22, 54:18,
  74:14.
entirely 13:7, 14:8,
  22:11, 69:25.
entirety 29:15.
entitled 27:17,
  79:7.
entity 11:25, 36:19,
  67:21.
entrusted 8:11.
enumerate 46:16.
enumerated 18:19.

enunciate 40:9.
equitable 72:1,
   79:9.
equities 27:4,
   70:18, 71:6, 72:6,
   72:7, 72:16, 73:2,
   73:6.
Erricka 3:21,
   16:14.
escape 58:9.
Esquire 1:25, 1:26,
   1:27, 1:28, 1:29,
   1:30.
establish 6:24,
   8:18, 22:21,
   67:1.
established 9:12,
   10:6, 13:12,
   15:18, 22:17,
   22:24, 59:6.
establishes 67:25.
et 1:6, 1:11, 2:6.
ethnicity 23:9,
   29:25.
evaluate 44:9,
   44:10.
evaluated 37:3.
evaluating 43:15.
evaluation 43:19.
evaluators 43:17.
everyday 68:21.
everyone 3:4, 3:14,
   6:10, 41:8,
   43:11.
everything 62:9.
evidence 15:14,
   22:16.
exact 75:16.
exacting 68:25.
exactly 38:24,
   41:14, 43:18,
   55:24, 57:5, 57:6,
   62:22, 65:18.
exceedingly 30:10.
exception 36:2.
exclusive 9:20.
excuse 36:11.
executive 39:2,
   73:17, 76:25.
exercise 26:18.

exercised 78:21.
exercises 21:4,
   67:22.
exercising 9:19,
   20:19, 21:6.
exhibit 45:10.
existence 15:6,
   43:5, 49:7.
existing 49:20.
exists 31:6.
exits 46:4.
expanded 38:13.
expansive 6:17,
   47:4, 49:18.
expect 19:14, 33:22,
   39:18.
expectation 9:22,
   25:25, 33:21,
   35:3, 35:17,
   35:20, 37:2,
   37:16, 37:19,
   47:12, 48:10,
   59:7, 60:15,
   60:16.
expected 76:20.
expecting 76:23.
expects 29:1.
experiencing 77:6.
explain 53:19,
   54:17.
explained 15:3,
   15:12, 22:14,
   31:7, 39:3, 57:10,
   58:7, 69:4.
explaining 35:8,
   62:24.
explains 10:1.
explanation 30:7.
explicit 56:18.
explicitly 43:1.
explored 67:20.
express 61:4,
   78:8.
expressed 74:21.
extended 2:25.
extension 47:1.
extent 21:4, 44:10,
   54:20.
extraordinary 26:17,
   78:21, 79:5.

eye 50:6, 52:20,
   52:24.
.
.
< F >.
F.3d 27:10.
F.supp.3d 61:21.
Facebook 44:2,
   77:14, 77:15.
facility 53:3.
facing 73:13.
factor 52:14,
   74:1.
factors 5:10, 26:24,
   40:9, 40:10, 68:6,
   70:12, 72:5,
   76:19, 79:2.
facts 70:2.
factual 55:15,
   57:13.
fails 69:3.
fair 16:23, 25:13,
   25:21, 55:6.
fairly 3:17, 4:15,
   26:5, 51:19, 56:7,
   65:20.
fall 23:22.
falls 65:14.
familiar 7:18.
families 80:15.
far 16:24, 26:18,
   29:9, 52:9, 64:1,
   78:23.
fashion 27:20.
favor 70:18, 76:7.
favorable 8:22.
favors 27:4,
   74:13.
FBI 30:8, 57:3.
FCRR 1:46, 81:8.
fear 14:9, 19:25.
fearful 23:15.
fears 19:16.
Federal 1:47, 2:14,
   26:16, 60:8,
   78:20.
feel 40:4, 46:12.
feels 20:2.
feet 52:19, 53:3.
Felicia 80:2.

few 6:2, 30:12,
    32:2, 46:16,
    53:16, 55:14,
    59:1, 59:11.
fighting 8:1,
    36:6.
file 42:6, 69:16,
    79:18.
filed 4:3, 16:3,
    16:13, 16:24,
    32:24, 32:25,
    79:13, 79:14.
final 12:22, 14:23,
    38:6, 58:4.
finally 22:10, 27:5,
    70:19.
find 18:6, 30:14,
    47:2, 50:3, 51:16,
    66:10, 80:17.
finding 22:4, 30:17,
    60:6.
fine 43:3, 67:16,
    68:8.
finish 24:19.
Fire 16:15, 16:16,
    19:24.
five 2:3, 6:3,
    35:18, 36:25,
    37:23, 38:4,
    60:25, 73:20.
flight 33:11.
flights 4:12, 59:8,
    63:23.
flip 56:24.
Floor 1:48.
floor-mounted
    53:2.
Florida 52:21,
    59:4.
flushed 21:24.
fly 33:1, 40:22.
flying 40:21, 59:15,
    59:16.
focus 24:17, 25:4,
    26:12, 27:21,
    34:24, 55:21,
    55:22, 56:1.
focused 59:25,
    60:21.
focusing 34:6.

follow 26:20, 39:24,
    66:7, 66:8, 66:14,
    66:18, 67:11,
    78:25.
follow-up 48:16,
    53:14, 59:1.
followed 61:19.
following 4:8, 55:4,
    56:20, 60:2.
follows 3:4, 25:3.
footage 57:2.
footnote 32:12,
    61:17, 61:18.
forced 13:22.
forecloses 14:16,
    15:20.
foregoing 81:9.
forfeit 35:22.
forgetting 80:18.
form 20:3, 78:20.
forth 4:17, 26:15,
    26:20, 27:22,
    37:19, 68:18,
    79:1.
forward 13:23,
    17:17, 20:11,
    56:3, 78:14,
    78:16.
forward-looking
    19:25.
forwards 30:14.
fought 38:23.
found 47:16, 48:4,
    61:13, 65:15,
    66:3.
founded 16:6.
four 18:19, 22:16,
    30:17, 40:9,
    40:10, 45:2,
    60:25, 68:5, 68:6,
    70:12, 71:24,
    71:25, 72:5, 73:4,
    75:24, 79:2.
four-step 64:18.
frailties 40:18.
frame 33:8, 33:14,
    33:24.
framework 37:2,
    43:13.
free 40:4.

Freed 1:29.
freedom 68:15.
Friday 4:23, 69:17,
    79:19.
front 64:10.
full 35:4.
fully 8:11.
functioning 2:11.
fundamental 75:9.
funding 72:12,
    72:21, 72:22.
future 10:16, 11:3,
    14:21, 18:24,
    24:12, 25:18,
    26:11, 59:18.
.
.
< G >.
gather 2:4, 62:19.
general 30:3, 51:19,
    58:14.
generate 19:20.
generated 34:15.
gesture 35:23.
gets 20:1.
getting 36:11, 54:7,
    66:23, 74:23,
    77:1.
Giancola 60:3.
give 6:2, 10:10,
    55:11, 62:4,
    69:14.
given 4:19, 19:21,
    74:14, 76:20.
gives 51:1.
giving 77:8.
Glad 8:23, 9:1,
    17:3, 28:6, 28:12,
    28:13, 40:2,
    53:13, 68:8,
    75:12, 75:23.
Global 36:24.
Google 57:19.
Gorski 1:25, 5:7,
    5:13, 8:23, 10:12,
    11:5, 12:5, 12:20,
    15:24, 21:12,
    25:14, 28:7,
    28:14, 68:7, 68:8,
    70:8, 71:6, 73:6,

