**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

LEADERS OF A BEAUTIFUL
STRUGGLE, *et al.*

     *Plaintiffs,*

  v.

BALTIMORE POLICE DEPARTMENT,
*et al.*,

     *Defendants.*

Case No.  RDB-20-0929

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
<u>MOTION TO DISMISS COMPLAINT</u>**

DANA P. MOORE
Acting City Solicitor
ELISABETH S. WALDEN
KARA K. LYNCH
MOLLY J. CROSS
Baltimore City Department of Law
100 N. Holliday Street, Suite 100
Baltimore, Maryland 21202
T: 410.396.3659
F: 410.659.4077

*Counsel for Defendants Baltimore Police
Department and Police Commissioner
Michael S. Harrison*

Dated:  August 12, 2020

## TABLE OF CONTENTS

FACTUAL BACKGROUND ………………………………………………..…… 1

STANDARD OF REVIEW ……………………………………………….…… 6

ARGUMENT …………………………………………………………..….….. 7

    I.      **Plaintiffs Do Not Have Standing Under Article III of the Constitution** ……….…15

    II.     **Plaintiffs' §1983 Claims Fail Against Defendants** ………………………….… 15

        A.  **Plaintiffs Have Failed to Allege Facts Sufficient to Establish a Fourth Amendment Violation** …………………………………………..……….. 15

            *1.*  *The AIR program allows police to track movements for only a short period of time, in public spaces where individuals have a limited expectation of privacy*……………………………………………………………… 16

            *2.*  *The Supreme Court has held that aerial surveillance far more intrusive than that used in the AIR program does not violate the Fourth Amendment*.......... 20

            *3.*  *The Supreme Court's narrow decision in Carpenter v. United States, 138 S. Ct. 2206 (2018), does not prohibit an aerial surveillance program that allows police to reliably track a person's movements for only several hours* …….. 23

        B.  **Plaintiffs Have Failed to Allege Facts Sufficient to Establish a First Amendment Violation** …………………………………………………….. 27

    **CONCLUSION** ……………………………………………………………… 31

i

On April 9, 2020, Plaintiffs Leaders of a Beautiful Struggle, Erricka Bridgeford, and Kevin James, filed a Complaint for Declaratory and Injunctive Relief against Defendants Baltimore Police Department ("BPD") and Police Commissioner Michael S. Harrison. ECF No. 1. The Complaint contains two claims for relief: 42 U.S.C. § 1983 Claim for Violation of Plaintiffs' Fourth Amendment Rights and 42 U.S.C. § 1983 Claim for Violation of Plaintiffs' First Amendment Rights. Plaintiffs allege that Defendants will violate their Constitutional rights through the implementation of the "Aerial Investigation Research" Program ("AIR"). Defendants, through undersigned counsel, move to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6) because the Complaint fails to state a claim upon which relief can be granted.

## FACTUAL BACKGROUND[1]

On April 1, 2020, the Board of Estimates[2] approved and authorized the execution of a professional services agreement ("Agreement") between BPD and a private contractor for the purpose of conducting a 180-day pilot program. ECF No. 1 ¶¶ 1-2, 16. The Agreement is attached hereto as Exhibit A.[3] The contractor, Persistent Surveillance Systems ("PSS"), will fly three manned aircraft over the City of Baltimore for approximately 40 hours per week. *Id.* at ¶ 20. Through this pilot program, PSS will assist BPD in the investigation of specified violent crimes in Baltimore during the trial period. *Id.* at ¶19. PSS will assist only in investigations of any of the

---

[1] Defendants recite the facts as pled in the Complaint. This recitation should not be construed as a concession or admission of any of the facts contained therein.

[2] The Baltimore City Board of Estimates consists of five voting members: The Mayor, President of the City Council, the Comptroller, the City Solicitor, and the Director of Public Works. The President of the City Council serves as President of the Board of Estimates, and the City Comptroller serves as Secretary to the Board.

[3] The Court may consider Exhibit A (the "Agreement") in ruling upon the motion to dismiss because it is "integral to the complaint and authentic." *Goines v. Valley Community Servs. Bd.*, 822 F.3d 159, 164 (4th Cir. 2016).

following four target crimes – "murder, non-fatal shooting, armed robbery, or car-jacking." *Id*. at ¶ 28.

The planes will fly when weather permits and the system will not employ infrared or night vision technology. *Id.* at ¶ 20. The resolution of the AIR program cameras will be one pixel per person – "meaning that an individual cannot immediately be identified through a single image alone." *Id.* at ¶¶ 20-22. One pixel per person is essentially the equivalent of dots on a map. At this resolution, the system cannot determine any personally identifiable characteristic, including a person's ethnicity, gender, or clothing, nor features of vehicles.  Exhibit A, at 19.  No infrared or night vision technology will be used and the ability to capture usable data will be weather dependent.  *Id.*

Once collected, images will be transmitted from the aircraft to ground stations operated by the contractor and staffed by local residents who completed background checks and have been trained as analysts.  *Id*. at 19.  The data is then accessed only after receiving a case number related to a murder, non-fatal shooting, armed robbery, or carjacking.  *Id*.  AIR technology categorically will not be used to seek out criminal activity.   Indeed, the contractor does not have the authorization, or even ability, to conduct real-time surveillance.  *Id.* at 19.  Rather, the program can be employed only when an egregious violent crime is already known to have occurred for the purpose of developing investigative leads.  *Id.*

BPD does not have direct access to the raw photographic data, and intends to use the imagery and reports provided by the contractor solely for the purpose of investigating the target crime for which it was requested.  Exhibit A, at 21-22.  BPD does not own the data. *Id*. at 21. The contractor is prohibited from using data collected during the AIR pilot for any purpose other than facilitating investigations as described in the Agreement and assisting prosecutors and defense

counsel in criminal prosecutions.  *Id.* at 21-22.  BPD will utilize the AIR program data to link with other existing surveillance technologies, such as CCTV and automated license plate readers, to identify individuals in the vicinity of scenes of the four listed target crimes.  ECF No. 1 at ¶ 24.

If the AIR images are used for an investigatory purpose, they will be compiled into information packets and become part of the permanent case file.  *Id.* at 22. As with all evidence, it will be produced to the prosecution and made available to the defense through discovery requests consistent with the prosecution's *Brady* and *Giglio* obligations.  *Id* at 19.  Any imagery not identified as relevant to a criminal investigation and reduced to an evidentiary packet will be destroyed after 45 days.  *Id.* at 22.