75:25, 76:15.
Governor 44:16,
  73:17, 78:7.
governs 65:24.
GPS 36:24, 60:15.
grainy 50:20,
  51:12.
grant 26:18, 31:25,
  40:6, 79:8.
granted 79:8.
granting 26:14.
grave 27:12.
gravely 19:13.
gravity 36:13.
Great 68:10.
Greater 74:18,
  75:21, 78:5.
grievous 80:15.
ground 5:1, 49:15.
ground-based 45:5,
  49:6, 51:17.
grounds 6:23, 18:5,
  19:3, 19:4.
guarantee 72:12.
guess 55:14, 62:3.
gulp 54:7.
.
.
< H >.
handed 43:19.
hands 55:19.
happen 19:1, 19:10,
  33:16, 53:25.
happened 19:9,
  20:10, 23:24,
  23:25, 41:14,
  63:2, 76:22.
happening 55:25,
  77:5.
happens 62:10.
happy 7:1, 10:9,
  39:21, 58:5.
harder 54:3.
harm 14:21, 24:12,
  27:2, 70:10,
  70:17, 70:22,
  70:25, 71:5,
  71:17.
harmed 72:8.
Harrison 1:38, 3:24,

5:16, 5:20, 5:23,
  7:17, 8:12, 17:4,
  41:11, 41:15,
  76:24, 77:20.
heard 17:8.
hearing 2:5, 4:14,
  4:19, 27:15,
  46:22.
hearings 75:2,
  75:4.
heart 30:19,
  31:23.
heavy 27:13, 72:3,
  79:3.
held 8:3, 10:5,
  11:19, 15:16,
  24:21, 24:23,
  26:17, 33:13,
  47:11, 52:9, 53:4,
  62:13, 78:23.
helicopter 52:18,
  52:23, 59:15,
  60:6.
hello 17:6.
help 50:15.
helpful 41:8,
  50:14.
helps 33:24, 45:7.
henceforth 12:15.
hereby 81:8.
herself 24:1.
high 79:15.
higher 44:17.
history 73:22.
Hogan 73:17, 78:7.
hold 10:22, 57:8,
  69:20.
holding 14:18, 35:6,
  35:11, 62:15.
holdings 32:14.
holistic 51:2.
home 34:14, 44:16,
  52:23.
homeowner 56:4.
homicides 73:19,
  74:15.
Honorable 1:18.
hooked 2:10.
hope 37:7, 45:7,
  49:19.

hour 50:3, 51:9,
  70:14.
hours 23:20, 31:21,
  32:22, 33:1, 33:5,
  33:7, 33:12,
  33:23, 34:7,
  40:19, 44:24,
  44:25, 46:6, 48:7,
  50:3, 51:10, 54:6,
  59:20, 62:9,
  79:16.
house 60:12.
human 78:12.
hypothetical 14:6,
  14:7, 14:21,
  15:22.
.
.
< I >.
idea 57:12.
identifiability
  29:14.
identifiable 29:25,
  50:22.
identification 31:8,
  31:9, 64:3.
identified 9:4,
  13:21, 14:24,
  18:20, 31:5.
identify 3:6, 3:19,
  5:3, 5:4, 23:8,
  30:11, 30:18,
  31:6, 40:24,
  40:25, 41:1, 49:2,
  51:14, 51:17,
  53:17, 53:23,
  54:17, 54:24,
  55:7, 55:8, 57:4,
  66:7.
identifying 29:21,
  30:15, 49:8,
  54:16, 55:9,
  55:10, 55:20,
  56:2, 56:5, 56:22,
  58:22.
identity 51:16,
  56:7.
ignore 70:20, 74:1,
  74:16, 74:22,
  75:8.

ignoring 31:7.
III 6:22, 8:18, 9:3,
  9:23, 19:3,
  69:14.
ills 36:16.
imagery 4:13, 25:9,
  26:7, 46:7, 48:16,
  48:19.
images 4:5, 23:6,
  29:14, 45:20,
  45:22, 50:19.
imagination 59:18.
imagines 28:20.
imaging 45:5.
immediately 54:21.
imminent 6:21,
  14:7.
imminently 15:13.
impact 17:18.
impair 13:25.
impairs 68:15.
impinges 7:11.
implemented 39:8.
implementing 37:25,
  72:9.
implicate 30:22.
implicated 19:7.
imply 37:7.
Important 3:1, 3:5,
  3:14, 12:14,
  17:15, 23:5,
  44:14, 45:24,
  52:1, 65:19,
  65:25, 74:1,
  80:13.
importantly 40:11.
improper 67:15.
in. 40:5.
incident 18:18.
incidental 66:20.
include 13:23, 24:9,
  80:18.
includes 44:14.
including 6:19,
  69:23.
incredibly 66:16.
indefinitely
  72:13.
independent 43:17.
indicated 8:24,

28:7, 54:15.
indication 18:10,
  23:11.
indiscriminate
  32:10.
individual 13:3,
  18:11, 35:15,
  40:24, 45:19,
  47:15, 48:20,
  48:21, 49:1, 57:3,
  57:17, 59:13,
  63:3.
individualized
  19:20, 22:13,
  22:18, 22:24,
  23:16, 24:5,
  71:15.
individually
  60:22.
individuals 18:15,
  24:15, 39:2,
  55:20, 59:6,
  60:1.
inescapable 6:20.
influence 29:16.
infrared 50:8.
infringes 8:2.
initial 11:8, 12:3,
  21:15, 21:18,
  30:11, 61:18,
  71:10.
initiated 9:14.
initiative 8:2,
  36:7.
injunction 4:3,
  4:10, 4:19, 18:23,
  18:24, 19:5,
  20:14, 24:20,
  26:14, 26:15,
  26:19, 26:20,
  27:5, 27:18, 40:7,
  40:12, 54:21,
  70:19, 72:8,
  78:19, 78:25,
  79:5, 79:7,
  79:9.
injunctive 27:3,
  70:11, 72:1, 72:4,
  76:5, 78:20,
  79:22.

injuries 13:13,
  14:5, 14:19,
  19:16, 20:13,
  80:16.
injury 8:20, 8:21,
  9:4, 9:10, 11:16,
  11:24, 12:4,
  13:14, 13:21,
  14:15, 14:16,
  14:23, 15:18,
  15:21, 17:12,
  20:4, 20:10, 21:2,
  21:21, 25:9, 26:6,
  68:23, 68:24.
innovation 16:11.
input 75:6.
inquiry 38:9,
  76:6.
insists 57:11.
instance 55:24.
instances 62:8.
instead 27:13.
institute 41:16.
instructive 18:1.
instrumentalities
  13:1.
insulates 29:16,
  57:6.
integrate 31:3.
integrated 56:16.
intellectual
  16:11.
intend 53:23,
  58:17.
intended 23:24.
intention 66:19.
intentions 75:2.
intents 55:18.
intercepting
  11:20.
interest 11:21,
  27:5, 69:2, 70:19,
  71:6, 72:25, 73:3,
  73:9, 74:2, 74:7,
  74:8, 74:11,
  74:13, 75:8,
  75:15, 75:25,
  76:6, 76:10,
  78:13.
interesting 58:18.

interference 42:9.
International 14:9,
  14:13.
interrelate 19:15.
interrupt 32:17,
  32:20, 54:11.
interrupted 52:2.
intimacies 48:3,
  48:12, 48:13.
intricacies 35:15.
introduce 3:4,
  3:16.
intrusive 47:4,
  48:8, 52:10.
invasion 11:20.
invasive 7:14.
investigating 36:8,
  59:14.
Investigation 3:24,
  7:9, 27:24, 28:1,
  51:7, 55:6,
  74:13.
investigative
  30:4.
invited 11:6.
involved 35:8,
  36:16, 36:23,
  38:19, 41:7,
  47:10, 52:18,
  59:12, 59:13,
  60:20, 74:20.
involves 78:23.
involving 26:17,
  60:12, 60:21.
irrefutable 78:13.
irrelevant 39:7.
irreparable 27:2,
  70:10, 70:17,
  70:22, 70:25,
  71:5, 71:17.
irresponsible
  66:16.
issuance 19:4,
  72:8.
issues 5:10, 11:6,
  27:23, 77:23.
itself 11:9, 11:10,
  13:16, 21:20,
  25:10, 26:8,
  30:21, 35:5,