Consistent with its purpose to test and rigorously evaluate the AIR program, the pilot is designed to incorporate robust independent evaluation.  Exhibit C to the Agreement requires both BPD and the contractor to provide full support to multiple independent research partners evaluating various aspects of the AIR program's functioning.  *Id.* at 26.  The RAND Corporation is tasked with assessing whether the AIR program's data was useful to investigators and whether it produced improved outcomes as measured by increase in clearance rate or reduction in rates of the target crimes.  *Id.*  The University of Baltimore will conduct two waves of surveys to assess residents' perceptions of the AIR program and how attitudes towards AIR impact perceptions of police legitimacy.  *Id.*  The Policing Project at New York University School of Law will review the program to evaluate civil rights and civil liberties concerns, and make recommendations for process improvements.  *Id.*  The reports of all of the independent research partners will be made public.  *Id.* at 26-28.

In addition, Morgan State University will evaluate the efficacy of the AIR pilot program. Specifically,

Morgan State University School of Social Work will be conducting an exploratory evaluation to obtain baseline data as to whether there are associations with the aerial surveillance technology, reduction of crime, and the attitudes and beliefs toward the aerial surveillance technology's impact. In order to investigate the overarching question of how the aerial surveillance will affect the crime and residents in Baltimore City the study will quantitatively: (1) Conduct a comparative interrupted time-series analysis of the aerial surveillance data provided by the BCPD and the Vendor in the areas of murder, nonfatal shooting, armed robbery and carjacking, (2) Conduct a comparative analysis of the communities surveilled by the aerial surveillance plane, and (3) Conduct a comparative analysis across targeted grid patterns of aerial imaging by neighborhoods, streets, and various environmental structures inclusive of the consideration and analysis of the bio-psycho-social- and environmental risk factors of each neighborhood. Qualitatively, the evaluation will conduct focus groups and administer surveys regarding public knowledge, attitudes, and beliefs toward the aerial surveillance plane. The evaluation outcomes will focus on the measurable change in clearance rates, case closure rates, and overall reduction in the crime categories, murder, non-fatal shooting, armed robberies, and car jackings; and the responses to the focus groups and survey analysis of the public's sentiment.

https://www.baltimorepolice.org/sites/default/files/General%20Website%20PDFs/Morgan%20St ate%20University%20Independent%20Aerial%20Research%20and%20Evaluation%20Analysis. pdf, last accessed on August 10, 2020.

A final safeguard incorporated into the pilot program design is the oversight of an independent verification and validation ("IV&V") consultant to audit the AIR program's operation. *Id.* at 29. Whereas the independent researchers are tasked with evaluating various aspects of the AIR technology's performance, the IV&V is separately responsible for independently verifying that the aerial imagery collected in connection with the pilot is used only for the purposes and in accordance with the procedures previously described. *Id.*

Plaintiffs allege that "if the AIR program is permitted to proceed, it will violate Plaintiffs' privacy rights and burden their freedom of association; it will undermine the ability of LBS to carry out political activities crucial to its mission; and it will hinder Ms. Bridgeford's and Mr. James's advocacy and community organizing." *Id.* at ¶ 4. They allege that this is so because "LBS

4

has been a frequent critic of law enforcement's use of surveillance technologies" *(Id.* at ¶ *9)* and a component of LBS's advocacy is requiring staff to travel throughout Baltimore, by foot, bus, and car. *Id.* at ¶ 51. Plaintiffs allege that they will have to be more cognizant of the individual and groups with whom they associate, and they will have to change their behavior by altering meeting times and means by which they travel, thereby diverting time and staff resources. *Id.* Plaintiff LBS also alleges a belief that some of its present and future partners may decide not to engage with the organization out of fear the association with LBS would cause government retaliation. *Id.* at ¶ 53.

Plaintiff Ericcka Bridgeford states that she conducts community outreach in neighborhoods throughout Baltimore by visiting and speaking with people in high crime neighborhoods. *Id.* at ¶ 56. Plaintiff Bridgeford states that she drives from neighborhood to neighborhood and spends two to three hours walking along public streets and parks to interact with community members. *Id.* at ¶ 59. She alleges that she will have to be cognizant of her associations. *Id.* She also alleges that the program will "burden the effectiveness" of her work and that she "believes that some people will likely no longer feel comfortable having private and sensitive conversations with her." *Id.* at ¶ 60. She alleges that the program is "likely" to generate an individualized report about her. *Id.* at ¶ 58.

Plaintiff Kevin James states that he drives public roads to his job and to areas with high rates of violent crime for community organizing and engagement. Plaintiff James alleges that the "AIR program intrudes on [his] reasonable expectation of privacy in the whole of his long-term physical movements, by foot and by car." *Id.* at ¶ 65. He also believes that he will have to be more aware of and deliberate about who he meets with and will have to spend more time deliberating about whether those associations could result in unwarranted government scrutiny. *Id.* at ¶ 67. He believes he will have to explain the program and the time spent explaining the program will reduce available time for substantive discussion, which will have a chilling effect on people who want to

volunteer and fewer people will want to participate. *Id*. He also alleges his belief that it is likely that the AIR program with generate an individualized report about him. *Id*. at ¶ 66.

Plaintiffs filed their Complaint on April 9, 2020, prior to the implementation of the AIR program, seeking a declaration that the policy and practice of the AIR program violates their First and Fourth Amendment rights and requesting a preliminary injunction against BPD's operation of the program.[4] They broadly allege that the "AIR program violates the Fourth Amendment because it infringes upon a reasonable expectation of privacy in the whole of Plaintiffs' movements and captures information about the privacies of life." *Id.* at ¶ 69.

Plaintiffs simultaneously filed a Motion for Temporary Restraining Order, which was denied by the Court on April 24, 2020. ECF No. 33. After a hearing, the Court issued a written opinion denying the request for a preliminary injunction and explaining its conclusion that Plaintiffs are not likely to succeed on the merits of their Fourth or First Amendment claims. ECF No. 32.

## **STANDARD OF REVIEW**

A complaint will survive a Rule 12(b)(6) motion only if it states a plausible claim for relief. FED. R. CIV. P. 8; *Ashcroft v. Iqbal*, 556 U.S. 662, 677-79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2009). Courts "are not bound to accept as true a legal conclusion couched as a factual allegation" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.   *Accord Glassman v. Arlington Cnty.*, 628 F.3d 140, 146 (4th Cir. 2010) (recognizing that a court "need not accept the legal conclusions drawn from the facts," nor "unwarranted inferences, unreasonable conclusions,

---

[4] At the time of the filing of Plaintiffs' Complaint, the Governor of Maryland issued a stay-at-home order due to the COVID-19 pandemic, where movement and activity were greatly reduced throughout Baltimore. ECF No. 1, at ¶ 38 38.

or arguments") (internal quotation marks and citations omitted), *quoting Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). "'[N]aked assertions' of wrongdoing necessitate some 'factual enhancement' within the complaint to cross 'the line between possibility and plausibility of entitlement to relief.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (*quoting Twombly*, 550 U.S. at 557).