35:10, 51:13,
  51:24, 55:11,
  57:9, 65:18,
  68:22, 69:13,
  69:21, 69:24.
.
.
< J >.
James 3:21, 16:18,
  20:7, 22:13,
  24:3.
jargon 53:11.
JKB-17-0099 42:5.
job 62:24.
join 28:13.
Joined 5:8, 5:20.
Jones 35:17, 36:22,
  36:23, 37:17,
  37:23, 53:8,
  60:14.
journey 35:8.
Judge 2:14, 38:19,
  41:7, 42:12,
  42:18, 61:9.
judgment 8:14.
judiciary 28:20,
  39:1.
June 10:18.
jurisprudence 18:7,
  60:5, 62:5.
jury 2:24.
Justice 7:20, 37:1,
  37:14, 38:22,
  41:19, 60:24,
  61:13, 64:8.
justices 35:18,
  37:23, 38:4.
.
.
< K >.
Kara 1:36, 5:22.
Katz 37:15, 37:20,
  37:24, 60:16.
Katz-based 37:1,
  37:5.
Kaufman 1:26, 5:8,
  5:11, 28:8, 28:10,
  28:12, 32:17,
  37:10, 52:16,
  53:13, 54:11,

58:25, 61:10,
  62:21, 64:16,
  65:5, 68:6, 69:4,
  71:6, 75:25.
keep 46:23, 77:3.
Kennedy 37:15.
Kevin 3:21, 16:18,
  20:7, 24:3.
key 10:19, 15:4.
killings 74:4.
kind 14:5, 33:23,
  35:9, 39:12,
  39:16, 58:15,
  64:2, 68:16.
Knotts 35:5, 35:7.
known 46:1, 54:24,
  78:1.
Kyllo 29:17.
.
.
< L >.
laborious 51:11.
lack 35:3, 43:6.
laid 76:18.
Laidlaw 14:13,
  14:19.
Laird 15:1, 15:5,
  15:19.
land 38:1.
landscaped 60:12.
language 60:24,
  75:16.
large 29:11, 35:21,
  56:25, 57:23,
  75:19, 76:22.
last 2:3, 44:18,
  56:12, 62:12,
  63:24, 70:14.
late 59:9, 60:13.
later 4:23, 9:12,
  32:16, 39:8,
  49:2.
latest 42:11.
law 2:12, 9:9, 10:3,
  28:18, 36:9,
  36:14, 38:1, 59:9,
  60:2, 63:5, 70:10,
  80:3.
lawful 15:6, 32:3,
  59:15.

lawsuit 3:22, 8:4,
  8:8.
lawyers 79:14.
lays 72:3.
lazy 20:3.
lead 55:5, 80:5.
Leaders 2:5, 3:20,
  14:1, 16:5, 19:10,
  78:5, 80:24.
LEADERS OF A
  BEAUTIFUL 1:5.
leadership 16:10.
leading 74:17,
  74:19.
leads 61:16,
  62:25.
League 27:9.
least 46:17, 69:1.
leave 34:13.
leaving 34:9.
left 49:9, 49:12,
  80:13.
Legal 5:21, 5:22,
  12:13, 27:25,
  43:6, 43:9,
  53:10.
legality 15:7.
legally 9:13,
  11:21.
legitimate 47:11.
lengthy 6:3.
letter 77:13.
level 73:25,
  74:14.
liability 16:6.
license 31:4, 45:6,
  49:17, 63:14.
life 35:15, 48:1,
  48:3, 48:8.
light 53:7.
lightly 75:8.
likelihood 6:24,
  13:11, 24:4, 26:3,
  27:21, 54:20,
  64:17, 64:19,
  64:23, 68:2, 68:4,
  70:13, 71:2,
  71:15, 79:4.
likely 8:21, 19:10,
  19:17, 19:19,

19:21, 22:12,
  22:15, 26:25,
  27:2, 27:14,
  70:17, 72:9,
  75:4.
likes 58:6.
limbs 47:1.
limitation 32:14,
  61:12.
limitations 49:20,
  54:16.
limited 16:6, 18:17,
  19:22, 44:24,
  47:3, 47:6, 48:7,
  48:19, 59:25,
  64:1, 65:20, 66:1,
  78:22.
limits 36:20, 36:21,
  46:5.
line 2:4, 2:17,
  14:17, 58:11,
  71:23.
lining 69:18,
  70:20.
link 23:13, 30:3,
  30:5, 30:8.
linkages 31:12.
Lisa 5:21, 50:11.
List 22:23.
listed 16:18, 16:20,
  79:2.
listening 12:8,
  43:12, 44:5, 49:8,
  53:18.
literally 79:12.
litigation 27:13.
little 2:9, 17:16,
  51:5, 65:23.
Live 33:3, 44:2,
  77:14, 77:15.
lives 7:12, 7:13,
  29:6, 30:23,
  31:16, 48:12,
  48:13, 68:21.
living 56:6,
  76:21.
locate 54:23,
  55:3.
located 49:16,
  64:5.

Location 9:9, 13:3,
  13:20, 14:2,
  28:24, 29:8, 30:3,
  30:8, 30:17,
  34:23, 35:19,
  45:16, 46:18,
  47:17, 53:10,
  57:4, 57:20,
  57:25, 58:22,
  60:21, 61:5,
  61:14, 63:10.
locations 2:13,
  30:14, 32:9.
log 28:19, 29:20,
  39:10.
logic 64:13.
Lombard 1:48.
long 14:5, 33:25,
  66:11.
long-term 32:9.
longer 35:19.
look 23:24, 32:12,
  38:20, 48:8,
  63:13, 63:17.
looked 63:8.
looking 20:10,
  37:9.
looks 66:10.
losses 80:15.
lot 30:23, 34:21,
  59:17, 70:25.
Love 16:7.
loves 27:25.
LPR 56:15.
Lynch 1:36, 5:23,
  10:13, 17:3.
.
.
< M >.
M. 1:25, 1:26.
machine 31:19,
  52:6.
magic 34:3.
main 29:1, 35:4,
  64:18, 68:5.
maintains 47:11.
majority 36:25,
  37:7, 66:4, 74:12,
  76:7.
man 50:23.

manipulated 63:12.
manner 51:22.
map 68:20.
mapping 47:17,
  53:2.
marijuana 52:20,
  52:24.
Maryland 1:2, 1:20,
  1:49.
mass 6:17, 33:19.
Massachusetts 61:20,
  62:13.
match 49:14, 49:21,
  50:4.
matters 12:16,
  61:4.
Mayor 44:17,
  76:24.
Mcnutt 38:13,
  57:18.
mean 25:2, 32:20,
  37:7, 42:15,
  42:18, 42:23,
  59:11, 64:13,
  75:14.
meaning 28:3, 41:10,
  48:20, 61:5,
  64:21.
meaningful 30:9,
  54:9, 56:23.
meaningless 53:19.
means 13:6, 13:24,
  55:9, 63:17,
  68:24, 69:2.
measures 13:22,
  14:5, 14:15,
  14:16, 14:18,
  14:21, 63:5.
media 12:7, 24:14.
meet 42:12.
meeting 38:3.
meetings 14:2, 44:1,
  44:2, 77:14,
  77:23.
members 12:7, 25:6,
  27:25, 64:10.
memorandum 61:18.
mentioned 12:23,
  21:19, 36:22,
  45:2, 52:17, 59:3,

60:6, 69:11.
mere 15:6, 23:16.
merit 54:20.
merits 7:1, 9:23,
  10:7, 13:10, 22:9,
  26:3, 26:4, 27:1,
  27:14, 27:21,
  38:7, 64:19,
  64:23, 64:25,
  68:2, 68:5, 68:12,
  68:14, 70:14,
  71:2, 79:4.
met 40:10, 40:13.
methods 63:19.
Michael 1:38, 3:23,
  5:16, 5:20, 7:17,
  8:12.
military 28:16.
Miller 61:7.
mind 50:11.
minds 38:4.
minimization 39:6,
  39:13, 39:17.
Ministry 74:17,
  75:20, 77:11.
Minnesota 9:25.
minute 26:3, 26:7,
  34:15, 34:16,
  39:22, 73:1.
minutes 2:3, 6:2,
  6:3.
misplaced 13:7.
misspoke 8:16.
mistake 31:6.
mode 33:14.
modified 42:6.
moment 3:5, 10:13,
  11:1, 59:12,
  73:3.
momentarily 7:15.
monitoring 25:6,
  41:13, 41:18,
  65:2.
monitors 41:12,
  42:13.
Monsanto 14:19.
months 31:21, 63:2,
  63:10.
Moore-bush 61:21,
  62:12, 62:23,