Once a pleading is stripped of its allegations that are not entitled to truth, a court must determine if the remaining factual allegations state a plausible claim for relief. *See Iqbal*, 556 U.S. at 677-83; *Twombly*, 550 U.S. at 555-70; *Glassman*, 628 F.3d at 145-150; *Giacomelli*, 588 F.3d at 194-97.

In this case, the Complaint cannot survive this Rule 12(b)(6) motion to dismiss because it contains nothing more than speculative and conclusory allegations that are insufficiently supported by factual allegations. Therefore, the Complaint fails to state a plausible claim for relief and must be dismissed with prejudice and without leave to amend.

## ARGUMENT

This Court should dismiss the Complaint in its entirety because Plaintiffs have failed to state a plausible claim for relief and lack standing. Plaintiffs have failed to state an injury in fact to establish standing pursuant to Article III of the Constitution and failed to assert facts to establish Fourth or First Amendment violations.

### I.      Plaintiffs Do Not Have Standing Under Article III of the Constitution

Article III of the Constitution "limits the judicial power of the United States to 'Cases' and 'Controversies.'" *Griffin v. Dep't of Labor Fed. Credit Union*, 912 F.3d 649, 653 (4th Cir. 2019). *Accord* U.S. Const. art. III, § 2.  "Embedded in this limitation is a 'set of requirements that together make up the irreducible constitutional minimum of standing.'" *Griffin*, 912 F.3d at 653 (some

internal quotation marks omitted), *quoting Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014).

"First and foremost" of the requirements of standing is "injury in fact." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (describing the other two standing requirements as causation and redressability).  A plaintiff must allege (and ultimately prove) "an invasion of a legally protected interest that is concrete and particularized and actual or imminent . . . ." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016).  An asserted injury is "imminent" when it is "certainly impending."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 345 (2006).  "Abstract injury is not enough." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983).

> The plaintiff must show that he [or she] has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical.

*Id.* at 101–02 (internal quotation marks omitted).

"The Supreme Court has repeatedly held that an alleged harm is too 'speculative' to support Article III standing when the harm lies at the end of a 'highly attenuated chain of possibilities.'" *South Carolina v. United States*, 912 F.3d 720, 727 (4th Cir. 2019) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)), *cert. denied*, 140 S. Ct. 392 (2019).  For example, in *Clapper v. Amnesty International USA*, the Court considered a challenge to a section of the Foreign Intelligence Surveillance Act, which "authorize[es] the surveillance of individuals who are not 'United States persons' and are reasonably believed to be located outside the United States." *Amnesty Int'l USA*, 568 U.S. at 401.  The plaintiffs – "attorneys and human rights, labor, legal, and media organizations" –  alleged that their work required them to "engage in sensitive international communication with individuals who they believe are likely targets of surveillance" under the Act, making it reasonably likely that the government would intercept the plaintiffs' communications.

*Id.* at 401.   But the Supreme Court found this insufficient to establish a concrete injury in fact,

because a "series of hypothetical events would have to occur before the government would

intercept any particular plaintiff's communications."  *South Carolina*, 912 F.3d at 727 (discussing

*Amnesty Int'l USA*).

> The Court held that among other steps, the government would have to decide to
> invoke its [statutory] authority to target a non-U.S. person with whom a plaintiff
> communicated, a panel of federal judges would have to "conclude that the
> Government's proposed surveillance procedures satisfy [the statute's] many
> safeguards and are consistent with the Fourth Amendment," and the government
> would have to succeed in intercepting one of the target's communications with the
> plaintiff.

*Id.*, *quoting Amnesty Int'l USA*, 568 U.S. at 410–15.   Such a "highly attenuated chain of

possibilities" did "not satisfy the requirement that threatened injury must be certainly impending."

*Amnesty Int'l USA*, 568 U.S. at 410.

Similarly, in *City of Los Angeles v. Lyons*, the Court found that a plaintiff lacked standing

to seek an injunction barring Los Angeles police from using control holds (aka "chokeholds").

461 U.S. 95, 97–98, 105 (1983).   Although the plaintiff alleged that police had previously applied

a control hold to him, and that police regularly used the technique, *id.* at 98, the Court found that

neither allegation established "a real and immediate threat that [the plaintiff] would again be

stopped . . . by an officer . . . who would illegally choke him."   *Id.* at 105.   *See also O'Shea v.*

*Littleton*, 414 U.S. 488, 493–97 (1974) (finding that plaintiffs' claims that they had been subject

to discriminatory enforcement of criminal law, including the imposition of harsher sentences, was

insufficient to establish an injury in fact in an action for injunctive relief, because the prospect of

future injury rested "on the likelihood that [plaintiffs] [would] again be arrested for and charged

with violations of the criminal law and [would] again be subjected to bond proceedings, trial, or

sentencing before [the defendants]," and such a threat was not "sufficiently real and immediate to show an existing controversy").

The Fourth Circuit has also found standing lacking when the alleged injury in fact is too speculative.  In *Beck v. McDonald*, the Court held that plaintiffs who received treatment at a medical center that suffered a data breach failed to establish standing when their theory of injury rested on the mere risk of experiencing identity theft and the cost of protecting against such theft. 848 F.3d 262, 275 (4th Cir. 2017).  The Court found that both alleged injuries were too speculative to confer standing.

> As to the alleged increased risk of identity theft, in particular, [the Court] explained that plaintiffs' theory of injury required [the Court] to "assume that the thie[ves] targeted the stolen items for the personal information they contained" and that the thieves would "then select, from thousands of others, the personal information of the named plaintiffs, and attempt successfully to use that information to steal their identities."

*South Carolina*, 912 F.3d at 727–28, *quoting Beck*, 848 F.3d at 275.  "This 'attenuated chain,'" the Court held, "cannot confer standing."  *Beck*, 848 F. 3d at 275.  The Court also rejected the plaintiffs' "costs of mitigation theory," characterizing is as "a 'repackaged' version of their first theory of standing" and a futile "effort to recoup 'costs they incurred in response to a *speculative threat*.'" *South Carolina*, 912 F.3d at 727–28 (emphasis in original), *quoting Beck*, 848 F.3d at 276.