63:2, 63:9,
  63:15.
Morgan 43:17.
morning 2:2, 2:3,
  2:19, 2:21, 5:6,
  5:17, 5:25, 12:16,
  26:25, 27:7.
motion 4:2, 4:10,
  4:22, 7:5,
  78:18.
movant 26:25, 27:1,
  27:4, 70:16,
  70:18.
move 11:4, 12:5,
  17:17, 57:17.
movement 29:20,
  32:11, 35:12,
  47:15, 48:6,
  51:10, 66:8.
movements 18:11,
  19:9, 28:19,
  29:11, 30:20,
  31:20, 31:23,
  34:16, 35:6,
  35:13, 35:14,
  35:21, 47:13,
  47:15, 48:10.
moves 55:9.
Moving 13:8.
MR. KAUFMAN 28:13,
  32:19, 33:6, 37:6,
  37:13, 37:22,
  42:25, 53:15,
  54:13, 55:13,
  59:10, 61:25,
  67:7, 67:9, 67:14,
  80:9, 81:3.
MS. GORSKI 5:6, 9:2,
  12:11, 12:22,
  15:25, 16:25,
  21:14, 25:15,
  28:10, 68:7,
  68:10, 69:19,
  71:7, 73:7, 76:2,
  80:10, 81:2.
MS. WALDEN 50:14,
  81:5.
multiple 32:7,
  38:2.
murder 23:20, 49:10,

49:11, 51:7,
54:24.
Murders 44:13,
44:17.
mute 3:14.
muted 2:9.
myself 2:13.
.
.
< N >.
naked 52:20,
52:24.
naked-eye 32:9.
name 30:1, 30:5.
named 7:15.
narrow 61:4.
narrowing 33:24.
Nate 5:9.
Nathan 1:29.
Natural 26:21, 40:8,
79:1.
navigable 59:8.
navigate 26:1.
navigates 24:7.
near 19:2, 20:12,
57:2, 57:5.
nearby 57:3.
neatly 76:19.
necessarily 69:9.
need 3:15, 34:21,
44:19, 46:24,
54:17, 61:16,
63:16, 70:25,
77:25.
needed 67:11.
needs 36:3, 36:10,
38:8, 38:12, 39:8,
58:8, 58:10.
neighborhood 58:2.
neighborhoods
74:5.
New 14:14, 43:18,
63:17, 63:18,
77:2, 77:9, 77:21,
78:10.
Next 7:3, 12:6,
26:12, 30:15,
49:22, 73:6.
nexus 9:16.
nice 30:7.

night 40:23.
No. 1:9, 2:7, 2:23,
42:6, 42:7,
53:16.
None 7:15, 20:9,
24:6.
nonemergency 2:24.
nor 47:14, 47:20.
normal 63:8.
North 27:9.
NORTHERN 1:2.
note 3:5, 3:7,
10:12, 12:23,
16:2, 17:15, 23:5,
24:21, 36:23,
37:10, 44:14,
45:24, 52:16,
65:20, 65:25,
67:20, 69:6, 75:4,
75:13.
noted 20:15, 37:14,
61:1, 69:13, 74:6,
75:19.
notes 22:3.
Nothing 11:2, 67:15,
73:7, 80:9.
notice 75:1.
notion 11:24.
novel 41:14.
NSA 11:15, 11:19.
nub 20:1, 20:4.
number 18:18, 30:3,
34:3, 42:5, 46:15,
77:25, 80:25.
numbers 30:2,
34:9.
nutshell 49:7.
.
.
< O >.
o'clock 4:23,
79:19.
objective 15:14,
24:12, 76:8,
76:13.
observable 30:21,
48:22, 48:23,
49:1, 59:8.
observation 60:12.
observations

52:20.
observe 5:1.
observed 29:18.
observing 52:24.
obtain 4:12, 57:2.
obvious 53:22.
Obviously 8:17,
10:19, 12:8, 22:6,
37:14, 41:25,
46:13, 46:16,
53:6, 54:18, 55:2,
55:5, 56:4.
occasioned 19:17.
occur 51:23.
occurred 23:21,
23:25, 46:1.
occurs 26:7.
offensive 48:4.
offered 33:16,
38:7.
offering 38:25.
Office 2:13, 39:24,
80:1.
officers 41:11,
55:21, 77:2,
77:4.
Official 1:47,
81:14.
officials 72:7.
Ohio-based 12:9,
12:17.
Okay 12:13, 17:1,
23:4, 25:16,
53:15, 63:24,
80:22.
old 22:8.
on-the-ground
55:5.
Once 52:22, 63:7.
one-time 33:11.
one. 9:24, 34:3,
54:3, 61:4,
68:24.
open 73:16.
Opening 6:4, 6:11,
7:4, 7:6.
operate 43:13, 51:3,
62:8.
operated 65:25.
operates 38:10,

51:20.
operating 43:22.
opinion 10:18,
  21:22, 21:24,
  26:22, 27:10,
  37:20, 38:1,
  40:17, 52:18,
  52:22, 53:8, 53:9,
  60:10, 60:24,
  61:1, 61:12,
  61:19, 61:22,
  69:12, 69:16,
  79:18.
opinions 35:19,
  61:8.
opportunity 7:10,
  55:11, 55:14,
  62:4.
order 2:22, 3:13,
  4:3, 4:20, 31:5,
  45:1, 45:6, 51:4,
  51:5.
orders 44:16, 73:17,
  73:24, 76:21.
ordinary 63:4,
  63:23.
organization 16:8,
  17:19, 74:17,
  74:20.
organizational
  7:19.
organizer 16:19.
organizes 16:16.
others 43:20.
otherwise 15:6,
  17:14, 17:24,
  18:7, 32:1.
outcome 8:22.
outset 13:9, 39:6.
overall 74:11,
  79:21.
overlook 40:4.
overruling 63:22.
overturn 18:7,
  22:5.
overwhelming 78:12,
  78:13.
own 8:5, 8:14,
  18:11, 23:18,
  23:22, 24:1, 24:6,

  31:2, 35:11,
  38:14, 57:2.
.
.
< P >.
p-i-x-e-l 48:20.
P. 1:34.
p.m. 4:24.
pace 74:4.
page 26:22, 30:12,
  50:18.
pages 53:22.
pandemic 8:6, 73:13,
  73:23, 74:3,
  75:7.
panned 63:12.
paper 42:6.
papers 7:23, 20:15,
  45:9, 69:16,
  71:21, 73:10,
  73:18, 77:25.
paragraph 20:1.
pardon 50:10.
part 7:21, 45:10,
  48:4, 56:18,
  63:4.
participating
  57:1.
particular 17:14,
  35:12, 45:19,
  49:3, 57:1, 58:2,
  62:10, 66:3.
particularly
  46:20.
partners 19:14.
parts 63:23.
party 20:18,
  61:25.
passed 58:16.
past 31:20, 33:3.
patently 66:16.
pause 7:1.
pending 4:9.
people 3:6, 14:24,
  16:9, 30:15,
  30:18, 31:1, 31:5,
  31:6, 32:10,
  33:22, 35:3, 39:7,
  39:10, 53:17,
  53:23, 54:17,