Like the plaintiffs in *Amnesty International USA*, *Lyons*, *O'Shea*, and *Beck*, the Plaintiffs here have failed to assert any non-speculative injury arising out of the AIR program.[5]  They assert

---

[5] Likewise, Plaintiffs have not pled facts sufficient to show that there is a likelihood of irreparable harm. *See Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 32 (2008) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.") (*quoting Amoco Production Co v. Village of Gambell, AK.*, 480 U.S., 531, 546, n. 12 (1987)). In addition to success on the merits, a plaintiff must also prove: they are likely to suffer irreparable harm; the

that the program infringes upon their "reasonable expectation of privacy in the whole of [their] movements" as well as their "exercise of associational freedoms."   ECF No. 1 ¶ 68-73.  But both claims assume that the pilot program will capture "information about the privacies of life."  *Id.*

The AIR program's analysts track the movements of only those people and vehicles at the scene of a "target crime," at the time the crime is committed. These target crimes are murder, non-fatal shooting, armed robbery, and car-jacking. As asserted in Plaintiffs' complaint, the resolution is one pixel per person, essentially making images of individuals and cars non-specific dots on a map. Because people and vehicles are identifiable only as anonymous dots in aerial photos, police cannot even begin to piece together an identity unless the person or vehicle passes a ground-based device – like a surveillance camera or a license-plate reader – and that device captures a sufficiently clear and unobstructed image of the individual or automobile.  This may prove difficult if, for instance, the dot being tracked is an individual on foot wearing a hat or a hood that obscures his or her face, or the dot being tracked is a vehicle that is obstructed by another vehicle as it passes a ground-based camera.

The Plaintiffs are wrong to suggest that police could simply deduce a person's identity by "roll[ing] back the tape to trace pedestrians' or vehicles' paths to the homes they left in the morning, and roll[ing] it forward to the homes they returned to at night."  ECF No. 1 at ¶ 7.  This allegation either assumes an uncertainty – that the person being tracked would enter no other structures along their commute – or simply ignores that the resolution of the aerial imagery makes it impossible to determine if a dot leaving a structure is the same dot that entered that structure earlier that day. In any event, it is mere speculation that during   last months of the pilot program,

_____

balance of hardships tips in their favor; and the injunction is in the public interest. *Winter*, 555 U.S. at 20.

the Plaintiffs will be present at a homicide, serious non-fatal shooting, armed robbery, or carjacking and, thus, potentially have their public movements tracked.

Neither *ACLU v. Clapper*, 785 F.3d 787 (2d Cir. 2015), nor *Wikimedia Foundation v. NSA*, 857 F.3d 193 (4th Cir. 2017), support a finding of standing here.  In the Second Circuit case of *Clapper*, the plaintiffs challenged

> the legality of the bulk telephone metadata collection program . . . under which the National Security Agency ('NSA') collects in bulk 'on an ongoing daily basis' the metadata associated with telephone calls made by and to Americans, and aggregates those metadata into a repository or data bank that can later be queried.

*ACLU*, 785 F.3d at 792.  In finding Article III standing, the court reasoned that the plaintiffs had alleged a government seizure of their metadata, i.e., records containing a "startling amount of detailed information" about the plaintiffs' phone calls.  *Id.* at 793–94, 801.  The plaintiffs did not need to show if or how the government would use or otherwise *search* that data; it was enough that the government had *seized* the metadata, which can reveal "civil, political, or religious affiliations," "social status" and details about one's "intimate relationships."  *Id.* Similarly, the Fourth Circuit held that the lead plaintiff in *Wikimedia Foundation* had standing to challenge Upstream surveillance, an electronic surveillance program operated by the NSA.  *Wikimedia Found.*, 857 F.3d at 200.  Wikimedia alleged that the NSA was intercepting, copying, and reviewing at least some of Wikimedia's communications.  *Id.* at 209.

*ACLU* and *Wikimedia Foundation* are readily distinguishable from the case here.  Plaintiffs have alleged no seizure of any sensitive documents or communications that might reveal intimate details about their lives.  The AIR program unquestionably takes and stores aerial photographs; but none will ever identify Plaintiffs as anything more than anonymous dots.  Indeed, Plaintiffs do not claim any harm arising out of the aerial photography in and itself other than fear of potential effects it may have on *other* people—such as a speculative hesitation to work with Plaintiffs--and

a *belief* that BPD *may* use the imagery to create "individualized report[s] about" the Plaintiffs' public movements. These hypothetical "individualized" reports – not the bare aerial images themselves – are the analogues to the metadata in *ACLU* and the intercepted communications in *Wikimedia Foundation*. But, as already noted, the production of such reports would depend on "a highly attenuated chain of possibilities," *Amnesty Int'l USA*, 568 U.S. at 410, beginning with the Plaintiffs' presence at the scene of a serious violent crime, and culminating with the BPD's use of traditional, ground-based investigative tools to obtain an image clear enough to identify the Plaintiffs. Such a scenario is purely hypothetical and, thus, incapable of conferring Article III standing. That the Plaintiffs allegedly will have to modify their behavior to avoid the program's aerial photography does not change the equation. In *Laird v. Tatum*, the Supreme Court emphasized that any

> "chilling" effect of executive actions, falling short of a direct restraint of First Amendment rights, [does] not give rise to a justiciable cause if it [arises] "merely from the individual's knowledge that a governmental agency [is] engaged in certain activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some *other* and additional action detrimental to that individual."

*Donohoe v. Duling*, 465 F.2d 196, 201–02 (4th Cir. 1972) (emphasis in original), *quoting Laird*, 408 U.S. 1, 11 (1972).

In *Laird*, the plaintiffs challenged the Army's use of "sophisticated electronic methods of surveillance" and secret agents' infiltration of political meetings to target activists and gather information about their activities, which was then broadly distributed to federal, state, and local government officials. *Donohoe*, 465 F.2d at 201 (discussing *Laird*). *See also Laird*, 408 U.S. at 2. The *Laird* plaintiffs alleged that

> the purpose and effect of the collection, maintenance and distribution of the information on civilian political activity  .  .  . [was] to harass and intimidate plaintiffs and others similarly situated and to deter them from exercising their

13

> rights . . . protected by the First Amendment by invading their privacy, damaging
> their reputations, [and] adversely affecting their employment . . .

Brief for Respondents, *Laird v. Tatum*, No. 71-288 (S. Ct.), 1972 WL 135682, *7– 8.  The plaintiffs

further alleged that they were harmed by "fear that they [would] be made subjects of reports in the

Army's intelligence network," *Id.* at *8 (bracket omitted), and, in fact, "most if not all . . .  ha[d]

been the subject of Army surveillance reports and their names ha[d] appeared in the Army's

records," *Tatum v. Laird*, 444 F.2d 947, 956 n.17 (D.C. Cir. 1971), *rev'd*, 408 U.S. 1. While

recognizing that "constitutional violations may arise from the deterrent, or 'chilling,' effect of

governmental regulations that fall short of direct prohibition against the exercise of First

Amendment rights," the *Laird* Court nonetheless reaffirmed that a plaintiff must show "that he [or

she] has sustained, or is immediately in danger of sustaining, a direct injury as the result of that

action." *Laird* 408 U.S. at 11, 13 (internal quotation marks and ellipsis omitted).  Because the

plaintiffs had failed to do so in *Laird*, they lacked standing to proceed. Likewise, in *Donohoe v.