  55:3, 55:7, 55:10,
  58:23, 66:7,
  77:25, 78:1.
per 23:7, 33:1,
  40:20, 44:21,
  48:20, 55:10.
percent 30:18.
perfectly 31:20.
perhaps 2:10, 72:14,
  75:5.
period 32:5, 33:2,
  34:6, 39:12.
permits 44:25.
permitted 7:25,
  13:23.
permitting 40:22,
  78:14.
Persistent 12:8,
  12:16, 25:11,
  62:18.
person 23:7, 23:8,
  23:9, 29:25,
  30:21, 31:20,
  35:12, 44:22,
  45:20, 46:3, 46:4,
  46:8, 47:11,
  48:20, 49:3, 50:1,
  50:24, 51:17,
  51:22, 54:25,
  57:17, 57:25,
  58:3.
personal 44:23,
  50:22, 60:7.
Peterson 5:18.
petit 2:24.
petitioner 27:2.
philanthropic 72:11,
  72:15.
phone 3:14, 10:22,
  12:25, 13:2, 30:2,
  30:3, 34:13,
  34:15, 34:17,
  35:12, 45:17,
  46:19, 47:6,
  47:17, 47:20,
  49:23, 54:5,
  57:15, 57:24.
phones 46:21, 46:22,
  46:24, 46:25.
photo 44:23.

photograph 51:13.
photographic 4:13.
photographs 44:21,
  53:3.
photos 50:15, 50:22,
  51:4, 51:5,
  53:19.
phrase 36:4,
  48:19.
physical 18:15,
  47:12, 47:15.
PI 5:10.
picture 51:18.
piece 56:12.
Pilot 7:8, 7:9,
  23:6, 23:23,
  23:24, 24:2,
  24:18, 41:16,
  44:9.
Pilots 17:21.
ping 57:15, 57:24.
pixel 23:7, 44:21,
  48:20.
place 4:13, 11:9,
  32:16, 35:6,
  38:12, 56:4,
  75:7.
placed 10:2, 57:5.
placement 36:24.
planes 33:1, 40:22,
  59:15.
plate 31:4, 45:6,
  49:17.
plates 63:14.
pleadings 73:11.
please 5:7, 77:13.
pled 56:14.
point. 10:5, 11:12,
  52:1, 54:14,
  58:17, 71:20.
pointed 28:14, 30:5,
  32:7, 34:20, 56:5,
  57:14, 58:9.
pointing 29:23,
  30:12, 57:11.
points 15:4, 30:13,
  30:17, 32:2, 36:1,
  50:12, 51:19,
  53:16, 57:4.
pole 62:3, 62:6,

62:7, 62:14,
  62:19, 62:22,
  63:4, 63:6.
poles 63:8.
policies 58:6, 58:7,
  58:18.
policing 20:4,
  41:24, 43:13,
  49:21.
policy 8:10, 16:8,
  16:9, 36:18,
  36:20, 76:12.
political 16:10.
pool 34:19.
pooled 56:1.
popularity 76:6.
population 29:3.
populations 31:22.
portion 66:1.
position 7:5, 10:15,
  10:25, 25:13,
  26:6, 26:10, 53:6,
  65:1.
Positioning 36:24.
positions 6:5.
possibility 20:11.
possible 10:16,
  11:3, 18:25,
  25:18, 26:11,
  44:22, 51:23,
  55:14, 66:10.
post 35:24.
posture 3:18,
  4:25.
potential 28:16.
power 26:18,
  78:24.
powers 9:19, 20:19,
  21:5, 67:22.
practical 34:5,
  51:24.
practice 63:23,
  72:10.
precedent 22:4,
  22:6.
precedents 9:13.
predictive 46:2.
preliminary 4:3,
  4:10, 4:18, 18:23,
  19:4, 20:14,

24:20, 26:13,
  26:15, 26:18,
  26:19, 27:3,
  27:17, 40:7,
  40:12, 54:21,
  70:17, 72:8,
  78:18, 78:25,
  79:5, 79:9,
  79:22.
premise 37:1.
prerogative 9:20,
  67:22.
presence 56:25.
Present 1:38, 23:14,
  23:19, 24:11,
  24:16, 49:9,
  49:11.
presented 77:20.
presenting 8:24.
presents 7:10,
  41:25.
presumption 40:11,
  40:13.
presuppose 51:23.
pretty 46:22,
  67:21.
prevents 72:9.
previously 79:2.
prior 61:8.
privacies 35:15.
privacy 9:23, 25:25,
  33:21, 35:3,
  35:17, 35:20,
  37:2, 37:16,
  37:19, 47:12,
  48:10, 58:20,
  59:7, 60:16,
  60:17.
private 7:13, 13:15,
  13:18, 25:24,
  26:9, 29:6, 30:23,
  31:16, 39:7,
  52:23, 67:21,
  69:24.
probably 10:16,
  65:12.
problem 7:22, 14:20,
  18:2, 41:25.
procedural 4:25.
Procedure 26:16,

78:20.
proceed 6:12, 7:4,
  27:20, 64:11.
proceeding 3:10.
Proceedings 1:17,
  2:24, 3:12, 73:16,
  81:6, 81:10.
process 2:8, 3:3.
Professional 32:23,
  48:17.
professionals
  45:21.
proffered 54:23.
programs 78:8,
  78:15.
prohibit 4:4.
promise 4:21, 4:22,
  79:11, 79:17.
promised 39:11.
promises 39:1.
promptly 4:7.
proper 33:8, 36:18,
  37:25, 56:1,
  64:9.
properly 2:11, 10:2,
  31:10.
properties 59:16.
property 60:7.
propose 27:19,
  39:14.
proposed 6:18.
proposes 35:10.
proposition 11:14,
  29:16.
propriety 43:15.
protect 58:20.
protected 8:3,
  11:21.
protection 30:23,
  43:22.
protective 13:22,
  14:5, 14:14,
  14:16, 14:18,
  14:20.
protocol 39:18.
protocols 58:18.
protocols. 38:24.
prove 32:5.
provide 33:2, 45:3,
  45:14, 47:21.

provided 9:18,
  15:13, 47:18.
providers 13:1,
  13:2.
providing 75:1.
publicly 24:14,
  44:1.
pulled 48:2.
purport 75:17.
purpose 19:3, 19:21,
  20:5, 23:23, 36:7,
  53:16, 53:17,
  59:22, 66:6,
  66:13, 66:17,
  67:10.
purposes 11:22,
  20:20, 26:4, 34:5,
  43:23, 55:18,
  59:2, 67:23,
  68:23.
pursuant 2:23, 9:15,
  13:19, 16:3,
  16:12, 21:5.
pursue 7:16, 7:24,
  8:10, 17:19,
  20:13, 43:25,
  76:11, 80:14.
purveyor 57:18.
purview 10:2.
Put 32:16, 36:19,
  38:11, 56:8, 58:1,
  63:6, 63:7,
  78:10.
puts 31:11, 36:20.
putting 29:7.
.
.
< Q >.
qualify 11:18,
  36:10.
qualifying 45:2.
quality 51:4,
  79:15.
quarterly 16:16.
question 6:21,
  13:19, 14:10,
  27:12, 28:25,
  31:11, 33:25,
  42:17, 43:6,
  48:16, 59:24,

61:10, 61:16,
  62:3, 74:8,
  79:21.
questions 22:8,
  39:21, 39:24,
  53:14, 59:1.
quick 22:3, 69:20.
quickly 20:25,
  38:19, 78:3.
quite 29:11, 52:3.
quote 16:9, 16:16,
  16:17, 38:22,
  41:7, 61:10.
.
.
< R >.
R. 1:27.
race 29:25.
raise 43:10.
raised 77:24.
raises 33:25.
Ramirez 1:28, 5:9.
rampant 7:22.
randomly 45:20,
  45:22.
range 24:2.
rather 73:12.
ratified 42:16,
  42:24.
rationale 30:19.
raw 50:25, 51:24,
  76:7.
RDB-20-0929 1:9.
RDB-20-0929 2:7,
  80:25.
reach 25:24,
  64:12.
reaching 10:7,
  26:18, 46:10,
  78:23.
read 15:19, 21:24,
  37:25, 38:3,
  59:19, 71:21.
readers 31:5, 45:6,
  49:17.
reading 19:11, 35:7,
  37:9, 63:22.
real 19:16, 20:4,
  45:14, 51:10,
  60:17, 61:5.