Duling*, this Court considered the propriety of a police department routinely surveilling

demonstrations and public meetings, photographing participants, and compiling files on them to

be shared with other law enforcement agencies.  *Donohoe*, 465 F.2d 196, 197 (4th Cir. 1972).

Noting that local police authorities enjoy a greater right to conduct domestic surveillance than the

Army had in *Laird*, the *Donohoe* Court held that plaintiffs had no justiciable claim. *Id.* at 202–03.

Here, as in *Laird* and *Donohoe*, the Plaintiffs do not assert that BPD is directly regulating

their movements, meetings, or associations, but rather that the AIR pilot program's mere existence

has a chilling effect on their right to association.  But as already noted above, the Plaintiffs' fears

rest on sheer speculation that BPD *might* generate reports identifying the Plaintiffs and their

movements in public.  Because such conjecture is incapable of establishing an injury in fact, the

Plaintiffs have failed to demonstrate Article III standing.

**II.     Plaintiffs' § 1983 Claims Fail Against Defendants.**

Plaintiffs assert two claims for relief under 42 U.S.C. § 1983 for violations of their Fourth and First Amendment rights. Section 1983 of Title 42 of the United States Code provides that a plaintiff may file suit against any person who, under color of law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g., Filarsky v. Delia*, 566 U.S. 377 (2012). Importantly, § 1983 is not an independent source of rights, but provides "a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (citation omitted).  Plaintiffs have alleged violations of their Fourth and First Amendment rights pursuant to § 1983 but have failed to establish any facts to support a plausible claim for relief.

**A.   Plaintiffs Have Failed to Allege Facts Sufficient to Establish a Fourth Amendment Violation.**

 "In determining whether a particular form of government-initiated electronic surveillance is a 'search' within the meaning of the Fourth Amendment, [the] lodestar is" the "reasonable expectation" test from *Katz v. United States*, 389 U.S. 347 (1967).  *Smith v. Maryland*, 442 U.S. 735, 739 (1979).[6]  Under Justice Harlan's "oft-quoted concurrence" in *Katz*, "a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society

---

[6] Although the Supreme Court has recently revived principles of common law trespass in determining whether a "search" has occurred, the Court has not abandoned the *Katz* analysis in cases of electronic surveillance.  *See United States v. Jones*, 565 U.S. 400, 404–06, 412 (2012) (concluding, under trespass principles, that police conduct a search when they physically attach a GPS monitoring device to a car, but noting that "achieving the same result through electronic means, without an accompanying trespass," may be "an unconstitutional invasion of privacy" under *Katz*).

recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33 (2001), *citing Katz*, 389 U.S. at 361.

In this case, the Plaintiffs failed to allege any facts to show that the AIR program violates a reasonable expectation of privacy. As claimed by the Plaintiffs, the pilot program permits police to observe only those movements that occur in public, by bus, by walking, or by car, where individuals have a limited expectation of privacy. Although the program employs sophisticated technology, it is far less invasive than other examples of aerial surveillance that the Supreme Court has found to fall outside the scope of the Fourth Amendment.

### 1. The AIR program allows police to track movements for only a short period of time, in public spaces where individuals have a limited expectation of privacy.

The Supreme Court has long held that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz*, 389 U.S. at 351. Thus, "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *United States v. Knotts*, 460 U.S. 276, 281 (1983). As the person travels, he or she

> voluntarily convey[s] to anyone who want[s] to look the fact that he [or she] [is] travelling over particular roads in a particular direction, the fact of whatever stops he [or she] ma[kes], and the fact of his final destination when he [or she] exit[s] from public roads onto private property.

*Id.* at 281–82. A police officer's observations of these facts do not constitute a "search" for purposes of the Fourth Amendment. "As a general proposition, the police may see what may be seen from a public vantage point where they have a right to be." *Florida v. Riley*, 488 U.S. 445, 449 (1989) (internal quotation marks and brackets omitted). *See also, e.g.*, Rachel Levinson-Waldman, *Hiding in Plain Sight: A Fourth Amendment Framework for Analyzing Government Surveillance in Public*, 66 Emory L.J. 527, 541 (2017) (recognizing that "surveillance in public areas typically has been deemed not to be a Fourth Amendment search in the first place").

16

That police employ technology to aid in their observation does not per se convert the surveillance into a Fourth Amendment search.   The Supreme Court has "never equated police efficiency with unconstitutionality," *Knotts*, 460 U.S. at 284, and "no one would expect police to continue to operate via teletypes and punchcard machines," Levinson-Waldman, *Hiding in Plain Sight*, 66 Emory L.J. at 565– 66.   *See also Kyllo*, 533 U.S. at 33–34 ("It would be foolish to contend that the degree of privacy secured to citizens by the Fourth Amendment has been entirely unaffected by the advance of technology.").

"It is the exploitation of technological advances that implicates the Fourth Amendment, not their mere existence."   *United States v. Karo*, 468 U.S. 705, 712 (1984). Police invade reasonable expectations of privacy only when they use "sense-enhancing technology" to obtain information that is not available to the public, at least where "the technology in question is not in general public use."   *Kyllo*, 533 U.S. at 34 (holding that police needed to obtain a warrant before using a "thermal-imaging device aimed at a private home from a public street to detect relative amounts of heat within the home").   Thus, police did not need a warrant to track a vehicle through public streets with visual surveillance aided by an electronic beeper attached to a container in the vehicle.   *Knotts*, 460 U.S. at 281– 82.   But they *did* need a warrant when they used a beeper to track a can of ether's movement into a private residence.   *Karo*, 468 U.S. at 708–10, 714.   In the latter case, the police could not visually verify that the can was inside the house, so using the beeper to monitor the can's movement violated the occupants' reasonable expectation of privacy in the home.   *Id.* at 714–17.

More recently, in *United States v. Jones*, a majority of the Supreme Court addressed what effect the duration of government surveillance may have on the reasonable expectation of privacy in "a person's movements on public streets."   565 U.S. 400, 430 (2012) (Alito, J., concurring in

the judgment).  Five justices recognized that, while "relatively short-term monitoring . . . accords with expectations of privacy that our society has recognized as reasonable," "the use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy."  *Id.* (Alito, J., writing for himself and three other justices); *id.* at 415 (Sotomayor, J., concurring) (agreeing that "longer term GPS monitoring" raises constitutional concerns).