reality 34:4, 72:22,
  76:4.
realize 80:20.
realized 49:13.
really 20:1, 21:7,
  24:6, 25:2, 25:4,
  33:24, 37:16,
  37:17, 45:24,
  47:8, 47:25, 48:2,
  48:9, 50:7, 50:9,
  51:5, 51:20,
  51:25, 54:16,
  64:25, 78:11.
reason 18:14, 29:1,
  30:25, 58:16,
  78:15.
reasonable 8:1,
  9:22, 18:9, 25:25,
  28:4, 33:21,
  33:22, 35:3,
  35:20, 36:6,
  36:14, 37:2,
  37:16, 38:3,
  48:10, 59:7,
  60:7.
reasonableness 38:9,
  38:17, 39:5,
  39:14.
reasonably 29:1,
  33:22.
reasoning 34:22.
reasons 8:12, 46:15,
  69:3.
rebuttal 21:13.
recall 77:19.
recent 11:13,
  27:8.
recently 15:16.
recognized 19:15,
  60:23.
reconstructed
  31:20.
reconstructing
  31:22.
record 2:5, 3:2,
  4:19, 5:3, 5:5,
  12:7, 16:2, 16:5,
  22:17, 29:2, 37:8,
  42:3, 42:14,
  42:15, 47:12,

47:14, 47:18,
  47:21, 51:25,
  62:9, 79:20,
  81:10.
recording 3:12.
recordings 3:9,
  33:3.
records 9:11, 9:12,
  10:6, 11:25.
recruit 77:2.
redressed 8:21.
reduce 51:6, 51:15,
  76:25.
reducing 36:8,
  76:9.
refer 52:11.
reference 17:25,
  42:4, 42:8,
  61:17.
referenced 61:18.
referred 22:4,
  50:6.
referring 12:8.
refers 12:16.
reflected 42:6.
reformatting
  31:13.
regard 55:12, 66:22,
  67:6, 75:2.
regarding 47:25.
regardless 9:11,
  35:20.
regularly 42:12,
  42:13.
regulations 60:9.
reinforces 50:21.
reject 8:13.
rejected 22:2,
  29:16.
relate 41:23,
  66:21.
related 17:20,
  36:12, 66:3,
  77:23.
relates 18:18.
relating 9:11.
relaxed 24:24.
relevant 23:12,
  31:10, 51:19,
  56:8, 64:2,

66:5.
reliant 49:5.
relied 60:5.
relief 27:3, 70:12,
  70:17, 72:1, 72:4,
  76:5, 78:21, 79:7,
  79:22.
religious 74:17.
rely 24:14, 46:14.
relying 60:13.
remains 44:4,
  79:9.
remarkable 7:10.
remedy 26:17, 78:21,
  79:5.
remind 41:8.
remotely 3:2, 19:21,
  73:14, 80:6.
render 29:21.
replace 8:13.
reply 30:5.
report 19:20, 23:16,
  24:5, 45:4.
Reporter 1:47, 2:16,
  2:18, 2:21, 61:2,
  80:5, 81:14.
reporting 22:19,
  22:25, 39:16,
  71:16.
reports 22:13.
represent 75:18.
representation
  48:22, 67:2.
representing 46:3.
request 30:2.
requested 70:12.
requests 30:1.
require 63:22.
required 58:11.
requirement 4:21,
  36:2, 39:13,
  39:17, 52:8, 58:9,
  74:23.
requirements 24:23,
  70:21.
requires 51:11.
Research 3:24, 7:9,
  27:24, 28:2.
resembling 51:13.
reset 34:1.

resident 16:21.
residents 6:19.
resolution 44:21,
  44:22.
resolve 67:4.
Resource 40:8,
  51:17.
Resources 14:2,
  26:21, 45:5,
  59:14, 79:1.
respective 6:5.
respond 8:6, 11:3,
  23:1, 44:19,
  55:11, 62:4,
  65:8.
responded 72:10.
response 7:5, 53:13,
  53:16, 58:4,
  67:18, 70:23.
responses 55:15.
rest 39:20, 52:13.
restraining 4:3.
restrictive 69:1.
result 46:5, 62:25,
  63:1, 64:13.
reveal 18:15,
  30:22.
revealing 35:14,
  56:10.
Review 11:17, 45:3,
  45:20, 45:24,
  49:2, 50:17,
  56:22, 69:15,
  71:22, 73:18,
  74:13.
reviewed 18:11,
  18:16, 25:20,
  66:24.
reviewing 11:25,
  50:3.
reviled 58:14.
revolution 38:23.
rich 29:9, 34:19.
Richard 2:14.
Richard D. Bennett
  1:18.
rights 3:25, 10:1,
  17:23, 18:25,
  19:6, 35:23, 39:2,
  62:16, 65:3,

69:10, 74:8,
  74:10, 74:11,
  76:10.
Riley 38:20, 39:3,
  52:22, 59:4.
rise 69:14.
risk 22:18, 22:22.
risked 62:16.
robberies 44:13.
robbery 51:8.
Roberts 38:22,
  60:24, 61:9,
  61:13, 64:8.
Rocah 1:27, 5:8.
role 28:20, 43:9.
roll 30:13, 56:3.
rolling 28:18, 34:6,
  39:10, 40:16.
root 8:4.
roughly 44:21.
round-the-clock
  33:18.
RPR 1:46, 81:8.
rudimentary 63:5.
Rule 26:15, 35:2,
  35:22, 35:24,
  78:19.
Rules 3:8, 5:1,
  26:16, 38:11,
  38:14, 78:20.
ruling 47:6,
  69:16.
running 62:14.
.
.
< S >.
S. 5:20, 7:17,
  8:12.
safe 77:10.
Safety 60:4.
satisfied 70:13,
  71:24.
satisfies 21:2.
satisfy 27:17,
  71:25, 74:10.
saying 2:3, 20:24,
  51:15, 63:22,
  67:5, 67:16,
  77:13.
says 29:5, 31:15,

36:7, 38:22, 54:1,
  54:3.
Scalia 37:1.
scenario 64:12.
scenarios 64:2.
scene 23:20, 49:9,
  49:12, 54:23,
  57:1, 57:2.
schedule 4:8,
  4:17.
scheduled 4:7,
  4:14.
scheduling 4:20.
scope 19:22, 23:23,
  24:1, 47:4,
  69:4.
scrutiny 68:25.
se 55:10.
searched 9:12.
searching 11:25.
Second 10:3, 11:24,
  12:6, 13:21,
  15:15, 29:3, 29:7,
  29:14, 29:15,
  32:18, 54:12,
  70:21, 73:21.
second-by-second
  34:18, 57:14,
  57:16, 57:20.
Secondarily 28:2,
  70:16.
Secondly 27:1,
  28:4.
Section 20:20,
  67:24.
sector 56:25.
sectors 29:11,
  57:23.
security 31:4,
  61:11, 63:5.
seduce 29:20.
seeing 77:1.
seeking 4:4, 18:22,
  72:3.
seeks 16:8.
seems 69:7.
seen 50:15.
selections 2:24.
self 39:16.
sense 30:19,

56:23.
sensitive 9:8,
  30:22, 58:1.
sentence 25:13,
  25:21.
separate 56:17,
  69:22.
separately 40:11,
  42:17, 71:12,
  71:17.
sequential 44:20.
serious 27:12.
serves 74:8.
service 76:12.
Services 32:23,
  48:17.
set 4:17, 26:15,
  26:20, 27:22,
  37:19, 40:7,
  68:18, 78:25.
seven 6:3, 46:6,
  46:17.
several 38:21.
sheltering 75:7.
ship 33:14.
shooting 51:7.
shootings 44:13.
short-term 59:24.
shorter 34:23.
show 8:18, 8:20,
  27:12, 63:25,
  66:19, 67:10.
showing 27:14, 57:3,
  79:4, 79:6.
shown 18:10.
shows 11:20, 30:16,
  56:5.
side 6:2, 63:20,
  71:4.
sides 60:3, 69:11,
  72:16.
sight 61:5.
signed 42:19.
significant 9:18,
  47:17.
similar 52:21.
similarly 11:14.
simple 29:1.
simply 31:18, 39:3,
  39:9, 43:11,