In *Jones*, police "installed a GPS tracking device on the undercarriage of" a suspect's car "while it was parked in a public parking lot."  *Jones*, 565 U.S. at 403. "Over the next 28 days," police "used the device to track the vehicle's movements," acquiring "more than 2,000 pages of data over the 4-week period."  *Id.*  Justice Scalia, writing for the Court, applied common-law trespass principles to conclude that the government's installation of the GPS device, and the subsequent monitoring, constituted a Fourth Amendment "search." *Jones*, 565 U.S. at 404–11. He expressly declined to respond to the Government's contention that Jones had no reasonable expectation of privacy in the underbody of his vehicle, or in the locations of the vehicle on public roads.  *Id.* at 406.  While recognizing that *Katz* and subsequent cases "ha[d] deviated from [an] exclusively property-based approach" to the Fourth Amendment, *id.* at 405, Justice Scalia noted that the "reasonable-expectation-of-privacy test ha[d] been *added to,* not *substituted for,* the common-law trespassory test," *id.* at 409 (emphasis in original). Endorsing what some courts and scholars have called the "mosaic theory," five justices in two concurring opinions recognized that nearly a month of GPS monitoring also raised constitutional concerns under the *Katz* reasonable expectation-of-privacy test.[7] Justice Alito, writing for himself and three other justices, rejected the

---

[7] *See, e.g.*, Orin S. Kerr, *The Mosaic Theory of the Fourth Amendment,* 111 Mich. L. Rev. 311, 313 (2012) (noting that the "concurring opinions signed or joined by five of the justices endorsed some form of the D.C. Circuit's mosaic theory").  The theory first arose in *United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010), the case that the Supreme Court renamed and reviewed in *Jones*.  *Id.* at 320.

Court's trespass theory, arguing that only the *Katz* standard governed.  Applying that test, he said it was unnecessary to "identify with precision the point at which the tracking of [Jones's] vehicle became a search, for the line was surely crossed before the 4-week mark."  *Jones*, 565 U.S. at 430. He observed that "society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car for a very long period."  *Id.*

Justice Sotomayor, writing only for herself, agreed with Justice Scalia that "the trespassory test" was "an irreducible constitutional minimum" sufficient to decide the case.  *Jones*, 565 U.S. at 414.  But she agreed with Justice Alito that "longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy."  *Id.* at 415.  She argued that any reasonableness analysis should consider the "unique attributes of GPS surveillance," which permits police to surreptitiously and relatively inexpensively obtain, store, and mine "a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, political, professional, religious, and sexual associations."  *Id.* at 415–16. Nonetheless, in *Jones*, the Government's physical trespass in placing the GPS monitoring device on the vehicle was sufficient to establish a Fourth Amendment search without having the reach the "difficult questions" about when exactly government surveillance intrudes upon a reasonable expectation of privacy. *Id.* at 418.

---

The mosaic theory requires courts to apply the Fourth Amendment search doctrine to government conduct as a collective whole rather than in isolated steps. Instead of asking if a particular act is a search, the mosaic theory asks whether a series of acts that are not searches in isolation amount to a search when considered as a group. The mosaic theory is therefore premised on aggregation: it considers whether a set of nonsearches aggregated together amount to a search because their collection and subsequent analysis creates a revealing mosaic.

*Id.*

Read in harmony, *Knotts*, *Karo*, and *Jones* establish that a person has no reasonable expectation of privacy in his or her movements in public over a brief period of time. Accordingly, short-term surveillance of a person's movements in public does not constitute a "search" for purposes of the Fourth Amendment. Only when police monitor a person's movements in public over a longer period of time – for example, the 28 days at issue in *Jones* – does surveillance intrude upon any reasonable expectation of privacy.

Under these principles, the AIR program does not invade any reasonable expectation of privacy. The pilot program allows police to observe individuals' movements in public spaces, using images captured from public airspace. Although the program involves the use of sophisticated technology, there is no allegation or possibility that it permits police to see inside homes or other buildings that are beyond the public's view. Moreover, the program's limitations allow police to monitor movements for only a brief period of time. As noted in the Plaintiffs' Complaint, surveillance does not include night time surveillance and is conducted only when weather permits. The absence of overnight surveillance flights necessarily limits police to twelve hours, but the one-person-per-pixel resolution means monitoring will often be of a much shorter duration. Because it is impossible to tell if a dot entering a structure is the same dot that later leaves the structure, the reality is that the AIR program often will allow police to track an individual only for the few hours, or even minutes, it takes the person to travel "from one place to another." *Knotts*, 460 U.S. at 281. Accordingly, the AIR program, as alleged and described in Plaintiffs' Complaint, is entirely consistent with *Katz*, *Knotts*, *Karo*, and *Jones*.

**2. *The Supreme Court has held that aerial surveillance far more intrusive than that used in the AIR program does not violate the Fourth Amendment.***

The pilot program not only comports with the foundational cases on one's reasonable expectation of privacy in public, but also with a series of cases approving of warrantless aerial

surveillance.  The Supreme Court has said that police do not need a warrant to: fly a plane 1,000 feet above a home in order to look into and photograph the contents of a fenced-in backyard within the curtilage, *California v. Ciraolo*, 476 U.S. 207, 209 (1986); repeatedly fly over a chemical plant at altitudes of 12,000, 3,000, and 1,200 feet to take aerial photographs that show objects as small as a half-inch in diameter, *Dow Chem. Co. v. United States*, 476 U.S. 227, 239 (1986); *Dow Chem. Co. v. United States ex rel. Burford*, 749 F.2d 307, 309 (6th Cir. 1984); or  circle a home in a helicopter 400 feet in the air to look through the partially open roof and sides of a greenhouse within the curtilage, *Florida v. Riley*, 488 U.S. 445, 447–48, 450–51 (1989).[8]

In each of these cases, involving aerial surveillance far more intrusive than the AIR program, the Supreme Court found that the police actions did not constitute a "search" and, thus, did not trigger the Fourth Amendment's protections. In upholding the right of police to conduct warrantless aerial surveillance, the Supreme Court reiterated that "the touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy,'" *Ciraolo*, 476 U.S. at 211, *quoting Katz*, 389 U.S. at 360, and "[w]hat a person knowingly exposes to the public . . . is not subject to Fourth Amendment protection," *id.* at 213, *quoting Katz*, 389 U.S. at 351. *See also Riley*, 488 U.S. at 449 (noting that "police may see what may be seen from a public vantage point where they have a right to be") (internal quotation marks and brackets omitted); *Dow Chem.*, 476 U.S. at 238 (noting that "what is observable by the public is observable without a warrant, by the Government inspector as well") (bracket omitted).

---

[8] *See also United States v. Breza*, 308 F.3d 430, 433–35, 437 (4th Cir. 2002) (holding that police officers' warrantless surveillance from a helicopter flying 200 feet above a garden on private property near a home did not violate the Fourth Amendment); *Giancola v. State of W. Va. Dep't of Pub. Safety*, 830 F.2d 547, 548, 550 (4th Cir. 1987) (noting that the Fourth Amendment does not prohibit "warrantless, physically nonintrusive observation of the curtilage of a residence from an aircraft lawfully operating within public navigable air space," and finding that police officers did not violate this standard when they flew a helicopter 100 feet above a property).