47:22, 49:25,
  51:21, 52:6, 56:8,
  56:16, 57:8,
  57:13.
single 36:18,
  46:8.
Site 13:3, 23:13,
  29:10, 30:1,
  45:16, 46:18,
  53:10, 60:21,
  61:14, 80:4,
  80:6.
sites 73:14.
sitting 3:8, 58:3.
situation 39:19,
  47:2, 47:19, 48:5,
  48:13, 49:22,
  51:21, 59:20,
  63:17, 74:3,
  75:6.
six-month 33:1.
sky 29:2, 33:4,
  50:6, 50:7.
slim 24:6.
slow 74:4.
small 50:24.
Smith 61:7.
smoothly 3:13,
  5:2.
social 24:14.
society 28:17.
Solicitor 1:34,
  1:35, 1:36, 5:18,
  39:24, 50:21,
  51:1, 51:14.
solution 7:21,
  80:17.
solutions 36:19,
  76:23, 77:10.
solve 36:16, 45:8,
  55:3.
solving 44:12,
  66:11.
somebody 56:4.
somehow 38:16.
someone 20:12.
somewhat 24:24.
sophisticated
  51:12.
sorry 69:19.

sort 35:23, 50:21,
  51:1, 51:16, 52:1,
  63:17.
sought 58:12.
sources 50:5.
spaces 25:25.
sparingly 78:22.
speaking 3:15, 5:7,
  9:5, 32:15.
speaks 15:19.
special 36:3, 36:10,
  38:7, 58:8,
  58:10.
specific 17:15,
  23:9, 24:11,
  24:12, 29:9,
  40:24, 40:25,
  45:18, 49:3,
  56:4.
Specifically 3:9,
  16:20, 18:17,
  47:6, 60:25, 61:1,
  61:8, 69:13.
specifics 31:14.
specified 24:17.
speculating 70:2,
  70:4.
speculation 23:17.
speculative 14:10,
  19:2, 19:12,
  19:25, 20:8, 20:9,
  21:1, 22:11, 24:4,
  26:10, 70:1.
spend 50:2, 70:25.
spending 70:14.
spoke 77:12.
sporadically 64:5.
squarely 41:4,
  65:14.
staff 14:2, 80:2.
standard 22:22,
  26:14, 27:11,
  53:2.
standards 24:20.
stars 78:10.
start 49:11.
started 63:4,
  77:18.
starting 2:3,
  6:13.

State 9:13, 9:20,
   11:6, 11:23, 12:1,
   20:20, 21:6,
   43:17, 55:17,
   56:10, 56:24,
   59:9, 60:4, 65:22,
   66:17, 67:23,
   69:2, 72:9,
   73:18.
stated 40:7, 43:23,
   66:13, 66:21.
statement 6:4, 6:11,
   7:4, 7:6.
States 1:1, 4:1,
   10:18, 19:19,
   23:19, 26:21,
   37:20, 42:4,
   52:13, 53:1, 53:8,
   53:9, 59:5, 60:1,
   60:11, 61:3,
   61:20, 61:21,
   61:23, 62:11,
   62:12, 69:12,
   77:24.
static 32:9.
station 44:4.
Stavlas 80:2.
stay 44:16, 54:14.
stay-at-home
   73:24.
stenographic 81:9.
step 40:4, 64:18.
steps 30:5, 73:15.
stitch 46:7, 48:1.
stitched 18:3.
stoop 58:3.
stop 35:4.
stopping 72:13.
story 46:7, 48:2.
strain 43:24.
strategies 8:10.
Street 1:48,
   62:10.
strict 39:12.
strictly 39:8,
   65:21.
strongly 31:15,
   33:9.
structure 46:3,
   46:4.

Struggle 1:5, 2:6,
   3:21, 14:1, 16:6,
   19:11, 80:24.
stuck 43:23.
study 30:15, 56:5.
stuff 56:2.
subject 6:18, 14:11,
   15:13, 21:18,
   22:18, 24:17,
   39:16, 51:14,
   70:2, 71:15.
subjective 15:1.
submission 45:11.
submissions 75:15.
submitted 43:2.
subsequently
   11:17.
subsided 44:15.
substantial 22:18,
   22:22, 68:24,
   71:14, 76:25.
substantially 22:12,
   22:15, 68:15.
substantive 10:2.
succeed 27:1, 27:14,
   70:13, 79:4.
success 6:25, 26:4,
   27:21, 54:20,
   64:19, 64:23,
   68:2, 68:5,
   71:2.
suffer 27:2,
   70:17.
suffered 80:15.
suffices 11:21.
sufficient 11:10,
   13:14, 22:20,
   29:21.
sufficiently 34:1.
suggest 6:1, 15:19,
   35:2.
suggested 34:2.
suggesting 32:22,
   42:18.
suggestion 34:22.
suggests 35:1.
suing 17:18.
summarize 3:18.
summarized 26:5,
   48:17.

summary 16:23,
   25:13, 25:21.
supervised 39:1.
supplant 7:25.
support 10:4, 11:14,
   74:21, 75:20,
   78:6, 78:8.
supported 72:11.
Supreme 9:25, 10:17,
   10:21, 14:4,
   22:22, 26:21,
   26:23, 29:15,
   30:6, 37:12,
   38:21, 47:10,
   52:8, 52:18,
   52:22, 53:4, 53:7,
   53:8, 59:3, 60:5,
   61:2, 61:8, 65:16,
   69:12.
surrounded 57:24.
survive 35:25,
   68:25.
Susan 22:23.
suspicion 39:8.
system 2:10, 28:17,
   38:25, 51:20,
   54:16, 54:22,
   57:18, 57:19,
   60:15, 64:3, 64:6,
   65:18.
Systems 12:9, 12:17,
   25:11, 31:9,
   31:13, 49:6,
   56:15, 62:19.
.
.
< T >.
T. 1:46, 81:13.
tactics 8:9.
talked 46:12,
   79:12.
talks 31:12,
   34:17.
tape 30:13, 56:3,
   63:7.
target 22:16,
   45:23.
targeted 32:8.
targeting 59:13.
team 41:13, 41:18,

41:19, 76:25.
techniques 61:11,
  65:15.
technologies 50:8.
technology 28:16,
  32:15, 34:24,
  40:19, 47:8,
  63:18.
technology-assisted
  32:10.
telephone 4:7,
  73:15, 80:23.
telephonic 2:5.
telephoto 50:8.
television 31:3,
  44:4.
temporary 4:2.
term 35:19, 39:17.
test 7:10, 26:20,
  69:3, 78:25.
Thanks 55:13.
themselves 3:4, 3:6,
  3:16, 3:19, 5:3,
  5:4, 15:10, 17:20,
  51:5, 56:18.
theoretically
  17:22.
theory 14:16, 15:21,
  37:24.
thereafter 23:21.
thereof 43:6.
thereto 16:4.
they'll 71:15.
they've 9:18, 56:7,
  68:13.
thinking 33:20.
Third 8:21, 14:23,
  20:18, 27:3,
  30:10, 70:18,
  70:21, 72:5.
thorough 4:16.
Though 62:22.
thousand 52:19.
threat 24:12,
  36:13.
threatens 19:23.
three 7:15, 9:2,
  13:13, 32:8,
  40:21, 45:23.
threshold 28:25.