Even when officers use vision-enhancing technology, aerial surveillance does not necessarily "give rise to constitutional problems," *Dow Chem.*, 476 U.S. at 238,[9] provided that police remain in "public navigable airspace" and conduct their surveillance "in a physically nonintrusive manner," *Ciraolo*, 476 U.S. at 213. Moreover, the Supreme Court has repeatedly and "strongly reaffirmed the concept that visual surveillance from a lawful vantage point is not a search at all." Brandon Nagy, *Why They Can Watch You: Assessing the Constitutionality of Warrantless Unmanned Aerial Surveillance by Law Enforcement*, 29 Berkeley Tech. L.J. 135, 168 (2014) (discussing *Jones* and *Kyllo*). *See also Jones*, 565 U.S. at 406 (citing *Ciraolo* for the proposition that a Fourth Amendment violation occurs when the government invades a person's reasonable expectation of privacy), *and* 412 (noting that the Court has "not deviated from the understanding that mere visual observation does not constitute a search"); *Kyllo*, 533 U.S. at 33 (citing *Ciraolo* and *Riley* for the proposition that "aerial surveillance of private homes and surrounding areas does not constitute a search").

Similarly, it matters not that the earlier cases involved surveillance of a more limited duration. The critical factor then – as it is today – was whether the police observed "intimate details" not readily available to the public. *Dow Chem.*, 476 U.S. at 235–36, 238. The planes here unquestionably fly for longer intervals than did the aircraft in *Ciraolo*, *Dow Chemical*, and *Riley*; but the images they capture reveal no "intimate details" that give rise to "constitutional concerns." *Dow Chem.*, 476 U.S. at 238. The AIR program's limitations – the overnight gaps in collecting imagery and the one-pixel-per-person resolution that makes it impossible to continue tracking someone after they enter a building – meaning police cannot see anything other than an

---

[9] In *Dow Chemical*, the police hired a private company to take pictures using a "floor-mounted, precision aerial mapping camera," *Dow Chem.*, 476 U.S. at 229, which "saw a great deal more than the human eye could ever see, *id.* at 249–50 (Powell, J., concurring in part).

individual's short-term movements, which are readily observable to all from publicly accessible spaces.  Accordingly, the AIR program fully comports with the Supreme Court's precedents authorizing warrantless aerial surveillance.

> ### 3. The Supreme Court's narrow decision in Carpenter v. United States, 138 S. Ct. 2206 (2018), does not prohibit an aerial surveillance program that allows police to reliably track a person's movements for only several hours.

 The Supreme Court's decision in *Carpenter* – which the Court itself characterized as "a narrow one," *Carpenter*, 138 S. Ct. at 2220 – does not suggest any constitutional problems with the AIR program.   *Carpenter* concerned the unique issue of cell-site location information ("CSLI"), "a time-stamped record" that results "[e]ach time [a cell] phone connects to" a "set of radio antennas" called a "cell site." *Id.* at 2211.

> Cell phones continuously scan their environment looking for the best signal, which generally comes from the closest cell site. Most modern devices, such as smartphones, tap into the wireless network several times a minute whenever their signal is on, even if the owner is not using one of the phone's features.

*Id.* at 2211.  Thus, cell-site records provide an exhaustive account of a cell phone's location – in Carpenter's case, "an average of 101 data points per day," *id.* at 2212 – and, because "a phone goes wherever its owner goes," CSLI provides a "detailed, encyclopedic," and "comprehensive record of the person's movements."  *Id.* at 2214, 2216–17.

Because a majority in *Jones* had already found that "individuals have a reasonable expectation of privacy in the *whole* of their physical movements," *Carpenter*, 138 S. Ct. at 2217 (emphasis added), *citing Jones*, 565 U.S. at 430 (Alito, J., concurring in the judgment) and 415 (Sotomayor, J., concurring), the question in *Carpenter* was whether the Government needed a warrant to obtain cell phone records retracing some part of that whole. The Court responded "yes" – at least when the Government accesses "seven days of CSLI," which, the Court concluded,

invades a reasonable expectation of privacy, and, thus, "constitutes a Fourth Amendment search." *Id.* at 2217 & n.3, 2219–20.[10]

The Court emphasized the narrowness of its holding. *Carpenter*, 138 S. Ct. at 2220. The decision did not "call into question conventional surveillance techniques and tools, such as security cameras," *id.*, and the Court explicitly declined to "decide whether there is a limited period for which the Government may obtain an individual's historical CSLI free from Fourth Amendment scrutiny," *id.* at 2217 n.3. Thus, the Court took great care to limit its holding to a particular quantum (at least seven days) of a particular type of technology (historical CSLI).

The foremost concern of *Carpenter* was the potential for police, "[w]ith just the click of a button," to acquire a "deep repository of historical location information" about a specific person whose identity they already knew. *Carpenter*, 138 S. Ct. at 2218. A cell phone – "almost a 'feature of human anatomy,'" *Carpenter*, 138 S. Ct. at 2218, *quoting Riley v. California*, 573 U.S. 373, 385 (2014) – "tracks nearly exactly the movements of its owner," "faithfully follow[ing]" him or her "beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales," *id. See also Riley*, 573 U.S. at 395 (noting that "nearly three-quarters of smart phone users report being within five feet of their phones most of the time, with 12% admitting that they even use their phones in the shower"). As such, tracking "the location of a cell phone . . . achieves near perfect surveillance, as if [the Government] had attached an ankle monitor to the phone's user." *Carpenter*, 138 S. Ct. at 2218.

By contrast, the AIR program is of no use when police already know the identity of a suspect. The purpose of the program is not to reveal the movements of an identified person but,

---

[10] The Court also considered and rejected the Government's argument that, because cell service providers maintain CSLI, the third-party doctrine applied. *Carpenter*, 138 S. Ct. at 2216–17.

rather, to reveal the identity of a person whose movements have been photographed in public. Even if police wanted to look up the past or current movements of a known suspect, there would be no way to do it: The aerial imagery is not precise enough to identify people or vehicles, which again are only photographed at one pixel per person and appear only as dots. Assuming that police can identify one of the dots in an aerial image, AIR can provide only a relatively brief snapshot of that person's movements.  The longest possible period of time the police could retrace is twelve hours, the daily maximum a plane flies and takes photos, and only movement conducted in public view. There is no assertion made by Plaintiffs that the AIR program will be able to record conversations, or track movements inside buildings or homes.