throughout 38:2,
  49:16.
thrust 10:25,
  25:5.
tied 56:17.
ties 68:21.
tilted 63:13.
timing 14:1.
tip 63:8.
Tivo 57:19.
Today 5:9, 5:21,
  20:13, 27:15,
  29:6, 36:5, 44:17,
  46:20, 54:18,
  55:17, 61:3, 67:4,
  68:6, 77:7, 80:6,
  80:23.
together 18:3, 46:7,
  48:1, 54:8,
  56:17.
tool 7:11, 44:3,
  66:10, 66:12.
tools 23:13, 49:20,
  61:11, 66:12.
top 34:18.
totality 38:15,
  38:17.
totally 71:1.
touch 34:11.
tour 77:22.
tower 34:17, 57:24,
  61:6.
track 19:8, 45:15,
  51:9, 51:13,
  51:22, 57:17,
  57:20, 67:19.
tracked 49:10.
tracking 34:13,
  35:19, 49:12.
tracks 31:19.
traditional 63:19.
traditionally 9:20,
  67:22.
transcribed 3:10.
Transcript 1:17,
  3:11, 67:10,
  81:9.
transitory 32:8.
trespass 37:3.
trials 2:24.

tries 35:16, 57:6.
trigger 29:21.
trilogy 60:13.
true 54:2, 57:13.
Try 33:13, 41:16,
  45:15, 54:24,
  58:20, 78:10.
trying 21:10, 36:16,
  54:18, 55:3, 55:7,
  55:8, 59:22.
Tuesday 1:19.
turn 34:14, 56:24.
TV 44:5.
twenty 61:2.
two 8:19, 11:6,
  15:4, 22:23,
  23:21, 50:3, 51:9,
  52:16, 52:25,
  60:20, 61:2,
  79:16.
two-hour 73:14.
type 50:16.
.
.
< U >.
Ultimately 9:22,
  76:8.
unauthorized
  39:15.
unconstitutional
  21:3, 28:21,
  72:10, 76:12.
underlying 15:8,
  29:8, 51:24,
  57:25.
underscore 13:17,
  15:4, 76:4.
understand 10:12,
  10:14, 10:24,
  12:15, 23:5,
  32:23, 33:13,
  44:2, 48:15,
  48:16, 48:18,
  59:21, 59:23,
  64:24, 67:13,
  67:15, 73:10.
understanding 51:2,
  51:19, 59:2.
understands 43:4,
  70:11, 71:24.

understood 32:13.
undertake 9:15,
    37:17, 71:12.
unfortunate 74:2.
unique 30:17, 30:21,
    49:18, 63:21.
United 1:1, 4:1,
    10:18, 26:21,
    37:20, 42:4,
    52:12, 53:1, 53:8,
    53:9, 59:5, 60:1,
    60:10, 61:3,
    61:19, 61:20,
    61:22, 62:11,
    62:12, 69:12,
    74:16, 75:20,
    77:11.
University 43:17,
    43:18.
unknowable 32:1.
unless 17:13, 19:7,
    23:12, 52:13,
    79:23.
unlike 14:8.
unmute 3:16.
unpersuaded 11:19.
unprecedented
    63:21.
unquestionably
    76:3.
unreasonable 38:15,
    64:22.
unsurprising
    30:16.
until 4:13, 11:1,
    11:2, 11:24,
    17:13, 17:23,
    19:7, 23:12,
    49:13.
untrue 66:16.
unusual 78:4, 78:7,
    78:9.
unwarranted 38:25.
upheld 60:11,
    62:7.
upholding 74:7.
usable 45:7.
useful 51:5, 51:6,
    56:23.
uses 17:14, 17:24,

    19:8, 32:15,
    43:23.
using 12:12, 12:14,
    28:16, 34:15,
    34:23, 35:12,
    59:14, 63:3,
    65:17, 66:9.
utility 49:5, 49:12,
    63:8.
.
.
< V >.
v. 9:25, 10:4,
    11:11, 12:3,
    14:14, 21:19.
vague 24:4.
valuable 50:10.
value 7:20.
various 2:13.
vast 66:4.
vehicle 36:25,
    50:24, 60:15.
vehicles 18:16.
versus 2:6, 10:18,
    14:8, 26:21, 27:9,
    37:20, 40:8, 42:4,
    52:12, 52:17,
    52:22, 53:1, 53:8,
    53:9, 59:4, 59:5,
    60:3, 60:11,
    61:21, 62:11,
    67:25, 69:11,
    79:1, 80:24.
vicinity 20:8,
    22:15.
video 49:15.
view 6:5, 8:5,
    20:17, 22:7,
    25:16, 25:21,
    25:24, 42:21,
    42:22, 45:22,
    61:4, 62:5, 65:5,
    71:8, 79:23, 80:7,
    80:11.
viewed 63:11,
    77:16.
views 7:25, 37:25,
    44:3, 77:17.
vindicating 76:10.
violate 17:22.

violated 10:22,
    10:24, 19:1.
violates 3:25, 9:22,
    15:11, 35:19.
violation 69:8,
    70:23, 70:24.
violative 74:9,
    75:11.
violence 73:25,
    74:14.
violent 8:6, 36:8,
    44:12, 45:25,
    72:22, 73:21,
    76:19, 80:16.
Virginia 60:4.
virtually 6:18.
Vitti 2:12, 80:4.
voice 17:8, 78:6.
voted 37:4.
Voters 27:9.
votes 36:25.
vs 1:8.
.
.
< W >.
W. 1:48.
Walden 1:35, 5:21,
    10:13, 17:2, 40:1,
    40:4, 50:11,
    50:13, 52:4,
    54:22, 65:6,
    71:18, 76:1,
    76:16.
wanted 24:9,
    76:17.
wants 40:1, 55:21,
    58:6, 71:4.
warrant 36:2, 36:11,
    52:8, 58:9, 58:10,
    58:12, 58:13,
    58:17, 59:13.
warrantless 38:8.
watch 45:6.
ways 24:7, 26:1,
    68:18.
weather 40:22,
    44:25.
wedge-shaped
    57:23.
weeds 66:23.

week 32:23, 33:1,
  33:5, 33:12, 46:6,
  59:20, 62:9.
weekends 16:17.
weeks 23:21,
  31:21.
weighty 76:3.
welcome 5:14.
Wessler 1:29, 5:9,
  28:8, 37:11.
West 60:4.
Westlaw 61:3.
whenever 34:17,
  41:13.
whereabouts 29:2,
  47:19, 47:21.
who've 55:8.
whoever 40:1.
whole 25:4, 30:20,
  35:13, 37:15.
wide-area 76:7.
Wikimedia 11:13,
  12:2, 15:16,
  15:21, 21:22,
  69:22.
windows 63:13.
winning 34:25.
Winter 26:21, 40:7,
  52:14, 79:1.
within 10:2, 10:3,
  18:8, 23:20,
  23:23, 28:3,
  43:16, 59:10,
  64:20, 65:14,
  72:1.
without 10:7, 59:13,
  66:23, 74:8.
witnesses 56:24.
Wizner 1:30, 5:9,
  28:8, 37:10.
woman 50:23.
Women 27:9.
wonderful 38:22.
wondering 65:8.
word 24:10.
words 19:12, 24:1,
  45:20.
work 3:13, 3:17,
  7:21, 13:25, 14:3,
  19:24, 23:19,

  23:21, 24:4, 24:7,
  24:13, 24:16,
  30:7, 45:25,
  47:22, 49:21,
  68:18, 68:22,
  80:6.
working 45:21.
works 6:10, 39:4,
  49:8, 49:20,
  57:16, 78:11.
world 53:7.
worried 2:4.
worry 19:13.
worse 33:18.
worth 29:23, 30:12,
  53:18, 57:10,
  59:11.
written 31:2, 64:4,
  79:18.
.
.
< Y >.
yard 29:12.
yard-by-yard
  57:24.
year 44:18, 62:12,
  73:22, 74:14.
years 18:7, 22:4,
  22:6, 24:16,
  29:18, 32:16,
  38:21, 59:11,
  59:18, 63:24.
yesterday 44:3.
York 14:14, 43:18.
Young 76:24.
yourself 44:6.
youth 16:10.
.
.
< Z >.
Zero 43:10.
zoom 50:8, 63:13.
zoomed 63:12.