The limited duration for which police can track a person's movements distinguishes the AIR program from historical CSLI, which can provide "a detailed chronicle of a person's physical presence compiled every day, every moment, over several years." *Carpenter*, 138 S. Ct. at 1222. AIR does not – indeed, could not – produce such "a comprehensive chronicle of [a person's] past movements." *Id.* at 2211.  The relevant time period is not, as the Plaintiffs repeatedly claim, the 180-day duration of the pilot program or the 45-day period for retaining imagery. The only relevant time period is that revealing the movements of a particular, identified individual.  After all, "Fourth Amendment claims are brought by" specific litigants; accordingly, "there must be an identifiable" plaintiff "(be it an individual or a group) who is surveilled for a long enough period that it gives rise to a Fourth Amendment injury."  Levinson-Waldman, *Hiding in Plain Sight*, 66 Emory L.J. at 563–64.  In the case of the AIR program, the longest the police could possibly track a person's movements is several hours – far less than the week of movements the Supreme Court found problematic in *Carpenter*.

To summarize, *Carpenter*'s holding was "a narrow one" – that the Government invades a reasonable expectation of privacy when it accesses seven days' worth of CSLI.  *Carpenter* did not reject the well-established principle that "relatively short term monitoring of a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable."  *Jones*, 565 U.S. at 430 (Alito, J., concurring in the judgment), *citing Knotts*, 460 U.S. at 218–82.  *Carpenter* merely confirmed what Justice Alito presciently observed in *Jones*: that only the use of "longer term" monitoring "impinges on expectations of privacy."  *Id.*

Because the AIR program involves surveillance from public airspace and makes it impossible for police to reliably track an individual's movements for more than several hours, the program does not invade any reasonable expectation of privacy.[11]

What the high court *has* said is that people have a limited expectation of privacy in public, *e.g.*, *Knotts*, 460 U.S. at 281, the government can lawfully conduct warrantless aerial surveillance from public airspace, *Ciraolo*, 476 U.S. at 209; *Dow Chem. Co.*, 476 U.S. at 239; *Riley*, 488 U.S. at 447–48, 450–51; and surveillance of an individual's movements on public thoroughfares does not raise constitutional questions unless it is of such a long duration that the Government learns intimate details about a person's life, *Carpenter*, 138 S. Ct. at 2217 n.3; *Jones*, 565 U.S. at 430 (Alito, J., concurring in the judgment); *id.* at 415 (Sotomayor, J., concurring).  Because the AIR pilot program violates none of these principles, the Plaintiffs failed to establish a Fourth Amendment violation.

---

[11] Indeed, even the petitioner in *Carpenter* conceded that a person has no reasonable expectation of privacy in the sum of one's movements over a period of a day or less.  *See* Reply Brief, *Carpenter v. United States*, No. 16-402 (S. Ct.), 2017 WL 4838412 (arguing for "a bright-line rule allowing law enforcement agents to request no more than 24 hours of an individual's historical CSLI without triggering the warrant requirement").

**B.  Plaintiffs Have Failed to Allege Facts Sufficient To Establish a First Amendment Violation.**

Plaintiffs have also failed to state a claim that the AIR program violates the First Amendment by "infring[ing] on [their] exercise of associational freedoms through constant and inescapable monitoring by the BPD."  ECF No. 1, at ¶  72. "Freedom of association, although not explicitly enumerated in the First Amendment, is a right included within the 'penumbra' of the First Amendment." 16A Am. Jur. 2d Constitutional Law § 580 (updated May 2020).  But the First Amendment protects only two types of association: "intimate association and expressive association."  *Iota Xi Chapter Of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 146 (4th Cir. 2009), *citing Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–18 (1984).  "[I]ntimate association consists of the choice to 'enter into and maintain an intimate human relationship,'" whereas "expressive association" is "the 'right to associate for the purpose of engaging in those activities protected by the First Amendment – speech, assembly, petition for the redress of grievances, and the exercise of religion.'"  *Id.*, *quoting Roberts*, 468 U.S. at 617–18.

The Plaintiffs invoke neither type of association protected by the First Amendment.  They do not allege, for example, that the AIR program in any way affects their personal affiliations that "attend the creation and sustenance of a family," such as marriage, childbirth, "the raising and education of children," or "cohabitation with one's relatives."  *Roberts*, 468 U.S. at 619 (discussing intimate association).  Nor do they assert any factual basis that the AIR program interferes with their right "to speak, to worship, [or] to petition the government for the redress of grievances."  *Id.* at 622 (discussing expressive association).   Plaintiffs merely assert that the existence of surveillance itself, not its practical abilities, could have a chilling effect. However, "individuals

have not traditionally enjoyed protection against being observed by law enforcement . . . ." Levinson-Waldman, *Hiding in Plain Sight*, 66 Emory L.J. at 604.[12]

Plaintiffs make only vague assertions and beliefs that the AIR program will cause them to be more cognizant of their associations and that the program "could result" in unwarranted government scrutiny. ECF No. 1, at ¶67. Every assertion made by the Plaintiffs in their Complaint rests solely on beliefs that these limitations could happen. The Complaint merely states that the Plaintiffs have a belief that the AIR program could discourage others from participating in their volunteer activities, may have a chilling effect on their willingness to participate in community events, and could divert time and staff resources, and could result in business decline. *Id.*, at ¶¶ 53, 61, 67. These are all hypothetical assertions with no factual basis. Even if Plaintiffs asserted facts to support these "beliefs," the program itself is only utilized by BPD when one of the four target crimes is triggered and does not record or compel the identification of associations. As repeatedly noted above, the pilot program is incapable of revealing anything more than a person's movements in public over a very short period of time (in no case more than several hours).  And only those individuals who are at the scene of a serious violent crime will ever be subject to tracking or the possibility of identification.  Thus, one can only speculate that the AIR program will reveal anything about the movements of these particular Plaintiffs, much less that the program will *probably* produce "a comprehensive record of the movements of Plaintiffs and nearly everyone in Baltimore." *Id.* at ¶ 21. As such, Plaintiffs have failed to adequately state a claim for a First Amendment violation.

---

[12] Neither *Carpenter* nor *Jones* said otherwise. These cases simply recognized that when government surveillance is long-term and comprehensive, it may reveal information, including details of a person's associations, that renders the Government action a search.  But the Government's discovery of an intimate relationship does not per se establish an interference with that relationship.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants BPD and Police Commissioner Michael Harrison request that this Court dismiss all claims against them.


Dated: August 12, 2020

Respectfully submitted,

DANA P. MOORE
Acting City Solicitor

_____/s/_____

ELISABETH S. WALDEN
KARA K. LYNCH
MOLLY J. CROSS
Baltimore City Department of Law
100 N. Holliday Street, Suite 100
Baltimore, Maryland 21202
T: 410.396.3659
F: 410.659.4077

*Counsel for Baltimore Police Department and Police Commissioner Michael S. Harrison*